**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| *In re* | : | Chapter 11 |
| | : | |
| BIORA THERAPEUTICS, INC.,[1] | : | Case No. 24-12849 (BLS) |
| | : | |
| | : | |
| Debtor. | : | **Re: D.I. 56, 73, 117 and 120** |
| | : | |

**UNITED STATES TRUSTEE'S OBJECTION TO THE DEBTOR'S MOTION**
**TO SELL SUBSTANTIALLY ALL OF ITS ASSETS**

Andrew R. Vara, the United States Trustee for Regions 3 and 9 (the "U.S. Trustee"), files

this objection to the approval of the proposed sale of substantially all of the Debtor's assets to BT

BIDCO LLC (the "Stalking Horse"), a new entity formed by or on behalf of certain noteholders

under the issuer's Prepetition A&R Indenture[2] (the "DIP Lenders"), and in support thereof,

states:

## I. INTRODUCTION

1.      The DIP Lenders and the Official Committee of Unsecured Creditors (the

"Committee") are attempting to write a new playbook that outlines how to obtain approval of

priority-skipping, end-of-case distributions without the consent of skipped, higher priority

creditors, despite the Supreme Court's ruling that such distributions are impermissible in

*Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451 (2017). The alchemy to turn impermissible end-

---

[1] The last four digits of Biora Therapeutics, Inc.'s federal tax identification number are 0390. Biora Therapeutics, Inc.'s service address is 10070 Carroll Canyon Road, Suite 100, San Diego, CA 92131.

[2] As defined in the *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing Debtor to (A) Obtain Postpetition Senior Secured Financing and (B) Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Senior Secured Parties, (III) Granting Liens and Superpriority Claims, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* [D.I. 18; the "DIP Financing Motion"].

of-case, priority-skipping distributions of estate property into "permissible" distributions of "non-estate" property that are not "end of case" distributions in violation of the Bankruptcy Code's priorities, occurs through a multi-step process:

a. The Committee and the DIP Lender agree to a settlement that (a) resolves the Committee's objections to the DIP financing motion, which includes the Committee's support for 506(c) and 552 waivers, for shortening the Challenge Period and for the releases granted to the DIP Lenders and Agent, (b) results in no Challenges being pursued, and (c) resolves the Committee's objections to a sale of substantially all of the Debtor's assets through a credit bid, including the sale of *all* estate causes of action.

b. The settlement provides the transfer of assets to a trust that will solely benefit unsecured creditors, and apparently only benefits *certain* unsecured creditors.

c. The assets transferred to this trust are: (a) the estate's fraudulent transfer actions (and, presumably, avoidance actions created by the Bankruptcy Code, provided that such actions are not against go-forward trade vendors); (b) the estate's commercial tort claims; (c) cash equal to 100% of the savings from the DIP budget, calculated as of the closing date of the sale with respect to the Committee's professional fees; (d) cash equal to 75% of the savings from the DIP budget, calculated as of the closing date of the sale with respect to the Debtor's professional fees; and (e) a cash payment of $400,000. In addition, the DIP Lender agrees that the Assumed Liabilities (part of the Purchase Price) under the Stalking Horse APA will be no less than $500,000 (without disclosing (i) what liabilities are being assumed and (ii) what (if any) business purpose supports assuming such liabilities).

d. The parties do not seek approval of the settlement (a) at the time that it is entered, (b) prior to the Committee's support of the final DIP order and its entry, (c) prior to the Committee's support of the sale order and its entry, or (d) prior to the closing of the sale.

e. The settlement only provides that the parties will "discuss a mutually acceptable exit strategy."

f. The sale closes, the Debtor sells all the estate's assets, other than (i) funds budgeted for the wind-down and (ii) other negligible assets.

g. The transfer of the causes of action to the trust occurs "upon the closing" of the sale, such that the estate's causes of action will pass from the Debtor's estate to the purchaser and then to the trust *instantaneously*.

2.      While creative, this scheme simply calls a rose by another name hoping to convince the Court that it is no longer a rose. The Court should not accept the sleight of hand and should recognize what is happening – the Committee is attempting to leverage its rights and estate assets to facilitate class-skipping distributions[3] outside of a chapter 11 plan.  The Committee has no power to facilitate these impermissible distributions.

## II. FACTUAL BACKGOUND

3.      On December 27, 2024 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code.

4.      On January 16, 2025, the U.S. Trustee appointed the Official Committee of Unsecured Creditors (the "Committee").

5.      The Debtor sought interim approval to obtain debtor-in-possession ("DIP") financing from the DIP Lenders on the Petition Date. Through the DIP Financing Motion, the Debtor sought to obtain "new money loans" of up to $10.25 million and a "roll-up loan" of $35.875 million. Only prepetition secured debt owed to the DIP Lenders was included in the rolled-up DIP loan. DIP Financing Mot. ⁋⁋ 15, 26 & 31.

6.      The proposed DIP loan would be secured by (i) first priority liens on all unencumbered assets of the Debtor, (ii) first priority liens on all collateral that serve as collateral under the Prepetition A&R Indenture, and (iii) junior liens on all other encumbered assets of the Debtor. DIP Financing Mot. ⁋ 31. The liens securing the DIP loan would include liens on the proceeds of Avoidance Actions (upon entry of a final order). *Id.*

---

[3] The Debtor's schedules list 33 governmental authorities who may be entitled to priority claims based on taxes, licenses and fees. No bar date has been established in these cases but a handful of priority claims have already been filed. In addition, the settlement appears to skip unsecured creditors who do not hold trade, landlord or noteholder claims. The Debtor schedules list over $2.1 million in undisputed claims owed to the Department of Justices in California and New York, as well as unliquidated and disputed claims asserted by the Securities and Exchange Commission. Further, there are various customer claims for "lab refunds." All of these creditors appear to be "skipped" through this settlement.

7.      Through the proposed orders approving the DIP Financing Motion, the Debtor provided stipulations regarding the validity, extent and priority of the Prepetition A&R Indenture. DIP Financing Mot. Ex. A (Interim Order) ¶ 4(a).  The Debtor also released the DIP Lenders, the DIP agent, other prepetition secured parties, and related parties to each of them, of all claims relating to the DIP Obligations, the DIP Superpriority Claims, the DIP Liens, the Prepetition Liens and the Prepetition Obligations, including any "lender liability" claims, all claims under the Bankruptcy Code, and all claims regarding the validity, priority, extent, enforceability, perfection or avoidability of liens and claims. DIP Financing Mot. Ex. A (Interim Order) ¶ 29.

8.      The Debtor requested authority to waive all section 506(c) claims and "equities of the case" exceptions under Section 552(b) of the Bankruptcy Code, and also waive the equitable doctrine of "marshalling," subject to the entry of final order. DIP Financing Mot. Ex. A (Interim Order) ¶ 14.

9.      On December 30, 2024, the Court entered an interim order granting the DIP Financing Motion on an interim basis (the "Interim Financing Order") [D.I. 39]. The Interim Financing Order included the various stipulations and releases requested by the Debtor, provided that the marshalling, 506(c) and 552(b) waivers would be binding if included in a final order approving same and further provided parties in interest with 75 days to assert a Challenge to any of the Debtor's stipulations. *Id.*  The order also provided that the Committee could agree to reduce the Challenge Period on behalf of all parties, unless a party objected to the Committee's right to shorten the challenge period prior to the final hearing on the DIP Financing Motion. Interim Financing Order ¶ 28(a).

10.     On January 6, 2025, the Debtor filed a motion to establish bidding and auction procedures relating to a sale of substantially all its assets and to designate the Stalking Horse as

the Stalking Horse Purchaser ("Sale Motion") [D.I. 56].

11.     On January 17, 2025, the Debtor filed the proposed Stalking Horse asset purchase

agreement ("Stalking Horse APA") [D.I. 73]. The agreement provides:

    a.  The "Purchase Price" constitutes the Credit Bid of $30 million, the "Assumed Liabilities" provided in Section 2.3, and the Excluded Cash. Stalking Horse APA ⁋ 3.1.

    b.  All of the Assumed Liabilities are all liabilities that will arise after the closing date, other than the following Assumed Liabilities that accrued, or could have accrued, prior to the closing date: (a) liabilities under each employee Assumed Benefit Plan; (b) PTO obligations owed to employees; (c) ordinary course administrative expenses arising after the Petition Date that are included in the DIP Budget, accrued and unpaid as of the Closing, and are not otherwise included in the Wind-Down Amount or the Wind-Down Budget; and (d) Cure Costs in an amount up to $250,000. Assumed Liabilities also include "those Liabilities specifically set forth in Schedule 2.3(h)," but the schedule is not filed with the court. *Id.* ⁋ 2.3.

    c.  Excluded Cash means cash on hand and cash drawn under the DIP Facility equal to the Wind-Down Amount plus an amount sufficient to pay all ordinary course Administrative Expenses incurred on or after the Petition Date that are included in the DIP Budget, that are accrued but unpaid as of the Closing, and that are not Assumed Liabilities or otherwise included in the Wind-Down Amount or Wind-Down Budget. *Id.* ⁋ 1.1.

    d.  The Stalking Horse will purchase all "Acquired Assets," defined as all assets of the Debtor other than Excluded Assets. Acquired Assets include all cash other than Excluded Cash, and all causes of action of the Debtor, including any causes of action under the Bankruptcy Code (and, necessarily, all causes of action that the estate may have against the DIP Lender). *Id.* ⁋ 2.1.

    e.  "Excluded Assets" are any Equity Securities of the Debtor, the Excluded Cash (except to the Extent of any DIP Reversionary Interest), bank accounts but solely to the extent that they hold Excluded Cash, Contracts that are not Assigned Contracts, certain books and records, retained Seller Benefit Plans, Debtor's director and officer insurance policies, and, potentially, certain clinical records and biological samples. *Id.* ⁋ 2.2.

    f.  The "DIP Reversionary Interest" is any Excluded Cash remaining after all administrative expenses and expenses associated with the wind-down activities (up to a limit of $600,000) have been paid. *Id.* ⁋ 1.1.

12.     The proposed sale order ("Proposed Sale Order") [D.I. 74] provides that the

Debtor's stipulations are binding on all parties, and the right to assert a Challenge expired prior to entry of the sale order. Proposed Sale Order ¶ 5. It further confirms the right to credit bid and approves the Stalking Horse APA and all transactions contemplated thereunder. *Id.* ¶¶ 3 & 5.

13.     The Debtor's schedules list 33 governmental agencies as potentially holding priority claims relating to taxes, licenses and fees. A bar date has not been established but a few priority claims have already been filed against the estate. In addition, there are over $2.1 million in undisputed claims asserted by the Department of Justices in California and New York listed on the Debtor's schedules, as well as unliquidated and disputed claims asserted by the Securities and Exchange Commission and various undisputed claims held by several customers for "lab refunds." These creditors appear to be unable to participate in the settlement, as they do not appear to be trade, landlord or note claims.

14.     The Committee and the DIP Lender disclosed a settlement agreement in connection with the final hearing on the DIP Financing Motion (the "Committee Settlement Term Sheet") [D.I. 143-1, Exh. 3].

15.     Pursuant to the Committee Settlement Term Sheet, the Committee will support (i) the shortening of the Challenge Period (for all parties, and not just the Committee) to February 25, 2025; (ii) the Bid Procedures as approved pursuant to the Bidding Procedures Order; (iii) the releases of the DIP Lender and the Agent contained in the DIP financing order; and (iv) the section 506(c) and 552 waivers contained in the DIP Financing orders. Committee Settlement Term Sheet. At the final hearing on the DIP Financing Motion, the Committee did not object to the entry of the final order approving same.

16.     A condition to the effectiveness of the settlement is that the Committee has not brought a Challenge as of February 25, 2025. *Id.*

17.     In exchange for the Committee's undertakings, the Stalking Horse, the Agent and the DIP Lender agree to contribute to a state law trust: (i) $400,000; (ii) 100% of savings from the DIP budget calculated as of the closing date of the sale, with respect to the Committee's professional fees; (iii) 75% of the savings from the DIP budget calculated as of the closing date of the sale, with respect to Debtor's professional fees; and (iv) all of the commercial tort claims and fraudulent transfer claims (other than Avoidance Actions against go-forward trade vendors) that the Stalking Horse purchases from the Debtor. The causes of action will be transferred to the trust upon the closing of the sale. *Id.*

18.     The beneficiaries of the trust "shall be the *trade* creditors, landlord, and holders of the 2025 Convertible Notes." [4] *Id.* (emphasis added).

19.     The DIP Lender will also pay $75,000 to The Bank of New York Mellon Trust Company, N.A., the indenture trustee for the 2025 Convertible Notes, on behalf of its professional fees and expenses. *Id.*

20.     Under the Committee Settlement Term Sheet, the Stalking Horse agrees to amend the Stalking Horse APA to provide that (i) causes of action arising under the Bankruptcy Code and similar state-law avoidance actions purchased by the Stalking Horse will not be pursued against go-forward trade vendors, but can be utilized defensively, and (ii) the Assumed Liabilities (which constitute a portion of the Purchase Price) shall be no less than $500,000. *Id.*

21.     The trustee of the trust shall be selected by the Committee and shall be reasonably

---

[4] The Debtor's schedules list several claims as "Litigation" claims and not "Trade Claim[s]." These claimholders include the Securities and Exchange Commission, stockholders, and various individuals. The schedules also list several "settlement" claims, owed to the Department of Justices in California, New York and New Jersey. Several individuals are listed on the schedules as being owed "lab refunds." There are also priority claims on the claims register asserted by governmental agencies based on tax claims. None of these claims appear to constitute claims held by trade creditors, the landlord, or the noteholders under the Committee Settlement Term Sheet, and may, therefore, not be beneficiaries of the trust.

acceptable to the DIP Lenders. *Id.* No further details about the trust beyond what is in the Committee Settlement Term Sheet are provided, including, without limitation, (a) who the beneficiaries are; (b) how the beneficiaries will assert claims against the trust; (c) how objections to such claims will be resolved; (d) who will pursue the causes of action; (e) how cash belonging to the trust will be invested; (f) whether a bond will be required by the trustee; (g) when distributions will be made, when they will be considered "unclaimed," and if there will be a minimum amount for each distribution, among other standard provisions typically disclosed when a liquidation trust is proposed pursuant to a chapter 11 plan.

22.     The Committee Term Sheet provides that the parties will "discuss a mutually acceptable exit strategy. *Id.*

23.     The Committee Settlement Term Sheet was filed on the docket on February 18, 2025. The sale hearing is scheduled for February 25, 2025. It appears that administrative, secured and priority claimants have not been served with the Committee Settlement Term Sheet. Because it is unclear who is and who is not a beneficiary of the proposed trust under the Committee Settlement Term Sheet, a party in interest would not necessarily be aware of a need to file an objection even if the party was served with the Committee Settlement Term Sheet.

24.     At the final hearing on the DIP Financing Motion, the Committee and the DIP Lender acknowledged that more work needs to be done to convert the Committee Settlement Term Sheet into a complete settlement. They further suggested that it is possible that the Committee Settlement Term Sheet does not require court approval, asserting that the Committee and the DIP Lenders are "third parties" and that the assets to be transferred to the trust are not "estate assets."

## II. ARGUMENT

25.     First, section 1103(c) of the Bankruptcy Code cabins the Committee's authority, and the Committee does not have the power to participate in distributive schemes outside of formulation of a chapter 11 plan.

26.     Section 1103(c) states:

> (c) A committee appointed under section 1102 of this title may—
>
> (1)   consult with the trustee or debtor in possession concerning the administration of the case;
>
> (2)   investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business, and any other matter relevant to the case or to the formulation of a plan;
>
> (3)   participate in the formulation of a plan, advise those represented by such committee's determinations as to any plan formulated, and collect and file with the court acceptances or rejections of a plan;
>
> (4)   request the appointment of a trustee or examiner under section 1104 of this title; and
>
> (5)   perform such other services as are in the interest of those represented.

11 U.S.C. § 1103(c).

27.     The *ejusdem generis* rule of statutory interpretation "seeks to afford a statute the scope a reasonable reader would attribute to it." *Harrington v. Purdue Pharma, L.P.*, 603 U.S. 204, 217 (2024). The Supreme Court recently applied the canon of *ejusdem generis* to section 1123(b) of the Bankruptcy Code, which is structured similarly to section 1103(c) – meaning, both subsections contain a "catchall phrase tacked on at the end of a long and detailed list of specific directions," prefaced by the word "may." *Harrington v. Purdue Pharma, L.P.*, 603 U.S.

204, 217; *see Official Committee of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery,* 330 F.3d 548, 562-63 (considering the rule of *ejusdem generis* in the context of section 1103(c); citing *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 114-15 (2001)); *In re Dow Corning Corp.*, 199 B.R. 896, 901 (applying rule of *ejusdem generis* in construing section 1103(c)(5)).

28.     While the Committee would have this Court believe that section 1103(c)(5) permits the Committee to be party to the proposed settlement, the Committee's contention cannot be squared with the *ejudsem generis* canon.  The Committee's authorization to negotiate a distribution arrangement is limited by the plain text of section 1103(c) to exactly one instance: "participat[ing] in the formation of a [chapter 11] plan …." 11 U.S.C. § 1103(c)(3).  Leveraging Committee objections and estate claims/causes of action for a transfer of value to a newly-formed trust for distribution to certain unsecured creditors outside of a chapter 11 plan is a materially different activity than participating in the formulation of a chapter 11 plan, especially given that claimants senior to general unsecured creditors (secured, administrative, and priority) and certain general unsecured creditors are/may not be trust beneficiaries under the Committee Settlement Term Sheet.  By extension, the Committee is powerless to agree to the distribution scheme contained in the Committee Settlement Term Sheet, as the Code section 1103(c)(5) "catchall" does not permit its participation.

29.     Second, bankruptcy courts may not approve structured dismissals or other final distributions of property that violate the Code's priority rules without the affected creditors' consent. In *Jevic*, the United States Supreme Court reaffirmed the Code's bedrock priority rules by holding that they must be respected and applied when property is finally distributed, even

absent a confirmed plan.[5] In doing so, the Court roundly rejected the Third Circuit's relaxation of the priority rules in allegedly "rare" cases where the proposed "distributions would make some creditors (high- and low-priority creditors) better off without making other (midpriority) creditors worse off (for they would receive nothing regardless)." 580 U.S. at 469.

30.　　Moreover, the fiction of "gifting" by high-priority creditors to low-priority creditors to evade the Code's priority rules does not (and cannot) square with the Supreme Court's unequivocal support for "the protections Congress granted particular classes of creditors." *See Id.* at 470. The Supreme Court recognized that skipping priority claimants undermines the rights of creditors by, among other harms, depriving them of the prospect of a settlement that respects their priority. *See id.* at 464. Similarly, "gifting" here (by utilizing estate rights and assets to fund potential class-skipping distributions to creditors) unleashes the very harms that the Court sought to avoid: namely, (i) changes in the bargaining power of different classes of creditors, (ii) collusion between senior secured creditors and unsecured creditors to squeeze out priority unsecured creditors, and (iii) the increased difficulty of reaching global settlements due to greater uncertainty of the results. For all these reasons, the Committee Settlement Term Sheet violates the Code's priority rules and present this Court with the same question that the Supreme Court previously answered. This Court should apply *Jevic* and deny approval of the Committee Settlement Term Sheet, and thus, deny approval of the Sale Motion.

**A. The Court Must Consider Whether the Committee Term Sheet Is Permissible Prior to Ruling on the Sale**

31.　　The Debtor, the Committee and the DIP Lenders may take the position that,

---

[5] The Court left unresolved whether structured dismissals that do not violate priority are permissible. *See Jevic*, 580 U.S. at 467. ("We express no view about the legality of structured dismissals in general."). But it did acknowledge that final distributions of estate assets "normally take place through a Chapter 7 liquidation or a Chapter 11 plan . . . ." *Id.* at 464.

because no party is currently seeking approval of the Committee Settlement Term Sheet in connection with the approval of the sale, the Court should not review it at this time. This is incorrect for three reasons.

32.     First, the Committee Settlement Term Sheet requires that the Stalking Horse APA be amended in at least two ways: (a) the Assumed Liabilities must be amended to require that the Stalking Horse will assume a minimum of $500,000 of Assumed Liabilities; and (b) the Stalking Horse APA must be modified to include a covenant that the Stalking Horse shall not pursue Avoidance Actions against go-forward creditors. As critical aspects of the deal terms will be incorporated into the Stalking Horse APA, this Court should determine if the deal can be approved prior to approving a sale that incorporates such terms.

33.     Second, the *quid pro quo* provided by the Committee is the agreement to support various aspects of the DIP Financing Order, including releases, the shortening of the Challenge Period, the passage of the Challenge Period without a Challenge and the resulting confirmation of the validity of the credit bid, and supporting the sale. If the sale order is entered, the consideration provided by the Committee will have been given to the DIP Lenders, but none of the DIP Lenders' consideration will have been provided to the Committee. If subsequently, the Committee Settlement Term Sheet is disallowed, an estate fiduciary would have provided valuable consideration to the DIP Lenders without the ability to receive any consideration in exchange.[6]

34.     Third, creditors who may be harmed by the approval of the revised Stalking Horse

---

[6] This aspect of the Committee Settlement Term Sheet demonstrates precisely why this is not a "gift," but rather an exchange for value. The value provided by the Committee is the release and agreement not to pursue estate claims/causes of action and objections. Permitting the DIP Lenders to obtain that value without a legally-enforceable obligation to provide consideration would likely constitute a breach of the Committee's fiduciary duties.

APA have not received meaningful notice. The Stalking Horse has agreed to increase the

Purchase Price by increasing the amount of Assumed Liabilities it will assume. No transparency

is provided as to what liabilities are being assumed, to whom the liabilities are owed, or what, if

any, business purpose there is in assuming the liabilities. If, for example, the Stalking Horse APA

is amended to provide that the Stalking Horse will provide a *pro rata* distribution of the

$500,000 to holders of certain types of unsecured claims, this would be a clear violation of *Jevic:*

the Purchase Price for the sale of the Debtor's assets would be distributed to low-priority

creditors without the consent of higher-priority creditors solely because the senior creditors and

the junior creditors negotiated the rights of the middle creditors away. Likewise, secured,

administrative, priority, and disfavored unsecured claimants/creditors should receive notice that

the Committee has entered into a settlement and is supporting a sale process that does (or

arguably does) distribute a portion of the Purchase Price solely to favored unsecured creditors.

Such claimants/creditors should have ample opportunity to object to the Committee Settlement

Term Sheet prior to the approval of the sale.[7]

## B. *Jevic* Supports the Denial of the Settlement and Thus Denial of a Sale that Incorporates the Settlement's Terms.

### i. *Jevic* Restores Priority Rights Fundamental to the Code's Operation.

35.     In *Jevic*, the Supreme Court ruled that a "distribution scheme ordered in

connection with the dismissal of a Chapter 11 case cannot, without the consent of the affected

---

[7] As noted by the Second Circuit, "whether a pre-plan settlement's distribution plan complies with the Bankruptcy Code's priority scheme will be the most important factor for a bankruptcy court to consider in approving a settlement under Bankruptcy Rule 9019. In most cases, it will be dispositive." *In re Iridium Operating LLC*, 478 F.3d 452, 455 (2d Cir. 2007). The *Iridium* court concluded that a bankruptcy court could "endorse a settlement that does not comply *in some minor respects* with the priority rule if the parties to the settlement justify, and the reviewing court clearly articulates the reasons for approving, a settlement that deviates from the priority rule." *Id.* at 465. Because the Committee Settlement Term Sheet contemplates a settlement that would violate the Bankruptcy Code's distribution scheme, higher priority creditors must receive notice and be able to object thereto.

parties, deviate from the basic priority rules that apply under the primary mechanisms the Code establishes for final distributions of estate value in business bankruptcies."[8] 580 U.S. at 455. In doing so, the Court reversed an order approving a settlement of a fraudulent conveyance lawsuit that gave money to high-priority secured creditors and to low-priority general unsecured creditors, skipping certain dissenting mid-priority creditors. *Id*. The Supreme Court considered several justifications offered in support of the priority-skipping deal. It rejected all of them.

36.     First, the settling parties disputed that the skipped creditors had standing to challenge the structured dismissal at all. They argued that the skipped creditors would have received nothing even if the bankruptcy court had never approved the structured dismissal and would still get nothing if the structured dismissal were unwound on appeal. The Supreme Court was not persuaded. It reasoned that the structured dismissal and related fraudulent conveyance settlement harmed the skipped creditors because they "lost a chance to obtain a settlement that respected their priority [or] the power to bring their own lawsuit on a claim that had a settlement value of $3.7 million." 580 U.S. at 464. In reaching this conclusion, the Supreme Court questioned and ultimately rejected assertions that settlement could only occur through a priority violation and that the fraudulent conveyance claims had no value. *Id*. at 463. Overturning the

---

[8] *Jevic* is entirely consistent with the Court's long history of protecting the procedural and substantive rights of creditors, not courts, to determine whether to accept a proposal that does not follow the priorities of distribution established by the Bankruptcy Code: "the Code provides that it is up to the creditors—and not the courts—to accept or reject a reorganization plan which fails to . . . honor the absolute priority rule." *Norwest Bank Worthnigton v. Ahlers*, 485 U.S. 197, 207 (1988). Even if a "Court . . . believe[s] that petitioners or other unsecured creditors would be better off . . . " with the proposed deal, that "determination is for the creditors to make in the manner specified by the Code." *Id.* And if this is true when a plan is proposed and creditors are afforded the procedural safeguards attendant to plan confirmation and voting, it must be "doubly" true when creditors are denied them. Not only did the Court in *Jevic* cite *Ahlers* with approval, *Jevic*, 580 U.S. at 471, it reiterated the importance of the Code's procedural safeguards. *Id.* at 468 (explaining distributions looked like transactions disallowed by lower courts because they "circumvent the Code's procedural safeguards").

structured dismissal would redress the skipped creditors' loss because it would reinstate the fraudulent conveyance claims. Consequently, the skipped creditors had standing. *Id*. at 464.

37.     Second, the settling parties argued (and the lower courts agreed) that the Code's priority rules only apply to chapter 11 plans (and chapter 7 liquidations). The Supreme Court disagreed. Because the priority rules have "long been considered fundamental to the Bankruptcy Code's operation," limiting their scope requires more than mere legislative silence. *Id.* at 465 (citations omitted). The Supreme Court saw no indication that Congress intended a "major" departure from the priority system through a structured dismissal. *Id.* ("we would expect to see some affirmative indication of intent if Congress actually meant to make structured dismissals a backdoor means to achieve the exact kind of nonconsensual priority-violating final distributions that the Code prohibits in Chapter 7 liquidations and Chapter 11 plans.").[9]

38.     Third, the parties claimed that, under the allegedly rare circumstances of the case, the Court faced a binary choice of approving a settlement that made many creditors better off or rejecting the settlement and leaving all creditors empty-handed—an argument that the bankruptcy court had adopted. *See In re Jevic*, 08-11006, Docket No. 1519, *14 (Bankr.D.Del. Dec. 4, 2012) ("I am presented with two options, a meaningful return or zero."). The Supreme Court, however, was unmoved and reiterated that courts cannot "alter the balance struck by the statute . . . not even in rare cases." 580 U.S. at 471 (*quoting Law v. Siegel*, 134 S. Ct. 1188, 1198 (2014)) (further citations omitted).

---

[9] In arriving at the conclusion that the Code does not authorize general end-of-case distributions outside of a chapter 11 plan, the Court found that "the word 'cause' [in section 349(b)] is too weak a reed upon which to rest so weighty a power." 580 U.S. at 466 (*citing United Sav. Assn. of Tex. v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 371 (1988) (noting that "[s]tatutory construction ... is a holistic endeavor" and that a court should select a "meanin[g that] produces a substantive effect that is compatible with the rest of the law")) (further citations omitted).

39.     The Supreme Court also saw through the "rare case" purported justification for granting relief as being both dubious and dangerous. "[O]ne can readily imagine other cases that turn on comparably dubious predictions. . . . '[D]ebtors and favored creditors can be expected to make every case that 'rare case.'"[10] *Jevic,* 580 U.S. at 470 (citation omitted). The Court further found the "rare case" exception to be dangerous because it would inflict uncertainty upon the bankruptcy system with serious consequences—consequences including collusion and changes in bargaining power even in cases not ending in a structured dismissal. *Id.* (observing that the consequences of the rare case justification "include risks of collusion, *i.e.*, senior secured creditors and general unsecured creditors teaming up to squeeze out priority unsecured creditors.").

### ii. *Jevic* Casts Doubt on *ICL's* Continued Viability.

*40.*     Before the Supreme Court's consideration of *Jevic*, the Third Circuit decided *In re ICL Holding Co., Inc.*, 802 F.3d 547 (3d Cir. 2015). In *ICL*, the Third Circuit affirmed an order approving a pre-plan settlement between an official creditors' committee and a secured lender group that had purchased the debtors' assets. Similar to *Jevic*, high-priority (secured) creditors and low-priority (unsecured) creditors teamed up to squeeze out a dissenting mid-priority creditor (the United States, which held a large tax claim entitled to administrative priority). But unlike *Jevic*, the settling parties in *ICL* argued that the settlement payments did not belong to the estate and were instead a "gift" of the secured lenders' own money.

*41.*     Under the specific facts of the case, the Third Circuit agreed that the payment scheme did not involve bankruptcy estate property and therefore did not implicate the Code's

---

[10] Here, there is no allegation of a "rare" case such as was present in *Jevic.* There is no allegation that the DIP Lender would not agree to provide the same consideration being transferred through the settlement to the estate generally, to be distributed in accordance with the Bankruptcy Code's priority scheme.

priority rules. *Id*. at 556 ("the settlement sums paid by the [secured lenders and affiliated] purchaser were not proceeds from its liens, did not at any time belong to LifeCare's estate, and will not become part of its estate even as a pass-through"). In essence, *ICL* limited the scope of the priority rules on the grounds that the Code did not expressly prohibit distributions of non-estate property in bankruptcy.

42.     To be sure, the *Jevic* Court did not expressly consider whether the Code's priority rules apply to "gifts" of purportedly non-estate property. But in rejecting the *Jevic* settlement, the Supreme Court demanded strict adherence to the rules established by Congress and laid bare the true harms of so-called "gifting."[11] For at least two reasons, *Jevic* casts substantial doubt on *ICL*'s reasoning.

43.     First, courts cannot approve distributions that deviate from the "basic system of priority" simply because the Code does not contain an express prohibition. The Supreme Court directly repudiated this line of reasoning when it rejected arguments that the priority rules apply only to chapter 11 plans. *See Jevic,* 580 U.S. at 465. Because the priority system is fundamental to the Code's operation, any departure from it (whether in a structured dismissal, sale, settlement or other court-approved agreement) must come from Congress. *See id*. No such authorization exists for bankruptcy courts to approve priority-skipping gifts of non-estate property. The integrity of a comprehensive bankruptcy scheme, including the painstakingly-detailed priority rules governing distributions to creditors, cannot be cast aside in favor of creditor side deals. *See In re Lehman Bros. Holdings, Inc.*, 508 B.R. 283, 294 (S.D.N.Y. 2014) ("The Bankruptcy Code is meant to be a "comprehensive federal scheme . . . to govern" the bankruptcy process. Although

---

[11] The U.S. Trustee questions whether payments described as "gifts" in bankruptcy court filings are characterized as such in other records and reports, including in internal accounting records and reports to shareholders, taxing authorities, or regulators.

flexibility is necessary[,] the federal scheme cannot remain comprehensive if interested parties and bankruptcy courts in each case are free to tweak the law to fit their preferences . . .") (citations omitted). Simply put, parties should not reap the benefits from the comprehensive bankruptcy process without also accepting its obligations, including the obligation to follow statutory priorities.[12]

44.     Second, the Third Circuit in *ICL* failed to consider the full consequences of priority skipping distributions. By contrast, the Supreme Court exposed the harms that priority-skipping settlements inflict upon disfavored creditors and observed that departures from the Code's priority rules—even in supposedly "rare" cases—run counter to the protections Congress granted particular classes of creditors. 580 U.S. at 470. Those statutory protections take precedence over even well-intentioned payments to junior creditors, and departing from them invites "collusion, *i.e.*, senior secured creditors and general unsecured creditors teaming up to squeeze out priority unsecured creditors." *Id.* at (*citing Bank of America Nat. Trust and Sav. Assn. v. 203 North LaSalle St. P'ship*, 526 U.S. 434, 444 (1999) (discussing how the absolute priority rule was developed in response to "concern with 'the ability of a few insiders, whether

---

[12] The Supreme Court's mention of *In re Iridium Operating LLC*, 478 F.3d 452 (2d Cir. 2007) does not alter this analysis. The Court made clear that "[*Iridium*] does not state or suggest that the Code authorizes nonconsensual departures from ordinary priority rules in the context of a dismissal—which is a *final* distribution of estate value—and in the absence of any further unresolved bankruptcy issues." *Jevic*, 580 U.S. at 467 (emphasis in original). The interim nature of the *Iridium* settlement was a critical factor in the settlement's approval. In *Iridium*, settling the litigation surrounding the secured lenders' lien and distributing the proceeds to a litigation trust provided the estate with the ability to pursue an even more valuable claim, the proceeds of which would flow through the ordinary distribution scheme. *Iridium*, 478 F.3d 454. Here, however, the settlement is not necessary to fund the liquidation of other assets of the Debtor. The sale will transfer all assets to the Stalking Horse, leaving the estate with no assets. The settlement proceeds will simply flow to unsecured creditors and will not provide any potential of increasing the value of the estate. The *Iridium* settlement had the same qualities as interim payment to critical vendors in violation of the priority distribution scheme: the "distributions at issue would enable a successful reorganization and make even the disfavored creditors better off." *Jevic*, 580 U.S. at 468 (citations omitted). That does not hold true here.

representatives of management or major creditors, to use the reorganization process to gain an unfair advantage'" (*quoting* H.R. Doc. No. 93–137, pt. I, p. 255 (1973))). And by increasing uncertainty in the bankruptcy process, the failure to follow creditor priorities makes settlements more, not less, difficult to achieve. *Id*. at 471. When the Third Circuit evaluated the priority-skipping settlement on its merits in *ICL*, it did not consider the systemic harms that the Supreme Court found important when deciding *Jevic*.

### 3. This Court Should Apply *Jevic* Here.

45.     Despite the fact that the parties are willingly permitting the final DIP order to be entered, the sale order to be entered and the sale to close without seeking approval of the settlement, and without requesting dismissal or conversion, the court should view the entire package. Specifically, the settlement contemplates the Committee's agreement not to pursue Challenges, not to object to the DIP financing motion, including the releases therein, not to object to the Sale motion, including the sale of all causes of action, and the creation of a trust that will distribute the apparently only assets available for distribution, and the lack of any meaningful reorganization activity to occur in the bankruptcy cases after the sale closes. The approval of the sale and its closure is a necessary step to wash the proposed contributions to the trust of their ownership by the estate, thus permitting the fiction of a "gift" to arise. This is simply a multi-step process to conclude the cases with a final distribution of assets that violates the Code's priority rules. Any finding otherwise promotes gamesmanship in the structuring of structured dismissals to evade *Jevic* and its ban on non-consensual, priority-violating final distributions.

46.     Although the Committee claims that the settlement will maximize recoveries and is the only avenue for any recovery, that is irrelevant when there is no dispute that lower ranking creditors will receive distributions before higher ranking priority creditors without the senior

creditors' consent. Just as the Supreme Court rejected the supposed choice between a meaningful

return or zero, so, too, must this Court. The United States Court of Appeals previously rejected

the ability of senior creditors to "gift" what they claimed to be non-estate property – their

distributions -- to junior creditors in a chapter 11 plan. *See In re Armstrong World Industries,*

*Inc.*, 432 F.3d 507, 513-14 (3d Cir. 2005). The parties to the Committee Settlement Term do not

explain why their "non-estate property" argument should fare better here. At bottom, the parties'

proposal undermines the integrity of a comprehensive bankruptcy scheme.

47.     The Supreme Court was concerned that permitting priority-skipping distributions

would create serious consequences, including: departure from the protections Congress granted

particular classes of creditors; changes in bargaining power of different classes of creditors; risks

of collusion; and making settlements more difficult to achieve. *Jevic*, 580 U.S. at 470-71. The

balance struck by the Bankruptcy Code is important because it standardizes an expansive and

sometimes unruly area of law. *Id.* at 471.

48.     Even if the assets to be transferred to a state-court trust *could* be deemed non-

estate assets, permitting such "gifting" results in the very consequences that the Supreme Court

sought to avoid in *Jevic.* Permitting a secured lender to "gift" assets to low-priority creditors

creates uncertainty – how much is the secured lender really willing to pay for the assets? Who

are they willing to pay? Have they offered the true value of the assets to the estate, or did they

hold back knowing they would have to pay more to resolve objections? That uncertainty makes

in less likely to achieve a settlement. *Id.* at 470.

49.     Permitting lower-priority creditors to negotiate with the purchaser for the transfer

of assets after the sale departs from the Congressional protections granted to creditors.

Employees have been granted priority to encourage them not to abandon ship and to alleviate

hardship that unemployment causes. *Id.* Permitting settlements structures as "gifts" to avoid the need to pay these creditors first eliminates protections Congress built into the Bankruptcy Code.

50.     This structure also likely results in high-priority creditors and low-priority creditors colluding to squeeze out mid-priority creditors.

**B. *ICL* Does Not Apply to This Case**

51.     Even if this Court chooses not to revisit *ICL* after *Jevic*, the proposed structure of the Committee settlement cannot survive.. In *ICL*, the Third Circuit examined a settlement between an official unsecured creditors' committee and a secured lender group. Under the terms of that settlement, the committee agreed to drop its objections to an asset sale where the secured lender group would acquire all the estate's assets through a credit bid. In return, "the secured lenders agreed to deposit $3.5 million in trust for the benefit of the general unsecured creditors." 802 F.3d at 551. Under those fact specific circumstances, the Court found that the settlement payments were not "proceeds . . . of or from property of the estate" under section 541(a)(6) and, therefore, did not implicate the Code's priority rules. *See Id.* at 556 (finding that "the settlement sums paid by the [secured creditors and] purchaser were not proceeds from its liens, did not ***at any time*** belong to LifeCare's estate, and will not become part of its estate even as a pass-through") (emphasis added).

52.     Here, the settlement consideration differs from *ICL* in critical ways. First, the settlement effectively releases the committee's ability to challenge the validity, perfection, priority, extent, or enforceability of the secured lenders' claims by allowing the DIP Order to become final and not asserting a Challenge. The committee could only mount such a challenge if it obtained derivative standing on behalf of and "for the benefit of the estate." *See Cybergenics*, 330 F.3d at 580. Consequently, any consideration that the committee receives for the settlement of such claims belongs to the estate. By contrast, the settlement in *ICL* solely covered objections

relating to an asset sale and did not necessarily implicate the same derivative claim analysis.

53. Second, the settlement involves an ordinary carve-out where the secured lenders are permitting the use of a portion of their collateral. Savings of the carve-out are being distributed to the trust. In *ICL*, the Third Circuit strongly suggested that a gift through a carve-out from a secured lenders' collateral for the benefit of a junior class involves estate property. *See* 802 F.3d at 557 ("if we were [dealing with a carve-out], this would suggest it was LifeCare's property"). Here, the settlement calculates the amount of cash to be transferred by the savings of the carve-out. *ICL* counsels that these carve-out payments involve estate property, and therefore, the Code's priority rules expressly apply.

54. Third, the settlement involves the transfer of fraudulent transfer claims and commercial tort claims that belong to the estate. In *ICL*, the Third Circuit expressly considered whether specific cash transfers represented proceeds from the secured creditors' liens. *See* 802 F.3d at 556. Unlike cash transfers that may not have been traceable in *ICL*, the settlement in this case transfers non-cash litigation assets from the estate (whether directly or indirectly) to a litigation trust. Such claims must be traceable to the estate or else the party holding them has no ability to prosecute them. As such, *ICL* is inapplicable here. *See In re Constellation Enterprises LLC*, Case No. 16-11213, Hr'g Tr. at p. 248 (Bankr. D. Del. May 16, 2017) ("[A]ssuming *ICL* is still good law, assuming it has not been affected by *Jevic*, I find that this case is not controlled by *ICL* and doesn't fit *ICL* because the causes of action were property of the estate at one time. And the language [from the *ICL* opinion] makes a point in approving the transaction in *ICL* that it is important, among other things, that the transferred assets did not at any time belong to the Debtors' estate. So *ICL* is not applicable") (a copy of the transcript is attached as Exh.A).

55. Separate from the tracing issues, the Code created many of the underlying rights

for the estate in the first instance, as the transfer appears to include avoidance actions against parties who are not go-forward vendors. *See* 11 U.S.C. §§ 544-551. Permitting the sale of these claims and their subsequent assignment to unsecured creditors outside of priority undermines the Code's purpose and structure. In other words, the settlement distributes value derived from Code-created rights in violation of Code-specified priority.

56.     Fourth, the settlement requires the purchaser to assume at least $500,000 in Assumed Liabilities. Currently, the APA only requires up to $250,000 of prepetition cure claims to be assumed by the purchaser.[13] No business purpose is provided for the assumption of additional liabilities, and no transparency is provided as to who will be the beneficiary of these assumed claims. Indeed, the Purchase Price is defined to include the Assumed Liabilities, and thus, is value being provided to the estate for the estate's assets. Permitting the Stalking Horse to pay an additional purchase price but direct the payment to unsecured creditors where the payment of those claims is to resolve the Committee's objections and not for a going-forward business purpose, cannot be approved after *Jevic*.

57.     For all of these reasons, the settlement distributes estate property even under *ICL's* most generous reading. Because *Jevic* directly forbids these distributions, this Court should deny the sale motion that incorporates aspects of the settlement.

---

[13] Other assumed liabilities are liabilities that first arise after the closing.

## III. CONCLUSION

For the reasons stated above, the Court should deny the Motion and grant any other such

relief as may be just and proper.

Dated:  February 21, 2025                Respectfully submitted,
        Wilmington, Delaware

**ANDREW R. VARA**
**UNITED STATES TRUSTEE**
**REGIONS 3 AND 9**

By:  *Linda J. Casey, Esq.*
Linda J. Casey, Esq.
Trial Attorney
United States Department of Justice
Office of the United States Trustee
J. Caleb Boggs Federal Building
844 King Street, Suite 2207, Lockbox 35
Wilmington, Delaware 19801
Phone: (302) 573-6491
Fax: (302) 573-6497
Linda.Casey@usdoj.gov

Exhibit A

**In The Matter Of:**

*In re: Constillation Enterprises, LLC, et al.*

---

*Hearing*
*May 16, 2017*

---

*Wilcox & Fetzer, Ltd.*
*1330 King Street*
*Wilmington, DE   19801*
*email: depos@wilfet.com, web: www.wilfet.com*
*phone:  302-655-0477, fax:  302-655-0497*



Original File Constellation Enterprises 05-16-17 Hearing.txt
Min-U-Script® with Word Index

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE


In re:                          )Chapter 11
                                )
Constellation Enterprises LLC,  )Case Number
et al.,                         )16-11213 (CSS)
                    Debtors.     )




              Courtroom 6
              824 Market Street, 5th Floor
              Wilmington, Delaware
              Tuesday, May 16, 2017
              10:00 a.m.



BEFORE:

   THE HONORABLE CHRISTOPHER S. SONTCHI, Judge








              WILCOX & FETZER
      Registered Professional Reporters
 1330 King Street - Wilmington, Delaware 19801
              (302) 655-0477
              www.wilfet.com



**WILCOX & FETZER LTD**
Registered Professional Reporters
(302) 655-0477
www.wilfet.com

1   APPEARANCES:

2

3        ZACHARY I. SHAPIRO, ESQ.
         MARCOS A. RAMOS, ESQ.
         JOSEPH C. BARSALONA II, ESQ.
4        RICHARDS LAYTON & FINGER
            One Rodney Square
5           920 North King Street
            Wilmington, Delaware  19801
6           For the Debtors

7

8        CHRISTOPHER M. SAMIS, ESQ.
         WHITEFORD TAYLOR PRESTON
            405 North King Street, Suite 500
9           Wilmington, Delaware  19801

10              -and-

11       NORMAN N. KINEL, ESQ.
         SQUIRE PATTON BOGGS
12          30 Rockefeller Plaza
            New York, New York  10112
13          For the Official Committee of
            Unsecured Creditors
14

15       LINDA CASEY, ESQ.
         UNITED STATES TRUSTEE
16          844 King Street, Suite 2207
            Wilmington, Delaware  19801
17

18       WARD BENSON, ESQ.
         DEPARTMENT OF JUSTICE
19          Post Office Box 227
            Ben Franklin Station
20          Washington, D.C.  20044
            For the Internal Revenue Service
21

22

23

24



3

APPEARANCES, CONTINUED:

    ROBERT J. DEHNEY, ESQ.
    ANDREW R. REMMING, ESQ.
    MORRIS NICHOLS ARSHT & TUNNELL
        1201 North Market Street, 16th Floor
        Wilmington, Delaware  19801

            -and-

    GARY L. KAPLAN, ESQ.
    MATTHEW ROOSE, ESQ.
    NANCY BELLO, ESQ.
    FRIED FRANK
        One New York Plaza
        New York, New York 10004
        For DDTL Parties


    CHRISTOPHER D. LOIZIDES, ESQ.
    LOIZIDES, P.A.
        1225 King Street, Suite 800
        Wilmington, Delaware  19801

            -and-

    JACK A. RAISNER, ESQ.
    OUTTEN & GOLDEN
        685 Third Avenue, 25th Floor
        New York, New York 10017
        For Trevor Miller


    BLAKE CLEARY, ESQ.
    YOUNG CONAWAY STARGATT & TAYLOR
        1000 King Street
        Wilmington, Delaware  19801

            -and-

    JASON P. RUBIN, ESQ.
    SCOTT L. ALBERINO, ESQ.
    AKIN GUMP STRAUSS HAUER & FELD
        One Bryant Park
        Bank of America Tower
        New York, New York  10036
        For Secured Noteholders



```
 1   APPEARANCES, CONTINUED:

 2        ALESSANDRA GLORIOSO, ESQ.
          DORSEY & WHITNEY
 3            300 Delaware Avenue, Suite 1010
              Wilmington, Delaware  19801
 4            For Wells Fargo

 5
          SAMUEL C. BATSELL, ESQ.
 6        PENSION BENEFIT GUARANTY CORPORATION
              1200 K Street NW
 7            Washington, DC 20005
              For the PBGC

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```



**WILCOX & FETZER LTD**
Registered Professional Reporters
(302) 655-0477
www.wilfet.com

1           THE COURT:  Good morning.

2           MR. SHAPIRO:  Good morning, your

3   Honor.  For the record, Zac Shapiro of

4   Richards, Layton & Finger here today on behalf

5   of the Debtors.  With me at counsel table are

6   my colleagues, Mr. Ramos and Mr. Barsalona.

7   Behind me is Mr. Dana LaForge, who is among

8   other things a board member of Constellation.

9           We have two items on today's

10  agenda.  The first is a joint motion filed by

11  the Debtor and the Committee to seek approval

12  of the settlement; and the second is what we

13  call the Committee's related mechanics motion.

14  We would propose to take those items in the

15  order which they're listed on the agenda.

16          We would also propose to get

17  right into evidence.  We have one witness; the

18  Committee has one witness.  And then after

19  each of us do our direct and redirect and our

20  cross and redirect, then we would get into

21  arguments of counsel.  And at this point, I

22  would pause to see if that proposal is

23  acceptable to your Honor or other parties wish

24  to weigh in.

1          THE COURT:  Anyone wish to be

2   heard on that?

3          MR. KAPLAN:  Your Honor, if I

4   may, we had discussed with Debtor and the

5   Committee beforehand that we thought we brief

6   openings would be helpful just to frame the

7   testimony here, but obviously, we would defer

8   to your Honor.

9          THE COURT:  Brief openings are

10  fine.  I did read the briefs, so I'm aware of

11  the issues, obviously.  But if people would

12  like to make openings, that's fine.  So I'll

13  turn to the Debtors first and the Committee.

14  If you don't want to, that's fine, as well.

15          MR. SHAPIRO:  Your Honor, I'm

16  going to make my opening very brief.  I think

17  the papers made clear that at the very outset

18  of these cases, our goal was to achieve one or

19  more going concern sales of the Debtors'

20  businesses.  And to do that, we needed

21  financing and a buyer or buyers.  And it was

22  critical, in our view, to achieve those goals

23  that we obtain as much support as we could

24  from our key creditors.  And just one day

 1   before the August 16th hearing, which was at
 2   that time the hearing on the approval of the
 3   sales, and it was going to be the hearing on
 4   approval of the DIP but we adjourned that into
 5   later, and that was three months into the
 6   case, we hadn't yet received final approval of
 7   our DIP and neither of our sales were
 8   approved.
 9             And I think as the testimony
10   will make clear, at that stage, we didn't have
11   support for either sales or the DIP.  And then
12   on the morning of August 16th, we were sent a
13   term sheet that not only resolved inner-
14   creditor disputes and provided funding to out
15   of the money creditors solely from non-estate
16   sources, but it resolved the Committee's
17   objections to the sales and the DIP.
18             And importantly, it also
19   resulted in the Committee supporting the sales
20   and the DIP, something that I think it's safe
21   to say carries a lot of weight in this court.
22   And to us, that sounded like a no-brainer.  So
23   we agreed to the term sheet.
24             But it was clear that the term

1  sheet was still subject to further

2  documentation and finalization.  In fact, the

3  record makes clear that counsel to each party

4  stated on the record in no uncertain terms

5  that there was still a lot of work that needed

6  to be done with respect to the settlement, and

7  the Debtors even expressly said we would work

8  in good faith to finalize it.  In fact, it was

9  not until more than three weeks later that the

10 term sheet was finalized and filed with the

11 Court.

12           But what we really agreed with

13 on August 15th and 16th, and I think this is

14 important, is the concept.  And the concept

15 was get the support from the Committee for

16 your sales and your DIP, give up nothing, and

17 get something for certain of your creditors,

18 but admittedly not for others.  Or don't get

19 the Committee support for your sales and the

20 DIP.  Give up nothing, and get nothing for

21 none of your creditors.

22           And I would submit, your Honor,

23 that really wasn't a difficult choice.  Was it

24 a perfect settlement?  No.  We would not be

1  here today before your Honor if it were a

2  perfect settlement.  Would it have been better

3  if the objectors in this room received what we

4  thought they were entitled to?  Sure.  Of

5  course, that would have been great.  And the

6  record will reflect that we tried to help as

7  much as we could in that regard.  But the fact

8  is, as is true in most Chapter 11 cases, the

9  Debtors didn't control the economics.  We were

10  limited in what we could do.

11             But I don't think anyone can

12  credibly argue that the Debtors' decision to

13  enter into the settlement was anything but a

14  sound exercise in their business judgment, nor

15  can they argue the settlement does not fall

16  above the lowest point in the range of

17  reasons.

18             And I think that's it from me,

19  your Honor.  Thank you.

20             THE COURT:  You're welcome.

21             MR. ABER:  Good morning, your

22  Honor.  Norman Kinel, Squire Patton Boggs, on

23  behalf of the Creditors' Committee.

24             I don't have much to add to what



1   Mr. Shapiro had to say.  We're obviously the
2   co-movant on the settlement motion.  We
3   brought our own motion which we referred to as
4   the mechanics motion, which to some degree was
5   precipitated by the first round of objections
6   where the objecting parties wanted to know
7   exactly what the mechanic would be for
8   distribution of the settlement proceeds,
9   assuming it was approved by this Court.
10                  I think your Honor, and I think
11  the reasons that the Debtors and the Committee
12  didn't see the need for opening statements, I
13  think there's going to be a lot of noise in
14  the courtroom today, not necessarily loud, but
15  a lot of things that are distracting for
16  what's really at issue before the Court.  And
17  what's at issue before the Court is approval
18  of the settlement, and the standard for
19  approval is, as we all know, pretty low.  Not
20  that I think this is even close to approaching
21  the lowest level, but certainly we believe
22  that both the Debtors and the Committee, to
23  the extent relevant, entered into a
24  hard-fought, good-faith settlement after

1  lengthy negotiations, primarily between the

2  Committee and the noteholders, and that the

3  parties, the constituency that we represent,

4  the Unsecured Creditors Committee, this

5  settlement is the only last-best-chance hope

6  for obtaining substantial consideration,

7  consideration that would not have been

8  predicted to have been possible to obtain at

9  the outset of the cases given the huge amount

10  of debt that came before unsecured creditors.

11  And that only through the Committee's efforts

12  in pressing its objections to the DIP, to the

13  sale motions, and conducting investigations

14  and doing all that a Committee should do, has

15  the results which we're seeking approval of

16  come before your Honor for approval.

17          We took a long detour easily

18  referred to as the Jevic detour.  We're back

19  we believe where we started, and as we'll get

20  into argument at closing, we don't believe

21  that Jevic is relevant or in any way

22  precluding the Court's approval of the

23  settlement, and we believe that, frankly, it

24  should be almost a routine matter to approve

1  this type of settlement given the binding

2  third circuit precedent at LCI.

3          And as to the mechanics motion,

4  your Honor, the Committee is faced with

5  economic realities that there was never a bar

6  date set in these cases and that there is a

7  claims resolution process that needs to occur,

8  we're asking the Court to approve a mechanism

9  which we think is fair with respect to which

10  all creditors have been on notice for many,

11  many months, and the only parties who have

12  ever objected are sitting in this room.  And

13  we think it's an efficient way to get a

14  substantial distribution to unsecured

15  creditors in these cases.  Thank you.

16          THE COURT:  Mr. Kaplan?

17          MR. KAPLAN:  Thank you.  Good

18  morning, your Honor.  For the record, Gary

19  Kaplan from Fried, Frank, Harris, Shriver &

20  Jacobson on behalf of the DDTL parties.

21          First, your Honor, I wanted to

22  start with one of the issues that was covered

23  in the reply and one of the reasons why I

24  wanted some openings was there's a lot of the

1   argument that the Debtors and the Committee

2   make is, well, the APA always provided that

3   certain of these assets were going to be sold,

4   and that's all that's relevant is look at what

5   the APA said, and we're trying to relitigate

6   the APA.  We're not trying to relitigate the

7   APA.  We understand what the APA said, but

8   that's besides the point.

9              Because what we're here on today

10  is a settlement term sheet.  And the record is

11  going to show, and we put it in our brief and

12  it will come very clear as we go through the

13  testimony today, when the Debtors and the

14  Committee announced that they had a

15  settlement, there were assets that were going

16  to be left behind by the purchaser in the

17  estate and then the estate was going to be

18  distributing out.  That is what was announced

19  in court on August 16th.  That is the

20  settlement that was approved by the Debtor and

21  the Committee.

22              And we're going to also show

23  that then after that, because of Jevic or

24  otherwise , it changed, so that assets that

1   were going to be left in the estate, plainly

2   estate assets that had agreed to be carved

3   out, were now going to be sold to the

4   purchaser and immediately contributed back to

5   the Debtor.

6           And when the Committee and the

7   Debtor want your Honor to consider this, they

8   sort of want to you bifurcate pieces of the

9   settlement which you're assessing.  What we

10  argue is when you're looking at the claims and

11  causes of action, you can't look at anything

12  today because clearly the sale has closed, the

13  DIP has been assumed by the purchaser, so you

14  have to step back and look at the world on

15  August 16th when they stood up in court and

16  announced the settlement.  That's when they

17  argue you have to look at the claims that are

18  being settled.  But don't look at the facts

19  and what was agreed to on the 16th, because

20  that would run smack into Jevic and that would

21  be impermissible.

22          So they want you to sort of

23  bifurcate how you look at the settlement and

24  what you look at the settlement.  And frankly,

1  we don't think there's any precedent for that.

2        Now, Mr. Kinel mentioned you're

3  going to hear a lot of noise today.  Well,

4  that noise is the facts.  They may be

5  inconvenient, they may be unhelpful to the

6  Debtors, but that's what you're going to hear.

7        In terms of the settlement and

8  the Martin factors and the Committee's

9  argument that this was a home run considering

10  where, you know, what their claims were, we

11  think that sort of misses the point on this.

12  Because what we're really not talking about is

13  a settlement.  What we are talking about is

14  effectively a distribution scheme to wrap up

15  the Chapter 11 case.  You have a Debtor who as

16  the testimony show cannot, has no hope of

17  confirming a plan.  So they have to figure out

18  a way, how do we get out of Chapter 11, and

19  that's what they created.  They've done it

20  under the guise of 9019 and they're trying to

21  use the 9019 standard, but we're not talking

22  about a settlement, because as the facts will

23  show, there was really nothing to be settled.

24  The challenge period had expired.  There were



1  no claims against the noteholders.  They say,

2  oh, look at what we extracted from them, they

3  had to release them.  There were no claims

4  against them.  They were negotiating a

5  distribution mechanism, and that's it.

6             And then lastly, in terms of the

7  Debtors' business judgment, the record is

8  going to be pretty clear that the Debtor, as

9  they said and it says in the declaration, they

10  had a take it or leave it proposition right

11  before the hearing.  They said, hey, it's

12  better than nothing, it gets our DIP and our

13  sale approved, we'll take it.  That may be

14  fine, maybe the Debtor can do it, it wasn't

15  conditioned, none of those orders were

16  conditioned on approval of the settlement, so

17  I'm not criticizing them for making that

18  judgment.  But this Court has a role in

19  reviewing that settlement and looking at it,

20  saying, okay, it's nice they did it, they got

21  their sale approved, but is it the appropriate

22  thing and does it actually comply with the

23  law?

24             And it's important to consider,



1    as Mr. Shapiro said, the Debtors had already

2    addressed the DIP objection.  We're not

3    talking about an exigent circumstance with a

4    deadline blowing up where they were about to

5    lose the DIP.  They had already moved a

6    deadline or, I'm sorry, moved the hearing on

7    the DIP.  So it wasn't an exigent situation

8    where they could have taken time to actually

9    negotiate.

10             And one other point is that, and

11   the Committee has already made the point and

12   will continue to make the point, if this

13   settlement is denied, there's going to be a

14   windfall to noteholders and the creditors are

15   going to be out and they're not going to get

16   anything.  You know what, your Honor?  It's a

17   little bit like the child that kills his

18   parents and then begs mercy because they're an

19   orphan.  The Committee and the Debtor

20   structured this in this way.  Evidence will

21   show it wasn't the noteholders who insisted

22   you must skip priority claimants, you must

23   skip the DDTL parties deficiencies.  The

24   Committee and the Debtors decided, gee, maybe

1   we can try to get around Jevic if we structure

2   it this way, then they'll beg and say, well,

3   Judge, but if you deny it, then we won't get

4   anything.  They could have simply accepted the

5   terms that the noteholders proposed and said,

6   yeah, we'll make it correct amongst creditors,

7   we'll follow the absent priority rule.  If

8   they did that, we wouldn't have an objection,

9   none of the parties on this side would have an

10  objection.  They chose to go down that path,

11  your Honor, and whether the outcome ultimately

12  is negative for them, you know, we make

13  strategic decisions all the time, and they

14  have to live with those strategic decisions.

15            So to avoid beings repetitive,

16  in closing I will address ICL and Jevic and

17  all those other issues.  Thank you.

18            THE COURT:  Ms. Casey?

19            MS. CASEY:  Good morning, your

20  Honor.  Linda Casey on behalf of the United

21  States Trustee.

22            Your Honor, while we have some

23  technical objections to both the settlement

24  motion and the procedures motion, I think the

1  main issue today can be framed by the

2  following:  Can the Supreme Court's Jevic

3  decision be interpreted so narrowly as to

4  permit an end-of-case priority skipping

5  distribution of assets by finding that the

6  consideration paid to resolve objections to a

7  sale and thereby permit the sale to move

8  forward are not estate assets, and therefore

9  continue the harms that the Supreme Court

10 attempted to avoid, altering the balance

11 struck by the code; changing the parties'

12 negotiating positions; decreasing the

13 likelihood of settlement; and increasing the

14 uncertainty of distributions resulting in a

15 battle between all parties to obtain the

16 purported side deals or gifts provided by the

17 purchaser?

18            THE COURT:  Thank you,

19 Ms. Casey:

20            MR. RAISNER:  Good morning, your

21 Honor.  Jack Raisner on behalf of the WARN

22 class.

23            We have joined in Ms. Casey's

24 objection and made our own.  I just want to

1  highlight a chief concern of ours.  Regardless
2  of whether this is a gifting case or this is
3  not quite a Jevic case and may be a Jevic
4  case, the way which the distribution of
5  proceeds have been set up in a lopsided way,
6  which has none of the hallmarks of fairness,
7  of a disinterested broker looking over the
8  process, puts the employees' claims fully to
9  the discretion of the Debtor and the
10 noteholders and control that process and all
11 the decisions that are made, except
12 potentially for a person who would come for a
13 full hearing in court.  But that is not a
14 convention that belongs within any Bankruptcy
15 Code or bankruptcy resolution, your Honor.
16 Thank you.
17              THE COURT:  Thank you, sir.
18 Anyone else?
19              MR. RAMOS:  Good morning, your
20 Honor.  Marcos Ramos, Richards, Layton &
21 Finger.
22              Your Honor, as Mr. Shapiro
23 indicated, we intended to call Debtors'
24 witness first on the settlement motion.



```
 1              THE COURT:  Okay.
 2              MR. RAMOS:  Then we would be,
 3   after the other parties are finished,
 4   proceeding with the Committee witness on that
 5   motion, as well.  The Debtors' witness is Mr.
 6   Dana LaForge.  And your Honor, we included in
 7   the binders that we provided to the court and
 8   to the clerk the Debtors' exhibits.  Volume 3
 9   includes the declaration of Mr. LaForge.  It's
10   volume 3, and it's Exhibit 13 in volume 3.  I
11   have some extra copies of the declaration
12   itself, if I can approach.
13              Your Honor, the declaration of
14   Mr. LaForge was filed shortly before the
15   December hearing at which the settlement
16   motion was last considered by the Court.  We
17   intend to proceed by way of his declaration in
18   terms of offering it as his direct testimony
19   with only a few limited follow-up questions.
20   We've advised the parties of that, and there's
21   no objection to proceeding in that fashion.
22              THE COURT:  Any objection to the
23   admission of the declaration?  Okay; it's
24   admitted without objection.
```



```
 1                   MR. RAMOS:  And we would call
 2   Mr. LaForge to the stand, your Honor.
 3                   THE COURT:  Okay, very good.
 4   Mr. LaForge, if you would step up to the
 5   stand, remain standing for your affirmation.
 6                   DANA LAFORGE, after
 7        having been first duly sworn, was
 8        examined and testified as follows:
 9                   DIRECT EXAMINATION
10   BY MR. RAMOS:
11        Q.  Good morning, Mr. LaForge.
12                   Mr. LaForge, can I ask you to
13   pull out the binder that I was just referring
14   the Court to?  It's identified as binder 3 of
15   3.  And in that binder, ask you to turn to
16   what's identified as Debtors' Exhibit 13.
17        A.  I'm there.
18        Q.  Sir, can you identify that document
19   for the record?
20        A.  Yes.  It's the declaration I submitted
21   in December.
22        Q.  Are you familiar with the contents of
23   that declaration?
24        A.  I am.
```



1    Q.  Can I ask you to take a quick look at

2  paragraph 1?

3    A.  Okay.

4    Q.  And would you please describe whether

5  the information set forth in paragraph 1 is

6  accurate as of today?

7    A.  It's all accurate.  It leaves out the

8  fact that I'm also the chairman and sole

9  director of all those companies.

10   Q.  With that caveat, Mr. LaForge,

11  regarding your position with the Debtors, do

12  you affirm the contents of this declaration as

13  your testimony today in support of the joint

14  settlement motion?

15   A.  I do.

16   Q.  Mr. LaForge, let me ask you to stay in

17  binder 3 and ask you to turn to tab 9.

18   A.  I'm there.

19   Q.  And I'd ask you to turn two pages in

20  or so into the document and ask you if you can

21  identify that document.

22   A.  I can identify it.  It's our motion to

23  approve the settlement.

24   Q.  And is this the motion under which



1  you're today appearing?

2      A.  It is.

3      Q.  And let me refer you to Exhibit A to

4  that motion, and Exhibit 1 to Exhibit A, two

5  or three pages into what's under Exhibit A.

6      A.  Okay, I'm there.

7      Q.  And sir, are you familiar with that

8  document?

9      A.  I am.

10     Q.  What is it?

11     A.  This is the executed version of the

12 settlement term sheet.

13     Q.  And is this the settlement agreement

14 for which the Debtors and the Committee

15 jointly today seek Court approval?

16     A.  Yes, it is.

17     Q.  Sir, just stay on page 1 of the

18 settlement term sheet, about three or four

19 paragraphs down.  See the reference to CD Star

20 Holdings, LLC?

21     A.  I do.

22     Q.  It refers in that same paragraph to an

23 APA, correct?

24     A.  Yes, it does.



1    Q.  And sir, do you know, has the closing

2  occurred?

3    A.  The closing occurred in late November.

4    Q.  Do you remember the date that that

5  closing occurred?

6    A.  The date?

7    Q.  In November?

8    A.  I believe it was -- the document is

9  dated the 28th of November.

10    Q.  Sir, to your knowledge, was the APA

11  referred to here in the settlement term sheet,

12  was that amended prior to the closing?

13    A.  My understanding is it was amended

14  prior to the closing.

15    Q.  May I ask you to turn to tab 16 in the

16  same binder that you have before you?

17    A.  I'm there.

18    Q.  And sir, can you identify that

19  document?

20    A.  Yes, this is its amended asset

21  purchase agreement that I was referring to.

22    Q.  You're familiar with this document,

23  sir?

24    A.  I am.



1   Q. Is it your understanding this is the

2 final form of the APA referred to in the

3 settlement term sheet?

4   A. Yes, that's my understanding.

5   Q. I'm going to ask you to do a little

6 flipping back to tab number 9 for me, sir.

7 And back to the settlement term sheet that you

8 were just discussing.

9   A. I'm there.

10   Q. And, sir, do you know whether or not

11 under the settlement term sheet an escrow

12 agreement was contemplated?

13   A. It was.

14   Q. And do you know in connection with the

15 closing we were just referring to whether that

16 agreement was executed by the Debtors?

17   A. It was executed, yes.

18   Q. Let me ask you to turn to tab 17.

19   A. Okay, I'm there.

20   Q. Are you familiar with that document,

21 sir?

22   A. I am.

23   Q. And can you just describe what it is

24 for the record?



1 A. Yes. As part of the settlement, there

2 was some funding as part of the settlement

3 that needed to be put into escrow, and this is

4 the agreement that contemplated that.

5 Q. To your knowledge, sir, is that the

6 final form of the escrow agreement executed by

7 the Debtors as of the closing?

8 A. Yes, it is.

9 Q. Thank you. One last question from me,

10 Mr. LaForge. Tab number 9 again; I'm sorry.

11 Put you right back where I started you.

12 A. Okay.

13 Q. Let me ask you to turn to page 3 on

14 the settlement term sheet.

15 A. Okay, I'm there.

16 Q. It's page number 3 at the bottom. And

17 sir, you see the second bolded header on the

18 left-hand side called Claims and Causes of

19 Action?

20 A. I do, yes.

21 Q. And that long paragraph, that's next

22 to it, right?

23 A. I do, yes.

24 Q. Let me refer you to the last sentence



1  of that long paragraph, sir.  Have you

2  reviewed that, sir?

3      A.  I have, yes.

4      Q.  Sir, can you just clarify for me, are

5  the Debtors today asking the Court to approve

6  the Debtors' contribution of any claims or

7  causes of action to the trust?

8      A.  We are not.

9      Q.  And sir, have the Debtors considered

10 whether to add a clarifying provision to that

11 effect in the proposed order that they will

12 submit to the Court in connection with this

13 joint settlement action?

14     A.  I believe we have added that

15 clarification to the order, and have indicated

16 that they would be prepared to augment that as

17 any matter that would be helpful.

18              MR. RAMOS:  Thank you,

19 Mr. LaForge.

20              Your Honor, subject to redirect,

21 I'll pass the witness to the objecting

22 parties.

23              THE COURT:  All right.

24              MR. KAPLAN:  Good morning, your

1   Honor.  Your Honor, for the record, again,

2   Gary Kaplan, Fried Frank.

3                Your Honor, because we haven't

4   killed enough trees, we also have our own

5   witness binder, if we may approach the witness

6   and your Honor to hand out the binders.

7                THE COURT:  Yes.

8                CROSS-EXAMINATION

9   BY MR. KAPLAN:

10      Q.  Good morning, Mr. LaForge.  As you

11   know, Gary Kaplan from Fried Frank on behalf

12   of the DDTL parties.

13                I want to start actually back on

14   August 16th.  At the hearing on August 16th,

15   the Debtors announced that a settlement had

16   been reached, correct?

17      A.  Correct.  Yes, an agreement to move

18   forward and consummate the settlement that had

19   been agreed to, yes.

20      Q.  And the first that you had learned

21   that settlement had been reached was actually

22   the morning of August 16th, right?

23      A.  Of that settlement and that structure,

24   yes.



1    Q.  You were at Richards Layton's offices

2  when you learned of it?

3    A.  I was.

4    Q.  And at that point in time, you weren't

5  the sole director of the Debtors, right?

6    A.  That's correct, I was not.

7    Q.  Mr. Dennis Smith was the other

8  director?

9    A.  That's correct.

10    Q.  But Mr. Smith wasn't present in

11  Delaware at that time, was he?

12    A.  He was not.

13    Q.  And just to be clear, you were not

14  involved in any way in the negotiation of the

15  August 16th term sheet, correct?

16    A.  Of that term sheet, no.

17    Q.  And you were, in fact, completely

18  unaware of the structure of the term sheet,

19  meaning use of the trust and the contribution

20  of assets or cash, prior to receiving it on

21  the morning of the 16th, right?

22    A.  That structure was new to me on the

23  16th, yes.

24    Q.  And so then after receiving the term

```
 1   sheet that morning of the 16th, you then came
 2   to the courthouse for the hearing, right?
 3       A.  Correct.
 4       Q.  And when you got to the courthouse, it
 5   was your first chance to actually discuss the
 6   term sheet at all with any of the
 7   representatives, correct?
 8       A.  That's right.
 9       Q.  And prior to the start of the hearing,
10   you had a brief conversation with Committee
11   counsel about the term sheet, right?
12       A.  I did.
13       Q.  But because of the time constraints of
14   the start of the hearing, you were somewhat
15   limited in the amount of time you could
16   discuss it, right?
17       A.  That's correct.
18       Q.  And in that brief conversation, there
19   was one item of the term sheet that you were
20   attempting to negotiate, right?
21       A.  Yes, there was a -- yes.
22       Q.  And that item was expanding the
23   released parties under the term sheet?
24       A.  That's correct.
```



1      Q.  But the Committee wasn't prepared to

2  negotiate any of the terms with you, were

3  they?

4      A.  The Committee was not prepared to

5  discuss the term that I raised, and so, yeah,

6  there was the term sheet that was given to me

7  was the one that we had to make a choice on.

8      Q.  Okay.  And you didn't talk to the

9  noteholders prior to the start of the hearing,

10  did you?

11      A.  That morning?  Not between receiving

12  the term sheet or the concept of the term

13  sheet and the hearing, no.

14      Q.  And so you don't know, between that

15  time, you don't know whether the noteholders

16  would have been willing to make any

17  modifications to the term sheet, do you?

18      A.  I don't know.

19      Q.  And the Debtors didn't seek to adjourn

20  the August 16th hearing to have more time to

21  try to negotiate, did they?

22      A.  We did not.

23      Q.  Okay.  And then after receipt of the

24  term sheet and your conversations, at some

1  point, the Debtors approved the term sheet,

2  right?

3     A.  It actually was a little bit

4  different.  We had had a discussion among the

5  directors.  We had had a discussion before,

6  and I don't recall if we had one afterwards,

7  but we had a -- the directors, which were only

8  two, had a discussion about how we would

9  handle each of the alternatives.  That is that

10 term sheet or, you know, one with changes.

11    Q.  And let's take a look at the August

12 16th term sheet.  If you could turn to tab 20

13 in your binder.

14    A.  I have it.

15    Q.  And you see that the cover page of

16 this document is an email transmittal from

17 Ms. Hazan, counsel to the Committee, to a

18 number of parties saying here's a black line,

19 the term sheet showing changes to circulate

20 this morning?

21    A.  I do.

22    Q.  And is this -- obviously a clean

23 version, but is this version of the term sheet

24 like the board approved on the 16th?

1      A.   Yes.   This is the version of the term

2   sheet that the board agreed to give our

3   commitment that we would work forward to

4   documentation to apply the concept, yes.

5      Q.   But it's the one that the board

6   members met and decided --

7      A.   That's correct.

8      Q.   And approved?

9      A.   Yes.

10      Q.   And this term sheet provided for --

11   this term sheet changed over time from the one

12   you're seeking approval of today, right?

13      A.   Yes, it did.

14      Q.   And were there any significant changes

15   to the terms?

16      A.   The concept never changed that we

17   agreed to, no.

18      Q.   And when you say the concept never

19   changed, could you just be more specific about

20   what it is that you're referring to?

21      A.   Sure.   There were -- this was simply,

22   this was what it was.   And as we documented,

23   we drilled, my understanding is, between the

24   sides, they drilled down the language to

1    accurately document the verbal discussions

2    that our counsel had had prior to me coming to

3    the courthouse and talking to the Committee

4    counsel.

5         Q.   Wasn't it your understanding when you

6    approved the term sheet that none of the

7    Debtors' assets were going to be distributed?

8         A.   Yeah, that is my -- that was my

9    understanding, yes.

10        Q.   And your understanding was because all

11   the assets were going to be sold to the

12   purchaser, so it was up to the purchaser and

13   the Committee how they were going to allocate

14   the assets, right?

15        A.   That's correct.

16        Q.   And were you aware at the time that

17   the term sheet contemplated that the APA would

18   be amended so that certain assets of the

19   estate would be excluded assets and remain

20   back in the Debtors' estate?

21        A.   I don't think that's -- let me try to

22   answer, see if I've accomplished what you

23   want.  I was -- in a deposition, I

24   acknowledged that I was unaware of the

1   mechanic that the assets that were being sold

2   to the purchaser would get to the trust.

3   There was never, as part of this transaction,

4   a situation where assets were coming back to

5   the Debtor for the Debtor to do something

6   with.

7              The concept, as I referred to

8   it, was that assets would be contributed,

9   assuming the purchase was approved, those

10  assets purchased by the buyers, the

11  purchasers, would then be contributed to the

12  GUC.  The mechanism of how that happened was,

13  quite frankly, not a big discussion that

14  morning.

15       Q.  You testified on direct that you're

16  familiar with the asset purchase agreement,

17  correct?

18       A.  I am, yes.

19       Q.  And are you familiar with the concept

20  of excluded assets?

21       A.  I am.

22       Q.  I'd like you to turn to page 2 of the

23  term sheet, and in particular the side where

24  it says claims and causes of action.



1      A.  Yes.

2      Q.  And if you see there at the beginning,

3  it says, "The purchaser shall cause the APA to

4  be amended at closing so that the following

5  shall be excluded assets under the APA."  Do

6  you see that?

7      A.  That's what it says, yes.

8      Q.  So doesn't that mean that the term

9  sheet that you agreed to on the 16th

10  contemplate that had certain assets would be

11  excluded assets and thus remain with the

12  Debtor under the APA?

13           MR. RAMOS:  Objection, your

14  Honor.  It mischaracterizes the term sheet,

15  pause it was an incomplete referral to the

16  term sheet, his question, because he omitted

17  the clause after the term APA.  But he's

18  calling for a legal conclusion in addition to

19  that.

20           THE COURT:  Overruled.

21           THE WITNESS:  Would you repeat

22  the question, please?

23  BY MR. KAPLAN:

24      Q.  Sure.  Doesn't the term sheet that you



1   approved on the 16th provide for the APA to be

2   amended so that certain assets would be

3   excluded assets from the APA to remain back

4   with the estate and then contributed to the

5   GUC trust?

6       A.  The mechanism was not something we got

7   into that morning.  The discussion was whose

8   assets would end up in the GUC trust.  The

9   settlement agreement would only be relevant if

10  the purchase agreement was approved.  If the

11  purchase agreement was approved, then there

12  were no assets that the Debtor estate would

13  still have that would be contributed.  In my

14  mind, that language there was simply a

15  mechanism to distribute the assets which would

16  or wouldn't work to be determined by the

17  professionals, legal professionals, when they

18  had time.  We never assumed that the assets

19  were being contributed back to the estate for

20  it to, you know, for it to do something with.

21      Q.  Why not?  I mean, doesn't the term

22  sheet clearly say that they are going to be

23  excluded assets?

24      A.  We were very interested that morning



1   in whether or not there were any estate assets

2   being contributed.  There was a fulsome

3   discussion about that.  Not about the term

4   sheet, but about whether or not any of our

5   assets would be included.  And it was

6   presented to me by our counsel that the very

7   fact it wasn't helped make this a term sheet

8   that we could consider.

9            So the thought that there might

10  be language that if I went back and mapped to

11  a definition would imply something to a

12  different reader wasn't the issue.  I had a

13  concept in mind.  I confirmed verbally that

14  that was the concept, and we ensured that by

15  the time we had an executed version, that

16  that's what was in the agreement.

17      Q.  By prior to receiving the term sheet,

18  you never heard of the concept that is in the

19  term sheet, right?

20      A.  I hadn't seen the structure.

21      Q.  So how could you have a concept of

22  mind of what the term sheet would provide

23  until you got the term sheet and read it and

24  understood what it provided for?

1    A.  The discussion, I think the way, if
2  you can imagine the way this would play out in
3  the offices that morning, was there was a term
4  sheet.  The time on this term sheet was 10:23.
5  I don't know what time the hearing was; I
6  believe it was a late morning hearing.  The
7  discussion wasn't about the language as much
8  as that the board was involved with, it was
9  about the concept.  The concept was that the
10  purchasers would contribute their, the assets
11  that they would have acquired under the APA,
12  and they would contribute that to the GUC
13  trust.  If I thought for a moment there was a
14  chance I could get those assets back, I would
15  have done that.  I would have tried to do
16  that.
17    Q.  And you didn't try to do that, though,
18  after receiving and approving this timesheet,
19  did you?
20    A.  I did not try to do that; that's
21  correct.
22    Q.  Now if we could turn to tab 21?
23    A.  I'm there.
24    Q.  You see there's a cover email, and



 1   this one comes from Nava Hazan to Kramer Levin

 2   and to Akin Gump attaching another draft of

 3   the term sheet, right?

 4        A.  Yes.

 5        Q.  And this one says attached is the

 6   draft term sheet that reflects the agreement

 7   reached yesterday, right?

 8        A.  It does, yes.

 9        Q.  Let's turn to, just going to the same

10   provision we just looked at on page 2, this

11   term sheet continues to provide that same

12   language about the APA being amended so that

13   certain assets would be excluded assets under

14   the APA and contributed to the GUC trust,

15   right?

16        A.  It does, yes.

17        Q.  Do you remember reviewing this term

18   sheet?

19        A.  I don't remember reviewing this term

20   sheet.

21        Q.  Let's turn to 21; tab 21.

22        A.  We're on 21.

23        Q.  I'm sorry, 22.

24             MR. KINEL:  Excuse me, your



1   Honor, I'm going to object at this time.  I

2   could save it until the end, but if Mr. Kaplan

3   is going to go through numerous iterations of

4   term sheets, the objection is relevance.

5   What's before the Court today is the

6   settlement term sheet that was marked by

7   Mr. Ramos earlier, not these drafts.

8                    THE COURT:  Overruled,

9   Mr. Kinel.  Of course it's relevant.

10  BY MR. KAPLAN:

11      Q.  Mr. LaForge, if you could turn to the,

12  again, the language on claims and causes of

13  action.  Actually, before you get there, to be

14  clear, if you go to the first page, this is

15  actually an email from Kramer Levin, Debtors'

16  counsel, to the other parties, the purchaser

17  and the Committee, right?

18      A.  That is, yes, that's the email.

19      Q.  And then if you turn, we'll go to the

20  black line because it's easier to see the

21  changes, so page 2 of the black line?

22      A.  Yes.

23      Q.  You see that the Debtors have added in

24  some language into that provision that we've



1  been focused on, right?

2      A.  I see the changes that, yeah.  It's a

3  KL draft, yes.

4      Q.  And in particular, the Debtors,

5  Debtors' counsel drafted to this draft term

6  sheet was clarification that these assets

7  which were going to be excluded assets would

8  be contributed to the GUC trust by the

9  debtors.  Do you see that?

10     A.  I see that, yes.

11     Q.  Were you aware that at least your

12  counsel was continuing to propose that the

13  Debtors would be receiving these assets and

14  contributing them to the GUC trust after you

15  had approved the settlement?

16     A.  I can't -- I don't recall reviewing

17  any of these term sheets from the first one we

18  saw to the last one.  I don't know what the

19  thinking of the marked change was.  It reads

20  as you read it.  I know what the board

21  approved, and I know what the final term sheet

22  said, and I'm just afraid I can't get at this

23  with any more information than what it says on

24  the page.

Q. And the board certainly, as far as you're aware, didn't authorize this change, did it?
A. I don't recall seeing this, so no, the board would not have approved interim drafting.
Q. We may get back to the term sheets, but we can move to another topic for a few minutes.
Do you have your declaration in front of you still?
A. I'm sure it's...
Q. 13.
A. 13 of 3?
Q. Yes.
A. I have it.
Q. I'd like to you turn to paragraph 22, if you would, which is on page 6.
A. I'm there.
Q. All right. You see in there you testify that the terms of the settlement are fair and reasonable, right?
A. I see that, yes.
Q. Do you remember being deposed a couple

1  of weeks ago?

2      A.  I do.

3      Q.  And do you remember that we had a

4  dialog about whether it was fair or not?

5      A.  I do.

6      Q.  And do you recall saying that you

7  couldn't answer whether the settlement was

8  fair?

9      A.  I recall telling you I wouldn't answer

10  the question the way you had phrased it.

11      Q.  And do you recall why you said that?

12      A.  Yes, because the question was getting

13  at an equitable -- in my mind, it was a

14  question about equity that was not a matter

15  that the board or I would have considered at

16  the time.  I'd be happy to entertain the

17  question again, but that's the best

18  recollection I have.

19      Q.  Okay.  Do you recall that I asked you

20  whether the allocation of value to some

21  creditors and not others was fair?

22      A.  I do recall that, yes.

23      Q.  And do you recall saying that you

24  could not answer that question?



```
 1              MR. RAMOS:  Your Honor, perhaps
 2   he could refer him to his deposition
 3   transcript.
 4              MR. KAPLAN:  Yeah, I was going
 5   to ask him the question first.
 6              THE WITNESS:  Yeah, it would be
 7   helpful to see it.  Thank you.
 8              MR. KAPLAN:  May I approach,
 9   your Honor?
10              THE COURT:  Sure.  Thank you.
11   BY MR. KAPLAN:
12      Q.  And in particular, let's go to the
13   bottom of page 48, line 24.  Let me know when
14   you're there.
15      A.  I'm sorry, 48?
16      Q.  Yeah, page 48, then there's a question
17   beginning on line 24.  Mr. Diaz asked you,
18   "But sitting here today, you're not prepared
19   to say that the settlement, that the
20   allocation of value in the settlement to some
21   creditors and not others is fair?"  Mr. Ramos
22   objected.  Then you can read your answer.  And
23   you can read it out loud and tell me if it's
24   changed.
```



```
 1                    THE COURT:  It's a long answer.
 2                    THE WITNESS:  I was criticized
 3    for that.
 4                    MR. RAMOS:  Your Honor, I'd just
 5    note, as well, that he directed him to 24,
 6    starting in line 24.  For completeness, it may
 7    be appropriate to direct the witness starting
 8    at line 8 of the same page, 48.
 9    BY MR. KAPLAN:
10        Q.  I'm happy to start there, if that's
11    easier.  You can start at page 48, line 7, to
12    avoid the objection; that's fine.  Again, it's
13    going to be another long answer.
14                    THE COURT:  All right, read to
15    us.
16                    THE WITNESS:  Would you like me
17    to read it out loud?
18    BY MR. KAPLAN:
19        Q.  Read it and tell me if that's still
20    your view today.
21        A.  I'm sorry, am I being asked to read it
22    out loud or just read it?
23        Q.  Yeah, you can read it out loud and let
24    me know if that's still your testimony today.
```



1    A.  I want to go back before 7 to get the

2  question.

3    Q.  Let me know where you need to start.

4    A.  Maybe someone can help me.

5    Q.  You can start, if you'd like, on 46.

6    A.  Yeah, yeah.  So look, starting on 47,

7  the question is, you were going to the

8  fairness, and I don't recall if it was earlier

9  or later, but we certainly talked about a

10 settlement, a more wholesome settlement that I

11 would have much preferred.  And I believed

12 what you were asking here was whether in my

13 heart of hearts I personally thought this was

14 fair.

15            And I had said what -- and I

16 believe at some point in this, I referred to

17 that I had a responsibility when I came to

18 work every day, and what I would have

19 preferred to see, I had to leave at home.  And

20 the determination at the time we had this term

21 sheet was given the situation we were facing,

22 which was we had vendors, all the normal

23 constituents in any operating company,

24 vendors, employees, clients, customers, et

1  cetera.  And we were trying to preserve the

2  value of the ongoing operation, that with the

3  decision we had in front of us, which is what

4  I believe we get at on page 6, paragraph 22 of

5  my declaration, was that was a fair

6  determination of what the right thing to do

7  was for the -- taken as a whole for the

8  estate.  It is not, and I have not ever tried

9  to imply, that it is the agreement that I

10  would have drafted myself.

11             I'm sorry if I didn't answer

12  your question.

13     Q.  Yeah, just go to the basic question,

14  which is do you believe that the terms of the

15  settlement, including the disparate treatment

16  of unsecured creditors, is fair?

17             MR. RAMOS:  Objection, your

18  Honor.  No foundation in terms of the

19  disparate treatment issue embedded in this

20  question.

21             THE COURT:  Overruled.

22             THE WITNESS:  I'm sorry, I've

23  got to get some context, a little more context

24  for the question.  And I'm sorry that I need

```
 1   to do that, but I do.
 2               Do I personally think, or do I
 3   think it was a fair decision -- it was fair to
 4   make that decision?
 5   BY MR. KAPLAN:
 6      Q.  Do you think the term sheet -- putting
 7   aside your decision-making process, and I'm
 8   not questioning your decision-making, I'm
 9   asking you sitting here today, is it your
10   testimony that you believe the term sheet and
11   the disparate treatment of creditors is fair?
12               MR. RAMOS:  Objection, your
13   Honor; relevance.  He's appearing on behalf of
14   the Debtors as their board member and to
15   discuss the decision he made in that capacity.
16   So his personal view --
17               THE COURT:  He says in his
18   declaration it's fair.  Overruled.
19               THE WITNESS:  I said in my
20   declaration it's fair.  It was -- yes, it was
21   fair.
22   BY MR. KAPLAN:
23      Q.  So today it is your view that it is
24   fair?
```



1    A.  It is fair.

2    Q.  And why is it fair to have certain

3  creditors -- you're aware, for example, that

4  priority creditors don't receive any

5  distribution from the GUC trust, right?

6    A.  I am aware of that.

7    Q.  And you're aware that under the

8  Bankruptcy Code priority scheme, they're

9  called priority creditors because they're

10 supposed to be paid before general unsecured

11 creditors, right?

12   A.  I am aware of that.

13   Q.  And why is it fair to have a

14 settlement that provides -- that the priority

15 creditors don't receive any value?

16   A.  It is -- they were assets of the

17 purchaser.  The purchaser and the Committee

18 negotiated this term sheet and presented it to

19 us.  Taken as a whole, I believe it was fair.

20 I had a decision to make, and my decision was

21 that the term sheet was fair, taken as a whole

22 to the overall company, the value of the

23 estate.

24   Q.  Was it fair to those creditors, to the

1  priority creditors?

2      A.  There's never -- when people --

3  there's not much of an answer to that.  There

4  is -- there were all throughout the case and

5  my term at the companies, there were parties

6  exercising their contractual rights.  They

7  made those determinations.  I wish in many

8  cases those determinations were different.

9      Q.  You haven't tried to negotiate the

10 terms of the term sheet since you received it

11 back on August 16th, right?

12     A.  I have had discussions around changes

13 to -- I've had discussions around agreements

14 that were not in the term sheet that I would

15 have liked to have had in the term sheet, yes.

16 So I have -- I didn't pull the term sheet out,

17 send it to someone, and say let's negotiate

18 this paragraph.  There were elements of the

19 term sheet, of the settlement, that I

20 preferred would have been different, and I on

21 several occasions had those discussions.

22     Q.  You never had specific discussions,

23 for example, to have priority creditors

24 receive a distribution from the GUC trust,

1  right?

2      A.  I did not have that discussion.

3      Q.  And you never had specific discussions

4  about the deficiency claimants getting any

5  distribution from those aspects of the GUC

6  trust?

7      A.  I did not.

8              MR. KINEL:  Objection; it

9  assumes facts knots in evidence.

10             THE COURT:  Which facts?

11             MR. KINEL:  That deficiency

12 claimants are not receiving anything under the

13 term sheet.  That's just factually incorrect.

14             MR. KAPLAN:  I said under the

15 provisions of the term sheet under which they

16 do not receive a distribution.

17             THE COURT:  The objection is

18 overruled.

19 BY MR. KAPLAN:

20     Q.  Let's go back just to make sure that

21 we get the record complete with respect to the

22 term sheets.  So we can go back to the binder

23 of the term sheets.  Go to 24.

24             THE COURT:  You can use our



**WILCOX & FETZER LTD**

Registered Professional Reporters

(302) 655-0477

www.wilfet.com

1  handy shelf there.  Isn't that a nice shelf?

2  BY MR. KAPLAN:

3      Q.  I apologize; I'll wait until you get

4  it in front of you.

5      A.  So I'm at the witness binder, correct?

6      Q.  Correct, and tab 24.

7      A.  Yeah.

8      Q.  Are you there, Mr. LaForge?

9      A.  I'm there.

10     Q.  It's an email forwarding from Nava

11 Hazan to Steve Leonard, and below is an email

12 from Joe Shifer to Nava, right?

13     A.  Yeah.

14     Q.  And this is also attaching a revised

15 term sheet red lined to the prior one, right?

16     A.  Yes, it is.

17     Q.  Okay.  And now if you could turn to on

18 the black line, that's actually what we've

19 been focusing on, the claims and causes of

20 action?

21     A.  The black line, page 2?

22     Q.  Yeah, the black line, page 2.

23     A.  I'm there.

24     Q.  And you see now there's markup, it now



1 provides that the purchasers will cause the

2 APA to be amended, so rather than being

3 excluded assets, that upon the later date the

4 bankruptcy court enters an approval order on

5 the formation of the GUC trust, these assets

6 will be contributed to the GUC trust.

7     A.  Yes.

8     Q.  Did you authorize that change to the

9 term sheet?

10     A.  I don't recall seeing an interim term

11 sheet, so I don't recall authorizing it, no.

12     Q.  Did you recall any discussion about

13 the fact that this change was being made to

14 modify it from these assets being excluded

15 assets to now being assets that would be sold

16 to the purchaser?

17     A.  There was -- I don't recall any

18 discussion on the mechanism of transferring

19 from the purchaser to the GUC trust, which

20 this is an element of.  As I said, when I read

21 it the first time, given the timing, how they

22 got there was irrelevant to the decision that

23 we made at the time.  So no, there was no

24 discussion about making this change.

1    Q.  We talked a little bit about the

2  decision-making back on August 16th.  Let's

3  fast forward to where we are today.

4    A.  Okay.

5    Q.  You testified earlier that the C Star

6  transaction closed at the end of November,

7  right?

8    A.  I did, yes.

9    Q.  And the Columbus sale closed, as well?

10    A.  The Columbus sale was closed.  I don't

11  remember the specific date, but yes, it closed

12  about the same time.

13    Q.  And the DIP has long been approved in

14  this case, right?

15    A.  The DIP has been assumed by the

16  purchasers.

17    Q.  And you personally, I guess it's your

18  testimony in deposition was you're continuing

19  to support the settlement because you gave

20  your word you would support it, right?

21    A.  That's correct.

22    Q.  And what is the reason that the

23  Debtors are continuing to seek approval today,

24  besides your word?  Is there any other reason?

1    A.   I think it's been covered, but not by

2  me, so I'll say it.   When we negotiated the

3  APA, that is the point in time where we

4  crossed the bridge of letting these causes of

5  action leave the estate.   And it was with

6  great reluctance that we agreed with that

7  provision of the APA.   And I recall during

8  those discussions trying to change that all

9  along the way.   Those assets were no longer

10  ours.   Somebody had acquired them as part of

11  the APA.   The ability to share those among

12  some of the creditors struck me as, continues

13  to strike me as maybe not as good as sharing

14  them with all the creditors, but better than

15  not sharing them at all.

16    Q.   When you say that ship sailed, you

17  were unaware that the actual terms of the term

18  sheet contemplated modifying the APA so they

19  wouldn't be transferred, correct?

20            MR. RAMOS:   Objection, your

21  Honor; misstates his prior testimony.

22            THE COURT:   Overruled.

23            THE WITNESS:   I've tried to

24  reply to that by telling you I did not believe

1    that's what the term sheet said.  The words

2    are what the words are.  We, because of the

3    time that we had, much of the discussion on

4    what we were agreeing to was verbal, and I

5    believe that the terms were read into the

6    hearing that day, which probably didn't

7    address the mechanics, but certainly addressed

8    the concept that I had agreed to either in

9    RLF's offices or out in the hallway here that

10   the board had agreed to.  And that was not

11   that we were getting the assets back.  There

12   may have been a mechanism proposed in my mind

13   amended as proposed that there was a mapping,

14   but it was never my assumption that we would

15   get those assets without a quid pro quo that

16   they would be directed to the GUC trust.

17        Q.  But it's different between getting the

18   asset back and directing them to the GUC trust

19   and never getting them back and having the

20   purchaser deal with it as they please, right?

21        A.  I'm not sure of the distinction you're

22   trying to draw.

23        Q.  Do you see a distinction between that?

24        A.  Between?



1    Q.  The Debtor retaining certain causes of

2  action and contributing them to a trust versus

3  the purchaser buying them and contributing to

4  the trust.

5    A.  If that were the case, I would see a

6  distinction, yes.

7    Q.  If that were the case -- explain that;

8  I don't think I follow that.  I apologize.

9    A.  You created a hypothetical that in my

10  mind didn't exist at the time.

11    Q.  Not with standing the words of the

12  term sheet?

13    A.  Notwithstanding the words of the term

14  sheet.

15    Q.  We talked a little bit earlier about

16  the time before the hearing.  Do you recall

17  that prior to the August 16th hearing, the

18  Debtors had already agreed to adjourn the DIP

19  hearing?

20    A.  Can you repeat the question?

21    Q.  Yes.  Do you recall that prior to the

22  morning of August 16th, the Debtors had

23  already agreed to adjourn the DIP hearing?

24    A.  So I recall that now, after reading

1  some documents preparing for this, I did

2  not -- I didn't, certainly didn't recall that

3  at deposition time.

4      Q.  And you weren't expecting the sale to

5  close immediately upon approval of the sale

6  order, were you?

7      A.  No.

8      Q.  And in fact, it took several months

9  for it to close after the sale order, right?

10     A.  It did.

11     Q.  And would there have been any harm

12  during the sale hearing for a week while the

13  term sheet was finalized?

14     A.  There was pressure all the time from

15  the three operating companies.  They weren't

16  strong companies to begin with.  Usually in

17  the food chain of making the product, they

18  were not the strongest provider, and so I

19  can't calibrate sitting here the effect of

20  being able to go to employees and customers

21  and say the sale has been approved I can't

22  recall what actions were taken upon the

23  approval, pardon me, the approval of the sale

24  and the closing of the transaction.  But it's

1  not like those were three months where

2  nothing, where no -- where we didn't utilize

3  the benefit of the information of the sale

4  being approved by the Court.

5      Q.  But sitting here today, you can't say

6  one way or another whether adjourning the sale

7  by a week would have had any impact?

8              MR. RAMOS:  Objection; calls for

9  speculation.

10             THE COURT:  Overruled.

11             THE WITNESS:  I can't say that.

12  BY MR. KAPLAN:

13     Q.  And just to go back to a couple of

14  questions before, you said you sort of

15  refreshed your recollection that the DIP

16  hearing, that the DIP motion had been

17  adjourned prior to August 16th.  On the

18  morning of the 16th when you approved the

19  settlement term sheet, were you aware that the

20  DIP hearing had already been adjourned?

21     A.  I don't recall.  I'm sorry.

22             MR. KAPLAN:  One minute, your

23  Honor.

24             THE COURT:  Mm-hmm.



1          MR. KAPLAN:  I have nothing

2  further.

3          THE COURT:  Okay.  Any other

4  objectors wish to cross-examine the witness?

5  No?  Yes.  Okay.  Before you do so, we're

6  going to take a short recess, then we'll have

7  your cross.

8          During our break, you may not

9  discuss your substance of your testimony with

10  any person.  Okay?

11          THE WITNESS:  Understood.

12          THE COURT:  About five minutes.

13          (A brief recess was taken.)

14          CROSS-EXAMINATION

15  BY MR. RAISNER:

16     Q.  Good morning, Mr. LaForge, Jack

17  Raisner, the Trevor Miller WARN class.

18     A.  Good morning.

19     Q.  Mr. LaForge, it's correct to say you

20  are familiar with the August 19, 2016 sale

21  order?

22     A.  The sale of Columbus?

23     Q.  Correct, the sale of Columbus.

24     A.  Yes, I am.



1      Q.  And you're familiar with the provision

2    in that sale order which provides for

3    something called an employee funding escrow?

4      A.  Yes, I am.

5      Q.  Are you also familiar with something

6    called the CFC Employee Reserve?

7      A.  I may be mixing those terms.  I'm

8    familiar with an escrow of $4.6 million.  I

9    believe it may fall under the latter, not the

10    former.

11      Q.  Is it correct to say or does this

12    refresh your recollection that after the

13    September 13th closing of the Columbus assets,

14    the escrow was renamed the CSC Employee

15    Reserve, that the two things are one in the

16    same, or is that not correct?

17                MR. RAMOS:  Your Honor, if I

18    could just lodge a quick objection.  I'm not

19    sure of the relevance of these questions.  I

20    think the questions are arising under the

21    terms of the sale order, which is not at issue

22    today; we're here under the settlement term

23    sheet.

24                MR. RAISNER:  Your Honor, the

1    question before there Court is a hearing on

2    the settlement, the global settlement of this

3    case leading to the dismissal of the case, and

4    what provisions have been made for creditors

5    in this case.  And therefore, I'm asking

6    questions that are not precisely pertinent to

7    the declaration that Mr. LaForge provided in

8    his direct testimony, but he has knowledge as

9    a witness that is pertinent to the fairness

10   and the appropriateness of this entire

11   transaction.

12              THE COURT:  Yeah, overruled.  Do

13   you recall the question?

14              THE WITNESS:  Well, I think the

15   question is about a change in names of an

16   escrow agreement.  And in preparation for

17   this, in reviewing public documents, I didn't

18   review public documents.  And I'm afraid I

19   can't answer the question of the name change.

20   I'm very familiar with an escrow of $4.6

21   million, whatever its name may be, if that's

22   helpful.

23   BY MR. RAISNER:

24        Q.  Is it your understanding that this



1  escrow of $4.6 million is part of the Debtors'

2  estate, or is it your understanding it has

3  been alienated from the estate of the Debtors?

4      A.  It never was the Debtors estate, to

5  the best of my knowledge.  It is an escrow

6  provided by the purchasers or the noteholders,

7  it's an overlapping group, that the directors

8  insisted upon after the sale or during the

9  sale process to provide in the event that --

10  well, there are a couple of elements.  To

11  provide certain claims that employees might

12  have with respect to severance and vacation,

13  of the Columbus entity only; and in the event

14  it was deemed that the company was responsible

15  for any WARN wages, that it would cover that,

16  too, and legal fees.

17      Q.  Whose legal fees?

18          MR. RAMOS:  Your Honor, if I may

19  renew an objection.  I think counsel is

20  examining him without the benefit of putting

21  the documents before him, and so it's unfair

22  to the witness to ask for his recollection in

23  that way.  And I'd simply note that we have

24  some sensitivity as we understand that these,

1    that there are ongoing issues with the WARN

2    claimants in the separate adversary

3    proceeding, so we're cautious in terms of the

4    scope of what counsel is inquiring into.

5                THE COURT:  I think the witness

6    said he was familiar with the escrow and with

7    the APA, although he didn't review the

8    documents, so I think he can answer the

9    questions.  Overruled.

10   BY MR. RAISNER:

11       Q.  Mr. LaForge, I'm correct that your

12   testimony is that the escrow in question is

13   not part of the Debtors' estate.  My question

14   to you, is there any provision that the

15   Debtors have made in its estate to pay for any

16   employee priority claims of any sort?

17       A.  Of the Columbus estate?

18       Q.  Yes.

19       A.  Assuming that the priority claims

20   include severance and vacation, which I assume

21   is the case, we have made a provision.  We

22   have negotiated as part of that sale agreement

23   that $4.6 million would be escrowed that would

24   revert back to the folks that funded it in the

1  event that it was not used.

2      Q.  But my question a moment ago was

3  whether it is your understanding that at

4  present, this escrow is part of the estate of

5  the Debtors or is alienated from the estate?

6  And I understood you to say that you thought

7  it had never been part of this estate, and now

8  you just said that the Debtors are relying on

9  this $4.6 million to pay the claims of the

10  estate.  And am I correct that without that

11  $4.6 million from the escrow, the Debtors have

12  no capability or intention to pay any employee

13  priority claims?

14              MR. RAMOS:  Objection; compound

15  and argumentative.

16              THE COURT:  Overruled.

17              THE WITNESS:  There are a few

18  questions in there; I'll do my best to sort

19  them out.  Taking them in reverse order, from

20  a capacity standpoint, in the absence of the

21  escrow, there would be no ability, probably

22  no, I can't think of any, ability to pay

23  claims.  That was the primary reason that we

24  negotiated that into the agreement.

1           Help me, what didn't I answer?

2   What's the second part?

3           THE COURT:  I think that was the

4   question.  I didn't hear more than one

5   question.

6   BY MR. RAISNER:

7       Q.  Are you aware of any documentation

8   that exists that set terms for this escrow?

9       A.  I don't believe there's an escrow

10  agreement, to the best of my knowledge.  I

11  believe the only reference to it is in a

12  file -- a document that was filed with the

13  Court, and I can't remember which document it

14  was.  But it does refer to it as an escrow.  I

15  have since that date looked for an escrow

16  agreement and have been told there is not one.

17      Q.  So there is nothing that describes

18  whether this escrow is revocable or not, is

19  there?

20      A.  The only --

21           MR. RAMOS:  Objection, your

22  Honor; calls for a legal conclusion.

23           THE COURT:  Overruled.

24           THE WITNESS:  The only



1   documentation is what appears in the documents

2   that were provided to the court.  I would have

3   to -- I would have to read that again.  I'm

4   sorry, but I would have to read that again to

5   know if there are any provisions.

6   BY MR. RAISNER:

7       Q.  Is there any understanding as to

8   whether that escrow will survive if the

9   Debtors' estate is converted into a Chapter 7?

10      A.  Is there any -- will it survive?

11      Q.  Yes.

12      A.  I don't know the answer to that.

13      Q.  And do you know or have any

14  understanding as to whether the escrow would

15  survive if the Debtors' estate is dismissed?

16      A.  I'm sorry, I don't know the answer to

17  that.

18      Q.  The escrow as it's described in the

19  sale order and in the Debtors' dismissal

20  order, which is docket 685, refers to an

21  amount that the escrow would contain that

22  would satisfy what are called the estimated or

23  anticipated employee priority claims if they

24  are non-WARN claims, and would pay the

1  anticipated or estimated WARN claim.  Are you

2  familiar with that language generally?

3      A.  I'm familiar that that is the intent

4  that the directors had when they negotiated

5  that provision.

6      Q.  Is there any provision that you're

7  aware of that purports that the employee

8  priority claims will be paid in full?

9          MR. RAMOS:  Objection, your

10  Honor.  The question is based on the dismissal

11  motion which is not before your Honor this

12  morning.  And we renew the relevance motion.

13          THE COURT:  Look, I know you and

14  Mr. Kinel have a very specific theme, which is

15  you want me to focus, laser focus on one

16  thing.  I have to say I disagree.  I think

17  it's a package deal.  So I'm not going to not

18  have testimony that's focused on the dismissal

19  motion.  I don't see how you can separate

20  them.

21          THE WITNESS:  Can you repeat the

22  question, please?

23  BY MR. RAISNER:

24      Q.  Sure.



1    A.   Thanks.

2    Q.   Are you aware of any document or do

3  you have any understanding whatsoever based on

4  anything that the Debtors and the noteholders

5  intend to use the escrow to pay the priority

6  claims in full?

7    A.   The calculation that was done, there

8  was a calculation done by the CFO of Columbus

9  that came up with an amount.  And the intent

10 of the amount was -- and it was to ensure that

11 if, in fact, some court or some other party

12 determined that there were amounts owed, that

13 there would be adequate funding to cover those

14 amounts.  That included, remembering the

15 columns from that lengthy spreadsheet, which I

16 believe you have, was vacation pay, severance

17 pay, and potential WARN, in the WARN subject,

18 there's a WARN case going on at the moment.

19 And in the event that the company were deemed

20 by a court to be responsible for the WARN

21 wages, that the intent initially was to

22 calculate an adequate amount to cover that,

23 plus an amount for the taxes around that,

24 workers' comp, payroll taxes, and legal fees.

1          So the intent would have been,

2   would be to pay vacation, to pay severance,

3   and to see if the company is responsible under

4   WARN.  As most people probably know, there's

5   two sides, two differing opinions on the

6   liability there, and that will be sorted out

7   in another venue, I suppose.

8          Now, the reason I went through

9   that is because if the question is is it fully

10  adequate, as I think you know and there have

11  been the issue raised with us, or your

12  partners have, that there are different

13  calculations when you go from Columbus court

14  to Delaware court with respect to how you

15  calculate some of those numbers.  To the

16  extent that those, that post funding the

17  escrow those amounts have gone up, then there

18  would not be enough to cover all of those

19  claims in full.  But that doesn't change the

20  vacation, severance, and the non-WARN priority

21  claims.

22      Q.  So there is a reasonable scenario in

23  which the escrow at $4.6 million would fall

24  short of what a court might award the

1   claimants in that fund; is that correct?

2       A.  If -- I don't know about a reasonable

3   chance.  I can imagine a scenario where that's

4   the case where it is fully determined without

5   any settlement that the company is responsible

6   for the full WARN wages as calculated subject

7   to the caps that exist, that given the fact

8   that it is moved from Columbus to Delaware or

9   that was just not factored in, if you will, at

10  the time of the calculation, that that would

11  not cover it.  So that's correct.

12      Q.  And in the event that the funds in the

13  escrow were insufficient to cover the

14  employees' priority claims, what would happen

15  then?  Would the distribution then be at some

16  fraction of the full amount of those claims,

17  or would there be added funds to the escrow in

18  order to pay the claims in full?

19      A.  At the moment, there have been no

20  discussions about adding funds.  So it would

21  be, if we got there, we would have to answer

22  that question, but it's quite frankly hard to

23  know who would come up with that money and why

24  they would.

1     Q.  And that would be up to whom to

2  determine whether funds should be added or

3  could be added?

4     A.  Well, whoever the board at the time --

5  I say board, it's just me, right?  So whoever

6  I would go to and ask if they would consider

7  topping that up.

8     Q.  And you would go to the noteholders?

9     A.  That would be the only relevant place

10  to go, although it's hard -- I'll just stop

11  there.  I don't know what their reaction would

12  be.  I suspect -- I don't know what their

13  reaction would be.

14     Q.  But they would have veto power to not

15  fund the claims in full by topping up the

16  escrow?

17     A.  Well, the -- I'm sorry to interrupt.

18     Q.  That's okay.

19     A.  It's not an agreement that they made

20  that they have a veto over, it's that there

21  was a calculation made, there was a deal cut

22  at the time to protect the employees.  In the

23  event -- and it still would fully cover the

24  employees under the assumptions of the laws

1   that were deemed the calculations would be

2   made.  Because, as you've pointed out to us,

3   that in the event that the company is, in

4   fact, responsible for those WARN wages, and

5   there are defenses that suggest it's not, but

6   if it is, and since we are in Delaware,

7   there's additional -- the calculation is

8   different.  Same number of days, but business

9   days, work days, and it becomes more money and

10  there's inadequate funds.

11      Q.  Mr. LaForge, I'd just like to return

12  to your itemization of what would be payable

13  out of the escrow, and you mentioned the

14  various types of claims, and you also

15  mentioned at the end attorneys' fees.  So I

16  just wanted to ask you your understanding of

17  what the attorneys' fees payment would be.

18  Are you referring to the attorneys' fees that

19  might be part of a statutory remedy to the

20  claimant, or are you referring, as well or as

21  opposed to, the fees and expenses of the

22  defendant who is defending the claims against

23  the employee claims?

24      A.  I think, you know, depending on what

1    the company chose to do, it will probably come

2    to court to, you know, to see.  But this

3    was -- although for the reasons I mentioned

4    before, the numbers turn out to be somewhat

5    inadequate in Delaware calculation rather than

6    Ohio calculation where they are adequate, the

7    attorneys' fees were a bit of a sway.  There's

8    a lengthy spreadsheet, as you know, a lengthy,

9    hard-to-follow spreadsheet.

10                    But in fact, what the directors

11   were trying to protect themselves and to

12   ensure we could do is if the defenses that the

13   company has and believes are strong held up,

14   this went to court and held up in court --

15   pardon me, did not hold up in court, and the

16   full amount was, the full WARN wages were

17   granted to the employees, then we estimated

18   that what the legal expenses would be, and I

19   think that was without -- it was a very, it

20   was around -- it was $500,000.

21        Q.  Legal expenses of whom, Mr. LaForge?

22        A.  I don't believe -- I would have to

23   look back to the document to see if it's

24   referred to exactly who that would be.

1     Q.  So you're not sure if it refers to the

2  legal expenses of the plaintiffs' counsel or

3  the defendants' counsel?

4     A.  Well, we were -- as directors, we were

5  interested in both.  So I don't know that

6  there's any specific language that deals with

7  that.  I think that would be a matter, if we

8  get to the point where the company believes it

9  needs to defend the claims in court, that we

10  would have to see, you know, we'd have to

11  figure out how to pay for that, and that's a

12  source of funding.

13     Q.  Would it be consistent with your

14  understanding of this fee provision element

15  that the defending Debtor would be able to

16  have its attorneys have its fees paid and

17  expenses out of the fund, even without a court

18  order?

19     A.  It is not my -- and I'd rather see the

20  document and understand what it says before I

21  comment on it, but I'll tell you my

22  understanding in the absence of that, which is

23  that there are multiple signatories to that

24  document.  We would probably err on the side

1  of cautiousness and reach out to other

2  parties, whether it's the Court or not.  But I

3  would certainly take advice from counsel as to

4  what would be the prudent way to deal with the

5  situation.

6      Q.  Turn for a moment, Mr. LaForge, to the

7  non-WARN employee priority claims.  Are you

8  familiar with a process whereby a notice would

9  be sent upon a dismissal to holders of the

10 non-WARN employee claims which they would be

11 informed that they were being allowed a

12 certain amount of money for one of their

13 claims?

14     A.  Only in the most general terms from

15 reviewing a potential settlement agreement

16 with respect to this.  Prior to that, I have

17 not participated in WARN claims before.

18     Q.  So you have no personal understanding

19 of the terms of that sequence of events or the

20 procedures, other than what the documents

21 themselves say?

22     A.  That is correct.

23     Q.  Mr. LaForge, you're aware of the GUC

24 trust which is I think indisputably part of

1  today's agenda?

2      A.  I am.

3      Q.  And you're familiar with the terms of

4  the GUC trust in that it creates a body of

5  oversight, board members of whom a majority of

6  creditors, correct?

7      A.  I am aware that there's a mechanism,

8  and that, whether it's been fully worked out

9  or not, I'm not sure.  But yeah, there's

10  oversight.

11      Q.  And there's a disinterested trustee

12  who is handling the administration of that

13  trust, the distributions, and all of the

14  operative functions of that trust; is that

15  more or less true?

16              MR. RAMOS:  Your Honor, I don't

17  know if a document could be put in front of

18  the witness.  I think he just testified he

19  wasn't familiar.

20              THE COURT:  If you don't know

21  the answer, that's an adequate answer.

22              THE WITNESS:  I don't believe I

23  know the answer to that.

24  BY MR. RAISNER:



1        Q.   You're aware that a liquidating

2   trustee is contemplated to administer that

3   trust?

4        A.   I'm aware of that.

5        Q.   Was there ever any discussion of there

6   being a liquidating trustee of sorts or a set

7   of written procedures for the employees'

8   priority claims as there is for the GUC trust?

9        A.   There was never a discussion, to the

10  best of my knowledge.

11       Q.   Do you know why that was never

12  discussed?

13       A.   I don't know why it was never

14  discussed.

15       Q.   Do you know of any participation that

16  employees are contemplated as having in

17  administering or overseeing the employee

18  priority claims distribution mechanism?

19       A.   I don't.  I'm not aware of that.  I

20  think there's a -- I won't draw the

21  distinction between the GUC trust, which was

22  negotiated by parties other than the directors

23  of the company, and the task undertaken by,

24  the negotiation undertaken by the directors of

1  the company and their professional advisors to

2  protect the employees in a sale that generated

3  cash.  And with great confidence, I can say

4  that we've got somebody looking after, you

5  know, that can handle this.  It's law, and the

6  law will be what it is as opposed to a highly

7  structured GUC trust that needs to be

8  administered.

9      Q.  Who is the person who will be handling

10  this?

11     A.  Well, there are calculations which

12  will be shared among the parties, have been

13  shared among the parties, the interested

14  parties, the professionals, and that will be

15  worked out.  But on the Debtor side, I am the,

16  other than the assistance of the former CFO

17  who has access to the information, it is me.

18              MR. RAISNER:  No further

19  questions.

20              THE COURT:  Thank you.

21              MR. RAISNER:  Thank you.

22              THE COURT:  You're welcome.

23              MR. BENSON:  Your Honor, for the

24  record, Ward Benson, Department of Justice tax



1  division here on behalf of the Internal

2  Revenue Service.

3                 CROSS-EXAMINATION

4  BY MR. BENSON:

5     Q.  Just a few questions, Mr. LaForge.

6                 Are you aware that the Internal

7  Revenue Service has filed proofs of claim in

8  this case?

9     A.  Has what?  I'm sorry.

10    Q.  Has filed proofs of claim in this

11 case?  In these cases, I should say.

12    A.  I'm sorry, I'm not familiar with the

13 term.  I'm not familiar with the term.

14    Q.  When you say term, proof of claim?

15    A.  Proof of claim.

16    Q.  Okay.  Are you aware that the Internal

17 Revenue Service has asserted that it has

18 claims against the Debtors?

19    A.  Oh, yes.  Yes.

20    Q.  Do you know what I mean by the phrase

21 priority claim?

22    A.  I do, generally.

23    Q.  What does that mean?

24    A.  It means it comes ahead of other



1  creditors.  Priority claim comes ahead of

2  other creditors.

3      Q.  Would a priority claim come ahead of

4  the beneficiaries of the GUC trust?

5      A.  I'd have to remember who all the

6  beneficiaries -- it's just the unsecured

7  Creditors' Committee.  If the company were

8  distributing money, that's correct, the

9  priority claims would come ahead of the

10  unsecured claims, non-priority claims.

11     Q.  Okay.  Do you have any reason to

12  believe that the asserted priority claims of

13  the Internal Revenue Service are not, in fact,

14  entitled to priority?

15             MR. RAMOS:  Objection, your

16  Honor; calls for a legal conclusion.  Not

17  relevant.

18             MR. BENSON:  As to relevance, it

19  goes to the fairness of the settlement.  It

20  also goes, the direction I'm going in, in

21  terms of bringing in priority creditors, which

22  the Jevic court said was very important.

23             As to legal conclusion, I'm not

24  asking him to determine whether they're

1    entitled to priority, I just want to know if

2    the Debtors have any reason to believe we're

3    not entitled to priority.

4                    THE COURT:  Overruled.

5    BY MR. BENSON:

6        Q.  Do you have any reason to believe --

7        A.  No.  As a matter of fact, I assume

8    they are priority claims.  I just didn't want

9    to make a -- draw a conclusion that I can't

10   back up with the law.  But I'm assuming they

11   are priority claims.

12       Q.  And are you aware that the priority

13   claims of the Internal Revenue Service are

14   approximately 2.4 million?

15       A.  That sounds right, yes.

16       Q.  Do you have any reason to believe that

17   the amount the IRS has asserted in claims is

18   incorrect?

19       A.  I haven't looked at the numbers, but

20   it would not surprise me that that's the

21   correct amount.

22       Q.  Okay.  Now, at any point between the

23   initiation of the negotiation of the

24   settlement term sheet and the filing of the

1 objection by the Department of Justice to the

2 settlement, did you or any of the Debtors'

3 professionals reach out to the Internal

4 Revenue Service or the Department of Justice

5 to include them in negotiations?

6     A.  I just want to make sure I -- did the

7 Debtors or any of their professionals reach

8 out to the participants to the, did you say

9 the UCC or the noteholders?

10     Q.  Did you or the professionals reach out

11 to the Internal Revenue Service or the

12 Department of Justice?

13     A.  Not to the best of my knowledge of my

14 knowledge.

15     Q.  Did you ever ask the professionals

16 whether they should be reaching out to either

17 the Internal Revenue Service --

18     A.  I did not.

19     Q.  And as to the Department of Justice?

20 Did you ask them or ask whether you should be

21 reaching out to the Department of Justice?

22           MR. RAMOS:  I apologize, your

23 Honor, could I just clarify the time period?

24 I'm afraid I didn't hear that part of the

1  question.

2  BY MR. BENSON:

3      Q.  From when the negotiations of the term

4  sheet commenced, term sheet versions,

5  Mr. Kaplan asked you about, to the filing of

6  the objection by the United States to this

7  settlement motion.

8      A.  And the question was did I think to

9  ask the professionals if they should?

10     Q.  Yes.

11     A.  I did not think to ask the

12 professionals if they should.

13     Q.  Why not?

14     A.  It comes back to the decision that we

15 were making on August the 16th, which was the

16 only situation where the settlement would be

17 relevant would be where the purchase was

18 approved, and the purchase approved all of the

19 assets would be owned by the purchaser.  And

20 we could have reached out to the IRS, but we

21 didn't have anything to share with them,

22 unfortunately, and it was the purchaser who

23 decided to contribute those assets to the GUC

24 trust.  So we wouldn't have reached out



1 directly to the -- why it did not cross my

2 mind to reach out to the IRS.

3     Q.  Did it occur to you you should reach

4 out just to let the IRS know that this type of

5 settlement was being contemplated?

6     A.  Not to hide here, but I was a

7 director.  Whether things get filed, we reach

8 out to professionals.  We've been blessed to

9 have good advisors, and I rely on them to make

10 those kind of suggestions.

11     Q.  Was there any discussion that perhaps

12 the sale hearing should be adjourned to allow

13 the inclusion of priority creditors such as

14 the Internal Revenue Service?

15     A.  Sale hearing on the 16th of August?

16     Q.  Correct.

17     A.  There was no discussion of that.

18     Q.  Is there any reason why the sale could

19 not have been postponed to include the

20 Internal Revenue Service as a negotiating

21 party?

22     A.  The only answer, two answers to that,

23 first is the pressure was extraordinary at

24 these companies.  I answered Mr. Kaplan

1  earlier in his follow-up questions, so those

2  will speak for themselves.  To suggest that we

3  come out of a hearing with no decision and

4  that there would not have been damage caused

5  was not a risk we were prepared to take at

6  that moment.  And risk -- these were fragile

7  companies that were relying on people paying

8  their bills, were relying on people to ship,

9  and fulfilling, more importantly, fulfilling

10 orders and keeping employees.

11            So that was the primary decision

12 for feeling a sense of urgency that morning in

13 spite of the fact pattern that's been

14 discussed.

15     Q.  Okay.  And so as a result of that

16 sense of urgency, it was deemed unnecessary to

17 bring in priority creditors to these

18 negotiations?

19     A.  As I said in my deposition, while the

20 term sheet was new on the 16th to me and the

21 structure and the narrowness of it,

22 discussions of a settlement had been going on

23 in some form or another since prior to filing.

24 There were inner creditor matters that we

1   tried to resolve at every step along the way.

2   There were -- I can't give you specific dates

3   in the context, but our professionals were

4   encouraging the parties to get together to

5   talk, to come up with what I would have termed

6   a global resolution.  We had come to the

7   conclusion that that was probably not

8   happening since we were a couple of days

9   before the settlement, and -- pardon me, the

10   August 16th hearing, and we didn't have

11   anything.

12           So when the term sheet was

13   handed to us, it was the transaction that

14   appears in the settlement term sheet, which

15   was the purchasers and the Unsecured

16   Creditors' Committee coming up with that

17   arrangement, and the Creditors' Committee

18   would drop their oppositions.  It wasn't

19   that -- we weren't doing something, we weren't

20   distributing some of our assets.  We didn't

21   feel like we had anything to bring people in.

22   We had made the case for months that we would

23   prefer a settlement that would resolve these

24   cases and end litigation, and this one has

1  seemed to, you know, keep it going for some

2  obvious, you know, legal reasons outside of

3  this case.  But nonetheless.  Our -- we were

4  not giving anything -- we were not giving

5  anything we had to anyone at the time.

6      Q.  You mentioned that there were

7  negotiations, including between creditors

8  starting before the petition date through the

9  sale hearing, and there was a hope that there

10 would be a global settlement.  Did those

11 parties ever include the Internal Revenue

12 Service?

13     A.  When you say include, did they talk

14 to -- if the question is did they actually

15 reach out and talk to them, as I mentioned in

16 the deposition, if we go pre-filing, there was

17 a settlement with the IRS.  The IRS claim, I

18 believe, is primarily from one company,

19 Columbus Metal Forming, and the claim was

20 larger.  And there was a settlement reached

21 with the IRS where payments were made, monthly

22 payments were made to the IRS to whittle down,

23 if you will, that obligation.  Prior to fully

24 whittling it down, there was a filing.

1      So again, the timing matters

2  here.  To the best of my knowledge post

3  filing, I don't know of any conversations

4  directly with the IRS by any of the parties.

5  I'm just not aware.

6      MR. BENSON:  All right, that's

7  all, your Honor.

8      THE COURT:  Thank you,

9  Mr. Benson.  Any further questions?  Any

10  redirect?

11      MR. RAMOS:  Two very quick ones,

12  your Honor.

13      REDIRECT EXAMINATION

14  BY MR. RAMOS:

15      Q.  Mr. LaForge, you were asked during the

16  cross-examination whether after the August

17  16th date, after that term sheet that was

18  being looked at with counsel for the DDTL

19  parties, did you try to negotiate for the

20  assets to come back into the estate, and I

21  believe your answer was no.  But my question

22  to you is prior to that time period, from the

23  outset of these cases, had you tried to have

24  claims and causes of action kept in the estate



1    that otherwise were going under the proposed

2    purchase agreements?

3         A.   I -- yes.   The answer is yes.   And it

4    was one of the more important matters for me,

5    because to the extent that damage had been

6    caused, and there were causes of actions that

7    would with Stan, you know, the scrutiny of

8    people who determined that, those struck me as

9    better belonging to the estate than to the

10   purchasers.   There were, I think it's been

11   documented here there was a term sheet about

12   mid May from the purchasers that included all

13   the causes of actions, and then there was an

14   APA in late May from the same people with the

15   same causes of actions.   We had, I believe,

16   filed with the Court an APA after that date

17   keeping the causes of action.

18                    It was very important to me

19   personally, and I know the directors as a

20   whole, to maintain those.   And in the

21   negotiation of the sale and the results of the

22   sale auctions, that's where we ended up,

23   disappointingly.

24        Q.   So in the context of the sales, then,



1    the Debtors were not successful in terms of

2    those discussions to try to retain claims and

3    causes of action?

4         A.  We were not successful.

5         Q.  Sir, I think you testified, there was

6    discussion during your examination about the

7    August 16th hearing and the DIP motion and the

8    timing issues related to that.  But my

9    question is do you have any recollection as to

10   whether the Committee's objections to the DIP,

11   were they actually withdrawn?

12        A.  They were -- to the best of my

13   recollection, they were withdrawn.  That was

14   important, there's a timing difference there

15   that was pointed out to me, but, yeah, they

16   were withdrawn.

17             MR. RAMOS:  No further

18   questions, your Honor.

19             THE COURT:  Thank you, sir; you

20   may step down.

21             THE WITNESS:  May I leave the

22   books?

23             THE COURT:  Yes, please.

24             MR. RAMOS:  Just one



1  housekeeping matter, then, your Honor.  From

2  the Debtors' perspective, we would move the

3  introduction of the exhibits in the binders,

4  which I understand there was no objection to

5  by the various parties.  That would be Debtors

6  1 through 17, and your Honor, just so you

7  know, we handed copies to you; we're obviously

8  retaining the originals of the exhibits being

9  offered into evidence.

10              THE COURT:  Right.  Any

11  objection to the admission of Debtor 1 through

12  17?

13              MR. KAPLAN:  No objection, your

14  Honor.

15              THE COURT:  They're admitted.

16              MR. RAMOS:  Thank you, your

17  Honor.

18              THE COURT:  You're welcome.

19  Next witness?  Let's at least get started on

20  the next witness before we break for lunch.

21              MR. KINEL:  Your Honor, the

22  Committee calls Steven Sass.

23              THE COURT:  All right, Mr. Sass,

24  please take the stand and remain standing,



1   please.

2                    STEVEN D. SASS, after

3          having been first duly sworn, was

4          examined and testified as follows:

5                    DIRECT EXAMINATION

6   BY MR. KINEL:

7       Q.  Good afternoon, Mr. Sass.

8       A.  Good afternoon.

9       Q.  Could you briefly describe your

10  educational background?

11      A.  Sure.  In addition to an undergraduate

12  degree, I have an MBA in management, I have a

13  law degree and am admitted as an attorney in

14  Maryland, state and federal, and I'm qualified

15  for CPA certification.

16      Q.  Are you in good standing in the bar?

17      A.  I'm sorry?  Yes, I'm in good standing.

18      Q.  And do you practice law currently?

19      A.  I do at times, yes.

20      Q.  Can you tell us what your role is in

21  the Constellation cases?

22      A.  Sure.  In the Constellation case, I

23  participate as a member of the Creditors

24  Committee on behalf of Praxair, one of the

1    large creditors.

2        Q.   And how big is the Committee?

3        A.   The Committee has seven members.

4        Q.   And you are Praxair's representative

5    on the Committee?

6        A.   That's correct.

7        Q.   Do you participate in Committee

8    meetings and calls?

9        A.   Yes.  It's very important to me and

10   it's important to the process, so yes, I do?

11       Q.   Would you say that you've participated

12   in nearly all of the Committee meetings and

13   calls?

14       A.   Yes, I would say if not all, very

15   close to all.

16       Q.   Okay.  Have you ever been on a

17   Creditors' Committee before?

18       A.   I've been on approaching 100 Creditors

19   Committees over the last 20-some-odd,

20   30-some-odd years.  Thirty-ish.

21       Q.   So you have a lot of experience in

22   Committee matters?

23       A.   Yes.

24       Q.   Would you consider the Creditors'



1   Committee in these cases to have been active?

2       A.   This particular Committee was very

3   active, much more so than average.

4       Q.   Did there come a time when the

5   Committee, you as a Committee member, became

6   aware of settlement negotiations that were

7   occurring between the Committee on behalf of

8   the Committee and the noteholders?

9       A.   Yes, settlement negotiations -- well,

10  this case moved very fast in the beginning and

11  then went into a hiatus more recently through

12  a bunch of extraneous reasons.  So yes, I was

13  aware of negotiations ongoing.

14      Q.   And was the Committee kept apprised of

15  the developments in those negotiations?

16      A.   Yeah, in my opinion, Committee

17  professionals did a very good job keeping the

18  Committee apprised of the ebb and flow and

19  development of the negotiations, both

20  through -- mostly through conference calls,

21  but through a few emails, as well.

22                  MR. KINEL:  Your Honor, may I

23  approach?

24                  THE COURT:  Mm-hmm.



1          MR. KINEL:  I apologize, we're

2    doing this out of order.  But I've handed the

3    witness what has been marked as Committee 3,

4    which is simply the settlement term sheet,

5    which I believe is already in the Debtors'

6    binder, but not to make people look through

7    binders.

8    BY MR. KINEL:

9        Q.  Mr. Sass, I direct your attention to

10   Committee 3.  Do you recognize that document?

11       A.  Yes, I do.

12       Q.  Was this document approved by the

13   Creditors' Committee?

14       A.  Yes, it was.  It was brought to the

15   Committee's attention and approved through a

16   Committee meeting, telephonically, I believe.

17       Q.  Was there a discussion about the terms

18   of this settlement?

19       A.  As was all of the calls that we had

20   about the ebb and flow of the negotiations,

21   there was extensive discussion, questions

22   raised and answered, so yes, there was a lot

23   of discussion.

24       Q.  Mr. Sass, do you believe the



1  settlement embodied in Committee 3 is fair?

2      A.  Is it fair?  Yes, I believe it's fair.

3      Q.  Do you believe it's a reasonable

4  settlement?

5      A.  Given the circumstances in which the

6  creditor body found itself, it's a more than

7  reasonable settlement to the general unsecured

8  creditors.

9      Q.  To your knowledge, was it negotiated

10  at arm's length?

11     A.  I'm sorry, say that again?

12     Q.  To your knowledge, was the Committee

13  settlement negotiated arm's length?

14     A.  Yes, absolutely.

15             MR. KAPLAN:  Objection, your

16  Honor.  There's been no foundation whatsoever

17  about any firsthand knowledge.  All the

18  testimony so far was he learned everything

19  through counsel.

20             THE COURT:  Overruled.

21             MR. KINEL:  I asked to his

22  knowledge.

23             THE COURT:  Overruled.

24             MR. KINEL:  Thank you.  You can



1   answer.

2               THE WITNESS:  I'm sorry, what

3   was the question again?

4               MR. KINEL:

5       Q.  To your knowledge, was the settlement

6   negotiated at arm's length between the

7   parties?

8       A.  Oh, yes, it was.

9               MR. KINEL:  May I approach once

10  again?

11              THE COURT:  Mm-hmm.

12  BY MR. KINEL:

13      Q.  Mr. Sass, I've handed you what's been

14  marked as Committee Exhibit 1.  Do you

15  recognize that document?

16      A.  Yes, I do.

17      Q.  What is that?

18      A.  This is the liquidating trust

19  agreement presented here as an exhibit to one

20  of the other documents.

21      Q.  Okay.  Have you had a prior

22  opportunity to review this document?

23      A.  Yes, I did, more than once.

24      Q.  Do you believe that the terms of the



1  liquidating trust agreement are fair and

2  reasonable under the circumstances?

3      A.  I do.  For the most part, they are not

4  unusual as to liquidating trust agreements

5  I've seen before.

6      Q.  I direct your attention to Committee

7  Exhibit 2.  Could you identify that document?

8      A.  Yes.  That is the, as it's called, the

9  binding claims mediation agreement.

10     Q.  I'm sorry, could you --

11     A.  Yes, I do recognize it.

12     Q.  What's the title of that document, for

13 the record?

14     A.  Liquidated trust binding claims

15 mediation agreement.

16     Q.  Have you seen that document before?

17     A.  I have.

18     Q.  You've had a chance to review it

19 before?

20     A.  I have.

21     Q.  Do you believe that the terms of the

22 proposed mediation procedures are fair and

23 appropriate under the circumstances of these

24 cases?



1     A.  Yes, I believe they are fair and

2  appropriate and created for the situation we

3  find ourselves in.

4     Q.  Why is that?

5     A.  Well, we've got a situation right now

6  where, as I understand it, the claims are

7  unknown, so the GUC trust that's created in

8  the case is kind of going into an unknown

9  situation which normally would create a lot of

10  work for the Court and for the trust.  And

11  this mediation structure seems to be a much

12  more efficient way of dealing with it and

13  saving the Court and the trust money and time.

14     Q.  Mr. Sass, you said you served on

15  approximately 100 creditors' committees.  Do

16  you believe the creditors' committees in these

17  cases have exercised their fiduciary duties?

18     A.  Absolutely.

19           MR. KINEL:  Thank you; no

20  further questions.

21           THE COURT:  Cross?

22           MR. KAPLAN:  Should I continue?

23           THE COURT:  Yes.

24          CROSS-EXAMINATION



BY MR. KAPLAN:

    Q.  Good afternoon, Mr. Sass.  Gary Kaplan

from Fried Frank on behalf of the DDTL

parties.  I believe you have a witness binder

still up there; we're going to go through that

in a few minutes.  I just want to make sure

it's still up there in front of you.

              Just to go back to --

              THE COURT:  You want to help him

out?  I don't think he knows which one.

              THE WITNESS:  I don't know which

one.  Which one are we talking about?

BY MR. KAPLAN:

    Q.  You had no involvement in the

negotiation of the settlement, correct?

    A.  I was not on hand at the negotiation,

that's correct.

    Q.  You didn't witness a single

conversation between any representative of the

Committee and the noteholders in negotiating

the settlement, correct?

    A.  That's correct.

    Q.  All of those negotiations were handled

by counsel and the financial advisors,



1  correct?

2      A.  That's correct.

3      Q.  And in fact, in your deposition, you

4  testified there would be nobody on the

5  Committee who would have firsthand knowledge

6  of the negotiations between the Committee and

7  the purchaser on the terms of the agreement,

8  right?

9      A.  I think I said I wasn't aware of

10  anybody.  If I wasn't clear enough, I wasn't

11  aware of anybody.

12      Q.  Now, your counsel you asked you some

13  questions about your fiduciary duties.  Do you

14  recall those?

15      A.  Yes, sir.

16      Q.  And you testified that you think the

17  settlement is consistent with your fiduciary

18  duties to unsecured creditors, correct?

19      A.  That's correct.

20      Q.  And as a member of the Committee, your

21  fiduciary duties run through all unsecured

22  creditors, correct?

23      A.  The general unsecured creditors, yes.

24      Q.  When you say general unsecured, is



1   there a category of unsecured creditors that

2   are excluded from your fiduciary duties?

3       A.  Is there a category excluded from

4   general unsecured?  No, not that I'm aware of.

5       Q.  So your fiduciary duties run to

6   priority creditors, right?

7       A.  Priority are not unsecured, they're

8   priority.

9       Q.  So you don't have duties to priority

10  creditors?

11      A.  I don't believe so.

12      Q.  How about creditors to the extent they

13  have a -- secured creditors to the extent they

14  have a deficiency claim, do you have a duty to

15  those creditors?

16      A.  Secured creditors as to their secured

17  interest, we would not.  As to an unsecured

18  deficiency, we would be at times looking after

19  them, as well.

20      Q.  At times, you said.  When would you

21  not be looking after those deficiency claims?

22      A.  It depends in how they got to where we

23  are at that point in time.  General unsecured,

24  unsecured creditors for the most part, those

1  that serve on committees tend to be think

2  trade employees and related.  Other groups

3  that tend to be priority may not be in that

4  category and come in with a different

5  perspective and different ability to represent

6  themselves.  May not need our help as much.

7      Q.  So is it your testimony that your

8  fiduciary duty is to those who serve on the

9  Committee as opposed to those who hold

10  unsecured claims?

11      A.  No, no.  It's very clear, it's to all

12  of the creditors that hold claims,

13  specifically not to our own companies or just

14  those on the Committee, but to all creditors.

15      Q.  And that would include secured

16  creditors to the extent they have an unsecured

17  deficiency claim?

18      A.  Yes, it would.

19      Q.  Are there any exceptions that you're

20  aware of to that?

21      A.  Exceptions?  No, not normally.

22      Q.  Let's go to the binder, if you will,

23  and start on tab 17.  Let me know when you're

24  there.

```
1        A.   I'm at tab 17.

2        Q.   And the first page of it is an email

3   from a lawyer at Akin Gump to Committee

4   counsel, right?

5        A.   It appears to be, yes.

6        Q.   And the email says that it attaches a

7   term sheet for global resolution and asks that

8   it be shared with the Committee?

9        A.   Yes.

10       Q.   Do you recall this term sheet being

11  shared with the Committee?

12       A.   It probably was.  I believe so.  But

13  there were a lot of term sheets that went back

14  and forth.  Most of them were shared with us,

15  and mostly tracked to the one that came out at

16  the end of the day that's now in the documents

17  before the Court.  So probably yes, but I

18  don't recall this specific one.

19       Q.   If you could turn to page 2 of the

20  term sheet.

21       A.   Mm-hmm.

22       Q.   And you see there's a paragraph close

23  to the bottom that talks about, that says the

24  beneficiaries of the litigation trust.  Do you
```



1   see it starts there, and it's highlighted on

2   the screen if that's easier.

3       A.  Yes, I see that.

4       Q.  So the term sheet proposed by the

5   noteholders proposed a litigation trust, and

6   goes on to say it shall be all of the Debtors'

7   general unsecured creditors, including

8   noteholders to the extent of any deficiency

9   claim, right?

10      A.  Yes, it says that.

11      Q.  So this proposal didn't carve out any

12  specific unsecured creditors, it said all

13  would receive the benefit of the liquidation

14  trust, right?

15      A.  Not as far as the paragraphs we looked

16  at, so I don't see it, where they carve

17  anything out.

18      Q.  And then if you go down to the bottom

19  of the next paragraph on that page, the bottom

20  of page 2, you see it talks about specified

21  causes of action?

22      A.  Yes.

23      Q.  And you see it says the proceeds

24  recovered from the proceed of any specified



1   causes of action will be allocated on a

2   ratable basis among the holders of general

3   unsecured claims.  Do you see that?

4        A.  Yes.

5        Q.  So the noteholders' proposal that was

6   sent to the Committee in mid July proposed

7   that the allocation of what was being put into

8   trust, if you will, would go to all unsecured

9   creditors, right?

10       A.  That's what this one appears to do,

11  yes.

12       Q.  And after receiving that term sheet,

13  do you recall the Committee discussing that it

14  shouldn't be allocated, that proceeds to the

15  unsecured should not be allocated ratably, and

16  instead should only go to certain creditors?

17       A.  No, I don't recall a discussion of

18  that nature.

19       Q.  Let's turn to tab 18, if you would.

20       A.  Yes, I'm there.

21       Q.  And tab 18, we've already established,

22  this term sheet is on August 10th, and this

23  goes from Nava Hazan, who is Committee

24  counsel, to the noteholders' counsel,

1    Mr. Rubin and Mr. Alberino, right?

2        A.  Yes.

3        Q.  And it attaches a revised version of a

4    term sheet, right?

5        A.  There is a version of the term sheet

6    there, yes.

7        Q.  Okay.  And let's turn to page 3, if we

8    will.

9        A.  Of the term sheet?  Yes.

10       Q.  And in the middle, there's a paragraph

11   that starts the exclusive beneficiaries of the

12   GUC trust.

13       A.  I see that.

14       Q.  And this term sheet provided, and you

15   can read the language, provided that the

16   beneficiaries of the GUC trust would be

17   holders of allowed general unsecured claims,

18   and the only carve out was the deficiency

19   claims of the holders of the notes, of the

20   purchasers with whom you're negotiating,

21   right?

22       A.  That's what that paragraph says, yes.

23       Q.  And then you see the next paragraph

24   talks about, again, the specified causes of



1   action, and there, too, it says the proceeds

2   recovered from the pursuit of any specified

3   causes of action will be allocated on a

4   ratable basis among the GUC trust

5   beneficiaries, right?

6       A.  Yes.

7       Q.  So here, too, there was no carve outs

8   for deficiency claims or priority claims, that

9   they wouldn't be beneficiaries of the

10  distributions, right?

11      A.  I don't see language that does that;

12  that's correct.

13      Q.  Let's see if we can turn to tab 19.

14  And this one, the cover page, it's an email

15  from Committee counsel back to the counsel to

16  the noteholders or purchasers that says

17  attached please find a revised draft of the

18  term sheet.  Do you see that?

19      A.  I see that, yes.

20      Q.  And if we could turn to, the black

21  line would be easier, turn to page 3, if you

22  will.

23      A.  Is this the black line attached?

24      Q.  Yeah, the black line should be



1    attached.

2        A.   I'm on page 3.

3        Q.   You see there's a paragraph in the

4    middle that says the holders of general

5    allowed unsecured claims --

6        A.   Actually, my page 3 is not the black

7    line.

8        Q.   They're repaginated, so if you go past

9    the claims, you'll see the black lines after

10   that, and the page numbers start again.

11       A.   There it is; thank you.  I'm sorry,

12   you were saying?

13       Q.   And you see there's language in the

14   middle of the page that says the holders of

15   allowed general unsecured, and new language

16   now, non-priority claims against the Debtors,

17   excluding deficiency claims of pre-petitioned

18   secured creditors.  Do you see that that's

19   been added?

20       A.   I do see that addition.

21       Q.   Do you recall the Committee directing

22   its counsel to change the term sheet so as to

23   exclude certain creditors from participating

24   in the GUC recovery?



1    A.  No, I do not recall us directing them

2  to do that.

3    Q.  Do you recall discussion amongst the

4  Committee about changing the term sheet so

5  that holders of priority claims and deficiency

6  claims would no longer receive a distribution

7  under the -- from the GUC recovery?

8    A.  As I think I mentioned, there were

9  numerous versions of the settlement term

10  sheet.  We discussed many of them.  I can't

11  even say that we discussed all of them.  There

12  were probably some we didn't see where the

13  change was very minor.  I don't recall this

14  particular change coming in at a particular

15  point in time, but it did come in.  I can't

16  tell you why it came in at that point in time.

17    Q.  But you can't tell us why this change

18  was made, right?

19    A.  That's correct.

20    Q.  You certainly can't say it was because

21  the noteholders were insisting on it, right?

22    A.  I can't say that.  I have no

23  knowledge.

24    Q.  Let's move on.  Now, you've testified



1   earlier that you thought that the settlement

2   was fair and reasonable to all unsecured

3   creditors, right?

4       A.  Yes, I did.

5       Q.  And you understand, obviously, based

6   on your experience, that priority creditors

7   ordinarily would receive a distribution ahead

8   of other unsecured creditors, right?

9       A.  Often, that's correct.

10      Q.  When you say often, is there -- other

11  than when priority creditors agree to not come

12  first, you understand that under the

13  Bankruptcy Code, priority creditors are

14  supposed to be paid before general unsecured

15  creditors are paid?

16      A.  When the Debtor is making payments,

17  yes, that's correct.

18      Q.  Okay.  But as we've seen here, the

19  term sheet no longer provides for priority

20  creditors to be paid ahead let alone receive

21  any recovery from the GUC trust, right?

22      A.  Well, the discussion here, unless I

23  missed something, was mostly about their

24  deficiency portion.  I didn't see a lot of

1  discussion about the priority payments.

2      Q.  Well, let's go back.  The language is

3  on the screen if it's easier, but obviously if

4  you need to refer to the whole document, you

5  should.  But you see the first addition is to

6  add the word non-priority, right?

7      A.  Right.

8      Q.  So that would carve out priority

9  claims?

10     A.  Right.  It's not addressing what

11  happens with priority, correct.  It's saying

12  what isn't happening with the priority.

13     Q.  But under this, based on this

14  language, because it says the holders of

15  allowed general unsecured non-priority claims

16  against the Debtors excluding deficiency

17  claims, will be the sole and exclusive

18  beneficiaries of the GUC trust, correct?

19     A.  It does say that, yes.

20     Q.  So we both agree that priority

21  claimants will not be a beneficiary of the GUC

22  trust, correct?

23     A.  Under this language, that's correct.

24     Q.  Why is that fair to holders of



1  priority claimants?

2      A.  The holders -- there's a lot of

3  reasons that the holders of the priority

4  claims are more favorably situated in the

5  entire process than the general unsecured

6  creditors.  Well, first of all, by nature of

7  priority claim, they're going to get payments

8  first for the priority portion.  Typically,

9  and as was the case here, many of them had

10  their own counsel and were very vocal and

11  visible in the process as compared to the

12  general unsecured creditors, which tend not to

13  be and need the support and protection of the

14  general unsecured creditor committee, Official

15  Committee of Unsecured Creditors.

16            So it's not unusual in my

17  experience for priority claimants to end up

18  with a lesser than standard distribution in a

19  case through a plan or other vehicles.

20      Q.  When they don't agree to it?

21      A.  Most often they agree to it, but not

22  always.

23      Q.  Which circumstances are you aware of

24  where priority claimants haven't agreed to it

1    and in a plan or otherwise, they've been

2    forced to --

3         A.  It's not the Debtors' money when it's

4    coming from a third party, often a third party

5    can have a very strong influence, I won't say

6    dictate, but can have a very strong influence

7    on the structure of where the money goes, what

8    happens to it, and who gets it.  And I've seen

9    that before on occasion.

10        Q.  How many cases have you've been

11   involved with have you seen that?

12        A.  Not a lot.  Of the approaching 100

13   committees I've been on, probably single

14   digits.

15        Q.  But let's go back to the situation in

16   front of us that you testified previously was

17   fair, okay?

18        A.  Yes.

19        Q.  My question was is the treatment being

20   afforded to the priority claims fair under

21   this settlement?

22        A.  Yes, I think it is for a number of

23   reasons.  As I said before, they are getting

24   distribution of the priority portion.  Without



1  this settlement structure coming forth, the

2  unsecured creditors would be getting nothing.

3  So is there a trade-off happening that is less

4  than optimum?  Sure.  But that happens

5  sometimes, and in order to get something for

6  the creditors, that was a structure that had

7  to happen.

8      Q.  Explain to me what you mean, if you

9  would, they're getting paid on their priority

10  portion?

11      A.  If they have a priority claim.

12  They're not getting paid by us, but pursuant

13  to any other money in the estate or any other

14  vehicle for payment, they would be getting

15  paid before us.

16      Q.  And it's your understanding there's

17  other money in the estate to pay other

18  priority claims?

19      A.  I don't know that.

20      Q.  You're on the Committee, right?

21      A.  Yes.

22      Q.  And you're an active member of the

23  Committee, right?

24      A.  Yes.



1      Q.   And you understand the Debtors'

2   current financial circumstances, right?

3      A.   That's correct.

4      Q.   And you understand that the Debtors,

5   for example, haven't been paying Committee

6   counsel for some time, right?

7      A.   That's my understanding.

8      Q.   So are you aware of any source of

9   funds that the Debtors have to pay any of the

10   priority claims aside from the WARN act

11   claimants?

12      A.   I am not.

13      Q.   And under the terms of this

14   settlement, there's no money allocated to pay

15   the priority creditors, right?

16      A.   That's correct.

17      Q.   So go back to my question, then.   If

18   we've established there's no money to pay the

19   priority claimants, putting aside the WARN

20   claimants, we've established there's no money

21   in the Debtors' estate to pay the priority

22   claimants, they're going to receive nothing

23   under this settlement, how is this settlement

24   fair to priority claimants?

1           MR. KINEL:  Objection, your

2  Honor.  It assumes facts not in evidence.  We

3  haven't established that there's no money in

4  the estate.  Mr. Sass testified he's not aware

5  of any method of payment from the estate.

6  That's not dispositive of the issue.

7           THE COURT:  Mr. Ramos, how much

8  money is in the estate?

9           MR. RAMOS:  Your Honor, I can't

10  answer that question just standing here today.

11  Obviously, in addition to whatever funds there

12  might be, there are claims and causes of

13  action in the estate that have some value, and

14  those have quantified.

15           MR. KAPLAN:  Your Honor, the

16  Debtors have put on the record repeatedly,

17  including in refusing to set a bar date, that

18  these estates are administratively insolvent.

19  And again, we've had the fight about a bar

20  date and the Debtors' refusal to do it.  It is

21  clear, we can pull out their pleadings and

22  admissions, but to have this debate right now

23  about whether the Debtors have funds or don't

24  have funds is a little bit silly.

1             MR. RAMOS:  Your Honor, I

2  frankly wasn't trying to be part of a debate,

3  I was trying to ask the question that the

4  Court posed.  Certainly, as counsel indicated,

5  the Debtors have made filings including with

6  regard to the bar date issue and talk about

7  the exigent circumstances from a financial

8  perspective of the estates.

9             THE COURT:  I'll allow it,

10  overrule the objection.  I think that, you

11  know, it actually boggles my imagination why

12  we would even be having this debate if there

13  was -- well, maybe with you, Mr. Kaplan, but

14  why we'd be having this debate if there was

15  sufficient money to pay unsecured creditors.

16             So I'm not going to close my

17  eyes to the reality of this case.  You know,

18  if I'm wrong, if this case is fully

19  administratively solvent and there's enough

20  money to pay priority unsecured claimants in

21  full, that still doesn't solve Mr. Kaplan's

22  problem.  But I'd be shocked.

23             So I think, you know, based on

24  my experience with the case, to sort of get up



1  here and imply there's no evidence that

2  there's insufficient money to pay priority

3  unsecured claimants I think is unrealistic.

4  So I'll allow the question.  Do you want to

5  restate it?

6  BY MR. KAPLAN:

7      Q.  So Mr. Sass, having established that

8  the priority creditors will receive nothing

9  under the terms of this settlement, and that

10 there's no money in the estate to pay priority

11 creditors, how is this settlement fair to

12 priority creditors?

13     A.  There's no money in the estate to pay

14 the priority creditors except for the ones

15 that are getting paid that you mentioned, so

16 we have a structure that even treats priority

17 claimants differently.  We had a situation

18 here where we could try to get some money for

19 the creditors through someone willing to put

20 some into a put through a trust, and it was

21 the best deal that could be negotiated.  It

22 still seems fair.

23     Q.  You previously testified that you have

24 no idea who insisted on this language and how

1  this language got in here, right?

2      A.  That's correct.

3      Q.  So you can't sit here and testify that

4  that's the best deal you could have gotten,

5  right?

6      A.  I can, because I trust my

7  professionals.  They seem to have been doing a

8  good job.  I've seen professionals -- this was

9  a difficult negotiation from what I could see

10  from a distance, but yet it kept moving and

11  kept move ing in a direction that had the

12  result of turning up some money for my

13  constituency.  That's fair.  That's a good

14  result.  They worked hard.

15      Q.  But we established your constituency

16  includes, for example, the holders of

17  deficiency claims, right?

18      A.  Normally who would be included.

19      Q.  Do you think they did their best job

20  to get a recovery for the holders of

21  deficiency claims?

22      A.  Yes.

23      Q.  Then let's look back at this

24  paragraph.  Do you see the language that was



1  added by Committee counsel excluding holders

2  of deficiency claims from the GUC recovery

3  trust?

4      A.  I don't know it was added by Committee

5  counsel, but it is in this version, yes.

6      Q.  And we established at the beginning

7  that this was a term sheet that was sent with

8  changes sent by Committee counsel, right?

9      A.  Right, subject to I think a discussion

10  they had previously, so I don't know -- I

11  mean, they did the crafting of the words and

12  sent it around, but I don't know who put the

13  concept in.

14      Q.  You are aware that the current version

15  of the term sheet contemplates that certain

16  claims and causes of action will be purchased

17  by the or were purchased by the purchaser then

18  contributed to the GUC trust, right?

19      A.  Yes, I'm aware of that.

20      Q.  And you're also aware that that

21  provision changed over time, right?

22      A.  Yes.

23      Q.  And that that provision originally

24  provided that those claims and causes of

1  action would be excluded assets and thus left

2  behind for the Debtor to contribute to the

3  trust, right?

4      A.  I'm gathering that from the flow of

5  documents.  I didn't really recall it

6  otherwise, but yes, that makes sense.

7      Q.  But you don't recall that, right?

8      A.  No.

9      Q.  And you don't know why that changed?

10     A.  I do not.

11     Q.  And you certainly are not testifying

12  it was insisted by the purchaser or any other

13  party, right?

14     A.  I generally cannot ascribe any

15  particular change to any particular party.  I

16  wasn't there for the discussion.

17     Q.  Any particular changes that you can

18  ascribe to the Committee having demanded?

19     A.  Not specifically, no.

20     Q.  Okay.  Sitting here today, what

21  benefits are there to the Debtors of pursuing

22  this approval of the settlement?

23     A.  I'm sorry, say again, please?

24     Q.  Sitting here today, what benefits, if



1   any, do the Debtors receive from approval of

2   the settlement?

3       A.  It moves them towards completion of

4   the case.

5       Q.  And how does it move them towards

6   completion?

7       A.  Well, we get a trust created to pay

8   creditors, and I presume there's a settlement,

9   that the settlement is approved, and they get

10  an opportunity to be left with very little to

11  do to get out of the bankruptcy.

12      Q.  The case could be concluded tomorrow

13  by converting it to Chapter 7, right?

14      A.  It would, and nobody would get

15  anything.  Except the noteholders I guess I

16  would get a bonus.

17      Q.  When you say nobody would get

18  anything, is that -- aren't there -- why do

19  you say that?

20      A.  As we were discussing, I don't think

21  there are substantial assets in the estate.

22  I'm not up to date on the numbers, but my

23  general understanding is there wouldn't be any

24  money coming in that would flow to the

```
1   creditors.
2               MR. KAPLAN:  I have nothing
3   further.
4               THE COURT:  All right, thank
5   you.  Anyone else?  Ms. Casey?
6               CROSS-EXAMINATION.
7   BY MS. CASEY:
8       Q.  Good afternoon.  Linda Casey on behalf
9   of the Committee -- excuse me, on behalf of
10  the U.S. Trustee.
11              I'm a little confused, and I
12  just want to see if I can drill down on one
13  point.  I believe your testimony was you were
14  not aware who requested that the deficiency
15  claims be excluded from the distribution of
16  the cash portion of the GUC trust, correct?
17      A.  Yes, that's correct.
18      Q.  And I believe your testimony was that
19  you are not sure why they were excluded from
20  the distribution of the cash portion of the
21  GUC trust?
22      A.  I think I expressed that I was not at
23  those discussions, so I really wasn't --
24  didn't have much direction as far as who
```



1   requested which change and what the quid pro

2   quo might have been.  It was give and take.

3   We got a little bit of a flavor of that from

4   counsel reporting back, but I wasn't there, so

5   I don't know.

6       Q.  I'm not sure if you were asked and I'm

7   not sure if I heard, when the Committee

8   approved the settlement agreement, what did

9   the Committee rely upon to determine that the

10  exclusion of the deficiency claims from the

11  distribution of the cash portion was fair?

12              MR. KINEL:  I'm going to object

13  to the extent it calls for attorney-client

14  communications.

15              THE COURT:  Without saying the

16  substance, I mean, if you can answer the

17  question without disclosing any

18  attorney-client communication, or the

19  specifics of any attorney --

20              THE WITNESS:  Can you restate

21  the question, please?

22  BY MS. CASEY:

23      Q.  Yes.  When the Committee approved the

24  settlement agreement, what did it rely upon to



1   determine that the exclusion of the deficiency
2   claims from the distribution of the cash
3   portion of the GUC trust was fair?
4       A.  Let me give you a little bit of a
5   flavor of what was happening as we looked at
6   these various versions, including the last
7   one.  We would get reports from our
8   professionals of what had changed and what the
9   impact of that change was on us.  They
10  typically would highlight the pros and cons,
11  people would have questions, and it would be
12  explained and discussed as to whether it was a
13  good thing or not.  So I think without giving
14  any specifics, that's...
15      Q.  Are you aware of any facts that would
16  justify the exclusion of the deficiency claims
17  from the distribution of the cash portion of
18  the GUC trust?
19      A.  To justify the exclusion?  Well,
20  there's the arithmetic and the economics.  You
21  have parties involved who are negotiating who
22  are in equal bargaining positions which gets
23  you to a point where they'll willing to put
24  together a deal of this nature.  But I'm not

1   sure what you're looking for in particular.

2       Q.  I'm not sure what you mean by the

3   economics.  Are you aware that there are

4   secured creditors in this case who have 100

5   percent deficiency claims and are not going to

6   be receiving any payments as a secured

7   creditor?

8       A.  That's my understanding, yes.

9       Q.  So are you aware of any facts that

10  would establish that a fully unsecured

11  deficiency claim, it is fair to not include

12  them with the other general unsecured

13  creditors sharing the cash portion of the GUC

14  trust?

15      A.  If we were talking about the

16  distribution of assets of the Debtor, I would

17  be looking at it somewhat differently.  But

18  we're looking at a third party making a

19  payment to a trust to give to the creditors,

20  giving them a lot more influence on how that

21  should be structured.  So it's really not --

22  as I mentioned, I've seen this a few times,

23  but it's an unusual circumstance and not the

24  one contemplated by the code I think for the

1   most part.

2       Q.   I'm a little confused.  How is the

3   fact that the money is not the Debtors', if

4   you can't testify that the person providing

5   the money insisted that it not go to the

6   deficiency claims, affects the analysis as to

7   whether it's fair to exclude the 100 percent

8   deficiency claims?

9       A.   Well, the end result is they accepted

10  a structure that had it that way, meaning they

11  thus approved it.  Whether they proposed it or

12  not probably isn't all that relevant; they

13  approved it.  And I would thus say that, you

14  know -- and it isn't money of the Debtor, it's

15  money being provided to a GUC trust from a

16  third party.

17      Q.   So is it your testimony that the fact

18  that the Committee relied upon to exclude the

19  deficiency claims was that it wasn't money of

20  the Debtors?

21      A.   That's a large component, yes, a

22  recommendation of professionals and so forth.

23              MS. CASEY:  Thank you; no

24  further questions.



1           THE COURT:  Any further

2   questions?  Mr. Benson?

3                 CROSS-EXAMINATION

4   BY MR. BENSON:

5       Q.  Mr. Sass, first I want to clarify

6   something you said earlier.  Did you say that

7   priority creditors are not included in the

8   class to which Committee professionals owe a

9   fiduciary duty?

10      A.  I didn't say Committee professionals.

11  I was referring to the Unsecured Creditors

12  Committee.  If I wasn't clear on that, I'm

13  sorry.

14      Q.  I'll rephrase it.  Did you say that

15  priority creditors are not within the class to

16  which Committee members, such as yourself, owe

17  a fiduciary duty?

18      A.  I believe the fiduciary duty of the

19  members of the Official Committee of Unsecured

20  Creditors are to the unsecured creditors, not

21  the priority creditors.

22      Q.  You've, I guess, distinguished

23  priority creditors versus unsecured creditors.

24  Are you aware that an unsecured creditor could

1   have a claim entitled to priority?

2      A.  I'm sorry, say again?

3      Q.  An unsecured creditor could have a

4   claim entitled to priority under section 507

5   of the Bankruptcy Code?

6                MR. KINEL:  Objection; calls for

7   a legal conclusion.

8                MR. BENSON:  He is --

9                THE COURT:  He's an attorney.

10  I've known Mr. Sass my entire career.  If he

11  can't answer this question, nobody in the room

12  can.

13               THE WITNESS:  Can we restate it

14  one more time?  Thank you, your Honor.

15               THE COURT:  You're welcome.

16               MR. KINEL:  Can we qualify him

17  as an expert, your Honor?

18  BY MR. BENSON:

19     Q.  Are you aware that a priority

20  creditor -- withdraw that.

21               Are you aware that an unsecured

22  creditor could have an unsecured claim that is

23  entitled to priority under section 507 of the

24  Bankruptcy Code?



1    A.  Yes.

2    Q.  So the fact that a creditor is a

3  priority creditor is not exclusive with being

4  an unsecured creditor?

5    A.  That's true, but the entire priority

6  structure relates to the property of the

7  Debtor and is contemplated that way under the

8  code.  We're talking about property not of the

9  Debtor, which I don't think is contemplated.

10    Q.  But we're talking about your fiduciary

11  duties and to whom they're owed.  And are you

12  saying that your fiduciary duties are

13  inapplicable when dealing with non-estate

14  property?

15    A.  It's an interesting question.  I

16  haven't really thought about that.  I don't

17  know.

18    Q.  Okay.  Moving on.  I have some

19  questions similar to what I asked Mr. LaForge.

20  Are you aware that the IRS has filed proofs of

21  claim in this case?

22    A.  Yes.

23    Q.  Are you aware that the IRS has

24  asserted priority claims?



1    A.   Yes.

2    Q.   Are you aware that the IRS has

3  asserted priority claims in the approximate

4  amount of $2.4 million?

5    A.   That's a number I heard, yes.

6    Q.   Do you have any reason to believe that

7  the asserted priority is invalid?

8    A.   No, although I do believe that our

9  professionals reached out to the IRS more than

10  once to discuss whether to address that claim,

11  make some or all unsecured, and those attempts

12  to have been not fruitful.

13    Q.   Two parts to that.  Were those

14  attempts by the Committee to, I guess,

15  negotiate down the priority claim based on a

16  perceived inaccuracy as to the asserted

17  priority?

18    A.   I don't know.  I don't recall what

19  they were, where they arose from, but there

20  was a $2.4 million claim out there.

21    Q.   But you have no reason to believe that

22  the IRS erred in claiming a priority claim?

23    A.   No, I have no information on that.

24    Q.   Do you have any reason to believe the



1   IRS erred in calculating the amount of the

2   claim?

3       A.  I have no information on that.

4       Q.  So you don't have any reason to

5   believe the claim is inaccurate in its --

6       A.  I have no reason to believe it's

7   inaccurate, that's correct.

8       Q.  Do you know if there's any intention

9   by the Committee or the Debtor to challenge

10  either the amount of priority the IRS has

11  claimed?

12      A.  You know, we have the procedures that

13  have been promulgated under some of the

14  documents we've looked at, and there is a

15  claims procedure.  It's intended for the

16  unsecured claims, but I guess if the IRS

17  wanted to come in as an unsecured claim and

18  assert it, we could have a discussion.

19      Q.  That answer was about your ability to

20  challenge it.  My question was is there any

21  intention to challenge it?

22      A.  Not being in that position, I really

23  don't have any intention to do anything yet.

24  It's not ripe yet.



1      Q.  You mentioned your professionals

2  reaching out to counsel for the IRS.  I want

3  to specifically talk about the period from the

4  petition date to the time the United States of

5  America filed an objection to the settlement.

6  At any time during that period, do you know if

7  anyone acting on behalf of the Committee

8  reached out to either the Internal Revenue

9  Service or the Department of Justice?

10      A.  I don't have the dates, but I believe

11  so, but I'm not sure.  I don't know when it

12  took place, so let me not say.  I don't know.

13      Q.  When you say let you not say, are

14  you --

15      A.  I don't know when the dates were that

16  they reached out.

17      Q.  Okay.  So you have --

18      A.  Relevant to the IRS.

19      Q.  Do you have any reason to believe that

20  there was any attempt to reach out to the IRS

21  before the sale hearing, for instance?

22      A.  Again, I don't know the timing

23  relevant to the other events.

24      Q.  Do you know if there was any attempt



1  by the noteholders to reach out to the

2  Internal Revenue Service from the petition

3  date to the sale hearing regarding treatment

4  of their priority claim?

5      A.  I do not know.

6              MR. BENSON:  That's all I have,

7  your Honor.

8              THE COURT:  Thank you,

9  Mr. Benson.  Any other questions?  Any

10 redirect, Mr. Kinel?

11             MR. KINEL:  Thank you, your

12 Honor.

13             REDIRECT EXAMINATION

14 BY MR. KINEL:

15     Q.  Mr. Sass, if you could just turn back

16 again to Committee 3, the term sheet.

17     A.  Yes, I have it.

18     Q.  I want to just direct your attention

19 to the bottom of page 4, the last full

20 paragraph.  It starts with the net proceeds.

21     A.  I have that.

22     Q.  Take a moment, just read it to

23 yourself.

24             Having read that, the Committee



1 approved a settlement that does provide a

2 recovery to deficiency claims of secured

3 creditors; is that not correct?

4     A.  Yes, thanks for refreshing my memory.

5 There is a provision that provides for some

6 payment to the deficiency claims.

7     Q.  So deficiency claims such as

8 Mr. Kaplan's clients would share in the net

9 proceeds and any specified causes of action?

10     A.  That's correct.

11                 MR. KINEL:  Thank you; no

12 further questions.

13                 THE COURT:  Thank you, Mr. Sass.

14                 THE WITNESS:  Thank you.

15                 THE COURT:  Any further evidence

16 by any party?  Mr. Kinel, you need to move

17 your documents.  I assume you want 1 through 3

18 admitted?

19                 MR. KINEL:  Yes, your Honor.

20                 THE COURT:  Any objection?

21                 MR. KAPLAN:  No objection, your

22 Honor.

23                 THE COURT:  Committee Exhibits 1

24 through 3 are admitted without objection.



1                    Mr. Kaplan, you had some

2    documents?

3                    MR. KINEL:  Your Honor, I have

4    one more.

5                    THE COURT:  Oh, you have one

6    more?  Okay.  Sorry.

7                    MR. KINEL:  May I approach?

8                    THE COURT:  Yes.

9                    MR. KINEL:  Your Honor, we'd

10   like to move Committee 4, which is an official

11   transcript of a hearing held before this court

12   on October 6, 2016.

13                   THE COURT:  Any objection?

14                   MR. KAPLAN:  No objection, your

15   Honor.

16                   THE COURT:  It's admitted.

17                   MR. KINEL:  Thank you, your

18   Honor.

19                   MR. KAPLAN:  Your Honor, we have

20   several documents that we used, and that's

21   DDTL 1 through 8, which are the tabs in our

22   binder, tab 17, 18, 19, 20, 21, 22, and 24.

23                   THE COURT:  Any objection?

24                   MR. KINEL:  For the record, I'm



1  going to object, but I know it will be

2  overruled.

3          THE COURT:  Based on relevancy,

4  I take it?

5          MR. KINEL:  Yes.

6          THE COURT:  That is overruled,

7  so they're admitted.

8          MR. KAPLAN:  And your Honor, I

9  know the Debtors' binders have a lot of

10 pleadings that are already on the docket.  I

11 think the Court can take judicial notice;

12 we're not going to burden the record unless

13 you want us to move in all of the different

14 pleadings into the record.  But there's a

15 whole host of pleadings that relate to this,

16 and we think the record -- we don't think they

17 need to go in as evidence by evidence.

18         MR. KINEL:  I would agree with

19 Mr. Kaplan on that.

20         MR. RAMOS:  No objection.

21         THE COURT:  I'm not going to

22 disagree.

23         MR. KAPLAN:  Thank you.

24         THE COURT:  Very good.  All



1  right.  Last call?  That will close the

2  evidentiary record.  Let's break for lunch,

3  then we'll hear argument when we return.  And

4  let's try to reconvene promptly at 2:00 p.m.,

5  if we could.  Thank you very much.

6            MR. KINEL:  Thank you, your

7  Honor.

8            (Whereupon, a lunch recess was

9  taken.)

10            THE COURT:  Good afternoon.

11            MR. SHAPIRO:  Good afternoon,

12  your Honor.  For the record, Zac Shapiro on

13  behalf of the Debtors.

14            I just have a few remarks, and

15  I'll save the balance in response, if that's

16  all right.

17            What's before your Honor is a

18  settlement.  And the standard that your Honor

19  should consider is whether the settlement

20  falls above the lowest point in the range of

21  reasonableness.  The standard is not whether

22  everyone is happy.  That simply can't be the

23  standard.  If it was, no settlement would ever

24  be approved.  For example, often the parties

1   to the settlement themselves aren't happy.  So

2   I think, your Honor, while the settlement

3   isn't perfect, it achieved something good, and

4   it did so at no cost to the Debtor.

5            You can argue about the merits

6   of the Committee's objections, you can argue

7   about the timing of when everything happened.

8   But what you can't argue is as a result of the

9   Debtor agreeing to move forward with this

10   settlement at the August 16 hearing, subject

11   to final documentation, that we gained the

12   support of the Committee.  And you can't argue

13   that that support doesn't mean something.

14   Therefore, for that reason, the Debtors would

15   submit that this settlement meets the relevant

16   standards and should be approved.

17            MR. KINEL:  Thank you, your

18   Honor.  Norman Kinel, Squire Patton Boggs, on

19   behalf of the Committee.

20            There are actually two motions

21   pending before your Honor, so I'll mention the

22   second one, and that is the Committee's motion

23   for entry of an order approving the

24   liquidating trust agreement and the binding

1   claims mediation agreements.

2              Your Honor, as I said earlier

3   this morning, the settlement is the best

4   possible outcome in these cases for the

5   creditor body as a whole, and the only outcome

6   in which any constituency other than the

7   senior secured creditors receive anything in

8   consideration of their claims against the

9   Debtors.  If the objectors today prevail, it

10  will not improve their position, but rather

11  simply ensure that unsecured creditors will

12  receive no recovery in these cases.

13             The settlement clearly settled

14  the Committee's DIP motion and non-CSC sale

15  motions.  And as we said in our papers, the

16  best indicator of the value of the Committee's

17  claims and the Committee's position is what a

18  third party was willing to pay to get rid of

19  those objections, and what the Debtors were

20  willing to pay to get rid of those objections.

21  Mr. LaForge, I don't know if he used the word

22  today, but during his deposition, he testified

23  it would have been catastrophic if either of

24  those motions had not been approved.  And

1  whether or not they were approved together on

2  the same day or whether there could have been

3  a possibility of coming back and dealing with

4  a DIP later, obviously this was an integrated

5  settlement that addressed a number of issues.

6          It also meets the standards of

7  9019 because it certainly does not fall below

8  the lowest point in the range of

9  reasonableness.  From Mr. LaForge's testimony,

10  it's simply not possible to conclude that it

11  was unreasonable for the Debtors to have

12  accepted this settlement.  And his unhappiness

13  had largely to do with the fact that there

14  were not additional releases given to other

15  parties who remain potential targets in the

16  settlement.

17          The settlement resolved highly

18  contentious litigation, and the objecting

19  parties would like to create a narrative where

20  somehow the timing is suspicious, somehow

21  there wasn't enough time for people to

22  consider the settlement.  I can assure the

23  Court that there was a hard-fought

24  negotiation, that while Mr. LaForge may not

1  have been involved and as Committee members

2  were not involved, counsel for all parties

3  were involved.  And the Committee had pending

4  DIP objections, had filed three different

5  objections to the DIP that were still pending,

6  had objections to the sale motion.  And

7  there's no question that something was settled

8  on August 16, 2016.

9          The standard that the parties

10  would have this court require for a settlement

11  that a claim or cause of action in particular

12  was settled is not a -- there's no authority

13  for that, and it's not a realistic standard.

14  Settlements are approved every day in this

15  court and other bankruptcy courts around the

16  country which resolve controversies.  That's

17  all the rule says.  You can resolve a

18  controversy or settle a matter, but there's no

19  requirement as to there being property of the

20  estate involved in the settlement.

21          What was before your Honor were

22  two core proceedings.  A motion to approve a

23  sale and a motion to approve final DIP

24  financing.  Admittedly, that was being

1    adjourned, but in the broader sense, they were

2    both before the Court.  There's no doubt,

3    those core matters, the Court had jurisdiction

4    over.  And there was no objection at the time

5    of sales, of the sale or the DIP objection, to

6    the court's jurisdiction to hear those

7    matters.  If the court had jurisdiction to

8    hear them, the Court certainly had

9    jurisdiction to settle them.  And that's all

10   that was put on the record.  And I'm not sure

11   what counsel is getting that there's some

12   deviation between what was put on the record

13   and what ultimately was approved.  The core

14   terms of the settlement were put on the record

15   by counsel for the noteholders, they were

16   echoed by my partner who was here that day,

17   and they were also confirmed by the Debtors.

18   And those terms were the economic terms of the

19   settlement, and those have never changed

20   throughout.

21          What has changed, what counsel

22   pointed out and of course we objected as to

23   the relevancy of those changes, is there were

24   many iterations of a term sheet that went back

1  and forth over a period of a couple of weeks

2  between three different sets of counsel, with

3  each taking a look at the document and making

4  whatever suggestions, improvements, or changes

5  they believed appropriate.  There's no

6  evidence that this was a Jevic plot.  As a

7  matter of fact, I sort of find that comical,

8  because Jevic, if it were applicable, and we

9  maintained throughout it was not, would have

10  supported the settlement.  So the idea that

11  lawyers were running around conspiring to

12  structure a settlement that would address a

13  Supreme Court ruling that wasn't going to come

14  for six months in the future, is kind of

15  ridiculous.

16          The economics were always the

17  same.  The APA from the very first day, before

18  the Creditors' Committee was ever even formed,

19  provided that the purchaser would purchase all

20  claims and causes of action.  And there were

21  excluded assets, but those were a small subset

22  of the assets that were purchased.  And from

23  the beginning until the end, that never

24  changed.  And while in hindsight some of the

1   wording in the term sheet may not have been

2   the best, no matter how many lawyers looked at

3   it, it's clear that the economics were always

4   the same.  There was no wandering of estate

5   assets.  This is what you heard Mr. LaForge

6   testify earlier today, that he fought hard to

7   keep those assets within the estate.  It's

8   exactly the opposite of what the other parties

9   are contending.  It's not that people

10  conspired to get them out of the estate and

11  then sent them to a GUC trust.  The Debtors

12  agreed to give those up before the Committee

13  even was alive and kicking.

14            We're going to hear from the

15  objectors about Jevic.  I argued before your

16  Honor on I think it was December 16th when we

17  had essentially a status conference on Jevic

18  and whether the settlement should go forward

19  on that day.  We argued that Jevic was

20  inapplicable.  And the Supreme Court's ruling

21  has not changed that argument one bit in our

22  opinion.  The Supreme Court in Jevic dealt

23  with a case-ending dismissal coupled with a

24  settlement in a distribution of predominantly

1  property of the estate, and how that was not

2  permitted where it was inconsistent with

3  normal code priorities, and if the settlement

4  lacked any Bankruptcy Code offsetting value.

5         The Court expressly declined to

6  prohibit other non-case ending distributions

7  which occur earlier or do not involve property

8  of the estate or have other code-based

9  justifications.  It did not endorse a blanket

10  rule that all structured dismissals are pro se

11  and valid.

12         The settlement here falls

13  squarely within the range of permitted

14  settlements and distributions under Jevic.

15  The deciding factor in Jevic and the one

16  missing here is that Jevic involved

17  predominantly the distribution of estate

18  assets.  It is not uncontroverted, it wasn't

19  in December, because I remember your Honor

20  indicating that we would need to have an

21  evidentiary hearing as to whether estate

22  assets were being transferred or not.  I

23  believe it is uncontroverted that no estate

24  assets are contributed; and indeed, the

1    Debtors have modified the proposed form of

2    order to specifically say that to allay any

3    misconception, misperception, or poor

4    draftsmanship that might have been involved

5    along the way.  So this is not Jevic.

6                    The Court approved the CSC sale

7    and the non-CSC sale.  The appeal period

8    passed; no appeal was filed.  The sale closed,

9    and it's now beyond legal challenge.  The

10   purchased assets as defined in the APA became

11   property of the noteholders at closing.  They

12   cannot be considered property of the estate.

13   Under the settlement, the purchased assets

14   include the specified causes of action, and

15   accordingly, the settlement contemplates the

16   contribution of only non-estate property to

17   the GUC trust.

18                    The DDTL parties do not dispute

19   that the settlement calls for a transfer of

20   the specified causes of action by the

21   purchaser, and they do not allege the

22   distribution of estate assets will be made to

23   the GUC trust.  Because of this, they argue

24   that the distinction between property of the

1  state and non-estate property is not relevant

2  to Jevic and that it's a fallacy.  Your Honor,

3  we assert that the Supreme Court's decision

4  turned precisely on that issue, and in our

5  brief, we go through the transcripts of the

6  Jevic hearing, what various of the justices

7  said.  And it is clear that the issue of a

8  non-estate property distribution is not

9  decided by the Supreme Court.

10                 On the other hand, we have ICL

11  Holdings, binding precedent in this

12  jurisdiction.  And as hard as the objecting

13  parties might try to distinguish it, I see no

14  distinguishing characteristics between ICL and

15  this case.

16                 I also see nothing that renders

17  it non-viable or controlling at this point.

18  The dispositive issue in ICL Judge Ambrose

19  said was whether there was a distribution of

20  estate assets in violation of the priority

21  scheme.  Absent a finding that estate assets

22  were involved, there could be no priority

23  violation, and the Court found that estate

24  assets were not implicated.

1          This case is virtually identical

2    to ICL.  The purchaser has acquired

3    substantially all of the estate's assets.  The

4    purchaser is contributing them, some of them,

5    to a trust.  That trust will make

6    distributions to unsecured creditors together

7    with additional funds from the noteholders.

8          The claims and causes of action

9    that will be contributed were purchased by the

10   purchaser and belong to them.  The $1.25

11   million that is chartered to go to unsecured

12   creditors is coming from the noteholders

13   pockets.  Those were funds that were never in

14   the estate, were never part of the

15   consideration.  The $1 million funding for the

16   GUC trust, the exact same thing applies.

17   There is nothing coming from the estate.

18          So for these reasons, we believe

19   that Jevic is inapplicable, and ICL is good

20   law and in fact binding precedent here.

21          The U.S. Trustee would like to

22   extend Jevic and ask this court effectively to

23   do so, and to take up the solicitor general's

24   arguments during oral argument, and wants to

1   turn this into a gifting case or a

2   class-skipping case which involved property of

3   the estate and which involved a plan scenario

4   or some other scenario which is not this

5   scenario.  This is not a gifting case.  This

6   is a case -- this is not a class-skipping

7   case.  This is a case where a settlement was

8   reached and where through an arm's length

9   negotiation, a third party has agreed to

10  provide funding and other assets to a trust

11  for the benefit of unsecured creditors.

12              U.S. Trustee also attempts to

13  distinguish ICL in four ways.  Mentioning

14  releases that the secured lenders and others

15  were getting.  However, that argument fails,

16  because all of those claims were released at

17  the time that the final DIP order was entered.

18  In fact, they were released by the Debtors on

19  the first day of these cases pursuant to the

20  stipulations set forth in the first interim

21  DIP order.  They became final after the

22  Committee six days before this settlement was

23  reached.  There was no ability to challenge

24  them.  That was actually the U.S. Trustee's

1  second argument as to why this is different

2  than ICL.

3           U.S. Trustee also argues that

4  certain payments for Committee counsel somehow

5  implement each other.  That's simply not

6  correct.  The fees that were set forth in the

7  DIP orders were capped.  The fees for

8  Committee counsel throughout the cases.  And

9  as part of the settlement term sheet, one

10  component was an increase in that cap, and an

11  elimination of a sub-cap that had been in all

12  the orders.  This was not a gift through a

13  carve out as the U.S. Trustee has alleged, but

14  it was a settlement, part of a settlement of a

15  final DIP order which is hardly unusual.  The

16  funding did not come from anyone's collateral,

17  it did not come from estate assets, it came

18  directly from the increase in the cap which

19  was funds that were negotiated as part of this

20  settlement.

21           I should also note that the

22  analysis falls apart, because attorneys's fees

23  are administrative expenses of the Debtors'

24  estates.  So under any scenario , those funds,



1  administrative claims would have to be paid

2  before priority claims or unsecured claims,

3  even if we were dealing with estate property

4  and even if we followed the absolute priority

5  rule.  So we don't believe there's any

6  applicability to that argument.

7            I want to address a few other

8  issues, and then I will end for now.  Part of

9  what your Honor has to consider is the

10  fairness and the appropriateness of the

11  settlement, and there was testimony regarding

12  whether it's fair to skip over the IRS,

13  whether it's fair for the noteholders'

14  unsecured deficiency claim to be treated

15  differently.  Not excluded, but to be treated

16  differently under the settlement.

17            And the question came up during

18  Mr. Sass's testimony as what duties does an

19  unsecured creditors Committee have to priority

20  claimants and to unsecured deficiency

21  claimants or under-secured secure creditors

22  who have deficiency claims?  This is an issue

23  we've thought long and hard about.  And while

24  it may seem one that most bankruptcy lawyers

1   would think there's an easy answer to, I hope

2   the Court can trust me, there is no easy

3   answers to those questions.

4                   There is precedent, however, and

5   I'll cite to SPM Manufacturing Corp, 984 F.

6   2d. 1305 for the proposition that

7   specifically that a Committee's appointment

8   pursuant to 11 U.S.C. Section 1102 charged it

9   only with representation of the general

10  unsecured creditors, not with representation

11  of the IRS or other priority creditors.  That

12  case was superceded on other grounds.  That's

13  one case that we were able to locate on that

14  specific issue.

15                  With respect to deficiency

16  claimants, the Court in In Re:  Fidelity

17  American Mortgage Code, 1981 Bankruptcy Lexus

18  3272, recognized that the interests of an

19  unsecured creditors committee and an

20  under-secured creditor very well might be

21  different, and suggests that an unsecured

22  creditors committee's fiduciary duty may only

23  be to general unsecured creditors.  I will

24  submit that we found no binding authority on

1    that particular issue.

2              But let's talk for a moment

3    about the objectors in this case.  And as

4    counsel indicated, a lot of people aren't

5    happy.  But let's look at who they are.  So we

6    have the DDTL lenders.  They're a secured

7    creditor.  And I had marked as Committee 4 the

8    transcript of the October 16th hearing before

9    this court.  If I could only put my hands on

10   it, it would be great.  I don't know if your

11   Honor has it before him.  But the transcript,

12   the hearing that day was about the DDTL

13   lenders' motion for a $5 million

14   administrative claim.  Your Honor ultimately

15   denied that motion.  However, throughout that

16   transcript, there are numerous references by

17   Mr. Kaplan on behalf of the DDTL lenders and

18   to the court to the secured status of the DDTL

19   lenders.  Specifically, your Honor held on

20   page 66 of the transcript, "As we sit here

21   today, they have an allowed secured claim in

22   the amount listed on the Debtors' schedules.

23   That is the law."

24              That followed several places in



1   the transcript where Mr. Kaplan argued that

2   his client was a secured creditor and his

3   collateral had diminished during the case.

4             On page 12 of the transcript, I

5   can quote him as saying -- I apologize; wrong

6   cite.  On page 51 of the transcript,

7   Mr. Kaplan says, "Your Honor, that simply

8   can't be true that a secured creditor who the

9   Debtors corrected, they originally said we

10   were listed as a contingent claim, were

11   disputed, and we were not; it was part of the

12   proffer.  So we have a prima facie valid

13   secure claim.  We have a claim that the

14   Debtors have acknowledged they have done no

15   investigation whatsoever of any claims."

16             Mr. Kaplan goes on on page 53,

17   "Let's take a look at some of the other

18   arguments that they make.  As I said, we talk

19   about the fact that, well, we were never

20   unsecured.  We were never a secured claim.

21   Because of the petition date, we were

22   unsecured."  But they have no basis for that.

23   The only basis they attempt to argue is, well,

24   look at the auction results.  But the auction

1   results actually prove the complete opposite.

2   Because as we have noted in our papers, the CE

3   Star transaction contemplated paying off their

4   PNC facility with a first lien on their

5   revolving priority collateral in full

6   regardless of the outcome of the Columbus

7   sale.  So even if the Columbus sale had

8   generated zero proceeds, the PNC was paid off

9   in full.

10                 There's another reference of

11  Mr. Kaplan on page 16 of the transcript.  "So

12  in sum, your Honor, I think the evidence is

13  uncontroverted and crystal clear that there

14  has been diminution of value, that we have a

15  prima facie allowed claim, that we have a

16  diminution of value under the DIP order."

17                 Then your Honor says to the

18  Debtors on page 64, "You schedule them as

19  undisputed as a secured creditor that the

20  claim is allowed."

21                 And finally, in Your Honor's

22  ruling on page 100 -- I particularly like this

23  passage because your Honor made the

24  observation that I said something astute that

1   day.  On page 100, your Honor said, "To my

2   point to that question, is the value of your

3   collateral actually may not have diminished,

4   it may have increased.  I don't know, because

5   you haven't established what the value of your

6   collateral is on the petition."  That was Your

7   Honor's ruling in denying the motion.

8               For the DDTL lender to stand up

9   today and argue, woe is me, we're an unsecured

10  creditor, we haven't been treated fairly, yet

11  in October, months after the settlement, they

12  came before this court and said, we're a

13  secured creditor.  And your Honor found that

14  there was no value that's been proven as to

15  what their collateral is worth.  So the idea

16  that the Unsecured Creditors' Committee should

17  have somehow figured out at some point along

18  the way in these cases that they were an

19  under-secured creditor and that we owed some

20  fiduciary obligations to them, notwithstanding

21  that they were represented from the very first

22  day by very able counsel who was clearly able

23  to advocate for its interests.

24               So to rely on the idea that



```
 1    they're being discriminated against unfairly
 2    because they're an unsecured creditor and the
 3    Committee has, whatever Mr. Sass says, and I
 4    have the utmost respect for Mr. Sass, as I
 5    said earlier, there's not a lot of authority
 6    on this.  But if you look at the situation
 7    practically, I think the Committee could only
 8    have been said to discharged its duty to
 9    general unsecured creditors.  Priority
10    creditors are different.  Mr. Kaplan's client
11    is different.
12              The IRS filed two priority
13    claims.  Did they do anything to protect their
14    interest in these cases?  No, they didn't do
15    anything.  They weren't heard from throughout
16    the cases.  They were never in the process.
17    They could have come in and objected to the
18    sales motion, they could have objected to the
19    DIP financing, they could have objected to the
20    settlement terms when they were put on the
21    record.  They didn't do anything during the
22    cases.  Instead, the Committee was aggressive
23    and went out and tried to create value for its
24    constituency.  And now that that value has
```

1  been created, they want to jump on the

2  bandwagon and receive a portion of that

3  distribution.  Number one, it's not property

4  of the estate, it's not the estate's assets,

5  and if they wanted to be involved and if they

6  want to have a voice in these cases, you don't

7  come in in the 11th hour and try to take away

8  what was heavily negotiated months earlier.

9            They also didn't come in here

10  and complain when the employees who also hold

11  priority claims, when millions of dollars was

12  set aside for them.  I didn't see the IRS here

13  that day when those arrangements were made.

14  Why didn't they object to that?  Why are we

15  now?  Why was it okay for millions of dollars

16  in priority claimants to be paid ahead of

17  others?

18            That leads me to the WARN

19  claimants who are the last people who should

20  be here objecting.  If I were them, I wouldn't

21  come anywhere near this courtroom.  They're

22  being paid in violation of the absolute

23  priority rule, exactly what they're alleging

24  today, assuming that their argument holds up

1   that somehow these are estate assets or are

2   controlled by Jevic.  Why were they getting

3   paid?  What is the basis for that?  They

4   shouldn't be objecting, they should be

5   grateful that that money was set aside for

6   them specifically, and their objections really

7   don't go to this settlement, it goes to the

8   fact that they are being forced to litigate

9   the validity of their claim, and not simply

10   being handed all those funds.  And by the way,

11   any funds that aren't handed to them from that

12   pot go back to the noteholders.

13           So that leads me to my

14   conclusion, at least for now, and that's the

15   noteholders.  I want to give them credit, your

16   Honor.  They are sitting pretty today, because

17   if the court rules against and does not

18   approve the settlement, they walk off with two

19   and a quarter million dollars plus all kinds

20   of causes of action that otherwise are going

21   to go to general unsecured creditors.  To

22   their credit, they have stood by the

23   settlement, have not tried to weasel out of

24   it.  I give them a lot of credit for that.

1   They have been supportive throughout, and

2   certainly have earned the respect of me and

3   the Committee.  And are here today, even, and

4   I'm sure will comment, if necessary.

5               But as much as they have earned

6   our respect and as much as we had a hard

7   fought negotiation, it would be inappropriate

8   for them to walk away today with a

9   multi-million dollar windfall, and I think

10  they understand that, and that's why they have

11  been supportive.  And that's what they will be

12  handed if this settlement is not approved.

13  Your Honor, we urge the Court not to set a

14  precedent today that would reverberate around

15  the country, that out of the money unsecured

16  creditors shouldn't even waste their time at a

17  Chapter 11 case such as this in trying to

18  obtain a recovery for their constituency.

19              The secured creditors in these

20  cases got recoveries, they got assets, the DIP

21  letter got paid off.  But we often talk about

22  paying the freight and using the process and

23  not abusing the process.  And I would

24  respectfully submit that's exactly what



1    occurred here.  The process played out as it
2    should.  Unfortunately, this was not a case
3    where a plan could be confirmed and the
4    Committee created significant leverage, was
5    able to obtain a settlement for its
6    constituency.  And it would be respectfully a
7    terrible shame if they weren't able to realize
8    on that after all this effort.  Thank you,
9    your Honor.
10              THE COURT:  Thank you.
11              MR. KAPLAN:  Your Honor, Gary
12   Kaplan from Fried Frank on behalf of the DDTL
13   parties.  I have some slides that I want to
14   put up, but before I do that, I just want to
15   respond to a couple of the points.
16              First, I always love when I lose
17   in a hearing and somehow all of my arguments
18   are quoted back to me.  There was a
19   fundamental change since that hearing, and
20   that is my collateral is gone, it was sold.  I
21   have no collateral left.  We have an estate
22   that everybody has admitted has no assets
23   left.  So them to argue, no, they're really a
24   secured creditor because they argued pre sale



1 closing that they were a secured creditor is a

2 little bit ridiculous.  I wish I was a secured

3 creditor, I wish I still had my collateral

4 here, but that ship sailed a long time ago.

5 So we are a completely unsecured creditor,

6 have been for some time, and it was well-known

7 to the Committee when they were negotiating

8 that there was no collateral left and no value

9 left for us.

10          Your Honor, I'll put up the

11 slides.  If it will be helpful, I can hand you

12 a hard copy, as well.

13          THE COURT:  That would be great.

14 Thank you.

15          MR. KAPLAN:  So your Honor, yes,

16 Mr. Kinel was right, we are going to start

17 with Jevic, because we think it's pretty clear

18 that what's happening here is simply a

19 back-door means to avoid Jevic, move assets

20 that the documents themselves are very clear,

21 or at least at the time of this settlement

22 contemplated to go into the estate, and then

23 in a change which no witness could explain who

24 insisted on it, why it was there, there was

1  certainly zero testimony that the purchaser

2  insisted on it, somehow it shifted from assets

3  being left behind in the estate and words of

4  Debtors' counsel, and we'll go through the

5  exhibits, Debtors' counsel changed it and made

6  it crystal clear that the APA was to be amend

7  sod that there would be excluded assets, and

8  then contributed to the GUC trust by the

9  Debtor.  You have some very talented lawyers

10 on that side that everybody all of a sudden is

11 saying, oh, gee, that's not what we meant,

12 never meant it, I guess it was really sloppy

13 by the multiple firms from the Committee, from

14 the Debtor, everybody was sloppy, everybody

15 who was using defined terms somehow just

16 completely messed up term sheet after term

17 sheet after term sheet.  Even in the documents

18 that say this was the agreement, crystal clear

19 these assets were to come into the estate, be

20 contributed by the Debtor to the trust, then

21 all of a sudden, and it's something that

22 nobody, no witness could explain why there was

23 a change, but all of a sudden, we got a change

24 that now these assets are not going to be

1  excluded assets, but rather they're going to

2  go to the purchaser.

3            And so as when I started my

4  opening about the boy who kills his parents,

5  they made this change.  If they had kept the

6  term sheet as it was when it was announced,

7  then we wouldn't be dealing with this issue

8  and we wouldn't be, and we wouldn't be

9  standing up saying, woe is me, if you deny

10  this, your Honor, we're not going to get

11  anything.  Because under the terms of this,

12  the estate would be getting these causes of

13  action.

14            The Committee says just ignore

15  all of it, the only thing that's relevant is

16  to look at the final and ignore all of the

17  facts and all of the background.

18            And then if we continue on in

19  Jevic, I notice Mr. Kinel's terminology

20  changed a little bit from their pleadings to

21  now when they say predominantly.  Jevic

22  involved predominantly estate assets.

23  Admittedly it wasn't the focus of the court,

24  it wasn't argued in Jevic about the estate



1  versus non-estate asset distinction, but the
2  facts in Jevic are pretty close to the facts
3  here.  Okay, we had CSC contributing cash and
4  some contributing a lien.  They had assets
5  subject to a lien, they contributed.  Neither
6  of those are estate assets, and based on the
7  same theory that's being used today, neither
8  of those are estate assets.  Granted, it
9  wasn't argued, but to make this distinction
10 and say Jevic was crystal clear, it was only
11 focused on estate assets, well, when the facts
12 according to them were all non-estate assets,
13 it means there's something wrong; the Jevic
14 decision just doesn't make sense.
15            And this settlement here clearly
16 involves estate assets or estate value, if you
17 want to go to Armstrong and the gifting cases.
18 You have funding to pay estate professionals.
19 You have, again, requiring an increase of the
20 wind-down budget, and directing how the funds
21 are going to be spent, including buying tail
22 insurance for the company's directors.  It
23 provides for a lease by the Debtors, and to
24 this point, Mr. Kinel said, oh, no, well

1   remember the challenge period had expired, so

2   the noteholders got releases.  Yes, but the

3   settlement term sheet contemplates broader

4   releases than that.  For example, the Debtors'

5   officers, directors, agents, affiliates, et

6   cetera, are not obviously released by the fact

7   that the DIP challenge period expired, and yet

8   under the terms of the settlement, there are

9   these broad releases that goes to the parties.

10  So you get broad releases, including by the

11  Debtor of their claims against officers, et

12  cetera.  So you do have estate assets that are

13  being dealt with by the releases.

14              This settlement involves the

15  Debtor continuing to be involved in the claims

16  reconciliation process.  This isn't some

17  assets outside the estate that the Debtor has

18  nothing to do with; the Debtor has to be

19  involved.  Then you have the pursuit of

20  Chapter 5 and other causes of action, which we

21  dealt with a lot in our brief and I'm not

22  going to belabor it now.  But you have, again,

23  it goes to, and I hate when we use the word

24  launder, but you have estate causes of action

1    that under the Bankruptcy Code can be brought

2    by the trustee or the Debtor on behalf of

3    creditors, and somehow they're saying, well,

4    those were purchased for a moment and now back

5    in the estate, and the estate can now somehow

6    bring those causes of action.  And if those

7    causes of action can only be brought by the

8    estate, and there have been some courts that

9    have granted standing where it benefits the

10   estate.  But here they're saying there is zero

11   benefit to the estate because it's outside of

12   the estate, that, Judge, frankly doesn't make

13   sense to say we're going to have a settlement

14   that transfers those assets to a

15   court-approved trust that is now going to be

16   able to pursue it.

17             And so, you know, part of Jevic

18   was very clear, and as discussed, the Supreme

19   Court was very clear that talked about that

20   there are certain times where you can have

21   non-priority or priority-violating

22   distributions where there's a significant

23   bankruptcy related objective.  And the

24   situations they talked about was contributing

1    to the reorganization.  And here, and in Jevic

2    they found, as your Honor knows, that when it

3    was attached to a final disposition, it didn't

4    preserve the Debtor as a going concern, and it

5    didn't promote the possibility of a

6    confirmable bound.  There was no bankruptcy --

7    there was no reason to approve it, and

8    certainly no objective of the Bankruptcy Code

9    that would be further.

10           And the same is certainly true

11   here.  In fact, and going to the woe is me

12   argument at the end, again, that was the

13   argument in Jevic.  The creditors will get

14   nothing.  If you deny this, if you overturn

15   it, we will get nothing.  And the Third

16   Circuit said that was a justification, and

17   Jevic said, no, that's not.  The fact that

18   certain creditors will not get the benefit of

19   what they bargained for, if it violates the

20   code, that doesn't matter, and that's not the

21   appropriate justification.  And that is the

22   only justification that has been posited.

23           And one of the things that I

24   think is important was that, you know, there's

1  an argument, oh, your Honor is going to set

2  this major precedent on limitation of Jevic.

3  Frankly, I don't think your Honor needs to go

4  that far.  This case, you don't need to get

5  into the contours of Jevic.  Frankly, you can

6  say, I can leave Jevic to another day as to if

7  it's non-estate assets, whether it can be a

8  priority skipping distribution.  Because here

9  you're clearly dealing with estate assets.

10  And so your Honor can rule on this and say,

11  we'll deal with Jevic another day, and

12  Mr. Kinel and other committees want to come in

13  some other time and say Jevic still exists,

14  that under Jevic I still have the ability to

15  do this, that may or may not be true.  But

16  certainly under the facts here, we are not

17  dealing where a clear issue of non-estate

18  assets, we are dealing with estate assets that

19  we're trying to sort of create this fiction to

20  say they're not estate assets for today.

21          Then we turn to ICL, which,

22  again, there are questions about whether ICL

23  continues to be viable under Jevic.  Again,

24  not something that frankly needs to be

1   addressed today, because this is clearly

2   distinguishable from ICL.  And when you look

3   apartment what ICL did, and in our brief

4   reattached the term sheet that was approved in

5   ICL.  And what you had in ICL was a simple

6   cash contribution, period, and that was it.

7   Avoidance actions were purchased and then

8   eliminated, versus here where you have them

9   contributed back and then being pursued, which

10  is a fundamental difference.  You had

11  Committee Chapter 11 fees.  ICL just had a

12  little bit of fees just for their distribution

13  of the trust, that permitted them to use some

14  of the trust funds for when they distributed

15  the assets.  This is actually dealing with

16  incurred fees during the course of a Chapter

17  11 case.

18              And again, I talked about

19  earlier the Debtors acted in the

20  reconciliation and the releases.  But I think

21  the quote at the bottom from ICL shows the

22  distinction between ICL and this case.  And

23  there, the Court was talking about Armstrong

24  and talking about TSIC, and the Court found,

1   and this was the quote from the Court, the

2   trustee presented no evidence that the

3   settlement funds were, quote, otherwise

4   intended for the Debtors' estate.  All are

5   true here.  The settlement sums paid by the

6   purchaser were not proceeds from its liens,

7   did not at any time belong to Life Care's

8   estate, and will not become part of its estate

9   even as a pass-through.

10              We have showed and the documents

11  show absolutely definitively that these were

12  assets of the Debtors' estate, and then, in

13  fact, at the time of the settlement, they

14  contemplated through mean assets of the

15  Debtors' estate, and it was only through this

16  mechanism and through, you know, changes to

17  the term sheet that they now flipped it and

18  said we're going to move these assets outside

19  of the Debtors' estate.

20              And that takes us to

21  jurisdiction.  Your Honor, we don't disagree

22  with the fact that obviously if they settle a

23  DIP objection or settle the sale objection,

24  and that your Honor has jurisdiction to hear

**W&F**

**WILCOX & FETZER LTD**

Registered Professional Reporters

(302) 655-0477

www.wilfet.com

 1   that settlement.  But there's a limitation to
 2   that jurisdiction.  They would have that say
 3   as long as it's in connection with resolving a
 4   DIP, anything in the world that happens, even
 5   if it's between third parties, no matter what
 6   the claims are, that now resides with you and
 7   you're stuck with it, your Honor.  And we can
 8   put in our agreements that bankruptcy court
 9   has exclusive jurisdiction, they get all the
10   benefits of the different provisions of the
11   Bankruptcy Code.
12              That frankly can't be, and it
13   just doesn't work that way.  If what they are
14   saying is true, that your Honor, don't worry
15   about the Bankruptcy Code, and we don't have
16   to worry about fiduciary duties because this
17   is not estate assets have nothing to do with
18   either the purchaser directing it, these are
19   outside the bankruptcy court.  If that is
20   true, how can your Honor hear claims that are
21   being brought by this non-debtor party that
22   has nothing to do with the estate against
23   third parties?  And your Honor is going to
24   hear them, there's core matters related, how

1  are those related if those are assets that are
2  not part of the Debtors' estate, according to
3  them, it's just the purchaser gratuitously
4  giving money off to the side.  Your Honor
5  can't hear those.  The bankruptcy court
6  wouldn't have jurisdiction overall of those.
7  Yet they want your Honor not only to hear
8  those, they want the chapter 5 actions to
9  somehow be resurrect had, and they want your
10  Honor to establish procedures where every
11  claimant who is, again, apparently some third
12  party creditors who will have claims against
13  this non-Debtor asset that has nothing to do
14  with the Chapter 11 so we don't have to worry
15  about Jevic, we don't have to worry about
16  absolute priority.  And your Honor should
17  mandate how they go and seek those funds and
18  require mediation and all of that.  Your Honor
19  has to, in essence, create a new sort of
20  Bankruptcy Code just for those type of
21  distributions.  And your Honor, we submit that
22  that is well beyond the jurisdictional limits
23  of this court.
24                    And then we'll turn to the



1   Debtors' business.  I have no doubt that the

2   Debtors wanted to get their DIP approved,

3   wanted to get the sale done, and said, hey, if

4   we can get rid of some objections, we'll take

5   it.  And the testimony was that's what

6   happened.  That, frankly, the term sheet as

7   written, even though the Debtors have a

8   sophisticated director, they didn't even

9   recognize that one of the things he testified

10   was so key to him that he wanted to keep those

11   actions, that the term sheet that he was

12   agreeing to actually contemplated that the

13   estate would keep those actions.  But instead,

14   he thought, no, I'm not keeping those, so it's

15   not fair, but I'm going to approve it anyway.

16          And the Debtors had a rushed

17   process, which they admitted, they never heard

18   of this structure before the morning of the

19   hearing, had no idea this was coming to them,

20   they got a term sheet, said we have a hearing,

21   even though we've adjourned the DIP, even

22   though there's no testimony that there would

23   actually be harm in delaying the hearing by

24   any time, that, well, you know what, let's

1  just take it, we'll get one objection out of

2  the way and we'll deal with it later.  And

3  that frankly is not an exercise of sound

4  business judgment.  Yes, the standard --

5  assuming the settlement actually complies with

6  law, which we argue we don't believe it does,

7  we don't disagree with them on the 9019

8  standards, although we'll talk about Martin

9  factors in a moment.  But this does have to be

10  an exercise of sound business judgment.  And a

11  rushed judgment where the Debtors had a take

12  it or leave it proposal that they didn't even

13  have time to understand or read what was in

14  it, didn't negotiate one iota, and just took

15  it, that does not meet the standard of an

16  exercise of their sound business judgment.

17          And one of the things I started

18  with in my opening, your Honor, was the fact

19  that this wasn't sold.  There were no claims

20  and causes of action that were actually being

21  sold.  There was a reservation of rights that

22  had been filed , and when we have all the

23  pleadings that we discuss this our brief, the

24  Committee had stood up and said, okay, we're

1   okay on the sale.  The Committee told the

2   Court that the sale produced the highest and

3   best value.  As the Committee acknowledged,

4   all of their claims against the noteholders

5   had been waived.  The noteholders had under

6   the terms of the DIP order valid binding liens

7   that were not subject to challenge by anyone.

8   So they had liens on all of the assets, there

9   were no claims left by the Committee.  So what

10  we have here, as I said before, this isn't a

11  settlement.  They would love to use the 9019

12  standard, but this isn't a settlement.  What

13  they're effectively trying to do is create in

14  essence a Chapter 11 plan but have it blessed

15  under a 9019 standard because they could never

16  comply with the standards for approval of

17  anything with any greater scrutiny.

18              And your Honor, there are

19  standards that courts in this district, as

20  your Honor knows very well, there are

21  standards that need to be looked at when

22  approving a 9019.  And they didn't even bother

23  to put on a case to show that they satisfied

24  the Martin factors.  They said, well, we had



1    the DIP objection, we had a sale objection,

2    that should be sufficient.  No evidence, no

3    testimony by either their Committee witness or

4    the Debtors' witness as to the viability of

5    those claims, whether they thought there was

6    any likes to those claims.  In fact, we heard

7    the opposite; they just wanted to be done with

8    as many objections as they could.

9                    Likely you heard of difficulty

10   in collection and complexity of litigation.

11   It was a DIP objection at most and a sale

12   objection; certainly not anything complex.

13                   Then that takes us to the

14   paramount interest of creditors.  And the

15   paramount interest of creditors, when you look

16   at the disparate treatment that's here, it

17   certainly is not in the paramount interest of

18   creditors.  For a creditors' committee who now

19   spends a lot of time trying to dig up cases to

20   prove that they don't have fiduciary duties to

21   those people with whom they are actually

22   harming by this settlement is astounding.  In

23   fact, if you listen to the argument, it was we

24   think we don't have fiduciary duties to the

1    DDTL parties' deficiency claims well, because

2    they were represented by counsel, they were

3    active in this case, and since they were

4    active, they didn't need to worry about them

5    so we could ignore our fiduciary duty.  And

6    that darn IRS, they just sat quiet the whole

7    time.  They could have spoken up.  They never

8    spoke up and they were silent the whole time,

9    so we didn't need to deal with them at all.

10   So somehow they don't have duties to you if

11   you're active in the case, they don't have

12   duties to you if you're silent in the case.

13              And what the record shows that

14   the documentary evidence shows, that it is the

15   Committee itself, not the purchaser, that

16   changed the term sheet and changed it to carve

17   out the priority claimants and to carve out

18   the deficiency claims.  I understand why

19   they're worried about breaching their

20   fiduciary duty and why they're very worried to

21   try to point out case law to say, gee, we

22   didn't breach our fiduciary duties.  But for

23   them to sit here and for a creditors'

24   committee to be an architect of a priority

violating scheme that discriminates against unsecured creditors to whom they owe a fiduciary duty is pretty outstanding. And for the argument to be that somehow that satisfies the Martin factors that's in the paramount interest of creditors to approve such a scheme, frankly, it just doesn't make sense even arguing it.

So in conclusion, your Honor, the settlement motion has to be denied. This is not a difficult case. Even if we were to agree with them that Jevic applies only to estate assets, there clearly is involvement of estate assets here, and this is clearly tied in instrumentally to the estate. They just failed to exercise any modicum of business judgement. They failed to satisfy their burden under 9019. And as I started and as I'm going to end, your Honor, this is something that they created. The term sheet that's in the record that the noteholders proposed from day one, more than a month before this settlement was reached, said pull out a treatment, everybody can get it. And

1    also said certain assets would come into the

2    estate.  The Committee and of perhaps the

3    Debtors' counsel for whatever reason decided,

4    no, we want to be Smarter, we want to make

5    sure it never comes into the estate so we want

6    to remove that, and we want to take all of

7    this for those people who are on the

8    Creditors' Committee.  That was their choice,

9    your Honor, and unfortunately for them, by

10   controlling case law, the settlement must be

11   denied.  Thank you, your Honor.

12                    THE COURT:  Thank you,

13   Mr. Kaplan.

14                    Ms. Casey?

15                    MS. CASEY:  Good afternoon

16   again, your Honor; Linda Casey for the United

17   States Trustee.

18                    Your Honor, the Committee and

19   the Debtors are urging an overly simplified

20   analysis of whether this court can approve the

21   settlement agreement.  They argue that the

22   Third Circuit's ICL decision remains binding

23   Third Circuit precedent that this court must

24   apply full stop, and because the assets are

1　purportedly not estate assets today, then the

2　settlement should be approved.

3　　　　　This is overly simplistic in two

4　ways.  First, while it is true that the Jevic

5　decision directly dealt with an end of case

6　distribution of admittedly estate assets, it

7　did not specifically address whether

8　consideration paid to objecting parties in

9　order to obtain the Debtors' assets through a

10　363 sale could be classified as anything other

11　than estate assets.  And a comprehensive

12　analysis of the Jevic decision demonstrates

13　that ICL's holding cannot survive.

14　　　　　In short, the potentially

15　serious consequences that the Supreme Court

16　sought to avoid by refusing to adopt a rare

17　case exception to an end of case priority

18　skipping distribution scheme will be present

19　if the fiction of non-estate assets continues

20　as a viable means of structuring an end of

21　case priority skipping distribution in the

22　context of a case involving a 363 sale.

23　　　　　The second way that the

24　Committee and the Debtors overly simplified



1  this analysis is even if ICL remains good law,

2  they urge the determining whether the

3  settlement proceeds can constitute assets of

4  the estate must be determined as of today,

5  wholly ignoring that as of the date the

6  settlement agreement was entered into, the

7  majority of the considerations should be

8  provided were clearly estate assets.  The

9  willingness of the Committee to provides its

10  quid pro quo, withdraw of its objections and

11  the entry of the orders prior to approval of

12  the settlement does not alter the fact that

13  the parties negotiated and settled upon

14  ultimately class-skipping distributions of

15  estate assets.

16            So we start with the first step

17  in analyzing whether the settlement agreement

18  can be approved by looking at the Jevic

19  decision.  The Committee urges this court to

20  adopt its narrowest possible holding, that

21  only end of case priority skipping

22  distributions of estate assets are prohibited.

23  Those were the facts in Jevic.  The

24  distribution was an end of case distribution,

1  and the assets to be distributed were with no

2  objection estate assets.  But Jevic cannot be

3  read so narrowly on either port.  The Jevic

4  decision does not authorize any and all

5  distribution of estate assets, but rather sets

6  forth the test to determine whether any

7  proposed interim class-skipping distribution

8  is appropriate.  The Supreme Court stated that

9  an interim distribution of estate assets in

10  violation of the code's priority scheme must

11  have a significant offsetting bankruptcy

12  related justification, setting forth several

13  examples, including preserving the Debtor as a

14  going concern, or promoting the possibility of

15  a confirmable plan.

16           Courts applying Jevic cannot

17  simply ignore those injunctions and say, well,

18  the Supreme Court only discussed end of case

19  distributions, and therefore, all interim

20  distributions are appropriate.  Rather, they

21  must apply Jevic's rationale and look at all

22  interim distributions to see if there is, in

23  fact, a significant offsetting bankruptcy

24  related justification before permitting it.

1           And that same principle applies

2    here whether determining that their

3    justification that there's this fiction of

4    non-estate assets continues to survive Jevic.

5    The Supreme Court specifically addressed

6    whether to create a rare case exception to an

7    end of case priority skipping distribution

8    scheme.  It declined to do so.  Its reasoning

9    in declining such an exception must be

10   reviewed and analyzed.  The Supreme Court

11   noted that if a rare case exception were

12   permitted, the fact that it is difficult to

13   give precise content to the concept of

14   sufficient reasons, would turn the exception

15   into a general rule resulting in uncertainty.

16   This uncertainty, in turn, would result in

17   consequences that would be potentially

18   serious.  These serious consequences include

19   the departure from the protections Congress

20   granted particular class of creditors; changes

21   in bargaining power of different classes of

22   creditors, even in bankruptcies that do not

23   end in structured dismissals; risk of

24   collusion where high priority creditors and

1  low priority creditors team up to squeeze out

2  mid priority creditors; and making a

3  settlement more difficult to achieve.

4          The Supreme Court specifically

5  noted the importance of clarity and

6  predictability in light of the fact the

7  Bankruptcy Code standardizes an expansive and

8  sometimes unruly area of law, and concluded

9  that the Court cannot alter the balance struck

10 by the statute.

11         Today we are faced with a

12 different exception to the prohibition of end

13 of case class-skipping distributions, and that

14 is that such distributions are not estate

15 assets.  Resting upon a Third Circuit decision

16 that rejected the notion that a payment

17 directly from the purchaser of the Debtors'

18 offers' assets to an objecting party

19 constituted proceeds of the property of the

20 estate.

21         So what we are really faced with

22 here today is deciding whether ICL's holding

23 can survive Jevic is the following question:

24 Can Jevic be read so narrowly as to create a

1  rush to the courthouse by individual

2  creditors, an official or ad hoc committee of

3  creditors, perhaps even equity holders or ad

4  hoc committees of equity holders, seeking

5  their share of the side deals or gifts offered

6  by the purchaser of the Debtors' assets?

7               To continue the holding of ICL

8  that allows this fiction of non-estate assets

9  is to adopt a fiction that creates the same

10 uncertainty that the Supreme Court's decision

11 in Jevic was designed to address.  Here my

12 argument was going to go on simply with the

13 facts of Jevic.  We have, however, a record

14 now established that shows the exact harm that

15 the Supreme Court was addressing.  And your

16 Honor, I would posit that we have that record

17 today, because as the Committee and the

18 Debtors have argued, they weren't trying

19 necessarily to get around Jevic, they were

20 trying to get an opinion with the Third

21 Circuit's decision.  And perhaps in future

22 cases we won't have quite the same record,

23 because lawyers will know to dot their I's and

24 cross their T's a little bit better to not

1  have a record so clearly show the harms that

2  the Supreme Court was trying to address.

3              But here what we have is the

4  same situation.  It is difficult to give

5  precise content to the concept of what is

6  non-estate assets when discussing a sale of

7  the Debtors' assets through a 363 sale.  It

8  creates uncertainty.  How much is the

9  purchaser willing to gift to rid itself of the

10  objections?  Who is the purchaser willing to

11  gift to?  How will the purchaser permit such

12  gift to be distributed?

13              This exception would incentivize

14  future stalking horse bidders and even other

15  bidders at the auction to hold back part of

16  their consideration they would otherwise be

17  willing to pay to ensure that funds would

18  still be available for it to pay objecting

19  parties, thus further depressing the

20  liquidation value of assets already in

21  bankruptcy.

22              And how does the fiction

23  permitting the ICL fiction to continue despite

24  the Supreme Court's admonition result in the



1  harm?  The first is the departure from

2  protections Congress granted particular

3  classes of creditors.  In Jevic, they talked

4  about the fact that Congress established

5  employee party to alleviate the hardships

6  employees face when their employers file

7  bankruptcy and to encourage employees not to

8  abandon ship.  Permitting the major parties in

9  a case to structure a sale such that the

10  transfer of consideration goes to some

11  individual creditors rather than the estate,

12  and therefore deeming that structure to create

13  non-estate assets results in that harm.

14           The record here demonstrates

15  that harm.  The record here, the Committee and

16  the purchaser negotiated a payment to certain

17  unsecured creditors while not protecting

18  priority creditors.  In fact, what we see here

19  is an email from Committee counsel

20  specifically providing that the priority

21  creditors will not even be able to participate

22  in a pro rata distribution of the assets to

23  the GUC trust.  And certainly not protecting

24  the code balance that gives them priority over

1  everybody else.

2            This also has the second harm of

3  Jevic, changes in bargaining power of

4  different classes of creditor, even in

5  bankruptcies that do not end in structured

6  dismissals.  Continuing the fiction that money

7  is paid to overcome objections to sales are

8  not considerations paid by the purchaser to

9  obtain the assets, shifts the balance struck

10 by the statute, and grants all creditors and

11 all equity holders an equal chance to obtain a

12 payment, as long as it directly comes from the

13 purchaser, altering the code's balance and

14 changing the bargaining power.

15            Here, again, we have testimony

16 that priority creditors and the deficiency

17 claims of the disfavored unsecured creditors

18 were excluded in a manner that appears not to

19 be directed by the owner of the assets

20 allegedly being contributed but by the

21 Committee.

22            We also have here the third harm

23 that Jevic addressed, risks of collusion,

24 where high priority creditors and low priority



1   creditor teams team up to squeeze out mid

2   priority creditors.  Sophisticated,

3   well-funded parties, major unsecured

4   creditors, large equity holders committees,

5   can use this non-estate assets fiction

6   exception to 363 sales to force a bargain with

7   a purchaser where the deal is structured in a

8   way that mid priority creditors are squeezed

9   out.

10              Query, would the Court shall

11  comfortable to approve this same settlement if

12  the settling party were not the Committee but

13  were rather than ad hoc group of equity

14  holders, squeezing out not just priority and

15  administrative creditors, but also unsecured

16  creditors, all with the fiction that, well,

17  it's not estate assets anyway.

18              The record here shows an attempt

19  to structure this settlement to exclude

20  certain estate assets from the estate prior to

21  contributing it to the GUC trust.  We don't

22  really know why.  The DDTL parties have

23  indicated that perhaps it's to get around

24  Jevic.  That may be the case.  It may be the

1  case to get around a Martin valuation, with a

2  valuation of the settlement -- excuse me, the

3  specified causes of action might be too great

4  compared to the benefit received by the estate

5  for the release of the Committee's objections.

6            But we see that attempt.  We see

7  the attempt to take assets that belong to the

8  estate and find a structure where it can come

9  into this court and say it's no longer an

10 asset to the estate, and now it can go to the

11 preferred creditors and skip over the

12 unpreferred creditors.

13           We also have a situation here

14 where you not only have the priority creditors

15 and the admin creditors not being invited to

16 participate in this distribution, but you have

17 fully unsecured secured lenders, clearly a

18 disfavored, probably a very large claim that

19 would swamp the unsecured creditors, and

20 they're kicked out of this distribution.

21           And finally, we have the last

22 harm that the Supreme Court tried to address,

23 which was making a settlement more difficult

24 to achieve.  If all parties know the playing

1  field and any money paid to acquire the assets

2  of the Debtors is proceeds and estate

3  property, then all parties will be invited to

4  the settlement table, and a global resolution

5  is more likely to result.  If on the other

6  hand all parties know that, structured

7  correctly, any money paid by the purchaser

8  could go directly to any creditor, settlement

9  will be more difficult to achieve, and there

10  will be a free for all to be the one that the

11  purchaser deems worthy enough of the separate

12  side deal.

13          The Jevic court did not close

14  the window on end of case priority-skipping

15  distributions, but leaves the barn door wide

16  open to permit creative lawyers to craft

17  individual solutions that transfer estate

18  property into purportedly non-estate property,

19  resulting in the very harm that the Supreme

20  Court was addressing.  ICL's blessing of the

21  fiction that consideration paid directly to a

22  creditor to obtain the Debtors' assets without

23  objection is not proceeds of the Debtors'

24  property cannot survive the Jevic decision.

1          It is also worth to know that

2     the procedures here, the settlement

3     procedures, as your Honor said, we cannot look

4     at this in a vacuum, the settlement procedures

5     that are proposed by the Committee go far

6     beyond anything in Jevic and go far beyond

7     anything that the code or the bankruptcy rules

8     provide.  I do have specific objections, and

9     if we get to that point where we have to

10    discuss it, I'll go through them.  But in

11    general, the Bankruptcy Code and the rules are

12    flipped on their head.  There's no right to

13    take discovery, no right to even provide

14    testimony supporting the claim, binding claims

15    mediation where the claimant has to pay half

16    of the mediation.  None of these are in the

17    code, and the entire scheme is just basically

18    saying, as long as there aren't estate assets

19    or as long as this court adopts the fiction

20    that these are not estate assets, we then can

21    just ignore the entirety of the code and the

22    rules and put whatever in place makes sense.

23          We also heard something very

24    telling in the Committee's argument today.

1    The Committee said if you disapprove this,

2    then the purchaser will have received a

3    multi-million dollar windfall.  That would not

4    be fair.  That, your Honor, is exactly what

5    the argument is.  This is not a gift, it is

6    not a side deal, it is the purchase of the

7    assets, and that payment came in as

8    consideration to be able to get those assets.

9    And the Committee admitted it.  If you

10   disapprove of this, they've received the

11   windfall without paying everything they agreed

12   to pay to get those assets.

13              The Committee also warned your

14   Honor that if you disapprove this, it will

15   reverberate across the nation and prevent

16   committees in future cases from being able to

17   enter into settlements.  But your Honor, it

18   will not be your decision that will

19   reverberate across the nation, it is the

20   Supreme Court's decision.  The Supreme Court

21   specifically said that the importance of

22   clarity and predictability in light of the

23   fact that the Bankruptcy Code standardizes an

24   expansive and sometimes unruly area of law

1  resulted in the Supreme Court saying it cannot

2  alter the balance of the code.  Right here,

3  the balance of the code is unsecured creditors

4  cannot get paid out of estate assets until all

5  senior creditors are paid in full.  And if

6  that makes it more difficult for a Committee

7  to enter into an agreement with this fiction

8  of a side deal, the fiction of non-estate

9  assets, and forces them to comply with the

10  Bankruptcy Code, that's what the Supreme Court

11  said in Jevic.

12            As such, the settlement

13  agreement here cannot be approved as it does

14  skip higher priority claims, discriminates

15  against disfavored unsecured creditors, and

16  the fiction that it is all done by non-estate

17  assets cannot be continued post Jevic.

18            However, even if your Honor

19  determines that ICL does continue to have

20  viability, it does not shield the settlement

21  agreement in this case.  And despite what the

22  creditors' Committee stated in their argument

23  today, there is a dispute as to whether the

24  assets are estate assets.  There are at least

1  four distinguishing factors.  First, the

2  Debtors and the Committee are providing mutual

3  releases.  The Debtor in ICL were not

4  providing any releases.  But here, as the DDTL

5  parties already pointed out, these releases

6  are broader than the releases that were

7  contained -- or excuse me, than the

8  stipulations and waivers contained in the

9  final DIP order, and they are also the

10  Committee's releases, as well, which of course

11  they're releasing estate causes of action.

12  This is clearly estate property, and anything

13  received in exchange for the Debtors'

14  releases, the Debtors' broader releases than

15  the final DIP order, the Committee's broader

16  releases than the final DIP order, are estate

17  assets.

18          Second, the settlement releases

19  the Committee's right to pursue claims against

20  the secured lenders which claims are estate

21  causes of action.  The Committee hangs its hat

22  now on the fact that the challenge periods set

23  in the interim order expired, the final order

24  had not been entered as of the date of this

1    settlement.

2              Third, the settlement provides

3    an increased payment to the secured lender to

4    pay professional fees.  And in this respect,

5    we need to look at the settlement agreement

6    which specifically provides how those

7    increased funds are going to come to the

8    Committee.  And that is the Committee's

9    professional fees shall be paid solely through

10   the wind-down budget and the applicable amount

11   of seller retained third party professional

12   fees, i.e. Debtor retained third party fees,

13   included in the wind-down budget.  And section

14   3.1 A-2 of the APA shall be amended to reflect

15   the updated total amount of seller, i.e.,

16   Debtor retained third party professional fees

17   or the wind-down budget.  So this is being

18   paid by the Debtor, according to the terms of

19   the settlement sheet.  In their papers, they

20   argue that, well, final DIP order was already

21   approved, the escrow was already funded, the

22   fee applications have been approved, we've

23   been paid, there's no Debtors' assets being

24   transferred in this.  But clearly that's not

1    true.  At the time of the settlement, none of

2    that had occurred, and the quid pro quo was

3    the favor of the DIP objection to allow the

4    DIP order to be entered, to allow that money

5    to be funded, and therefore, at the time the

6    settlement was entered into, it was clearly

7    estate assets.

8                    There's also an issue the

9    Committee says, well, it's not priority

10   skipping because we're admin creditors, we

11   have to be paid.  As your Honor indicated, you

12   have to look at this case in its totality, and

13   in the case in its totality, we are currently

14   administratively an insolvent estate; we have

15   the WARN act creditors establishing a record

16   that there's a possibility that their admin

17   claims have not been appropriately reserved

18   for, and that they might not be paid in full.

19   So therefore, you can't just say, well,

20   because we are admin creditors, there's no

21   priority skipping.  There are other admin

22   creditors here who are not being paid.

23                    Finally, there is the transfer

24   here of estate causes of action again



1  purportedly sold to the purchaser and then

2  transferred to the GUC trust.  ICL did not

3  address whether this indirect transfer of

4  estate assets could be deemed to be a transfer

5  of non-estate assets, and it's clear it should

6  not be.  Again, at the time the settlement was

7  entered into, not today, they were estate

8  assets.  The sale had not closed, the sale had

9  not been approved.  At the time that the

10 Committee and the noteholders were negotiating

11 over whether the Committee should be able

12 to -- excuse me, the GUC trust should be able

13 to get these causes of action, they were

14 estate causes of action.

15          They became non-estate causes of

16 action, arguably, when the Committee agreed to

17 withdraw its objection and let the sale order

18 be entered.  But at the time of the

19 settlement, they were clearly undeniably

20 estate causes of action.  They may come back

21 and say, your Honor, we had testimony that the

22 Debtor tried to get them to not be included in

23 the APA and worked hard not to get them into

24 the APA and they were into the APA.  The APA

1  was not approved.  At the time they entered

2  into the settlement, the APA was subject to

3  objection, had not been approved, the cause of

4  action were clearly estate causes of action.

5  Thus, even if ICL does remain good law, the

6  assets transferred pursuant to the settlement

7  cannot be deemed to be non-estate assets, and

8  the settlement cannot be approved.

9                I do have one technical point.

10  If your Honor were inclined to approve the

11  settlement agreement, the settlement agreement

12  provides that the Debtors and the Committee

13  will not object to fee applications brought by

14  any of the parties' professionals.  There is a

15  fiduciary out so that the Debtors and the

16  Committee can meet their fiduciary obligations

17  to review and object to fee statements of

18  estate professionals.  But, of course, the

19  parties include the DIP lender and the

20  purchaser, and therefore, their professionals,

21  they're not estate professionals, and the

22  fiduciary out in the settlement agreement does

23  not extend to that.  And if your Honor were to

24  approve the settlement agreement , we do

1  object to the provision that says that the

2  Committee and the Debtors agree not to object

3  to the fee statements of the DIP lenders or

4  the purchasers' agreements -- excuse me,

5  professionals.

6          I do have specific objections to

7  the procedures motion.  I don't know if your

8  Honor would like me to go through it now.  I

9  don't believe that that's where we are; I

10  think we're waiting --

11          THE COURT:  Yeah, let's wait on

12  that.

13          MS. CASEY:  If your Honor

14  doesn't have any further questions, that's

15  all.

16          THE COURT:  I don't.  Thank you.

17          We're going to take a short

18  recess, then I'll hear the next set of

19  objectors, so about five minutes.

20          (A brief recess was taken.)

21          THE COURT:  Next?  Mr. Raisner?

22          MR. RAISNER:  Thank you, your

23  Honor.  Good afternoon.  Jack Raisner on

24  behalf of the WARN class.



1          Your Honor, the Jevic court did

2   rule that in a case ending distribution by an

3   estate, the priority code must be followed.

4   It is true that the distinction between estate

5   and non-estate assets were by that point a

6   non-issue, and that's because the appellees

7   rendered itself by not pursuing that argument

8   rather early in the appeal process,

9   recognizing it as a non-starter.

10          And Mr. Kaplan and Ms. Casey did

11  an excellent job of showing how intertwined

12  the distributed assets were to the estate that

13  differentiated from ICL.  The argument we did

14  not attend that afternoon in the Third

15  Circuit.  So I'm not going to argue those

16  differences.

17          But I would like to make one

18  point that I think might have been lost and

19  may not even have surfaced in the Jevic

20  opinion, but is important here.  And that is

21  that when the assets are being used by the

22  Debtor, they are not just serving as a

23  messenger agent for the secured lender as a

24  passive intermediary, taking the money from

1   the lender and giving it to the creditors in
2   their pockets.  They're using the money to
3   settle claims against the estate which are
4   claims against the Debtor itself.  The Debtor
5   is playing the role of a self-interested
6   agent, in agency principles, being such an
7   agent is liable personally.  And when the
8   Debtor is using the money as it does here, to
9   extinguish claims against it from creditors,
10  then it is liable to have to follow due
11  process and the Bankruptcy Code.  And that is
12  a way to, again, differentiate ICL in which
13  this didn't happen, but it's compelling I
14  think in light of the procedures here that
15  were proposed in the dismissal motion for the
16  non-WARN CSC employee claimants.  Their claims
17  were supposedly going to be, are going to be
18  sent to them in the form of a notice saying
19  that they're allowed certain amount of money,
20  and they will have 14 days from receipt in
21  order to object to that with particularity and
22  with documentation if they want to preserve
23  their claim.  And if they don't respond in the
24  14 days, in the event that the Debtors do not

1   receive a timely claim objection to the

2   proposed disbursement notice, the Debtors may

3   make the appropriate distribution from the CSC

4   employee reserve in full and final

5   satisfaction of the related non-WARN CSC

6   employee claims.

7                   So what they are doing is

8   setting up a system to extinguish claims as

9   they see fit with the amount of money that the

10  Debtor sees fit.  And that is the finality of

11  taking away of someone's claim which is a due

12  process issue that I do think that the Jevic

13  decision does recognize.  And you hear certain

14  bankruptcy lawyers saying that after Jevic,

15  they didn't realize that the Constitution

16  played such a part under the Bankruptcy Code.

17  So there is that, your Honor.

18                  But I'd like to focus then on

19  the other side of Jevic and what the Supreme

20  Court did and what was supposed to be done,

21  and that is to make priority skipping final

22  distributions, of course, but with consent.

23  And the motivation to reach consent is to have

24  a dialog, to have some sort of settlement with

1  those priority claimants so that there's a

2  basis for reaching consent.  Here there was, I

3  think, a purpose of putting certain amount of

4  money into an escrow which was going to induce

5  some kind of resolution of claims, both the

6  Jevic -- I'm sorry, the WARN claim and also

7  the non-WARN claims.

8          The problem here is that the

9  procedures are hollow.  Our concern at the

10 outset was that we didn't have information.

11 And so we lodged our first objection based on

12 that alone, and then as we found it harder and

13 harder to pull out any details or terms

14 regarding this amount of four-and-a-half

15 million dollars roughly, it turned out it was

16 hard, because there was no there there.  There

17 are no terms.  There is nothing to stake that

18 money in the ground with certainty such that

19 one can even talk about settling no less

20 relinquishing an objection to the fact that

21 the estate is trying to get out of bankruptcy

22 with no provision to pay priority claims in

23 full.

24          But there's an opportunity when



1  there is supposedly $4.6 million to reach a

2  settlement, to reach a consensual resolution.

3  And that's a missed opportunity here.

4           Our objections were raised and

5  they were not responded to in the most recent

6  reply by the Debtor and Committee, and the

7  Debtor and Committee has put on no case

8  whatsoever to show that there is any there

9  there to this supposed $4.6 million.  So to

10 say they don't understand why we're here

11 rebuffing us the way they have done from day

12 one, what are you worrying about?  There is

13 this one here for you.  That would be

14 wonderful.  And get to go a resolution and

15 settlement includes, however, a proportionate

16 responsibility on our part to kick the tires,

17 do the due diligence, and keep litigating

18 until we see there's been some there there,

19 and there has been no case put on that there

20 is any.

21          So it does seem as though there

22 was an awareness that in order to, quote, get

23 around Jevic in order to try to at least

24 create the possibility or illusion of a



1    consensual settlement, something was done to

2    put some rules, a few sentences down in some

3    orders.  But it unfortunately turns out to be

4    a losery, that the 4.6 million would even used

5    to pay employees is suspect, because the first

6    sentence of the sale order of August 19th, the

7    very first sentence leaves an open-ended,

8    ambiguous clause as to what the money might

9    even be used for.  I'll just read it into the

10   record.  "The ad hoc notes and Creditors

11   Committee, PE and CE, GSPEO, and the DIP

12   lenders, the creditor parties, agree funds

13   will be set aside (in an escrow or other

14   acceptable manner) the employee funding escrow

15   from the net proceeds from the sale in an

16   amount sufficient to pay the estimated amount

17   of all allowed security priority and

18   administrative claims of the employees of CSC,

19   whether they're working or not, or such other

20   amounts as may be agreed upon."  The money of

21   the proceeds may be set aside to pay other

22   amounts as may be agreed upon.  That's

23   completely open-ended.

24                   And of course when we first read



**WILCOX & FETZER LTD**

Registered Professional Reporters

(302) 655-0477

www.wilfet.com

1    it, we didn't know what that means, and we
2    tried to fathom it.  But as you can see from
3    the testimony today, nobody knows what will
4    ultimately be the agreed upon use of whatever
5    money has been in some way segregated.  And so
6    there is a -- there was a sense in Jevic that
7    the one plaintiffs were offered something and
8    they didn't take it, and their recalcitrant or
9    the step up artists or something, and
10   unfortunately here, there's an idea that
11   somehow we're looking a gift horse in the
12   mouth.  But if the result of whatever the
13   Court's disposition is would be to have some
14   certainty placed in the use of these funds
15   that have been used in this settlement so that
16   a constructive settlement can be talked about
17   and perhaps reached, that should be the way
18   cases end in a final distribution, not with
19   terms thrown at creditors and then close the
20   doors and ears and come into court and say we
21   can't do anything else about this.  That is
22   not the best practice.  Thank you, your Honor.
23             THE COURT:  You're welcome.
24   Mr. Benson?



```
 1            MR. BENSON:  Thank you, your
 2   Honor.  Just a few brief points.  I know we're
 3   not currently discussing objections to the
 4   mechanics motion as it's called, but I want to
 5   direct the Court's attention to two provisions
 6   of the liquidating trust agreement, because I
 7   think they're directly relevant to the issue
 8   of just jurisdiction over the settlement.
 9            I first note in the liquidating
10   trust agreement Section 2.2 H, which entitles
11   the liquidating trustee to seek a
12   determination of tax liability or refund under
13   section 505 of the Bankruptcy Code.  10.6
14   entitles the trust to request an expedited
15   determination of taxes and tax refunds, tax
16   refund rights, excuse me, of the CE
17   liquidating trust, including the disputed
18   reserves under section 505 B of the Bankruptcy
19   Code for all the terms or claims filed by the
20   CE liquidating trust for all taxable periods
21   through the determination of the CE
22   liquidating trust.
23            Now, section 505, the broad
24   granted jurisdiction to bankruptcy courts to
```



1  determine tax liability has been limited by

2  the Third Circuit in the Qualcomm case to tax

3  liabilities of the Debtor or the estate for

4  the most part unless, very rare circumstances,

5  it says, but generally 1334 says you have to

6  have related jurisdiction.  If the liability

7  is not of the Debtor or the estate, it's

8  unclear how that relates to administration of

9  an estate, and therefore, as a general matter,

10  there can be no jurisdiction for the

11  liquidating trust, or no jurisdiction over tax

12  liabilities of the liquidating trust unless it

13  is, in fact, the estate.  Same holds true for

14  the expedited determination request under 505

15  B under the code.  That procedure is only

16  available to determine liabilities of the

17  estate.

18           Now, exceptions are made

19  sometimes when you have liquidating trust that

20  is deemed to be a de facto successor to the

21  estate.  But that is only where you have a

22  liquidating trust that is administering the

23  estate assets.  So here, in order for the

24  Court to have the jurisdiction that is being

1    sought under the liquidating trust agreement,

2    the liquidating trust must be a de facto

3    successor to the estate, meaning it must be

4    administering estate assets.  If that's true,

5    then there's a Jevic problem.  If the

6    liquidating trust has no estate assets, it is

7    not a successor to the estate, then there's no

8    jurisdiction, and we continue our objection to

9    the liquidating trust.

10             Moving on, I'd just like to

11   respond to Mr. Kinel's comment about how the

12   United States and the IRS were not involved up

13   until very recently.  We weren't involved

14   because as far as I know, no one at the tax

15   division or the IRS was alerted that any of

16   this was happening.  We do not have the

17   resources to have the DOJ attorney attend ever

18   sale hearing and DIP hearing and hearing of

19   any kind to make sure that there is no

20   settlement put in place that affects us down

21   the line and cuts out our priority claim.

22   It's just totally unrealistic, it's

23   unrealistic to all other priority claims,

24   employee claims when not represented by class



1  counsel.  And that also goes to what the

2  Supreme Court was saying about the whole

3  importance of priority, is it forces the

4  insiders to the case to bring in the con

5  congressionally preferred priority creditors.

6  Because if the priority doesn't matter, then

7  there's no reason to bring us in, we don't

8  find out until it's essentially a fait

9  accompli, or patricide, as Mr. Kaplan

10  described it.

11         So for that reason, I think it's

12  very important, however you want to talk about

13  it, as ICL, Jevic, the priority claims need to

14  be given their congressionally granted status

15  if we're ever to be brought in and allowed to

16  participate in these negotiations, which the

17  Supreme Court highlighted as the crucial part

18  of its Jevic decision.

19         THE COURT:  Thank you,

20  Mr. Benson.  Reply?

21         MR. SHAPIRO:  I'd like to

22  respond to just a few points raised by the

23  parties.

24         First, I'd like to address the



1  allegation that the Debtors did not exercise

2  sound business judgment in agreeing to enter

3  into a settlement.  So I think, again, the

4  context here is important in what was put in

5  front of the Debtors.  And specifically, what

6  was put in front of the Debtors were the

7  following terms.  The purchaser would

8  contribute causes of action that it purchased

9  to a GUC trust.  The purchaser would

10  contribute its own cash to the GUC trust.

11  Certain out of money creditors would be the

12  beneficiaries of those assets, and the

13  Committee would support the sales and the debt

14  and drop any objections there to.

15                    And importantly, that document

16  on August 16th was subject to further

17  documentation.  And I have a couple -- in case

18  that wasn't clear, I have a few quotes from

19  the August 16th hearing from each of the

20  parties.  First was Mr. Rubin, counsel to the

21  ad hoc Committee.  And there Mr. Rubin said,

22  "The Debtors are not today committing to these

23  things.  We know we have steps to take to get

24  there.  The Debtors are supportive of the

1  terms."  Mr. Wehrer, counsel to the Committee:
2  "There are certain elements regarding process
3  that we need to work through."  And finally,
4  Mr. Rogoff, counsel to the Debtors:  "The
5  Debtors are prepared and committed to work in
6  good faith with them, and the other parties
7  memorialized this agreement.
8          And then if you wanted to look
9  at what happened with the benefit of hindsight
10  when determining whether the Debtors exercised
11  sound business judgment, the Court did, in
12  fact, approve the sales on August 16th and the
13  DIP on September 9th.  So in other words, the
14  Debtors' key goals were achieved, and the
15  Debtors gave up nothing in the process.  And
16  in the reasonable view of the Debtors, the
17  Committee support helped achieve those goals.
18          And it can't simply be the case
19  that in order to enter into a settlement, all
20  parties must be treated fairly.  That simply
21  can't be right.  Why?  Most importantly
22  because on August 16th and even on September
23  9th, there was a binding Third Circuit opinion
24  that was binding on this court that allowed

1  for class skipping in the context of

2  settlements.  But at least in part what the

3  DDTL parties are saying is that the Debtors

4  couldn't have possibly signed on to the

5  settlement the same day that it received it.

6  That's just not enough time to digest the

7  document and make a determination as to

8  whether to enter into it subject to final

9  documentation.  To me that sounds like an

10  argument that the Debtors breached some kind

11  of duty of care.

12          But let's assume that underlying

13  premise is true and a few hours isn't enough

14  time to review and understand a six-page

15  document.  Fine.  But what about three weeks?

16  Because it was not until September 8, more

17  than three weeks later, that the settlement

18  term sheet was finalized, executed, and filed

19  with this court.  Three weeks is surely enough

20  time to review and understand a six-page

21  document.

22          Now, let's just talk about why

23  it was important to have the sale go forward

24  on August 16th and not adjourn it so that we

1  could get this settlement in a term that was

2  more fair to all the parties.  And I think the

3  testimony there, uncontroverted, we needed an

4  approved sale to show the market, the vendors,

5  employees, et cetera, that we had a buyer and

6  that this business would survive.  That surely

7  is a valid reason to move forward with a sale

8  on August 16th, not where standing that the

9  term sheet wasn't finalized and

10  notwithstanding that the term sheet didn't

11  make everybody happy.

12              And my next point speaks to the

13  allegation by the objectors, and really the

14  DDTL parties, that the settlement was some

15  kind of a laundering scheme that was the

16  result of some conspiracy between the Debtors

17  and the Committee.  We found this particular

18  accusation offensive, especially given the use

19  of the word laundering, and that connotes some

20  kind of criminal conduct.  But let's assume

21  the DDTL parties are right, we used the

22  purchaser to transfer state causes of action

23  to the trust to get around Jevic.  But how

24  could that be laundering?  How could that be

1  in any way criminal?  As I noted, at the time

2  the settlement was entered into, the Third

3  Circuit's opinion in Jevic was binding.  It

4  permitted class skipping in limited

5  circumstances.  There could be nothing

6  criminal about what was done.

7            But let's talk about why that

8  allegation is nonsensical.  From the outset of

9  these cases, the purchaser contemplated

10  acquiring what the settlement refers to as

11  specified causes of action.  In fact, just

12  days after the petition date and before the

13  Committee was even formed, the Debtors filed a

14  term sheet on the Court's docket that provided

15  such causes of action were proposed to be

16  purchased assets.  So in other words, this

17  so-called conspiracy began before the

18  Committee was even formed.  Now, it's been a

19  while since I've taken criminal law, but my

20  recollection is much like the tango, a

21  conspiracy requires at least two parties.

22            But let's assume there was a

23  conspiracy.  What would that conspiracy be?

24  Well, the Debtors and the Committee, before

1   the Committee was even formed, conspired to to

2   ensure that the purchaser acquire the

3   specified causes of action.  The Debtors and

4   the Committee then conspired to get the

5   purchaser to agree to contribute those causes

6   of action to the GUC trust if and only if the

7   summit was approved with knowledge and

8   downright clairvoyance that the Supreme Court

9   would overrule the Third Circuit in Jevic.  In

10  other words, we were really playing the long

11  game, and we were really coy if I dent that

12  this settlement would be approved.  Because if

13  it isn't approved, these causes of action will

14  remain as they are today since November 28,

15  2016, with the purchaser.  All criminal

16  conduct is risky, but this experience just

17  defies common sense.

18              In further support of their

19  experience theory, the DDTL parties point to

20  various drafts of the term sheet which they

21  say demonstrate we were manipulating the term

22  sheet to contravene Jevic.  Let's assume

23  that's correct.  Well, isn't that our job?

24  Isn't our job to comply with the law and to

1  structure transactions so they comply with the

2  law?  We tried to structure the transaction in

3  such a way to remove any concern that to the

4  extent Jevic was implicated wouldn't be an

5  issue.

6                 But getting past that, the only

7  item that changed of any relevance to the

8  issues before your Honor today was the precise

9  mechanic of how assets would be contributed.

10               THE COURT:  Which is the entire

11  thrust of your current argument that Jevic

12  doesn't apply.  So you dismiss it and rely on

13  it at the same time.

14               MR. SHAPIRO:  So I only rely on

15  it inasmuch as on August 16th when the Debtors

16  made the determination to exercise sound

17  business judgment, at that time, Third Circuit

18  law permitted class skipping.  That's the

19  extent I rely on it.

20               THE COURT:  On August 16th, the

21  document your client approved had the causes

22  of action coming back to the Debtor, and then

23  you changed it.

24               MR. SHAPIRO:  That's fair.



1          THE COURT:  And you say it

2   doesn't matter that you changed it, but of

3   course it matters you changed it, because as

4   we sit here today, if you hadn't changed it,

5   you'd be DOA.  That's my point.

6          MR. SHAPIRO:  And that's a fair

7   point.  But I think the record makes clear

8   both on August 16th at the transcript that

9   when Mr. Wehrer said that the mechanic was to

10  be worked out, and it was worked out.  And on

11  September 8th when we filed the executed term

12  sheet, that was the mechanic that's before

13  your Honor, that was the ultimate mechanic

14  that was decided.

15          THE COURT:  Who does Mr. Wehrer

16  represent?

17          MR. SHAPIRO:  The Committee.

18          So getting back to the term

19  sheet, there was never a -- so before August

20  16th, we had an auction.  And at that auction,

21  we declared the winning bidder for the non-CSC

22  assets.  And the purchase agreement that we

23  filed with the Court, the one that we declared

24  the winning bid, provided that the CE Star



1  entity would acquire these specified causes of

2  action.

3           So from our perspective, on

4  August 15th up until the morning of August

5  16th, it was always our understanding that the

6  purchaser was acquiring these causes of

7  action, because that's what the APA that won

8  the auction provided for.

9           So that morning when we were

10 told that the APA was going to be amended so

11 that these causes of action could be

12 contributed to a trust, from our perspective,

13 in sound exercise of our business judgment, we

14 were never entitled to those causes of action

15 to begin with.  We had already declared them

16 the winning bidder, and that bid contemplated

17 the purchase of those assets.

18           And the other thing that's

19 telling is --

20           THE COURT:  But at that time,

21 they were still your assets.

22           MR. SHAPIRO:  That's correct.

23 But the settlement that we entered no --

24 sorry.  The settlement that we agreed in good



1   faith to pursue on August 16th was always

2   subject to court approval.  A Debtor just

3   can't just enter into a settlement at that

4   time and have it be binding on him.  It's

5   still not binding on him; it has to be

6   approved by your Honor.

7              So what happened between then is

8   the sale closed and the causes of action are

9   owned by the purchaser.  And if the settlement

10  today is not approved, the causes of action

11  will still be owned by the purchaser.

12             THE COURT:  Look, the problem

13  you have is that most of the arguments I'm

14  hearing from you and from Mr. Kinel are the

15  exact same arguments that Judge Shannon relied

16  on when he did the lower court ruling in

17  Jevic, okay?  But that doesn't carry weight

18  anymore.  The Supreme Court has made it very

19  clear that those kind of arguments and the

20  kind of arguments you're making right now,

21  that if I don't approve this transaction, this

22  money will go away and everybody will be worse

23  off.  That was the exact rationale that was

24  overturned by the Supreme Court, and they say

1   that has to fall to the wayside when you're

2   talking about altering the priority scheme

3   without some bankruptcy related purpose.

4   Right?

5                 MR. SHAPIRO:  That's true, your

6   Honor.

7                 THE COURT:  And that was the

8   thrust of Mr. Kinel's closing at the very end

9   was you can't do this to us.  Well, I didn't

10  do it to you, eight people in Washington, D.C.

11  did it to you.  Well six, I guess in washing

12  done D.C. did it to you, I didn't do it to

13  you.

14                MR. SHAPIRO:  And I understand,

15  your Honor; that wasn't my argument.  The only

16  point would make to that is what distinguishes

17  this case from other cases and perhaps that

18  case is right now what's being contributed if

19  this settlement is approved is coming from a

20  non-Debtor.

21                THE COURT:  Yes and no, okay?

22  Yes, they currently have it after the closing.

23  No, it started off as a Debtor asset.  This

24  isn't -- is it ICL?  I'm no good with



1  acronyms.

2              MR. SHAPIRO:  That's right.

3              THE COURT:  This isn't ICL.

4  This isn't even Jevic to the extent we're

5  talking about the CIT cash distribution or the

6  lien contribution.  In ICL, that was money

7  that was never in the estate's coffers that

8  was going from the purchaser to the creditor.

9              In this case, you start, the

10 very proposition on as of the petition date,

11 this was property of the estate.  It's always

12 property of the estate.  So say it's not

13 estate property that's being distributed is

14 ignoring its origins.  And doesn't that

15 distinguish it from ICL because it started off

16 as state property?

17             And importantly, at the time the

18 settlement was reached on August 16th, and

19 even on September 8th, it still was property

20 of the estate.

21             MR. SHAPIRO:  What I think

22 distinguishes that is they're not co-dependent

23 on one another.  We're not saying that you

24 can't approve the sale unless the settlement



1    is approved.  They really truly are two

2    independent things.  Because right now, the

3    sale has closed, the sale has been approved,

4    and those assets belong with the buyer.

5    They're with the buyer.  The only string

6    attached is if this settlement is approved, at

7    that point, it's transferred.  But they're not

8    tied together.  They're independent, and

9    that's the way that we required them to be.

10                   So I don't know that you can --

11   I think you need to distinguish it in that

12   way.  There has to be the sale.  The sale is

13   done, the sale has closed, the sale is a final

14   order.  This settlement is separate and apart

15   from that.  And if you don't approve the

16   settlement, then this sale is unchanged and

17   nothing happens to the sale.  But if they were

18   tied, and I could see that being a concern,

19   because you would say, well, isn't this just

20   some creative two-step process to get around

21   Jevic?  In some sense maybe it is, but it's a

22   very risky one.  Because at this point we have

23   a sale that closed with the assets in the

24   purchaser's pocket with no obligation to

1    contribute them whatsoever unless your Honor

2    approves this settlement.  And so if somebody

3    wants to structure a deal that way, in such a

4    risky way, I don't think that's a legitimate

5    concern.

6              THE COURT:  I'm speculating, but

7    I don't see it as an attempt to get around a

8    Supreme Court decision that hasn't come down

9    yet as much as I see it as an attempt to fit

10   into the ICL model, which was controlling law

11   as of the settlement date.  But that's sort of

12   neither here nor there.  It doesn't matter why

13   it's being done this way.  You're right that

14   an independent sale order that's become final

15   has transferred these assets, and that's

16   separate from approval or disapproval of the

17   settlement.

18              But that doesn't answer my

19   fundamental point, which was to distinguish

20   this from ICL.  And I don't have the brief in

21   front of me, but the quoted -- yeah, this is

22   in Mr. Kaplan's depth from ICL, "And the

23   Trustee presented no evidence that the

24   settlement funds were otherwise intended for

1    the Debtors' estate.  All are true here.  The

2    settlement sums paid by the purchaser were not

3    proceeds from its liens, did not at any time

4    belong to Life Care's estate, and will not

5    become part of its estate even as a pass-

6    through."

7                    Did not at any time belong to

8    life care's estate.  This did at one time

9    belong to this estate.  There's no question

10   there.  So doesn't that distinguish ICL?

11                   MR. SHAPIRO:  You know, if you

12   take that out of context, I suppose.  And it's

13   true, I mean, you could at one point trace

14   assets to a lot of people and you could follow

15   where they go.

16                   THE COURT:  I'm telling you

17   you take it out of context, it's the

18   whole thing --

19                   MR. SHAPIRO:  Well, let me --

20                   THE COURT:  -- of the case.

21                   MR. SHAPIRO:  Sorry.  Let me

22   rephrase.  Yes, they were at one time owned by

23   the Debtor, but they were sold, and a purchase

24   price was negotiated, and that purchase price

1   was paid and the buyer bought them.  They're

2   theirs.  The buyer owns those causes of

3   action, no questions asked.  And they're only

4   obligated to contribute them to the trust if

5   your Honor approves the settlement.

6              So yes, at one point the Debtor

7   did own them, but the Debtor doesn't own them

8   now.  We have no claim to those causes of

9   action.  We can't ask the purchaser to return

10  them, we can't ask the purchaser to do

11  anything with them.  For all we know, the

12  purchaser brought them and started suing

13  individuals on account of those -- we don't

14  know.  We have no control over that.  And as

15  far as, yes, we did at one time own the causes

16  of action, but we don't anymore.

17             THE COURT:  Well, I don't see

18  how the purchaser can pursue Chapter 5 causes

19  of action on its own behalf if it's not on

20  behalf of the estate, they're simply not able

21  to be pursued.

22             MR. SHAPIRO:  That's fair, your

23  Honor, but that was only one component of the

24  specified causes of action.  I was just using



```
1    it as an illustration, but that is a fair
2    point.
3              THE COURT:  Fair enough.  I get
4    it, I get it.  You don't control the causes of
5    action.  I understand.
6              MR. SHAPIRO:  And just a couple
7    more points.  I heard your Honor loud and
8    clear, and I should probably keep my mouth
9    shut.  But I just wanted to make one point.
10   We haven't yet made a final determination as
11   to whether we're moving forward with dismissal
12   or conversion, but I think in both
13   Mr. LaForge's deposition testimony and other
14   filings we made before the Court, including
15   one in response to the dismissal motion, I
16   think that, it's safe to say that conversion
17   is the most likely outcome.  I don't think
18   that this is going to be a dismissal.  There
19   are causes of action that were not acquired by
20   the buyer, specifically causes of action that
21   belonged to the Columbus entities, and that
22   was a separate sale, that was a liquidation
23   sale, so they did not buy causes of action.
24   So while we've not valued what those causes of
```

1 action are, we cannot, we don't think, dismiss

2 those cases while they're there, because they

3 have some value, we just don't know what they

4 are.

5          THE COURT:  I think that goes to

6 the point does Jevic live and die on the fact

7 that it has to be a structured dismissal.  And

8 I think Ms. Casey did a nice job of going

9 through the concerns that the Supreme Court

10 had, and I don't think it's necessarily tied

11 to a dismissal, because there's certainly

12 language in the opinion that allows

13 intermediate settlements, like the Iridium

14 case, or critical vendor motions, orders, wage

15 orders that have this sort of bankruptcy

16 purpose or reorganization purpose.

17          But I think, you know, you're

18 right, I think this case is headed, if I deny

19 the settlement -- or if I grant it, I'm sorry.

20 If I grant the settlement, I think the case is

21 headed to dismissal or conversion, and

22 probably conversion.  But where it's not

23 headed is a plan.  And when it's headed to

24 dismissal or conversion, it's headed there



1  soon.  So I think, you know, while I certainly

2  understand your point about how the dismissal

3  motion isn't necessarily tied to the

4  settlement motion, I think, you know, the case

5  is such, I don't have to ignore my common

6  sense, this case is either approval or not

7  approval of the settlement, is either headed

8  to dismissal or conversion in short order.  I

9  may be wrong, I don't know.  That's my feel.

10            MR. SHAPIRO:  So a couple more

11 points, your Honor.  On the releases, it is

12 true that we are providing, the Debtors are

13 providing some releases.  But it can't be that

14 they are releases that makes this settlement,

15 you know, prohibited by Jevic.  Then every

16 settlement would be prohibited by Jevic.

17            THE COURT:  Why?  Maybe every

18 settlement is prohibited by Jevic.

19            MR. SHAPIRO:  Okay.

20            THE COURT:  Well, I don't know.

21 Maybe every case ending priority skipping

22 settlement is off the table.  I think it was

23 the Middle District of Tennessee, but

24 Bankruptcy Court in Tennessee just issued an

1   opinion that one could argue broadly

2   interpreted Jevic to deny a settlement.  I

3   don't know where we are.

4               MR. SHAPIRO:  I'm glad we're in

5   Delaware, I guess.

6               THE COURT:  We'll see.

7               MR. SHAPIRO:  Just one more

8   point, and this addresses the WARN claimants'

9   response.  I want to be clear, the WARN

10  claimants had a bunch of issues with the

11  procedures in a dismissal motion.  I informed

12  your Honor we're not going forward with that

13  dismissal motion.  Even if by some miracle we

14  do dismiss and not convert, we're not seeking

15  approval of those procedures.  So to the

16  extent the WARN claimants has an issue with

17  those procedures, that's certainly not

18  relevant to the court's consideration of the

19  settlement motion.

20              Finally, to the extent the WARN

21  claimants have an issue with us providing them

22  with information, they have an adversary

23  proceeding, they can seek discovery in the

24  context of that.  Of course, we're trying, as

1  I think the WARN claimant's counsel said

2  himself, we are trying to resolve that.  But

3  there is a mechanism for them to get the

4  information that they want.

5              And I think that's it for me,

6  your Honor.

7              THE COURT:  Okay.  Thank you.

8  Mr. Kinel?  You get the last word.

9              MR. KINEL:  I hope it's a good

10 one.

11             Your Honor, I'm just going to

12 address a few points.  I think it's pretty

13 clear that the U.S. Trustee is asking your

14 Honor to reverse the Third Circuit's ICL

15 decision.  I heard Your Honor's comments a few

16 minutes ago, and I think the distinguishing

17 factors have been pointing to don't

18 distinguish the case at all.  And I think that

19 the only way this settlement doesn't get

20 approved under ICL is to basically for this

21 court to conclude that ICL is no longer good

22 law.

23             The point made about -- well,

24 actually Ms. Casey said Jevic leads the door



1  wide open for creative lawyers.  Well, if
2  that's the case, I don't know if it is or
3  isn't, but the point, I think that's
4  effectively a concession that Jevic doesn't
5  deal with this case, and that the U.S. Trustee
6  would like it to, but it simply doesn't.  The
7  idea that it's a fiction that there are
8  non-estate causes of action when somebody buys
9  something and returns them, and I heard your
10  Honor say something similar a moment ago,
11  number one, if I buy your house and I live in
12  it, yeah, once upon a time, you owned it, but
13  I owned it now, why does it matter?  I don't
14  understand, no one has articulated a rule of
15  law as to why that was a distinguishing
16  feature in any case --
17          THE COURT:  Well, and I'm not
18  saying you have the facts now, but if it's a
19  sham transaction, you can ignore the fact that
20  it was sold.  I'm not saying these are the
21  facts, but if it was part of the conspiracy to
22  avoid Jevic and go back on what the
23  documentation said on August 16th and change
24  it to make sure that it stayed out of the

1  estate, I can collapse that transaction.  I

2  don't have to honor it.  And there are

3  plenty -- if those are the facts, you could do

4  that -- you know, it's in effect a fraudulent

5  conveyance.  It's a transfer that's not a

6  transfer.

7             So there are plenty of ways to

8  avoid that kind of transaction if the Court

9  deems that that's the appropriate based on the

10 facts of the case.

11             MR. KINEL:  Well, respectfully,

12 those are not the facts of this case.

13             THE COURT:  Fair enough.

14             MR. KINEL:  There's not a shred

15 of evidence that the economics of this

16 transaction ever changed or that the

17 noteholders would have paid an extra nickle

18 for this estate for the assets.  As a matter

19 of fact, the noteholders kept their powder dry

20 and didn't even fully credit bid what they

21 could have in order to win that auction.  The

22 idea that they just would have written a check

23 on top of -- if they had to increase their

24 credit bid, which they could have, that they

1  instead would have just written a check is

2  really just beyond credulity.  It's not this

3  case.  It's not what happened here.

4          The idea that the assets were

5  still the assets of the estate on the date the

6  parties came before the Court on approval of

7  the settlement, I don't see how that's

8  relevant.  Nobody objected.  If the U.S.

9  Trustee or some other party thinks that every

10  one of these transactions is a sham and that

11  you can't purchase estate causes of action,

12  then why not object at that point?  That's the

13  point when somebody should have objected and,

14  said a minute, why are these estate causes of

15  action going through the noteholders?  What

16  business does the Debtor have selling those?

17  What's the consideration for them?  That

18  entire unless shouldn't be done today, it

19  should have been then.  And nobody objected,

20  and this court approved that transaction.

21          And I just wanted to address one

22  of the apparently big distinguishing factors

23  that people are relying on and arguing about

24  the difference between ICL and this case is



1  the releases.  And I think Mr. Shapiro touched

2  on it.  But the releases that are set forth on

3  the term sheet, they released the noteholders

4  and the officers and directors and all that.

5  That was already done in the DIP.  And that

6  was done, and didn't need to be a final DIP

7  order, that was gone in connection with the

8  interim, first interim DIP order.

9                 The only other release that the

10  Debtor is giving is a release of the

11  Committee.  That's worth nothing, okay?  And

12  I'll represent to the Court that if that's the

13  deciding factor in this deal, we'll take that

14  out of the settlement, because that doesn't

15  distinguish this case from ICL, the fact that

16  the Debtors, just like every other settlement

17  you see, the parties who sign off on it want

18  mutual releases and exculpation.  There's zero

19  value that came out of the estate for that

20  release.  And that doesn't distinguish ICL.

21                 The other factors -- I mean,

22  sure , you can pick apart, and do they line up

23  exactly?  No.  And the phrase that your Honor

24  quoted, does that sort of imply that, it says

1  did not at any time belong to the estate.

2  Yes, it says that.  But I'm not sure that's

3  the holding.  If you look at the opinion, and

4  actually, I read it again yesterday and

5  thought I had lost a page, because it ends

6  very strangely for a circuit court decision.

7  It really has no conclusion.

8                    The last paragraph of the

9  decision is, "As noted, the Bankruptcy Code's

10  creditor payment hierarchy only becomes an

11  issue when distributing estate property.

12  Thus, even assuming the rules for bidding

13  equal ranked creditors from receiving unequal

14  payouts and lower ranked creditors from being

15  paid before higher ranking creditors apply.

16  In the 363 context, neither was violated

17  here."

18                    So I guess we could debate what

19  the actual holding of ICL is, but I don't

20  think that that one phrase taken in isolation

21  versus that phrase or others is enough to

22  distinguish ICL from the facts of this case.

23                    And yes, I apologize for

24  appealing to perhaps the Court's equitable



1   considerations here, but, you know, I believe

2   that you don't have to rely on that in order

3   to approve the settlement.  I believe that the

4   burden has been met under the standards for a

5   9019 settlement.  I don't believe any evidence

6   of any conspiracy, breach of duties, lack of

7   business judgment, I don't believe any of that

8   has been proven.  It's conjecture.  Why things

9   change and who changed them, the fact that an

10  email came from one person and went to another

11  doesn't mean that it was their idea.  So we

12  don't have a lot of those facts, and the

13  reason we don't have them is our position has

14  been since day one, and I told Mr. Kaplan this

15  in our various discovery disputes.  We don't

16  think they're relevant.  The Court indicated

17  earlier today that it does think they're

18  relevant.

19              But the intentions of the

20  parties were to document a settlement whose

21  economic terms were put on the record on

22  August 16th, and nothing changed.  There was

23  never any contemplation that those assets

24  would remain with the estate or that the

1  purchaser would have paid more had they not

2  agreed to this arrangement with the Committee

3  and the Debtors.  Thank you, your Honor.

4          THE COURT:  You're welcome.

5          All right, I'm going to take a

6  recess and then I'll come out and give my

7  ruling.

8          (A brief recess was taken.)

9          THE COURT:  All right.  Thank

10 you very much for your paper submissions.

11 Thank you very much for your arguments today

12 and your professional presentation of the

13 evidence and the argument.  I really do

14 appreciate it.  One of the real pleasures of

15 this job is the lawyers that appear in front

16 of me are so good.

17          I'm ready to rule, and I am

18 going to deny the settlement motion.  And I do

19 that with some reluctance because looking at

20 the equities, as Mr. Kinel referenced in his

21 reply, doing this takes money away from

22 creditors and keeps it in the hands of the

23 purchaser, both the potential loss proceeds of

24 the avoidance actions as well as the cash that



1  was going to be paid.  However, I am

2  constrained to do so by the facts and by the

3  law.  And I'll talk about the law first.

4            As we all know and as we talked

5  a lot about, the Supreme Court ruled recently

6  in the Jevic case with regard to what the

7  courts can and cannot do in priority skipping

8  or class skipping settlements that don't have

9  the consent of the affected class.  And the

10  argument that's primarily been made that Jevic

11  doesn't apply in this case is really focused

12  on the fact that the facts, and importantly,

13  the causes of action are not property of the

14  estate, they rest in the control and ownership

15  of the purchaser.  And since they're not

16  property estate, ICL, the Third Circuit's

17  opinion in ICL, specifically provides that

18  they can be dealt with however the parties

19  wish without regard to the priority scheme or

20  the Bankruptcy Code, because it's simply not

21  applicable, and that Jevic doesn't apply

22  because of that.

23            So there are a couple of things

24  going on there.  One, there's a question about



1  whether ICL applies to the facts of this case.

2  And I think it does not.  I think the fact

3  that thesis state causes of action were

4  property of the estate on the petition date,

5  they were property of the estate on the day of

6  settlement, they were property of the estate

7  when the settlement motion was filed.  They

8  are no longer property of the estate, but they

9  were at some point property of the estate.

10  And I don't think you can claim them for

11  purposes of the ICL ruling by transferring

12  them for some time to the purchaser with them

13  just to be transferred back.  And at the time

14  of the closing of the transaction when they

15  were transferred, it was contemplated that

16  they would be transferred back hopefully very

17  shortly; we had a hearing set for December

18  16th.

19          So I think you can't -- I think

20  ICL is a narrow exception.  I also think it's

21  not applicable here.  And I think that if it

22  hasn't been overturned by Jevic altogether,

23  and I'm not ruling that it has been

24  overturned, I think it probably has been



1  significantly narrowed even further by the
2  Supreme Court's ruling in Jevic.
3              But in any event, assuming ICL
4  is still good law, assuming it has not been
5  affected by Jevic, I find that this case is
6  not controlled by ICL and doesn't fit ICL
7  because the causes of action were property of
8  the estate at one time.  And the language that
9  I quoted during argument made a point, the
10 language from the opinion, makes a point in
11 approving the transaction in ICL that it is
12 important, among other things, that the
13 transferred assets did not at any time belong
14 to the Debtors' estate.  So ICL is not
15 applicable.
16             Is Jevic applicable?  I think
17 Jevic is applicable because even Jevic
18 involved, in part, transfer of assets that
19 were not property of the estate as part of the
20 settlement.  There was the $2 million from
21 Citi, and the lien contributed by Sun, and
22 neither of those were property of the estate.
23 Nevertheless the Court didn't draw a
24 distinction in its analysis in Jevic that was



1  focused one way or the other on whether the

2  property of the estate issue mattered or not;

3  it simply wasn't focused on by the Court.  And

4  counsel who was there and represented the WARN

5  act plaintiffs represented to the Court, which

6  is fine, I certainly accept it at face value,

7  that it wasn't present in the Court's mind

8  because the appellees pretty much abandoned

9  the argument at some point during the

10  appellate process.  But one way or another, it

11  wasn't on the mind of the Court.

12          So I don't think you can get too

13  into, you know, Jevic doesn't apply to this

14  because it's not property of the estate.  That

15  sort of falls away, because there were

16  non-estate property elements of that

17  settlement that were not, and it was not

18  approved, and the Court really didn't delve

19  into it one way or another, but a distinction

20  that simply says Jevic doesn't apply because

21  none of the property here is property of the

22  estate, I think goes too far.  I don't think

23  we can say with certainty that's the

24  distinguishing factor that would rule.

1                    However, if I were faced with a

2    true ICL situation post Jevic, I'd be in a

3    tough spot.  But I think I'd be constrained to

4    follow or enforce ICL.  But again, I find it's

5    not applicable in this instance.

6                    Also, the settlement here isn't

7    just the cash and the estate asset or the

8    causes of action.  The Debtor is significantly

9    involved in this settlement.  We've talked a

10   lot about the releases by the Debtors, the

11   releases by the Committee.  There's a

12   continued, proposed continued involvement of

13   the Debtors in the claims reconciliation

14   process.  We have the causes of action

15   themselves which will stay in the court and

16   arguably can only be brought by somehow

17   affecting property of the estate, so I'm not

18   even sure how that would work as a procedural

19   or jurisdictional matter.

20                    But in any event, the releases

21   in particular, we're talking about actual

22   property of the Debtors' estate beyond the

23   causes of action.  They're implicated by this

24   settlement.  So it's not a pure, just like

1  Jevic wasn't pure, estate property versus

2  non-estate property, this settlement isn't

3  pure estate property versus non-estate

4  property.

5           So where does that leave us?  I

6  think that we're in a situation, when you

7  think about Jevic here, is this more along the

8  lines of a wage order or a critical vendor

9  order or even a settlement order like in

10  Iridium that happens sort of halfway through

11  the case?  The types of things the Court went

12  out of its way to say, look, you know, these

13  kinds of things may be okay as long as there's

14  some Bankruptcy Code related objective that

15  justifies violating the normal priority

16  scheme.  And there's a focus on things like

17  does it promote a plan, does it promote

18  reorganization of the business?  None of that

19  is going on here.  It doesn't promote a plan,

20  it doesn't promote saving the business.  It

21  promoted at the time a Code- related

22  objective, which was the sale of the assets

23  under 363.  And it's a little awkward and

24  unfair to the Debtors and the Committee here

1  that we're looking at this settlement nine

2  months after it was reached and six months

3  after the claim, you know, the case, the asset

4  sales closed, so it kind of loses its

5  immediacy.

6          But I don't see the exception

7  that was talked about in Jevic applying under

8  the facts of this case.  And I think it's

9  important, too, that we're not at the

10  beginning, we're not in the middle, we're at

11  the end of this case's Chapter 11 life.  I

12  assume the case is either going to dismiss or

13  convert very shortly.  I assume if I had

14  approved it, it was going to dismiss or

15  convert very shortly.  The fact that this

16  settlement wasn't tied specifically to the

17  dismissal motion I don't think distinguishes

18  Jevic, either.

19          I'm not going to get into the

20  arguments about whether business judgment was

21  satisfied, whether there was a breach of

22  fiduciary duty by the Committee or by the

23  Debtors.  I'm going to rule based on the

24  merits as I've described them.  My alternative



1  ruling, though, is this -- or alternative

2  comment, rather, not ruling.  Is forget Jevic

3  ever was written, and we were back where we

4  were in August of 2016 where the Third Circuit

5  had ruled on the Jevic opinion that they had

6  ruled on, and ICL is still good law, and you

7  can do structured dismissals in the Third

8  Circuit and anywhere else.  I'm still not at

9  all convinced that I would have approved this

10  even under the quote/unquote old rules.  And

11  that's because I don't believe the facts

12  support freezing out the priority creditors in

13  the way that the facts generally have

14  supported that in other structured dismissal

15  cases, for example, Judge Shannon's ruling in

16  Jevic, and the fact that the WARN act

17  claimants had to be frozen out because Sun

18  didn't want to fund litigation against itself,

19  so they weren't going to pay the WARN act

20  claimants, and that's just the way it was.

21          We don't have any evidence here

22  today that indicates why the priority

23  creditors were cut out of the equation and why

24  the deficiency claim creditors are being

1  treated differently.  There's no evidence that

2  said, look, this had to be done, this was a

3  part of the deal.  There was a lot of movement

4  between August and September over the terms of

5  the settlement.  The economics may not have

6  changed, but certainly the details changed,

7  and I think the economics for priority

8  creditors changed, and I think the economics

9  for deficiency creditors changed, because the

10  document that was alive in August was not the

11  document that ultimately ended up controlling

12  the transaction in September.

13          So I'm not ruling on this basis,

14  but I just simply note that I think that even

15  under the old rules of structured dismissals

16  that are no longer applicable, I was still

17  very troubled, and I think I had real concerns

18  and may not have approved the settlement in

19  that instance.  But that's neither here nor

20  there, because we live under the new rules and

21  the new order, and in the first Jevic world,

22  this just doesn't satisfy the law.

23          So sorry it's a rather lengthy

24  ruling, but for those reasons, I am going to

1  deny the motion.  The Court will enter an

2  order.  And I think that moots the procedures

3  motion.

4              MR. RAMOS:  Thank you, your

5  Honor.  Marcos Ramos.  I think that's correct,

6  and therefore, nothing further on the agenda.

7  We thank your Honor very much for the time you

8  scheduled today and for spending the day with

9  us.

10             THE COURT:  Of course; happy to

11 do that.  Thank you very much; we're

12 adjourned.

13             (Hearing adjourned at 4:35 p.m.)

14

15

16

17

18

19

20

21

22

23

24

1  State of Delaware    )
                        )
2  New Castle County    )

3

4

5            CERTIFICATE OF REPORTER

6

7       I, Jennifer M. Guy, Registered

8  Professional Reporter and Notary Public, do

9  hereby certify that the foregoing record,

10  pages 1 to 256 inclusive, is a true and

11  accurate transcript of my stenographic notes.

12

13

14

15

16

               Jennifer M. Guy, RPR
17

18

19

20

21

22

23

24



## $

**$1 (1)**
153:15

**$1.25 (1)**
153:10

**$2 (1)**
248:20

**$2.4 (2)**
135:4,20

**$4.6 (9)**
63:8 64:20 65:1
66:23 67:9,11 72:23
211:1,9

**$5 (1)**
158:13

**$500,000 (1)**
76:20

## A

**A-2 (1)**
202:14

**abandon (1)**
193:8

**abandoned (1)**
249:8

**ABER (1)**
9:21

**ability (7)**
57:11 67:21,22
106:5 136:19 154:23
174:14

**able (14)**
60:20 77:15 157:13
161:22,22 166:5,7
172:16 193:21 199:8,
16 204:11,12 233:20

**above (2)**

9:16 142:20

**absence (2)**
67:20 77:22

**absent (2)**
18:7 152:21

**absolute (3)**
156:4 163:22
178:16

**absolutely (3)**
99:14 102:18
176:11

**abusing (1)**
165:23

**accept (1)**
249:6

**acceptable (2)**
5:23 212:14

**accepted (3)**
18:4 131:9 145:12

**access (1)**
81:17

**accompli (1)**
217:9

**accomplished (1)**
35:22

**according (3)**
170:12 178:2
202:18

**accordingly (1)**
151:15

**account (1)**
233:13

**accurate (2)**
23:6,7

**accurately (1)**
35:1

**accusation (1)**
221:18

**achieve (6)**
6:18,22 190:3

196:24 197:9 219:17

**achieved (2)**
143:3 219:14

**acknowledged (3)**
35:24 159:14 181:3

**acquire (3)**
197:1 223:2 226:1

**acquired (4)**
40:11 57:10 153:2
234:19

**acquiring (2)**
222:10 226:6

**acronyms (1)**
229:1

**across (2)**
199:15,19

**act (5)**
119:10 203:15
249:5 253:16,19

**acted (1)**
175:19

**acting (1)**
137:7

**action (75)**
14:11 27:19 28:7,
13 36:24 42:13 54:20
57:5 59:2 91:24 92:17
93:3 108:21 109:1
111:1,3 120:13
124:16 125:1 139:9
146:11 148:20 151:14,
20 153:8 164:20
169:13 171:20,24
172:6,7 180:20 196:3
201:11,21 203:24
204:13,14,16,20
205:4,4 218:8 221:22
222:11,15 223:3,6,13
224:22 226:2,7,11,14
227:8,10 233:3,9,16,

19,24 234:5,19,20,23
235:1 239:8 241:11,
15 246:13 247:3
248:7 250:8,14,23

**actions (9)**
60:22 92:6,13,15
175:7 178:8 179:11,
13 245:24

**active (6)**
97:1,3 118:22
183:3,4,11

**actual (3)**
57:17 243:19
250:21

**actually (25)**
16:22 17:8 29:13,
21 31:5 33:3 42:13,15
54:18 90:14 93:11
112:6 121:11 143:20
154:24 160:1 161:3
175:15 179:12,23
180:5,20 182:21
238:24 243:4

**ad (5)**
191:2,3 195:13
212:10 218:21

**add (3)**
9:24 28:10 115:6

**added (8)**
28:14 42:23 73:17
74:2,3 112:19 124:1,4

**adding (1)**
73:20

**addition (5)**
37:18 95:11 112:20
115:5 120:11

**additional (3)**
75:7 145:14 153:7

**address (13)**
18:16 58:7 135:10

148:12 156:7 186:7
191:11 192:2 196:22
204:3 217:24 238:12
241:21

**addressed (6)**
17:2 58:7 145:5
175:1 189:5 194:23

**addresses (1)**
237:8

**addressing (3)**
115:10 191:15
197:20

**adequate (5)**
71:13,22 72:10
76:6 79:21

**adjourn (4)**
32:19 59:18,23
220:24

**adjourned (8)**
7:4 61:17,20 87:12
147:1 179:21 255:12,
13

**adjourning (1)**
61:6

**admin (5)**
196:15 203:10,16,
20,21

**administer (1)**
80:2

**administered (1)**
81:8

**administering (3)**
80:17 215:22 216:4

**administration (2)**
79:12 215:8

**administrative (5)**
155:23 156:1
158:14 195:15 212:18

**administratively (3)**
120:18 121:19

203:14

**admission (2)**
21:23 94:11

**admissions (1)**
120:22

**admitted (10)**
21:24 94:15 95:13
139:18,24 140:16
141:7 166:22 179:17
199:9

**admittedly (4)**
8:18 146:24 169:23
186:6

**admonition (1)**
192:24

**adopt (3)**
186:16 187:20
191:9

**adopts (1)**
198:19

**adversary (2)**
66:2 237:22

**advice (1)**
78:3

**advised (1)**
21:20

**advisors (3)**
81:1 87:9 103:24

**advocate (1)**
161:23

**affected (2)**
246:9 248:5

**affecting (1)**
250:17

**affects (2)**
131:6 216:20

**affiliates (1)**
171:5

**affirm (1)**
23:12

**affirmation (1)**
22:5

**afforded (1)**
117:20

**afraid (3)**
43:22 64:18 85:24

**after (33)**
5:18 10:24 13:23
21:3 22:6 30:24 32:23
37:17 40:18 43:14
59:24 60:9 63:12 65:8
81:4 91:16,17 92:16
95:2 105:18,21
109:12 112:9 154:21
161:11 166:8 168:16,
17 209:14 222:12
228:22 252:2,3

**afternoon (9)**
95:7,8 103:2 127:8
142:10,11 185:15
206:23 207:14

**afterwards (1)**
33:6

**again (33)**
27:10 29:1 42:12
45:17 47:12 69:3,4
91:1 99:11 100:3,10
110:24 112:10 120:19
125:23 133:2 137:22
138:16 170:19 171:22
173:12 174:22,23
175:18 178:11 185:16
194:15 203:24 204:6
208:12 218:3 243:4
250:4

**against (20)**
16:1,4 75:22 82:18
112:16 115:16 144:8
162:1 164:17 171:11
177:22 178:12 181:4

184:1 200:15 201:19
208:3,4,9 253:18

**agency (1)**
208:6

**agenda (4)**
5:10,15 79:1 255:6

**agent (3)**
207:23 208:6,7

**agents (1)**
171:5

**aggressive (1)**
162:22

**ago (5)**
45:1 67:2 167:4
238:16 239:10

**agree (9)**
114:11 115:20
116:20,21 141:18
184:12 206:2 212:12
223:5

**agreed (23)**
7:23 8:12 14:2,19
29:19 34:2,17 37:9
57:6 58:8,10 59:18,23
116:24 149:12 154:9
199:11 204:16 212:20,
22 213:4 226:24 245:2

**agreeing (4)**
58:4 143:9 179:12
218:2

**agreement (46)**
24:13 25:21 26:12,
16 27:4,6 29:17 36:16
38:9,10,11 39:16 41:6
49:9 64:16 66:22
67:24 68:10,16 74:19
78:15 100:19 101:1,9,
15 104:7 128:8,24
143:24 168:18 185:21
187:6,17 200:7,13,21

202:5 205:11,11,22,
24 214:6,10 216:1
219:7 225:22

**agreements (6)**
52:13 92:2 101:4
144:1 177:8 206:4

**ahead (7)**
82:24 83:1,3,9
114:7,20 163:16

**Akin (2)**
41:2 107:3

**Alberino (1)**
110:1

**alerted (1)**
216:15

**alienated (2)**
65:3 67:5

**alive (2)**
149:13 254:10

**allay (1)**
151:2

**allegation (3)**
218:1 221:13 222:8

**allege (1)**
151:21

**alleged (1)**
155:13

**allegedly (1)**
194:20

**alleging (1)**
163:23

**alleviate (1)**
193:5

**allocate (1)**
35:13

**allocated (5)**
109:1,14,15 111:3
119:14

**allocation (3)**
45:20 46:20 109:7

**allow (5)**
87:12 121:9 122:4
203:3,4

**allowed (12)**
78:11 110:17 112:5,
15 115:15 158:21
160:15,20 208:19
212:17 217:15 219:24

**allows (2)**
191:8 235:12

**almost (1)**
11:24

**alone (2)**
114:20 210:12

**along (5)**
57:9 89:1 151:5
161:17 251:7

**already (15)**
17:1,5,11 59:18,23
61:20 98:5 109:21
141:10 192:20 201:5
202:20,21 226:15
242:5

**also (32)**
5:16 7:18 13:22
23:8 29:4 54:14 63:5
75:14 83:20 124:20
145:6 147:17 152:16
154:12 155:3,21
163:9,10 185:1 194:2,
22 195:15 196:13
198:1,23 199:13
201:9 203:8 210:6
217:1 247:20 250:6

**alter (3)**
187:12 190:9 200:2

**altering (3)**
19:10 194:13 228:2

**alternative (2)**
252:24 253:1

**alternatives (1)**
33:9

**although (5)**
66:7 74:10 76:3
135:8 180:8

**altogether (1)**
247:22

**always (8)**
13:2 116:22 148:16
149:3 166:16 226:5
227:1 229:11

**ambiguous (1)**
212:8

**Ambrose (1)**
152:18

**amend (1)**
168:6

**amended (11)**
25:12,13,20 35:18
37:4 38:2 41:12 55:2
58:13 202:14 226:10

**America (1)**
137:5

**American (1)**
157:17

**among (8)**
5:7 33:4 57:11
81:12,13 109:2 111:4
248:12

**amongst (2)**
18:6 113:3

**amount (24)**
11:9 31:15 69:21
71:9,10,22,23 73:16
76:16 78:12 84:17,21
135:4 136:1,10
158:22 202:10,15
208:19 209:9 210:3,
14 212:16,16

**amounts (5)**

**alternatives (1)** — see right column

71:12,14 72:17
212:20,22

**analysis (6)**
131:6 155:22
185:20 186:12 187:1
248:24

**analyzed (1)**
189:10

**analyzing (1)**
187:17

**announced (5)**
13:14,18 14:16
29:15 169:6

**another (13)**
41:2 44:8 47:13
61:6 72:7 88:23
160:10 174:6,11
229:23 244:10 249:10,
19

**answer (28)**
35:22 45:7,9,24
46:22 47:1,13 49:11
52:3 64:19 66:8 68:1
69:12,16 73:21 79:21,
21,23 87:22 91:21
92:3 100:1 120:10
128:16 133:11 136:19
157:1 231:18

**answered (2)**
87:24 98:22

**answers (2)**
87:22 157:3

**anticipated (2)**
69:23 70:1

**anybody (2)**
104:10,11

**anymore (2)**
227:18 233:16

**Anyone (7)**
6:1 9:11 20:18 90:5

127:5 137:7 181:7

**anything (29)**
9:13 14:11 17:16
18:4 53:12 71:4 86:21
89:11,21 90:4,5
108:17 126:15,18
136:23 144:7 162:13,
15,21 169:11 177:4
181:17 182:12 186:10
198:6,7 201:12
213:21 233:11

**anyway (2)**
179:15 195:17

**anywhere (2)**
163:21 253:8

**APA (37)**
13:2,5,6,7,7 24:23
25:10 26:2 35:17 37:3,
5,12,17 38:1,3 40:11
41:12,14 55:2 57:3,7,
11,18 66:7 92:14,16
148:17 151:10 168:6
202:14 204:23,24,24,
24 205:2 226:7,10

**apart (3)**
155:22 230:14
242:22

**apartment (1)**
175:3

**apologize (6)**
54:3 59:8 85:22
98:1 159:5 243:23

**apparently (2)**
178:11 241:22

**appeal (3)**
151:7,8 207:8

**appealing (1)**
243:24

**appear (1)**
245:15

**appearing (2)**
24:1 50:13

**appears (5)**
69:1 89:14 107:5
109:10 194:18

**appellate (1)**
249:10

**appellees (2)**
207:6 249:8

**applicability (1)**
156:6

**applicable (9)**
148:8 202:10
246:21 247:21 248:15,
16,17 250:5 254:16

**applications (2)**
202:22 205:13

**applies (4)**
153:16 184:12
189:1 247:1

**apply (9)**
34:4 185:24 188:21
224:12 243:15 246:11,
21 249:13,20

**applying (2)**
188:16 252:7

**appointment (1)**
157:7

**appreciate (1)**
245:14

**apprised (2)**
97:14,18

**approach (6)**
21:12 29:5 46:8
97:23 100:9 140:7

**approaching (3)**
10:20 96:18 117:12

**appropriate (10)**
16:21 47:7 101:23
102:2 148:5 173:21

188:8,20 209:3 240:9

**appropriately (1)**
203:17

**appropriateness (2)**
64:10 156:10

**approval (27)**
5:11 7:2,4,6 10:17,
19 11:15,16,22 16:16
24:15 34:12 55:4
56:23 60:5,23,23
125:22 126:1 181:16
187:11 227:2 231:16
236:6,7 237:15 241:6

**approve (19)**
11:24 12:8 23:23
28:5 146:22,23
164:18 173:7 179:15
184:6 185:20 195:11
205:10,24 219:12
227:21 229:24 230:15
244:3

**approved (66)**
7:8 10:9 13:20
16:13,21 33:1,24 34:8
35:6 36:9 38:1,10,11
43:15,21 44:5 56:13
60:21 61:4,18 86:18,
18 98:12,15 126:9
128:8,23 131:11,13
139:1 142:24 143:16
144:24 145:1 146:14
147:13 151:6 165:12
175:4 179:2 186:2
187:18 200:13 202:21,
22 204:9 205:1,3,8
221:4 223:7,12,13
224:21 227:6,10
228:19 230:1,3,6
238:20 241:20 249:18
252:14 253:9 254:18

**approves (2)**
231:2 233:5

**approving (4)**
40:18 143:23
181:22 248:11

**approximate (1)**
135:3

**approximately (2)**
84:14 102:15

**architect (1)**
183:24

**area (2)**
190:8 199:24

**arguably (2)**
204:16 250:16

**argue (17)**
9:12,15 14:10,17
143:5,6,8,12 151:23
159:23 161:9 166:23
180:6 185:21 202:20
207:15 237:1

**argued (7)**
149:15,19 159:1
166:24 169:24 170:9
191:18

**argues (1)**
155:3

**arguing (2)**
184:8 241:23

**argument (28)**
11:20 13:1 15:9
142:3 149:21 153:24
154:15 155:1 156:6
163:24 173:12,13
174:1 182:23 184:4
191:12 198:24 199:5
200:22 207:7,13
220:10 224:11 228:15
245:13 246:10 248:9
249:9

**argumentative (1)**
67:15

**arguments (10)**
5:21 153:24 159:18
166:17 227:13,15,19,
20 245:11 252:20

**arising (1)**
63:20

**arithmetic (1)**
129:20

**arm's (4)**
99:10,13 100:6
154:8

**Armstrong (2)**
170:17 175:23

**arose (1)**
135:19

**around (16)**
18:1 52:12,13
71:23 76:20 124:12
146:15 148:11 165:14
191:19 195:23 196:1
211:23 221:23 230:20
231:7

**arrangement (2)**
89:17 245:2

**arrangements (1)**
163:13

**articulated (1)**
239:14

**artists (1)**
213:9

**ascribe (2)**
125:14,18

**aside (7)**
50:7 119:10,19
163:12 164:5 212:13,
21

**asked (10)**
45:19 46:17 47:21

86:5 91:15 99:21
104:12 128:6 134:19
233:3

**asking (7)**
12:8 28:5 48:12
50:9 64:5 83:24
238:13

**asks (1)**
107:7

**aspects (1)**
53:5

**assert (2)**
136:18 152:3

**asserted (7)**
82:17 83:12 84:17
134:24 135:3,7,16

**assessing (1)**
14:9

**asset (9)**
25:20 36:16 58:18
170:1 178:13 196:10
228:23 250:7 252:3

**assets (177)**
13:3,15,24 14:2
19:5,8 30:20 35:7,11,
14,18,19 36:1,4,8,10,
20 37:5,10,11 38:2,3,
8,12,15,18,23 39:1,5
40:10,14 41:13,13
43:6,7,13 51:16 55:3,
5,14,15,15 57:9 58:11,
15 63:13 86:19,23
89:20 91:20 125:1
126:21 130:16 148:21,
22 149:5,7 150:18,22,
24 151:10,13,22
152:20,21,24 153:3
154:10 155:17 163:4
164:1 165:20 166:22
167:19 168:2,7,19,24

169:1,22 170:4,6,8,11,
12,16 171:12,17
172:14 174:7,9,18,18,
20 175:15 176:12,14,
18 177:17 178:1
181:8 184:13,14
185:1,24 186:1,6,9,11,
19 187:3,8,15,22
188:1,2,5,9 189:4
190:15,18 191:6,8
192:6,7,20 193:13,22
194:9,19 195:5,17,20
196:7 197:1,22
198:18,20 199:7,8,12
200:4,9,17,24,24
201:17 202:23 203:7
204:4,5,8 205:6,7
207:5,12,21 215:23
216:4,6 218:12
222:16 224:9 225:22
226:17,21 230:4,23
231:15 232:14 240:18
241:4,5 244:23
248:13,18 251:22

**assistance (1)**
81:16

**assume (9)**
66:20 84:7 139:17
220:12 221:20 222:22
223:22 252:12,13

**assumed (3)**
14:13 38:18 56:15

**assumes (2)**
53:9 120:2

**assuming (9)**
10:9 36:9 66:19
84:10 163:24 180:5
243:12 248:3,4

**assumption (1)**
58:14

**assumptions (1)**
74:24

**assure (1)**
145:22

**astounding (1)**
182:22

**astute (1)**
160:24

**attached (6)**
41:5 111:17,23
112:1 173:3 230:6

**attaches (2)**
107:6 110:3

**attaching (2)**
41:2 54:14

**attempt (8)**
137:20,24 159:23
195:18 196:6,7 231:7,
9

**attempted (1)**
19:10

**attempting (1)**
31:20

**attempts (3)**
135:11,14 154:12

**attend (2)**
207:14 216:17

**attention (5)**
98:9,15 101:6
138:18 214:5

**attorney (4)**
95:13 128:19 133:9
216:17

**attorney-client (2)**
128:13,18

**attorneys (1)**
77:16

**attorneys' (4)**
75:15,17,18 76:7

**attorneys's (1)**

155:22

**auction (7)**
159:24,24 192:15
225:20,20 226:8
240:21

**auctions (1)**
92:22

**augment (1)**
28:16

**August (45)**
7:1,12 8:13 13:19
14:15 29:14,14,22
30:15 32:20 33:11
52:11 56:2 59:17,22
61:17 62:20 86:15
87:15 89:10 91:16
93:7 109:22 143:10
146:8 212:6 218:16,
19 219:12,22 220:24
221:8 224:15,20
225:8,19 226:4,4
227:1 229:18 239:23
244:22 253:4 254:4,10

**authority (3)**
146:12 157:24
162:5

**authorize (3)**
44:2 55:8 188:4

**authorizing (1)**
55:11

**available (2)**
192:18 215:16

**average (1)**
97:3

**avoid (7)**
18:15 19:10 47:12
167:19 186:16 239:22
240:8

**Avoidance (2)**
175:7 245:24

**award (1)**
72:24

**aware (43)**
6:10 35:16 43:11
44:2 51:3,6,7,12
61:19 68:7 70:7 71:2
78:23 79:7 80:1,4,19
82:6,16 84:12 91:5
97:6,13 104:9,11
105:4 106:20 116:23
119:8 120:4 124:14,
19,20 127:14 129:15
130:3,9 132:24
133:19,21 134:20,23
135:2

**awareness (1)**
211:22

**away (6)**
163:7 165:8 209:11
227:22 245:21 249:15

**awkward (1)**
251:23

# B

**back (51)**
11:18 14:4,14 26:6,
7 27:11 29:13 35:20
36:4 38:3,19 39:10
40:14 44:7 48:1 52:11
53:20,22 56:2 58:11,
18,19 61:13 66:24
76:23 84:10 86:14
91:20 103:8 107:13
111:15 115:2 117:15
119:17 123:23 128:4
138:15 145:3 147:24
164:12 166:18 172:4
175:9 192:15 204:20
224:22 225:18 239:22

247:13,16 253:3

**back-door (1)**
167:19

**background (2)**
95:10 169:17

**balance (8)**
19:10 142:15 190:9
193:24 194:9,13
200:2,3

**bandwagon (1)**
163:2

**bankruptcies (2)**
189:22 194:5

**Bankruptcy (44)**
20:14,15 51:8 55:4
114:13 126:11 133:5,
24 146:15 150:4
156:24 157:17 172:1,
23 173:6,8 177:8,11,
15,19 178:5,20
188:11,23 190:7
192:21 193:7 198:7,
11 199:23 200:10
208:11 209:14,16
210:21 214:13,18,24
228:3 235:15 236:24
243:9 246:20 251:14

**bar (5)**
12:5 95:16 120:17,
19 121:6

**bargain (1)**
195:6

**bargained (1)**
173:19

**bargaining (4)**
129:22 189:21
194:3,14

**barn (1)**
197:15

**Barsalona (1)**

5:6

**based (11)**
70:10 71:3 114:5
115:13 121:23 135:15
141:3 170:6 210:11
240:9 252:23

**basic (1)**
49:13

**basically (2)**
198:17 238:20

**basis (7)**
109:2 111:4 159:22,
23 164:3 210:2 254:13

**battle (1)**
19:15

**became (4)**
97:5 151:10 154:21
204:15

**become (3)**
176:8 231:14 232:5

**becomes (2)**
75:9 243:10

**before (63)**
7:1 9:1 10:16,17
11:10,16 16:11 21:14
25:16 33:5 42:5,13
48:1 51:10 59:16
61:14 62:5 64:1 65:21
70:11 76:4 77:20
78:17 89:9 90:8 94:20
96:17 101:5,16,19
107:17 114:14 117:9,
23 118:15 137:21
140:11 142:17 143:21
146:21 147:2 148:17
149:12,15 154:22
156:2 158:8,11
161:12 166:14 179:18
181:10 184:23 188:24
222:12,17,24 224:8

225:12,19 234:14
241:6 243:15

**beforehand (1)**
6:5

**beg (1)**
18:2

**began (1)**
222:17

**begin (2)**
60:16 226:15

**beginning (6)**
37:2 46:17 97:10
124:6 148:23 252:10

**begs (1)**
17:18

**behalf (22)**
5:4 9:23 12:20
18:20 19:21 29:11
50:13 82:1 95:24 97:7
103:3 127:8,9 137:7
142:13 143:19 158:17
166:12 172:2 206:24
233:19,20

**Behind (4)**
5:7 13:16 125:2
168:3

**being (52)**
14:18 36:1 38:19
39:2 41:12 44:24
47:21 55:2,13,14,15
60:20 61:4 78:11 80:6
87:5 91:18 94:8
107:10 109:7 117:19
131:15 134:3 136:22
146:19,24 150:22
162:1 163:22 164:8,
10 168:3 170:7
171:13 175:9 177:21
180:20 194:20 196:15
199:16 202:17,23

203:22 207:21 208:6
215:24 228:18 229:13
230:18 231:13 243:14
253:24

**beings (1)**
18:15

**belabor (1)**
171:22

**believe (60)**
10:21 11:19,20,23
25:8 28:14 40:6 48:16
49:4,14 50:10 51:19
57:24 58:5 63:9 68:9,
11 71:16 76:22 79:22
83:12 84:2,6,16 90:18
91:21 92:15 98:5,16,
24 99:2,3 100:24
101:21 102:1,16
103:4 105:11 107:12
127:13,18 132:18
135:6,8,21,24 136:5,6
137:10,19 150:23
153:18 156:5 180:6
206:9 244:1,3,5,7
253:11

**believed (2)**
48:11 148:5

**believes (2)**
76:13 77:8

**belong (9)**
153:10 176:7 196:7
230:4 232:4,7,9 243:1
248:13

**belonged (1)**
234:21

**belonging (1)**
92:9

**belongs (1)**
20:14

**below (2)**

54:11 145:7

**beneficiaries (9)**
83:4,6 107:24
110:11,16 111:5,9
115:18 218:12

**beneficiary (1)**
115:21

**benefit (8)**
61:3 65:20 108:13
154:11 172:11 173:18
196:4 219:9

**benefits (4)**
125:21,24 172:9
177:10

**BENSON (17)**
81:23,24 82:4
83:18 84:5 86:2 91:6,
9 132:2,4 133:8,18
138:6,9 213:24 214:1
217:20

**besides (2)**
13:8 56:24

**best (16)**
45:17 65:5 67:18
68:10 80:10 85:13
91:2 93:12 122:21
123:4,19 144:3,16
149:2 181:3 213:22

**better (5)**
9:2 16:12 57:14
92:9 191:24

**between (26)**
11:1 19:15 32:11,
14 34:23 58:17,23,24
80:21 84:22 90:7 97:7
100:6 103:19 104:6
147:12 148:2 151:24
152:14 175:22 177:5
207:4 221:16 227:7
241:24 254:4

**beyond (6)**
151:9 178:22 198:6,
6 241:2 250:22

**bid (4)**
225:24 226:16
240:20,24

**bidder (2)**
225:21 226:16

**bidders (2)**
192:14,15

**bidding (1)**
243:12

**bifurcate (2)**
14:8,23

**big (3)**
36:13 96:2 241:22

**bills (1)**
88:8

**binder (13)**
22:13,14,15 23:17
25:16 29:5 33:13
53:22 54:5 98:6 103:4
106:22 140:22

**binders (5)**
21:7 29:6 94:3 98:7
141:9

**binding (15)**
12:1 101:9,14
143:24 152:11 153:20
157:24 181:6 185:22
198:14 219:23,24
222:3 227:4,5

**bit (13)**
17:17 33:3 56:1
59:15 76:7 120:24
128:3 129:4 149:21
167:2 169:20 175:12
191:24

**black (11)**
33:18 42:20,21

54:18,21,22 111:20,
23,24 112:6,9
**blanket (1)**
150:9
**blessed (2)**
87:8 181:14
**blessing (1)**
197:20
**blowing (1)**
17:4
**board (14)**
5:8 33:24 34:2,5
40:8 43:20 44:1,5
45:15 50:14 58:10
74:4,5 79:5
**body (3)**
79:4 99:6 144:5
**boggles (1)**
121:11
**Boggs (2)**
9:22 143:18
**bolded (1)**
27:17
**bonus (1)**
126:16
**books (1)**
93:22
**both (10)**
10:22 18:23 77:5
97:19 115:20 147:2
210:5 225:8 234:12
245:23
**bother (1)**
181:22
**bottom (7)**
27:16 46:13 107:23
108:18,19 138:19
175:21
**bought (1)**
233:1

**bound (1)**
173:6
**boy (1)**
169:4
**breach (3)**
183:22 244:6
252:21
**breached (1)**
220:10
**breaching (1)**
183:19
**break (3)**
62:8 94:20 142:2
**bridge (1)**
57:4
**brief (15)**
6:5,9,16 13:11
31:10,18 62:13 152:5
171:21 175:3 180:23
206:20 214:2 231:20
245:8
**briefly (1)**
95:9
**briefs (1)**
6:10
**bring (5)**
88:17 89:21 172:6
217:4,7
**bringing (1)**
83:21
**broad (3)**
171:9,10 214:23
**broader (5)**
147:1 171:3 201:6,
14,15
**broadly (1)**
237:1
**broker (1)**
20:7
**brought (9)**

10:3 98:14 172:1,7
177:21 205:13 217:15
233:12 250:16
**budget (4)**
170:20 202:10,13,
17
**bunch (2)**
97:12 237:10
**burden (3)**
141:12 184:18
244:4
**business (18)**
9:14 16:7 75:8
179:1 180:4,10,16
184:16 218:2 219:11
221:6 224:17 226:13
241:16 244:7 251:18,
20 252:20
**businesses (1)**
6:20
**buy (2)**
234:23 239:11
**buyer (7)**
6:21 221:5 230:4,5
233:1,2 234:20
**buyers (2)**
6:21 36:10
**buying (2)**
59:3 170:21
**buys (1)**
239:8

# C

**calculate (2)**
71:22 72:15
**calculated (1)**
73:6
**calculating (1)**
136:1

**calculation (7)**
71:7,8 73:10 74:21
75:7 76:5,6
**calculations (3)**
72:13 75:1 81:11
**calibrate (1)**
60:19
**call (4)**
5:13 20:23 22:1
142:1
**called (7)**
27:18 51:9 63:3,6
69:22 101:8 214:4
**calling (1)**
37:18
**calls (11)**
61:8 68:22 83:16
94:22 96:8,13 97:20
98:19 128:13 133:6
151:19
**came (13)**
11:10 31:1 48:17
71:9 107:15 113:16
155:17 156:17 161:12
199:7 241:6 242:19
244:10
**cannot (17)**
15:16 125:14
151:12 186:13 188:2,
16 190:9 197:24
198:3 200:1,4,13,17
205:7,8 235:1 246:7
**cap (2)**
155:10,18
**capability (1)**
67:12
**capacity (2)**
50:15 67:20
**capped (1)**
155:7

**caps (1)**
73:7
**care (1)**
220:11
**career (1)**
133:10
**Care's (3)**
176:7 232:4,8
**carries (1)**
7:21
**carry (1)**
227:17
**carve (8)**
108:11,16 110:18
111:7 115:8 155:13
183:16,17
**carved (1)**
14:2
**case (109)**
7:6 15:15 20:2,3,4
52:4 56:14 59:5,7
64:3,3,5 66:21 71:18
73:4 82:8,11 89:22
90:3 95:22 97:10
102:8 116:9,19
121:17,18,24 126:4,
12 130:4 134:21
152:15 153:1 154:1,2,
5,6,7,7 157:12,13
158:3 159:3 165:17
166:2 174:4 175:17,
22 181:23 183:3,11,
12,21 184:11 185:10
186:5,17,17,21,22
187:21,24 188:18
189:6,7,11 190:13
193:9 195:24 196:1
197:14 200:21 203:12,
13 207:2 211:7,19
215:2 217:4 218:17

219:18 228:17,18
229:9 232:20 235:14,
18,20 236:4,6,21
238:18 239:2,5,16
240:10,12 241:3,24
242:15 243:22 246:6,
11 247:1 248:5
251:11 252:3,8,12
**case-ending (1)**
149:23
**cases (33)**
6:18 9:8 11:9 12:6,
15 52:8 82:11 89:24
91:23 95:21 97:1
101:24 102:17 117:10
144:4,12 154:19
155:8 161:18 162:14,
16,22 163:6 165:20
170:17 182:19 191:22
199:16 213:18 222:9
228:17 235:2 253:15
**case's (1)**
252:11
**Casey (16)**
18:18,19,20 19:19
127:5,7,8 128:22
131:23 185:14,15,16
206:13 207:10 235:8
238:24
**Casey's (1)**
19:23
**cash (14)**
30:20 81:3 127:16,
20 128:11 129:2,17
130:13 170:3 175:6
218:10 229:5 245:24
250:7
**catastrophic (1)**
144:23
**category (3)**

105:1,3 106:4
**cause (4)**
37:3 55:1 146:11
205:3
**caused (2)**
88:4 92:6
**causes (75)**
14:11 27:18 28:7
36:24 42:12 54:19
57:4 59:1 91:24 92:6,
13,15,17 93:3 108:21
109:1 110:24 111:3
120:12 124:16,24
139:9 148:20 151:14,
20 153:8 164:20
169:12 171:20,24
172:6,7 180:20 196:3
201:11,21 203:24
204:13,14,15,20
205:4 218:8 221:22
222:11,15 223:3,5,13
224:21 226:1,6,11,14
227:8,10 233:2,8,15,
18,24 234:4,19,20,23,
24 239:8 241:11,14
246:13 247:3 248:7
250:8,14,23
**cautious (1)**
66:3
**cautiousness (1)**
78:1
**caveat (1)**
23:10
**CD (1)**
24:19
**CE (6)**
160:2 212:11
214:16,20,21 225:24
**certain (24)**
8:17 13:3 35:18

37:10 38:2 41:13 51:2
59:1 65:11 78:12
109:16 112:23 124:15
155:4 172:20 173:18
185:1 193:16 195:20
208:19 209:13 210:3
218:11 219:2
**certainly (24)**
10:21 44:1 48:9
58:7 60:2 78:3 113:20
121:4 125:11 145:7
147:8 165:2 168:1
173:8,10 174:16
182:12,17 193:23
235:11 236:1 237:17
249:6 254:6
**certainty (3)**
210:18 213:14
249:23
**certification (1)**
95:15
**cetera (4)**
49:1 171:6,12 221:5
**CFC (1)**
63:6
**CFO (2)**
71:8 81:16
**chain (1)**
60:17
**chairman (1)**
23:8
**challenge (10)**
15:24 136:9,20,21
151:9 154:23 171:1,7
181:7 201:22
**chance (5)**
31:5 40:14 73:3
101:18 194:11
**change (23)**
43:19 44:2 55:8,13,

In re: Constillation Enterprises, LLC, et al.

Hearing
May 16, 2017

24 57:8 64:15,19
72:19 112:22 113:13,
14,17 125:15 128:1
129:9 166:19 167:23
168:23,23 169:5
239:23 244:9

**changed (28)**
13:24 34:11,16,19
46:24 124:21 125:9
129:8 147:19,21
148:24 149:21 168:5
169:20 183:16,16
224:7,23 225:2,3,4
240:16 244:9,22
254:6,6,8,9

**changes (13)**
33:10,19 34:14
42:21 43:2 52:12
124:8 125:17 147:23
148:4 176:16 189:20
194:3

**changing (3)**
19:11 113:4 194:14

**Chapter (14)**
9:8 15:15,18 69:9
126:13 165:17 171:20
175:11,16 178:8,14
181:14 233:18 252:11

**characteristics (1)**
152:14

**charged (1)**
157:8

**chartered (1)**
153:11

**check (2)**
240:22 241:1

**chief (1)**
20:1

**child (1)**
17:17

**choice (3)**
8:23 32:7 185:8

**chose (2)**
18:10 76:1

**circuit (12)**
12:2 173:16 185:23
190:15 207:15 215:2
219:23 223:9 224:17
243:6 253:4,8

**Circuit's (5)**
185:22 191:21
222:3 238:14 246:16

**circulate (1)**
33:19

**circumstance (2)**
17:3 130:23

**circumstances (8)**
99:5 101:2,23
116:23 119:2 121:7
215:4 222:5

**CIT (1)**
229:5

**cite (2)**
157:5 159:6

**Citi (1)**
248:21

**claim (50)**
70:1 82:7,10,14,15,
21 83:1,3 90:17,19
105:14 106:17 108:9
116:7 118:11 130:11
133:1,4,22 134:21
135:10,15,20,22
136:2,5,17 138:4
146:11 156:14 158:14,
21 159:10,13,13,20
160:15,20 164:9
196:18 198:14 208:23
209:1,11 210:6
216:21 233:8 247:10

252:3 253:24

**claimant (3)**
75:20 178:11
198:15

**claimants (30)**
17:22 53:4,12 66:2
73:1 115:21 116:1,17,
24 119:11,19,20,22,
24 121:20 122:3,17
156:20,21 157:16
163:16,19 183:17
208:16 210:1 237:10,
16,21 253:17,20

**claimants' (1)**
237:8

**claimant's (1)**
238:1

**claimed (1)**
136:11

**claiming (1)**
135:22

**claims (140)**
12:7 14:10,17
15:10 16:1,3 20:8
27:18 28:6 36:24
42:12 54:19 65:11
66:16,19 67:9,13,23
69:23,24 70:8 71:6
72:19,21 73:14,16,18
74:15 75:14,22,23
77:9 78:7,10,13,17
80:8,18 82:18 83:9,10,
10,12 84:8,11,13,17
91:24 93:2 101:9,14
102:6 105:21 106:10,
12 109:3 110:17,19
111:8,8 112:5,9,16,17
113:5,6 115:9,15,17
116:4 117:20 118:18
119:10 120:12 123:17,

21 124:2,16,24
127:15 128:10 129:2,
16 130:5 131:6,8,19
134:24 135:3 136:15,
16 139:2,6,7 144:1,8,
17 148:20 153:8
154:16 156:1,2,2,22
159:15 162:13 163:11
171:11,15 177:6,20
178:12 180:19 181:4,
9 182:5,6 183:1,18
194:17 198:14 200:14
201:19,20 203:17
208:3,4,9,16 209:6,8
210:5,7,22 212:18
214:19 216:23,24
217:13 250:13

**clairvoyance (1)**
223:8

**clarification (2)**
28:15 43:6

**clarify (3)**
28:4 85:23 132:5

**clarifying (1)**
28:10

**clarity (2)**
190:5 199:22

**class (12)**
19:22 62:17 132:8,
15 189:20 206:24
216:24 220:1 222:4
224:18 246:8,9

**classes (3)**
189:21 193:3 194:4

**classified (1)**
186:10

**class-skipping (5)**
154:2,6 187:14
188:7 190:13

**clause (2)**

Min-U-Script®

Wilcox & Fetzer Ltd.
www.wilfet.com          (302) 655-0477

(10) changed - clause

37:17 212:8

**clean (1)**
33:22

**clear (30)**
6:17 7:10,24 8:3
13:12 16:8 30:13
42:14 104:10 106:11
120:21 132:12 149:3
152:7 160:13 167:17,
20 168:6,18 170:10
172:18,19 174:17
204:5 218:18 225:7
227:19 234:8 237:9
238:13

**clearly (17)**
14:12 38:22 144:13
161:22 170:15 174:9
175:1 184:13,14
187:8 192:1 196:17
201:12 202:24 203:6
204:19 205:4

**clerk (1)**
21:8

**client (3)**
159:2 162:10
224:21

**clients (2)**
48:24 139:8

**close (10)**
10:20 60:5,9 96:15
107:22 121:16 142:1
170:2 197:13 213:19

**closed (12)**
14:12 56:6,9,10,11
151:8 204:8 227:8
230:3,13,23 252:4

**closing (17)**
11:20 18:16 25:1,3,
5,12,14 26:15 27:7
37:4 60:24 63:13

151:11 167:1 228:8,
22 247:14

**code (35)**
19:11 20:15 51:8
114:13 130:24 133:5,
24 134:8 150:3,4
157:17 172:1 173:8,
20 177:11,15 178:20
190:7 193:24 198:7,
11,17,21 199:23
200:2,3,10 207:3
208:11 209:16 214:13,
19 215:15 246:20
251:14

**Code- (1)**
251:21

**code-based (1)**
150:8

**co-dependent (1)**
229:22

**code's (3)**
188:10 194:13
243:9

**coffers (1)**
229:7

**collapse (1)**
240:1

**collateral (10)**
155:16 159:3 160:5
161:3,6,15 166:20,21
167:3,8

**colleagues (1)**
5:6

**collection (1)**
182:10

**collusion (2)**
189:24 194:23

**Columbus (14)**
56:9,10 62:22,23
63:13 65:13 66:17

71:8 72:13 73:8 90:19
160:6,7 234:21

**columns (1)**
71:15

**come (32)**
11:16 13:12 20:12
73:23 76:1 83:3,9
88:3 89:5,6 91:20
97:4 106:4 113:15
114:11 136:17 148:13
155:16,17 162:17
163:7,9,21 168:19
174:12 185:1 196:8
202:7 204:20 213:20
231:8 245:6

**comes (6)**
41:1 82:24 83:1
86:14 185:5 194:12

**comfortable (1)**
195:11

**comical (1)**
148:7

**coming (13)**
35:2 36:4 89:16
113:14 117:4 118:1
126:24 145:3 153:12,
17 179:19 224:22
228:19

**commenced (1)**
86:4

**comment (4)**
77:21 165:4 216:11
253:2

**comments (1)**
238:15

**commitment (1)**
34:3

**committed (1)**
219:5

**Committee (178)**

5:11,18 6:5,13 7:19
8:15,19 9:23 10:11,22
11:2,4,14 12:4 13:1,
14,21 14:6 17:11,19,
24 21:4 24:14 31:10
32:1,4 33:17 35:3,13
42:17 51:17 83:7
89:16,17 94:22 95:24
96:2,3,5,7,12,17,22
97:1,2,5,5,7,8,14,16,
18 98:3,10,13,16 99:1,
12 100:14 101:6
103:20 104:5,6,20
106:9,14 107:3,8,11
109:6,13,23 111:15
112:21 113:4 116:14,
15 118:20,23 119:5
124:1,4,8 125:18
127:9 128:7,9,23
131:18 132:8,10,12,
16,19 135:14 136:9
137:7 138:16,24
139:23 140:10 143:12,
19 146:1,3 148:18
149:12 154:22 155:4,
8 156:19 157:19
158:7 161:16 162:3,7,
22 165:3 166:4 167:7
168:13 169:14 175:11
180:24 181:1,3,9
182:3,18 183:15,24
185:2,8,18 186:24
187:9,19 191:2,17
193:15,19 194:21
195:12 198:5 199:1,9,
13 200:6,22 201:2,21
202:8 203:9 204:10,
11,16 205:12,16
206:2 211:6,7 212:11
218:13,21 219:1,17

221:17 222:13,18,24
223:1,4 225:17
242:11 245:2 250:11
251:24 252:22

**Committees (9)**
96:19 102:15,16
106:1 117:13 174:12
191:4 195:4 199:16

**Committee's (19)**
5:13 7:16 11:11
15:8 93:10 98:15
143:6,22 144:14,16,
17 157:7,22 196:5
198:24 201:10,15,19
202:8

**committing (1)**
218:22

**common (2)**
223:17 236:5

**communication (1)**
128:18

**communications (1)**
128:14

**co-movant (1)**
10:2

**comp (1)**
71:24

**companies (7)**
23:9 52:5 60:15,16
87:24 88:7 106:13

**company (14)**
48:23 51:22 65:14
71:19 72:3 73:5 75:3
76:1,13 77:8 80:23
81:1 83:7 90:18

**company's (1)**
170:22

**compared (2)**
116:11 196:4

**compelling (1)**

208:13

**complain (1)**
163:10

**complete (2)**
53:21 160:1

**completely (4)**
30:17 167:5 168:16
212:23

**completeness (1)**
47:6

**completion (2)**
126:3,6

**complex (1)**
182:12

**complexity (1)**
182:10

**complies (1)**
180:5

**comply (5)**
16:22 181:16 200:9
223:24 224:1

**component (3)**
131:21 155:10
233:23

**compound (1)**
67:14

**comprehensive (1)**
186:11

**con (1)**
217:4

**concept (18)**
8:14,14 32:12 34:4,
16,18 36:7,19 39:13,
14,18,21 40:9,9 58:8
124:13 189:13 192:5

**concern (8)**
6:19 20:1 173:4
188:14 210:9 224:3
230:18 231:5

**concerns (2)**

235:9 254:17

**concession (1)**
239:4

**conclude (2)**
145:10 238:21

**concluded (2)**
126:12 190:8

**conclusion (10)**
37:18 68:22 83:16,
23 84:9 89:7 133:7
164:14 184:9 243:7

**conditioned (2)**
16:15,16

**conduct (2)**
221:20 223:16

**conducting (1)**
11:13

**conference (2)**
97:20 149:17

**confidence (1)**
81:3

**confirmable (2)**
173:6 188:15

**confirmed (3)**
39:13 147:17 166:3

**confirming (1)**
15:17

**confused (2)**
127:11 131:2

**Congress (3)**
189:19 193:2,4

**congressionally (2)**
217:5,14

**conjecture (1)**
244:8

**connection (4)**
26:14 28:12 177:3
242:7

**connotes (1)**
221:19

**cons (1)**
129:10

**consensual (2)**
211:2 212:1

**consent (4)**
209:22,23 210:2
246:9

**consequences (3)**
186:15 189:17,18

**consider (8)**
14:7 16:24 39:8
74:6 96:24 142:19
145:22 156:9

**consideration (12)**
11:6,7 19:6 144:8
153:15 186:8 192:16
193:10 197:21 199:8
237:18 241:17

**considerations (3)**
187:7 194:8 244:1

**considered (4)**
21:16 28:9 45:15
151:12

**considering (1)**
15:9

**consistent (2)**
77:13 104:17

**conspiracy (7)**
221:16 222:17,21,
23,23 239:21 244:6

**conspired (3)**
149:10 223:1,4

**conspiring (1)**
148:11

**Constellation (3)**
5:8 95:21,22

**constituency (7)**
11:3 123:13,15
144:6 162:24 165:18
166:6

**constituents (1)**
48:23

**constitute (1)**
187:3

**constituted (1)**
190:19

**Constitution (1)**
209:15

**constrained (2)**
246:2 250:3

**constraints (1)**
31:13

**constructive (1)**
213:16

**consummate (1)**
29:18

**contain (1)**
69:21

**contained (2)**
201:7,8

**contemplate (1)**
37:10

**contemplated (17)**
26:12 27:4 35:17
57:18 80:2,16 87:5
130:24 134:7,9 160:3
167:22 176:14 179:12
222:9 226:16 247:15

**contemplates (3)**
124:15 151:15
171:3

**contemplation (1)**
244:23

**contending (1)**
149:9

**content (2)**
189:13 192:5

**contentious (1)**
145:18

**contents (2)**

**constituents (1)**
22:22 23:12

**context (11)**
49:23,23 89:3
92:24 186:22 218:4
220:1 232:12,17
237:24 243:16

**contingent (1)**
159:10

**continue (8)**
17:12 19:9 102:22
169:18 191:7 192:23
200:19 216:8

**continued (3)**
200:17 250:12,12

**continues (5)**
41:11 57:12 174:23
186:19 189:4

**continuing (5)**
43:12 56:18,23
171:15 194:6

**contours (1)**
174:5

**contractual (1)**
52:6

**contravene (1)**
223:22

**contribute (9)**
40:10,12 86:23
125:2 218:8,10 223:5
231:1 233:4

**contributed (22)**
14:4 36:8,11 38:4,
13,19 39:2 41:14 43:8
55:6 124:18 150:24
153:9 168:8,20 170:5
175:9 194:20 224:9
226:12 228:18 248:21

**contributing (8)**
43:14 59:2,3 153:4
170:3,4 172:24 195:21

**contribution (5)**
28:6 30:19 151:16
175:6 229:6

**control (5)**
9:9 20:10 233:14
234:4 246:14

**controlled (2)**
164:2 248:6

**controlling (4)**
152:17 185:10
231:10 254:11

**controversies (1)**
146:16

**controversy (1)**
146:18

**convention (1)**
20:14

**conversation (3)**
31:10,18 103:19

**conversations (2)**
32:24 91:3

**conversion (6)**
234:12,16 235:21,
22,24 236:8

**convert (3)**
237:14 252:13,15

**converted (1)**
69:9

**converting (1)**
126:13

**conveyance (1)**
240:5

**convinced (1)**
253:9

**copies (2)**
21:11 94:7

**copy (1)**
167:12

**core (4)**
146:22 147:3,13

177:24

**Corp (1)**
157:5

**correct (62)**
18:6 24:23 29:16,
17 30:6,9,15 31:3,7,
17,24 34:7 35:15
36:17 40:21 54:5,6
56:21 57:19 62:19,23
63:11,16 66:11 67:10
73:1,11 78:22 79:6
83:8 84:21 87:16 96:6
103:15,17,21,22
104:1,2,18,19,22
111:12 113:19 114:9,
17 115:11,18,22,23
119:3,16 123:2
127:16,17 136:7
139:3,10 155:6
223:23 226:22 255:5

**corrected (1)**
159:9

**correctly (1)**
197:7

**cost (1)**
143:4

**could (70)**
6:23 9:7,10 17:8
18:4 31:15 33:12
34:19 39:8,21 40:14,
22 42:2,11 45:24 46:2
54:17 63:18 74:3
76:12 79:17 85:23
86:20 87:18 95:9
101:7,10 107:19
111:20 122:18,21
123:4,9 126:12
132:24 133:3,22
136:18 138:15 142:5
145:2 152:22 158:9

162:7,17,18,19 166:3
167:23 168:22 181:15
182:8 183:5,7 186:10
197:8 204:4 221:1,24,
24 222:5 226:11
230:18 232:13,14
237:1 240:3,21,24
243:18

**couldn't (2)**
45:7 220:4

**counsel (54)**
5:5,21 8:3 31:11
33:17 35:2,4 39:6
42:16 43:5,12 65:19
66:4 77:2,3 78:3
91:18 99:19 103:24
104:12 107:4 109:24,
24 111:15,15 112:22
116:10 119:6 121:4
124:1,5,8 128:4 137:2
146:2 147:11,15,21
148:2 155:4,8 158:4
161:22 168:4,5 183:2
185:3 193:19 217:1
218:20 219:1,4 238:1
249:4

**country (2)**
146:16 165:15

**couple (10)**
44:24 61:13 65:10
89:8 148:1 166:15
218:17 234:6 236:10
246:23

**coupled (1)**
149:23

**course (11)**
9:5 42:9 147:22
175:16 201:10 205:18
209:22 212:24 225:3
237:24 255:10

**COURT (236)**
5:1 6:1,9 7:21 8:11
9:20 10:9,16,17 12:8,
16 13:19 14:15 16:18
18:18 19:9,18 20:13,
17 21:1,7,16,22 22:3,
14 24:15 28:5,12,23
29:7 37:20 42:5,8
46:10 47:1,14 49:21
50:17 53:10,17,24
55:4 57:22 61:4,10,24
62:3,12 64:1,12 66:5
67:16 68:3,13,23 69:2
70:13 71:11,20 72:13,
14,24 76:2,14,14,15
77:9,17 78:2 79:20
81:20,22 83:22 84:4
91:8 92:16 93:19,23
94:10,15,18,23 97:24
99:20,23 100:11
102:10,13,21,23
103:9 107:17 120:7
121:4,9 127:4 128:15
132:1 133:9,15 138:8
139:13,15,20,23
140:5,8,11,13,16,23
141:3,6,11,21,24
142:10 145:23 146:10,
15 147:2,3,7,8 148:13
149:22 150:5 151:6
152:9,23 153:22
157:2,16 158:9,18
161:12 164:17 165:13
166:10 167:13 169:23
172:19 175:23,24
176:1 177:8,19 178:5,
23 181:2 185:12,20,
23 186:15 187:19
188:8,18 189:5,10
190:4,9 191:15 192:2

195:10 196:9,22
197:13,20 198:19
199:20 200:1,10
206:11,16,21 207:1
209:20 213:20,23
215:24 217:2,17,19
219:11,24 220:19
223:8 224:10,20
225:1,15,23 226:20
227:2,12,16,18,24
228:7,21 229:3 231:6,
8 232:16,20 233:17
234:3,14 235:5,9
236:17,20,24 237:6
238:7,21 239:17
240:8,13 241:6,20
242:12 243:6 244:16
245:4,9 246:5 248:23
249:3,5,11,18 250:15
251:11 255:1,10

**court-approved (1)**
172:15

**courthouse (4)**
31:2,4 35:3 191:1

**courtroom (2)**
10:14 163:21

**courts (6)**
146:15 172:8
181:19 188:16 214:24
246:7

**Court's (15)**
11:22 19:2 147:6
149:20 152:3 191:10
192:24 199:20 213:13
214:5 222:14 237:18
243:24 248:2 249:7

**cover (10)**
33:15 40:24 65:15
71:13,22 72:18 73:11,
13 74:23 111:14

**covered (2)**
12:22 57:1

**coy (1)**
223:11

**CPA (1)**
95:15

**craft (1)**
197:16

**crafting (1)**
124:11

**create (10)**
102:9 145:19
162:23 174:19 178:19
181:13 189:6 190:24
193:12 211:24

**created (8)**
15:19 59:9 102:2,7
126:7 163:1 166:4
184:20

**creates (3)**
79:4 191:9 192:8

**creative (3)**
197:16 230:20
239:1

**credibly (1)**
9:12

**credit (5)**
164:15,22,24
240:20,24

**creditor (33)**
7:14 88:24 99:6
116:14 130:7 132:24
133:3,20,22 134:2,3,4
144:5 157:20 158:7
159:2,8 160:19
161:10,13,19 162:2
166:24 167:1,3,5
194:4 195:1 197:8,22
212:12 229:8 243:10

**creditors (163)**

6:24 7:15 8:17,21
11:4,10 12:10,15
17:14 18:6 45:21
46:21 49:16 50:11
51:3,4,9,11,15,24
52:1,23 57:12,14 64:4
79:6 83:1,2,21 87:13
88:17 90:7 95:23 96:1,
18 99:8 104:18,22,23
105:1,6,10,12,13,15,
16,24 106:12,14,16
108:7,12 109:9,16
112:18,23 114:3,6,8,
11,13,15,20 116:6,12,
15 118:2,6 119:15
121:15 122:8,11,12,
14,19 126:8 127:1
130:4,13,19 132:7,11,
15,20,20,21,23,23
139:3 144:7,11 153:6,
12 154:11 156:19,21
157:10,11,19,22,23
162:9,10 164:21
165:16,19 172:3
173:13,18 178:12
182:14,15,18 184:2,6
189:20,22,24 190:1,2
191:2,3 193:3,11,17,
18,21 194:10,16,17,
24 195:2,4,8,15,16
196:11,12,14,15,19
200:3,5,15 203:10,15,
20,22 208:1,9 212:10
213:19 217:5 218:11
243:13,14,15 245:22
253:12,23,24 254:8,9

**Creditors' (15)**
9:23 83:7 89:16,17
96:17,24 98:13
102:15,16 148:18

161:16 182:18 183:23
185:8 200:22

**credulity (1)**
241:2

**criminal (5)**
221:20 222:1,6,19
223:15

**critical (3)**
6:22 235:14 251:8

**criticized (1)**
47:2

**criticizing (1)**
16:17

**cross (5)**
5:20 62:7 87:1
102:21 191:24

**crossed (1)**
57:4

**CROSS-EXAMINATION (7)**
29:8 62:14 82:3
91:16 102:24 127:6
132:3

**cross-examine (1)**
62:4

**crucial (1)**
217:17

**crystal (4)**
160:13 168:6,18
170:10

**CSC (7)**
63:14 151:6 170:3
208:16 209:3,5 212:18

**current (3)**
119:2 124:14
224:11

**currently (4)**
95:18 203:13 214:3
228:22

**customers (2)**
48:24 60:20

**cut (2)**
74:21 253:23

**cuts (1)**
216:21

**D**

**damage (2)**
88:4 92:5

**Dana (3)**
5:7 21:6 22:6

**darn (1)**
183:6

**date (23)**
12:6 25:4,6 55:3
56:11 68:15 90:8
91:17 92:16 120:17,
20 121:6 126:22
137:4 138:3 159:21
187:5 201:24 222:12
229:10 231:11 241:5
247:4

**dated (1)**
25:9

**dates (3)**
89:2 137:10,15

**day (22)**
6:24 48:18 58:6
107:16 145:2 146:14
147:16 148:17 149:19
154:19 158:12 161:1,
22 163:13 174:6,11
184:22 211:11 220:5
244:14 247:5 255:8

**days (8)**
75:8,9,9 89:8
154:22 208:20,24
222:12

**DC (2)**
228:10,12

**DDTL (20)**
12:20 17:23 29:12
91:18 103:3 140:21
151:18 158:6,12,17,
18 161:8 166:12
183:1 195:22 201:4
220:3 221:14,21
223:19

**de (2)**
215:20 216:2

**deadline (2)**
17:4,6

**deal (18)**
58:20 70:17 74:21
78:4 122:21 123:4
129:24 174:11 180:2
183:9 195:7 197:12
199:6 200:8 231:3
239:5 242:13 254:3

**dealing (9)**
102:12 134:13
145:3 156:3 169:7
174:9,17,18 175:15

**deals (3)**
19:16 77:6 191:5

**dealt (5)**
149:22 171:13,21
186:5 246:18

**debate (5)**
120:22 121:2,12,14
243:18

**debt (2)**
11:10 218:13

**Debtor (60)**
5:11 6:4 13:20 14:5,
7 15:15 16:8,14 17:19
20:9 36:5,5 37:12
38:12 59:1 77:15
81:15 94:11 114:16
125:2 130:16 131:14

134:7,9 136:9 143:4,9
168:9,14,20 171:11,
15,17,18 172:2 173:4
188:13 201:3 202:12,
16,18 204:22 207:22
208:4,4,8 209:10
211:6,7 215:3,7
224:22 227:2 228:23
232:23 233:6,7
241:16 242:10 250:8
**Debtors (103)**
5:5 6:13 8:7 9:9
10:11,22 13:1,13 15:6
17:1,24 23:11 24:14
26:16 27:7 28:5,9
29:15 30:5 32:19 33:1
42:23 43:4,9,13 50:14
56:23 59:18,22 65:3,4
66:15 67:5,8,11 71:4
82:18 84:2 85:7 93:1
94:5 112:16 115:16
119:4,9 120:16,23
121:5 125:21 126:1
131:20 142:13 143:14
144:9,19 145:11
147:17 149:11 151:1
154:18 159:9,14
160:18 170:23 175:19
179:2,7,16 180:11
185:19 186:24 191:18
197:2 201:2 205:12,
15 206:2 208:24
209:2 218:1,5,6,22,24
219:4,5,10,15,16
220:3,10 221:16
222:13,24 223:3
224:15 236:12 242:16
245:3 250:10,13
251:24 252:23
**Debtors' (53)**

6:19 9:12 16:7
20:23 21:5,8 22:16
28:6 35:7,20 42:15
43:5 65:1 66:13 69:9,
15,19 85:2 94:2 98:5
108:6 117:3 119:1,21
120:20 131:3 141:9
155:23 158:22 168:4,
5 171:4 176:4,12,15,
19 178:2 179:1 182:4
185:3 186:9 190:17
191:6 192:7 197:22,
23 201:13,14 202:23
219:14 232:1 248:14
250:22
**December (5)**
21:15 22:21 149:16
150:19 247:17
**decided (6)**
17:24 34:6 86:23
152:9 185:3 225:14
**deciding (3)**
150:15 190:22
242:13
**decision (31)**
9:12 19:3 49:3 50:3,
4,15 51:20,20 55:22
86:14 88:3,11 152:3
170:14 185:22 186:5,
12 187:19 188:4
190:15 191:10,21
197:24 199:18,20
209:13 217:18 231:8
238:15 243:6,9
**decision-making (3)**
50:7,8 56:2
**decisions (3)**
18:13,14 20:11
**declaration (14)**
16:9 21:9,11,13,17,

23 22:20,23 23:12
44:10 49:5 50:18,20
64:7
**declared (3)**
225:21,23 226:15
**declined (2)**
150:5 189:8
**declining (1)**
189:9
**decreasing (1)**
19:12
**deemed (7)**
65:14 71:19 75:1
88:16 204:4 205:7
215:20
**deeming (1)**
193:12
**deems (2)**
197:11 240:9
**defend (1)**
77:9
**defendant (1)**
75:22
**defendants' (1)**
77:3
**defending (2)**
75:22 77:15
**defenses (2)**
75:5 76:12
**defer (1)**
6:7
**deficiencies (1)**
17:23
**deficiency (37)**
53:4,11 105:14,18,
21 106:17 108:8
110:18 111:8 112:17
113:5 114:24 115:16
123:17,21 124:2
127:14 128:10 129:1,

16 130:5,11 131:6,8,
19 139:2,6,7 156:14,
20,22 157:15 183:1,
18 194:16 253:24
254:9
**defies (1)**
223:17
**defined (2)**
151:10 168:15
**definition (1)**
39:11
**definitively (1)**
176:11
**degree (3)**
10:4 95:12,13
**Delaware (6)**
30:11 72:14 73:8
75:6 76:5 237:5
**delaying (1)**
179:23
**delve (1)**
249:18
**demanded (1)**
125:18
**demonstrate (1)**
223:21
**demonstrates (2)**
186:12 193:14
**denied (4)**
17:13 158:15
184:10 185:11
**Dennis (1)**
30:7
**dent (1)**
223:11
**deny (7)**
18:3 169:9 173:14
235:18 237:2 245:18
255:1
**denying (1)**

161:7

**Department (7)**
81:24 85:1,4,12,19,
21 137:9

**departure (2)**
189:19 193:1

**depending (1)**
75:24

**depends (1)**
105:22

**deposed (1)**
44:24

**deposition (9)**
35:23 46:2 56:18
60:3 88:19 90:16
104:3 144:22 234:13

**depressing (1)**
192:19

**depth (1)**
231:22

**describe (3)**
23:4 26:23 95:9

**described (3)**
69:18 217:10
252:24

**describes (1)**
68:17

**designed (1)**
191:11

**despite (2)**
192:23 200:21

**details (2)**
210:13 254:6

**determination (9)**
48:20 49:6 214:12,
15,21 215:14 220:7
224:16 234:10

**determinations (2)**
52:7,8

**determine (7)**

74:2 83:24 128:9
129:1 188:6 215:1,16

**determined (5)**
38:16 71:12 73:4
92:8 187:4

**determines (1)**
200:19

**determining (3)**
187:2 189:2 219:10

**detour (2)**
11:17,18

**development (1)**
97:19

**developments (1)**
97:15

**deviation (1)**
147:12

**dialog (2)**
45:4 209:24

**Diaz (1)**
46:17

**dictate (1)**
117:6

**die (1)**
235:6

**difference (3)**
93:14 175:10
241:24

**differences (1)**
207:16

**different (20)**
33:4 39:12 52:8,20
58:17 72:12 75:8
106:4,5 141:13 146:4
148:2 155:1 157:21
162:10,11 177:10
189:21 190:12 194:4

**differentiate (1)**
208:12

**differentiated (1)**

207:13

**differently (5)**
122:17 130:17
156:15,16 254:1

**differing (1)**
72:5

**difficult (9)**
8:23 123:9 184:11
189:12 190:3 192:4
196:23 197:9 200:6

**difficulty (1)**
182:9

**dig (1)**
182:19

**digest (1)**
220:6

**digits (1)**
117:14

**diligence (1)**
211:17

**diminished (2)**
159:3 161:3

**diminution (2)**
160:14,16

**DIP (57)**
7:4,7,11,17,20 8:16,
20 11:12 14:13 16:12
17:2,5,7 56:13,15
59:18,23 61:15,16,20
93:7,10 144:14 145:4
146:4,5,23 147:5
154:17,21 155:7,15
160:16 162:19 165:20
171:7 176:23 177:4
179:2,21 181:6 182:1,
11 201:9,15,16
202:20 203:3,4
205:19 206:3 212:11
216:18 219:13 242:5,
6,8

**direct (11)**
5:19 21:18 22:9
36:15 47:7 64:8 95:5
98:9 101:6 138:18
214:5

**directed (3)**
47:5 58:16 194:19

**directing (5)**
58:18 112:21 113:1
170:20 177:18

**direction (3)**
83:20 123:11
127:24

**directly (9)**
87:1 91:4 155:18
186:5 190:17 194:12
197:8,21 214:7

**director (5)**
23:9 30:5,8 87:7
179:8

**directors (12)**
33:5,7 65:7 70:4
76:10 77:4 80:22,24
92:19 170:22 171:5
242:4

**disagree (4)**
70:16 141:22
176:21 180:7

**disappointingly (1)**
92:23

**disapproval (1)**
231:16

**disapprove (3)**
199:1,10,14

**disbursement (1)**
209:2

**discharged (1)**
162:8

**disclosing (1)**
128:17

**discovery (3)**
198:13 237:23
244:15
**discretion (1)**
20:9
**discriminated (1)**
162:1
**discriminates (2)**
184:1 200:14
**discuss (8)**
31:5,16 32:5 50:15
62:9 135:10 180:23
198:10
**discussed (9)**
6:4 80:12,14 88:14
113:10,11 129:12
172:18 188:18
**discussing (5)**
26:8 109:13 126:20
192:6 214:3
**discussion (28)**
33:4,5,8 36:13 38:7
39:3 40:1,7 53:2
55:12,18,24 58:3 80:5,
9 87:11,17 93:6 98:17,
21,23 109:17 113:3
114:22 115:1 124:9
125:16 136:18
**discussions (11)**
35:1 52:12,13,21,
22 53:3 57:8 73:20
88:22 93:2 127:23
**disfavored (3)**
194:17 196:18
200:15
**disinterested (2)**
20:7 79:11
**dismiss (5)**
224:12 235:1
237:14 252:12,14

**dismissal (20)**
64:3 69:19 70:10,
18 78:9 149:23
208:15 234:11,15,18
235:7,11,21,24 236:2,
8 237:11,13 252:17
253:14
**dismissals (5)**
150:10 189:23
194:6 253:7 254:15
**dismissed (1)**
69:15
**disparate (4)**
49:15,19 50:11
182:16
**disposition (2)**
173:3 213:13
**dispositive (2)**
120:6 152:18
**dispute (2)**
151:18 200:23
**disputed (2)**
159:11 214:17
**disputes (2)**
7:14 244:15
**distance (1)**
123:10
**distinction (11)**
58:21,23 59:6
80:21 151:24 170:1,9
175:22 207:4 248:24
249:19
**distinguish (10)**
152:13 154:13
229:15 230:11 231:19
232:10 238:18 242:15,
20 243:22
**distinguishable (1)**
175:2
**distinguished (1)**

132:22
**distinguishes (3)**
228:16 229:22
252:17
**distinguishing (6)**
152:14 201:1
238:16 239:15 241:22
249:24
**distracting (1)**
10:15
**distribute (1)**
38:15
**distributed (6)**
35:7 175:14 188:1
192:12 207:12 229:13
**distributing (4)**
13:18 83:8 89:20
243:11
**distribution (46)**
10:8 12:14 15:14
16:5 19:5 20:4 51:5
52:24 53:5,16 73:15
80:18 113:6 114:7
116:18 117:24 127:15,
20 128:11 129:2,17
130:16 149:24 150:17
151:22 152:8,19
163:3 174:8 175:12
186:6,18,21 187:24,
24 188:5,7,9 189:7
193:22 196:16,20
207:2 209:3 213:18
229:5
**distributions (17)**
19:14 79:13 111:10
150:6,14 153:6
172:22 178:21 187:14,
22 188:19,20,22
190:13,14 197:15
209:22

**district (2)**
181:19 236:23
**division (2)**
82:1 216:15
**DOA (1)**
225:5
**docket (3)**
69:20 141:10
222:14
**document (34)**
22:18 23:20,21
24:8 25:8,19,22 26:20
33:16 35:1 68:12,13
71:2 76:23 77:20,24
79:17 98:10,12
100:15,22 101:7,12,
16 115:4 148:3
218:15 220:7,15,21
224:21 244:20 254:10,
11
**documentary (1)**
183:14
**documentation (9)**
8:2 34:4 68:7 69:1
143:11 208:22 218:17
220:9 239:23
**documented (2)**
34:22 92:11
**documents (17)**
60:1 64:17,18
65:21 66:8 69:1 78:20
100:20 107:16 125:5
136:14 139:17 140:2,
20 167:20 168:17
176:10
**DOJ (1)**
216:17
**dollar (2)**
165:9 199:3
**dollars (4)**

163:11,15 164:19
210:15
**done (20)**
8:6 15:19 40:15
71:7,8 159:14 179:3
182:7 200:16 209:20
211:11 212:1 222:6
228:12 230:13 231:13
241:18 242:5,6 254:2
**door (2)**
197:15 238:24
**doors (1)**
213:20
**dot (1)**
191:23
**doubt (2)**
147:2 179:1
**down (12)**
18:10 24:19 34:24
90:22,24 93:20
108:18 127:12 135:15
212:2 216:20 231:8
**downright (1)**
223:8
**draft (5)**
41:2,6 43:3,5
111:17
**drafted (2)**
43:5 49:10
**drafting (1)**
44:6
**drafts (2)**
42:7 223:20
**draftsmanship (1)**
151:4
**draw (4)**
58:22 80:20 84:9
248:23
**drill (1)**
127:12

**drilled (2)**
34:23,24
**drop (2)**
89:18 218:14
**dry (1)**
240:19
**due (3)**
208:10 209:11
211:17
**duly (2)**
22:7 95:3
**during (15)**
57:7 60:12 62:8
65:8 91:15 93:6 137:6
144:22 153:24 156:17
159:3 162:21 175:16
248:9 249:9
**duties (17)**
102:17 104:13,18,
21 105:2,5,9 134:11,
12 156:18 177:16
182:20,24 183:10,12,
22 244:6
**duty (12)**
105:14 106:8 132:9,
17,18 157:22 162:8
183:5,20 184:3
220:11 252:22

**E**

**each (6)**
5:19 8:3 33:9 148:3
155:5 218:19
**earlier (14)**
42:7 48:8 56:5
59:15 88:1 114:1
132:6 144:2 149:6
150:7 162:5 163:8
175:19 244:17

**early (1)**
207:8
**earned (2)**
165:2,5
**ears (1)**
213:20
**easier (5)**
42:20 47:11 108:2
111:21 115:3
**easily (1)**
11:17
**easy (2)**
157:1,2
**ebb (2)**
97:18 98:20
**echoed (1)**
147:16
**economic (3)**
12:5 147:18 244:21
**economics (9)**
9:9 129:20 130:3
148:16 149:3 240:15
254:5,7,8
**educational (1)**
95:10
**effect (3)**
28:11 60:19 240:4
**effectively (4)**
15:14 153:22
181:13 239:4
**efficient (2)**
12:13 102:12
**effort (1)**
166:8
**efforts (1)**
11:11
**eight (1)**
228:10
**either (13)**
7:11 58:8 85:16

136:10 137:8 144:23
177:18 182:3 188:3
236:6,7 252:12,18
**element (2)**
55:20 77:14
**elements (4)**
52:18 65:10 219:2
249:16
**eliminated (1)**
175:8
**elimination (1)**
155:11
**else (5)**
20:18 127:5 194:1
213:21 253:8
**email (11)**
33:16 40:24 42:15,
18 54:10,11 107:2,6
111:14 193:19 244:10
**emails (1)**
97:21
**embedded (1)**
49:19
**embodied (1)**
99:1
**employee (17)**
63:3,6,14 66:16
67:12 69:23 70:7
75:23 78:7,10 80:17
193:5 208:16 209:4,6
212:14 216:24
**employees (16)**
48:24 60:20 65:11
74:22,24 76:17 80:16
81:2 88:10 106:2
163:10 193:6,7 212:5,
18 221:5
**employees' (3)**
20:8 73:14 80:7
**employers (1)**

193:6

**encourage (1)**
193:7

**encouraging (1)**
89:4

**end (26)**
38:8 42:2 56:6
75:15 89:24 107:16
116:17 131:9 148:23
156:8 173:12 184:19
186:5,17,20 187:21,
24 188:18 189:7,23
190:12 194:5 197:14
213:18 228:8 252:11

**ended (2)**
92:22 254:11

**ending (3)**
150:6 207:2 236:21

**end-of-case (1)**
19:4

**endorse (1)**
150:9

**ends (1)**
243:5

**enforce (1)**
250:4

**enough (12)**
29:4 72:18 104:10
121:19 145:21 197:11
220:6,13,19 234:3
240:13 243:21

**ensure (5)**
71:10 76:12 144:11
192:17 223:2

**ensured (1)**
39:14

**enter (8)**
9:13 199:17 200:7
218:2 219:19 220:8
227:3 255:1

**entered (11)**
10:23 154:17 187:6
201:24 203:4,6 204:7,
18 205:1 222:2 226:23

**enters (1)**
55:4

**entertain (1)**
45:16

**entire (7)**
64:10 116:5 133:10
134:5 198:17 224:10
241:18

**entirety (1)**
198:21

**entities (1)**
234:21

**entitled (8)**
9:4 83:14 84:1,3
133:1,4,23 226:14

**entitles (2)**
214:10,14

**entity (2)**
65:13 226:1

**entry (2)**
143:23 187:11

**equal (3)**
129:22 194:11
243:13

**equation (1)**
253:23

**equitable (2)**
45:13 243:24

**equities (1)**
245:20

**equity (6)**
45:14 191:3,4
194:11 195:4,13

**err (1)**
77:24

**erred (2)**

135:22 136:1

**escrow (35)**
26:11 27:3,6 63:3,8,
14 64:16,20 65:1,5
66:6,12 67:4,11,21
68:8,9,14,15,18 69:8,
14,18,21 71:5 72:17,
23 73:13,17 74:16
75:13 202:21 210:4
212:13,14

**escrowed (1)**
66:23

**especially (1)**
221:18

**essence (2)**
178:19 181:14

**essentially (2)**
149:17 217:8

**establish (2)**
130:10 178:10

**established (10)**
109:21 119:18,20
120:3 122:7 123:15
124:6 161:5 191:14
193:4

**establishing (1)**
203:15

**estate (193)**
13:17,17 14:1,2
19:8 35:19,20 38:4,12,
19 39:1 49:8 51:23
57:5 65:2,3,4 66:13,
15,17 67:4,5,7,10
69:9,15 91:20,24 92:9
118:13,17 119:21
120:4,5,8,13 122:10,
13 126:21 146:20
149:4,7,10 150:1,8,17,
21,23 151:12,22
152:20,21,23 153:14,

17 154:3 155:17
156:3 163:4 164:1
166:21 167:22 168:3,
19 169:12,22,24
170:6,8,11,16,16,18
171:12,17,24 172:5,5,
8,10,11,12 174:9,18,
20 176:4,8,8,12,15,19
177:17,22 178:2
179:13 184:13,14,15
185:2,5 186:1,6,11
187:4,8,15,22 188:2,5,
9 190:14,20 193:11
195:17,20,20 196:4,8,
10 197:2,17 198:18,
20 200:4,24 201:11,
12,16,20 203:7,14,24
204:4,7,14,20 205:4,
18,21 207:3,4,12
208:3 210:21 215:3,7,
9,13,17,21,23 216:3,4,
6,7 229:11,12,13,20
232:1,4,5,8,9 233:20
240:1,18 241:5,11,14
242:19 243:1,11
244:24 246:14,16
247:4,5,6,8,9 248:8,
14,19,22 249:2,14,22
250:7,17,22 251:1,3

**estates (3)**
120:18 121:8
155:24

**estate's (3)**
153:3 163:4 229:7

**estimated (4)**
69:22 70:1 76:17
212:16

**et (4)**
48:24 171:5,11
221:5

**even (53)**
8:7 10:20 77:17
113:11 121:12 122:16
148:18 149:13 156:3,
4 160:7 165:3,16
168:17 176:9 177:4
179:7,8,21,21 180:12
181:22 184:8,11
187:1 189:22 191:3
192:14 193:21 194:4
198:13 200:18 205:5
207:19 210:19 212:4,
9 219:22 222:13,18
223:1 229:4,19 232:5
237:13 240:20 243:12
248:1,17 250:18
251:9 253:10 254:14

**event (10)**
65:9,13 67:1 71:19
73:12 74:23 75:3
208:24 248:3 250:20

**events (2)**
78:19 137:23

**ever (12)**
12:12 49:8 80:5
85:15 90:11 96:16
142:23 148:18 216:17
217:15 240:16 253:3

**every (9)**
48:18 89:1 146:14
178:10 236:15,17,21
241:9 242:16

**everybody (8)**
166:22 168:10,14,
14 184:24 194:1
221:11 227:22

**everyone (1)**
142:22

**everything (3)**
99:18 143:7 199:11

**evidence (20)**
5:17 17:20 53:9
94:9 120:2 122:1
139:15 141:17,17
148:6 160:12 176:2
182:2 183:14 231:23
240:15 244:5 245:13
253:21 254:1

**evidentiary (2)**
142:2 150:21

**exact (4)**
153:16 191:14
227:15,23

**exactly (7)**
10:7 76:24 149:8
163:23 165:24 199:4
242:23

**EXAMINATION (5)**
22:9 91:13 93:6
95:5 138:13

**examined (2)**
22:8 95:4

**examining (1)**
65:20

**example (7)**
51:3 52:23 119:5
123:16 142:24 171:4
253:15

**examples (1)**
188:13

**excellent (1)**
207:11

**except (3)**
20:11 122:14
126:15

**exception (10)**
186:17 189:6,9,11,
14 190:12 192:13
195:6 247:20 252:6

**exceptions (3)**

106:19,21 215:18

**exchange (1)**
201:13

**exclude (4)**
112:23 131:7,18
195:19

**excluded (20)**
35:19 36:20 37:5,
11 38:3,23 41:13 43:7
55:3,14 105:2,3 125:1
127:15,19 148:21
156:15 168:7 169:1
194:18

**excluding (3)**
112:17 115:16
124:1

**exclusion (4)**
128:10 129:1,16,19

**exclusive (4)**
110:11 115:17
134:3 177:9

**exculpation (1)**
242:18

**Excuse (7)**
41:24 127:9 196:2
201:7 204:12 206:4
214:16

**executed (7)**
24:11 26:16,17
27:6 39:15 220:18
225:11

**exercise (8)**
9:14 180:3,10,16
184:16 218:1 224:16
226:13

**exercised (2)**
102:17 219:10

**exercising (1)**
52:6

**Exhibit (9)**

21:10 22:16 24:3,4,
4,5 100:14,19 101:7

**exhibits (5)**
21:8 94:3,8 139:23
168:5

**exigent (3)**
17:3,7 121:7

**exist (2)**
59:10 73:7

**exists (2)**
68:8 174:13

**expanding (1)**
31:22

**expansive (2)**
190:7 199:24

**expecting (1)**
60:4

**expedited (2)**
214:14 215:14

**expenses (6)**
75:21 76:18,21
77:2,17 155:23

**experience (6)**
96:21 114:6 116:17
121:24 223:16,19

**expert (1)**
133:17

**expired (4)**
15:24 171:1,7
201:23

**explain (4)**
59:7 118:8 167:23
168:22

**explained (1)**
129:12

**expressed (1)**
127:22

**expressly (2)**
8:7 150:5

**extend (2)**

153:22 205:23

**extensive (1)**
98:21

**extent (13)**
10:23 72:16 92:5
105:12,13 106:16
108:8 128:13 224:4,
19 229:4 237:16,20

**extinguish (2)**
208:9 209:8

**extra (2)**
21:11 240:17

**extracted (1)**
16:2

**extraneous (1)**
97:12

**extraordinary (1)**
87:23

**eyes (1)**
121:17

---

**F**

---

**face (2)**
193:6 249:6

**faced (4)**
12:4 190:11,21
250:1

**facie (2)**
159:12 160:15

**facility (1)**
160:4

**facing (1)**
48:21

**fact (54)**
8:2,8 9:7 23:8
30:17 39:7 55:15 60:8
71:11 73:7 75:4 76:10
83:13 84:7 88:13
104:3 131:3,17 134:2

145:13 148:7 153:20
154:18 159:19 164:8
171:6 173:11,17
176:13,22 180:18
182:6,23 187:12
188:23 189:12 190:6
193:4,18 199:23
201:22 210:20 215:13
219:12 222:11 235:6
239:19 240:19 242:15
244:9 246:12 247:2
252:15 253:16

**facto (2)**
215:20 216:2

**factor (3)**
150:15 242:13
249:24

**factored (1)**
73:9

**factors (8)**
15:8 180:9 181:24
184:5 201:1 238:17
241:22 242:21

**facts (28)**
14:18 15:4,22 53:9,
10 120:2 129:15
130:9 169:17 170:2,2,
11 174:16 187:23
191:13 239:18,21
240:3,10,12 243:22
244:12 246:2,12
247:1 252:8 253:11,13

**factually (1)**
53:13

**failed (2)**
184:16,17

**fails (1)**
154:15

**fair (51)**
12:9 44:22 45:4,8,

21 46:21 48:14 49:5,
16 50:3,3,11,18,20,21,
24 51:1,2,13,19,21,24
99:1,2,2 101:1,22
102:1 114:2 115:24
117:17,20 119:24
122:11,22 123:13
128:11 129:3 130:11
131:7 156:12,13
179:15 199:4 221:2
224:24 225:6 233:22
234:1,3 240:13

**fairly (2)**
161:10 219:20

**fairness (5)**
20:6 48:8 64:9
83:19 156:10

**fait (1)**
217:8

**faith (3)**
8:8 219:6 227:1

**fall (5)**
9:15 63:9 72:23
145:7 228:1

**fallacy (1)**
152:2

**falls (4)**
142:20 150:12
155:22 249:15

**familiar (19)**
22:22 24:7 25:22
26:20 36:16,19 62:20
63:1,5,8 64:20 66:6
70:2,3 78:8 79:3,19
82:12,13

**far (10)**
44:1 99:18 108:15
127:24 174:4 198:5,6
216:14 233:15 249:22

**fashion (1)**

21:21

**fast (2)**
56:3 97:10

**fathom (1)**
213:2

**favor (1)**
203:3

**favorably (1)**
116:4

**feature (1)**
239:16

**federal (1)**
95:14

**fee (5)**
77:14 202:22
205:13,17 206:3

**feel (2)**
89:21 236:9

**feeling (1)**
88:12

**fees (20)**
65:16,17 71:24
75:15,17,18,21 76:7
77:16 155:6,7,22
175:11,12,16 202:4,9,
12,12,16

**few (16)**
21:19 44:8 67:17
82:5 97:21 103:6
130:22 142:14 156:7
212:2 214:2 217:22
218:18 220:13 238:12,
15

**fiction (16)**
174:19 186:19
189:3 191:8,9 192:22,
23 194:6 195:5,16
197:21 198:19 200:7,
8,16 239:7

**Fidelity (1)**

157:16

**fiduciary (25)**
102:17 104:13,17,
21 105:2,5 106:8
132:9,17,18 134:10,
12 157:22 161:20
177:16 182:20,24
183:5,20,22 184:3
205:15,16,22 252:22

**field (1)**
197:1

**fight (1)**
120:19

**figure (2)**
15:17 77:11

**figured (1)**
161:17

**file (2)**
68:12 193:6

**filed (20)**
5:10 8:10 21:14
68:12 82:7,10 87:7
92:16 134:20 137:5
146:4 151:8 162:12
180:22 214:19 220:18
222:13 225:11,23
247:7

**filing (5)**
84:24 86:5 88:23
90:24 91:3

**filings (2)**
121:5 234:14

**final (24)**
7:6 26:2 27:6 43:21
143:11 146:23 154:17,
21 155:15 169:16
173:3 201:9,15,16,23
202:20 209:4,21
213:18 220:8 230:13
231:14 234:10 242:6

**finality (1)**
209:10

**finalization (1)**
8:2

**finalize (1)**
8:8

**finalized (4)**
8:10 60:13 220:18
221:9

**finally (5)**
160:21 196:21
203:23 219:3 237:20

**financial (3)**
103:24 119:2 121:7

**financing (3)**
6:21 146:24 162:19

**find (7)**
102:3 111:17 148:7
196:8 217:8 248:5
250:4

**finding (2)**
19:5 152:21

**fine (7)**
6:10,12,14 16:14
47:12 220:15 249:6

**Finger (2)**
5:4 20:21

**finished (1)**
21:3

**firms (1)**
168:13

**first (40)**
5:10 6:13 10:5
12:21 20:24 22:7
29:20 31:5 42:14
43:17 46:5 55:21
87:23 95:3 107:2
114:12 115:5 116:6,8
132:5 148:17 154:19,
20 160:4 161:21

166:16 186:4 187:16
193:1 201:1 210:11
212:5,7,24 214:9
217:24 218:20 242:8
246:3 254:21

**firsthand (2)**
99:17 104:5

**fit (4)**
209:9,10 231:9
248:6

**five (2)**
62:12 206:19

**flavor (2)**
128:3 129:5

**flipped (2)**
176:17 198:12

**flipping (1)**
26:6

**flow (4)**
97:18 98:20 125:4
126:24

**focus (5)**
70:15,15 169:23
209:18 251:16

**focused (6)**
43:1 70:18 170:11
246:11 249:1,3

**focusing (1)**
54:19

**folks (1)**
66:24

**follow (5)**
18:7 59:8 208:10
232:14 250:4

**followed (3)**
156:4 158:24 207:3

**following (4)**
19:2 37:4 190:23
218:7

**follows (2)**

22:8 95:4

**follow-up (2)**
21:19 88:1

**food (1)**
60:17

**force (1)**
195:6

**forced (2)**
117:2 164:8

**forces (2)**
200:9 217:3

**forget (1)**
253:2

**form (5)**
26:2 27:6 88:23
151:1 208:18

**formation (1)**
55:5

**formed (4)**
148:18 222:13,18
223:1

**former (2)**
63:10 81:16

**Forming (1)**
90:19

**forth (10)**
23:5 107:14 118:1
131:22 148:1 154:20
155:6 188:6,12 242:2

**forward (10)**
19:8 29:18 34:3
56:3 143:9 149:18
220:23 221:7 234:11
237:12

**forwarding (1)**
54:10

**fought (2)**
149:6 165:7

**found (8)**
99:6 152:23 157:24

161:13 173:2 175:24
210:12 221:17

**foundation (2)**
49:18 99:16

**four (3)**
24:18 154:13 201:1

**four-and-a-half (1)**
210:14

**fraction (1)**
73:16

**fragile (1)**
88:6

**frame (1)**
6:6

**framed (1)**
19:1

**Frank (5)**
12:19 29:2,11
103:3 166:12

**frankly (13)**
11:23 14:24 36:13
73:22 121:2 172:12
174:3,5,24 177:12
179:6 180:3 184:7

**fraudulent (1)**
240:4

**free (1)**
197:10

**freezing (1)**
253:12

**freight (1)**
165:22

**Fried (5)**
12:19 29:2,11
103:3 166:12

**front (10)**
44:11 49:3 54:4
79:17 103:7 117:16
218:5,6 231:21 245:15

**frozen (1)**

253:17

**fruitful (1)**
135:12

**fulfilling (2)**
88:9,9

**full (19)**
20:13 70:8 71:6
72:19 73:6,16,18
74:15 76:16,16
121:21 138:19 160:5,
9 185:24 200:5
203:18 209:4 210:23

**fully (10)**
20:8 72:9 73:4
74:23 79:8 90:23
121:18 130:10 196:17
240:20

**fulsome (1)**
39:2

**functions (1)**
79:14

**fund (4)**
73:1 74:15 77:17
253:18

**fundamental (3)**
166:19 175:10
231:19

**funded (3)**
66:24 202:21 203:5

**funding (11)**
7:14 27:2 63:3
71:13 72:16 77:12
153:15 154:10 155:16
170:18 212:14

**funds (24)**
73:12,17,20 74:2
75:10 119:9 120:11,
23,24 153:7,13
155:19,24 164:10,11
170:20 175:14 176:3

178:17 192:17 202:7
212:12 213:14 231:24

**further (18)**
8:1 62:2 81:18 91:9
93:17 102:20 127:3
131:24 132:1 139:12,
15 173:9 192:19
206:14 218:16 223:18
248:1 255:6

**future (4)**
148:14 191:21
192:14 199:16

## G

**gained (1)**
143:11

**game (1)**
223:11

**Gary (5)**
12:18 29:2,11
103:2 166:11

**gathering (1)**
125:4

**gave (2)**
56:19 219:15

**gee (3)**
17:24 168:11
183:21

**general (26)**
51:10 78:14 99:7
104:23,24 105:4,23
108:7 109:2 110:17
112:4,15 114:14
115:15 116:5,12,14
126:23 130:12 157:9,
23 162:9 164:21
189:15 198:11 215:9

**generally (5)**
70:2 82:22 125:14

215:5 253:13

**general's (1)**
153:23

**generated (2)**
81:2 160:8

**gets (3)**
16:12 117:8 129:22

**getting (17)**
45:12 53:4 58:11,
17,19 117:23 118:2,9,
12,14 122:15 147:11
154:15 164:2 169:12
224:6 225:18

**gift (6)**
155:12 192:9,11,12
199:5 213:11

**gifting (4)**
20:2 154:1,5 170:17

**gifts (2)**
19:16 191:5

**give (13)**
8:16,20 34:2 89:2
128:2 129:4 130:19
149:12 164:15,24
189:13 192:4 245:6

**given (10)**
11:9 12:1 32:6
48:21 55:21 73:7 99:5
145:14 217:14 221:18

**gives (1)**
193:24

**giving (7)**
90:4,4 129:13
130:20 178:4 208:1
242:10

**glad (1)**
237:4

**global (5)**
64:2 89:6 90:10
107:7 197:4

**goal (1)**
6:18

**goals (3)**
6:22 219:14,17

**goes (13)**
83:19,20 108:6
109:23 117:7 159:16
164:7 171:9,23
193:10 217:1 235:5
249:22

**going (90)**
6:16,19 7:3 10:13
13:3,11,15,17,22 14:1,
3 15:3,6 16:8 17:13,
15,15 26:5 35:7,11,13
38:22 41:9 42:1,3
43:7 46:4 47:13 48:7
62:6 70:17 71:18
83:20 88:22 90:1 92:1
102:8 103:5 116:7
119:22 121:16 128:12
130:5 141:1,12,21
148:13 149:14 164:20
167:16 168:24 169:1,
10 170:21 171:22
172:13,15 173:4,11
174:1 176:18 177:23
179:15 184:19 188:14
191:12 202:7 206:17
207:15 208:17,17
210:4 226:10 229:8
234:18 235:8 237:12
238:11 241:15 245:5,
18 246:1,24 251:19
252:12,14,19,23
253:19 254:24

**gone (3)**
72:17 166:20 242:7

**Good (43)**
5:1,2 8:8 9:21

12:17 18:19 19:20
20:19 22:3,11 28:24
29:10 57:13 62:16,18
87:9 95:7,8,16,17
97:17 103:2 123:8,13
127:8 129:13 141:24
142:10,11 143:3
153:19 185:15 187:1
205:5 206:23 219:6
226:24 228:24 238:9,
21 245:16 248:4 253:6

**good-faith (1)**
10:24

**gotten (1)**
123:4

**grant (2)**
235:19,20

**granted (7)**
76:17 170:8 172:9
189:20 193:2 214:24
217:14

**grants (1)**
194:10

**grateful (1)**
164:5

**gratuitously (1)**
178:3

**great (6)**
9:5 57:6 81:3
158:10 167:13 196:3

**greater (1)**
181:17

**ground (1)**
210:18

**grounds (1)**
157:12

**group (2)**
65:7 195:13

**groups (1)**
106:2

**GSPEO (1)**
212:11

**GUC (51)**
36:12 38:5,8 40:12
41:14 43:8,14 51:5
52:24 53:5 55:5,6,19
58:16,18 78:23 79:4
80:8,21 81:7 83:4
86:23 102:7 110:12,
16 111:4 112:24
113:7 114:21 115:18,
21 124:2,18 127:16,
21 129:3,18 130:13
131:15 149:11 151:17,
23 153:16 168:8
193:23 195:21 204:2,
12 218:9,10 223:6

**guess (9)**
56:17 126:15
132:22 135:14 136:16
168:12 228:11 237:5
243:18

**guise (1)**
15:20

**Gump (2)**
41:2 107:3

# H

**half (1)**
198:15

**halfway (1)**
251:10

**hallmarks (1)**
20:6

**hallway (1)**
58:9

**hand (5)**
29:6 103:16 152:10
167:11 197:6

**handed (7)**
89:13 94:7 98:2
100:13 164:10,11
165:12

**handle (2)**
33:9 81:5

**handled (1)**
103:23

**handling (2)**
79:12 81:9

**hands (2)**
158:9 245:22

**handy (1)**
54:1

**hangs (1)**
201:21

**happen (3)**
73:14 118:7 208:13

**happened (6)**
36:12 143:7 179:6
219:9 227:7 241:3

**happening (6)**
89:8 115:12 118:3
129:5 167:18 216:16

**happens (6)**
115:11 117:8 118:4
177:4 230:17 251:10

**happy (7)**
45:16 47:10 142:22
143:1 158:5 221:11
255:10

**hard (10)**
73:22 74:10 123:14
149:6 152:12 156:23
165:6 167:12 204:23
210:16

**harder (2)**
210:12,13

**hard-fought (2)**
10:24 145:23

**hardly (1)**
155:15

**hardships (1)**
193:5

**hard-to-follow (1)**
76:9

**harm (10)**
60:11 179:23
191:14 193:1,13,15
194:2,22 196:22
197:19

**harming (1)**
182:22

**harms (2)**
19:9 192:1

**Harris (1)**
12:19

**hat (1)**
201:21

**hate (1)**
171:23

**Hazan (4)**
33:17 41:1 54:11
109:23

**head (1)**
198:12

**headed (6)**
235:18,21,23,23,24
236:7

**header (1)**
27:17

**hear (15)**
15:3,6 68:4 85:24
142:3 147:6,8 149:14
176:24 177:20,24
178:5,7 206:18 209:13

**heard (13)**
6:2 39:18 128:7
135:5 149:5 162:15
179:17 182:6,9

198:23 234:7 238:15
239:9

**hearing (51)**
7:1,2,3 16:11 17:6
20:13 21:15 29:14
31:2,9,14 32:9,13,20
40:5,6 58:6 59:16,17,
19,23 60:12 61:16,20
64:1 87:12,15 88:3
89:10 90:9 93:7
137:21 138:3 140:11
143:10 150:21 152:6
158:8,12 166:17,19
179:19,20,23 216:18,
18,18 218:19 227:14
247:17 255:13

**heart (1)**
48:13

**hearts (1)**
48:13

**heavily (1)**
163:8

**held (4)**
76:13,14 140:11
158:19

**help (5)**
9:6 48:4 68:1 103:9
106:6

**helped (2)**
39:7 219:17

**helpful (5)**
6:6 28:17 46:7
64:22 167:11

**here's (1)**
33:18

**hey (2)**
16:11 179:3

**hiatus (1)**
97:11

**hide (1)**

87:6

**hierarchy (1)**
243:10

**high (2)**
189:24 194:24

**higher (2)**
200:14 243:15

**highest (1)**
181:2

**highlight (2)**
20:1 129:10

**highlighted (2)**
108:1 217:17

**highly (2)**
81:6 145:17

**himself (1)**
238:2

**hindsight (2)**
148:24 219:9

**hoc (2)**
191:2,4 195:13
212:10 218:21

**hold (5)**
76:15 106:9,12
163:10 192:15

**holders (19)**
78:9 109:2 110:17,
19 112:4,14 113:5
115:14,24 116:2,3
123:16,20 124:1
191:3,4 194:11 195:4,
14

**holding (6)**
186:13 187:20
190:22 191:7 243:3,19

**Holdings (2)**
24:20 152:11

**holds (2)**
163:24 215:13

**hollow (1)**

210:9

**home (2)**
15:9 48:19

**Honor (167)**
5:3,23 6:3,8,15
8:22 9:1,19,22 10:10
11:16 12:4,18,21 14:7
17:16 18:11,20,22
19:21 20:15,20,22
21:6,13 22:2 28:20
29:1,1,3,6 37:14 42:1
46:1,9 47:4 49:18
50:13 57:21 61:23
63:17,24 65:18 68:22
70:10,11 79:16 81:23
83:16 85:23 91:7,12
93:18 94:1,6,14,17,21
97:22 99:16 120:2,9,
15 121:1 133:14,17
138:7,12 139:19,22
140:3,9,15,18,19
141:8 142:7,12,17,18
143:2,18,21 144:2
146:21 149:16 150:19
152:2 156:9 158:11,
14,19 159:7 160:12,
17,23 161:1,13
164:16 165:13 166:9,
11 167:10,15 169:10
173:2 174:1,3,10
176:21,24 177:7,14,
20,23 178:4,7,10,16,
18,21 180:18 181:18,
20 184:9,19 185:9,11,
16,18 191:16 198:3
199:4,14,17 200:18
203:11 204:21 205:10,
23 206:8,13,23 207:1
209:17 213:22 214:2
224:8 225:13 227:6

228:6,15 231:1 233:5,
23 234:7 236:11
237:12 238:6,11,14
239:10 240:2 242:23
245:3 255:5,7

**Honor's (3)**
160:21 161:7
238:15

**hope (5)**
11:5 15:16 90:9
157:1 238:9

**hopefully (1)**
247:16

**horse (2)**
192:14 213:11

**host (1)**
141:15

**hour (1)**
163:7

**hours (1)**
220:13

**house (1)**
239:11

**housekeeping (1)**
94:1

**However (10)**
154:15 157:4
158:15 191:13 200:18
211:15 217:12 246:1,
18 250:1

**huge (1)**
11:9

**hypothetical (1)**
59:9

**I**

**ICL (57)**
18:16 152:10,14,18
153:2,19 154:13

155:2 174:21,22
175:2,3,5,5,11,21,22
185:22 187:1 191:7
192:23 200:19 201:3
204:2 205:5 207:13
208:12 217:13 228:24
229:3,6,15 231:10,20,
22 232:10 238:14,20,
21 241:24 242:15,20
243:19,22 246:16,17
247:1,11,20 248:3,6,6,
11,14 250:2,4 253:6

**ICL's (3)**
186:13 190:22
197:20

**idea (10)**
122:24 148:10
161:15,24 179:19
213:10 239:7 240:22
241:4 244:11

**identical (1)**
153:1

**identified (2)**
22:14,16

**identify (5)**
22:18 23:21,22
25:18 101:7

**ie (2)**
202:12,15

**ignore (7)**
169:14,16 183:5
188:17 198:21 236:5
239:19

**ignoring (2)**
187:5 229:14

**illusion (1)**
211:24

**illustration (1)**
234:1

**imagination (1)**

121:11

**imagine (2)**
40:2 73:3

**immediacy (1)**
252:5

**immediately (2)**
14:4 60:5

**impact (2)**
61:7 129:9

**impermissible (1)**
14:21

**implement (1)**
155:5

**implicated (3)**
152:24 224:4
250:23

**imply (4)**
39:11 49:9 122:1
242:24

**importance (3)**
190:5 199:21 217:3

**important (15)**
8:14 16:24 83:22
92:4,18 93:14 96:9,10
173:24 207:20 217:12
218:4 220:23 248:12
252:9

**importantly (6)**
7:18 88:9 218:15
219:21 229:17 246:12

**improve (1)**
144:10

**improvements (1)**
148:4

**inaccuracy (1)**
135:16

**inaccurate (2)**
136:5,7

**inadequate (2)**
75:10 76:5

**inapplicable (3)**
134:13 149:20
153:19

**inappropriate (1)**
165:7

**inasmuch (1)**
224:15

**incentivize (1)**
192:13

**inclined (1)**
205:10

**include (10)**
66:20 85:5 87:19
90:11,13 106:15
130:11 151:14 189:18
205:19

**included (8)**
21:6 39:5 71:14
92:12 123:18 132:7
202:13 204:22

**includes (3)**
21:9 123:16 211:15

**including (11)**
49:15 90:7 108:7
120:17 121:5 129:6
170:21 171:10 188:13
214:17 234:14

**inclusion (1)**
87:13

**incomplete (1)**
37:15

**inconsistent (1)**
150:2

**inconvenient (1)**
15:5

**incorrect (2)**
53:13 84:18

**increase (4)**
155:10,18 170:19
240:23

increased (3)
161:4 202:3,7

increasing (1)
19:13

incurred (1)
175:16

indeed (1)
150:24

independent (3)
230:2,8 231:14

indicated (7)
20:23 28:15 121:4
158:4 195:23 203:11
244:16

indicates (1)
253:22

indicating (1)
150:20

indicator (1)
144:16

indirect (1)
204:3

indisputably (1)
78:24

individual (3)
191:1 193:11
197:17

individuals (1)
233:13

induce (1)
210:4

influence (3)
117:5,6 130:20

information (9)
23:5 43:23 61:3
81:17 135:23 136:3
210:10 237:22 238:4

informed (2)
78:11 237:11

ing (1)

123:11

initially (1)
71:21

initiation (1)
84:23

injunctions (1)
188:17

inner (1)
88:24

inner- (1)
7:13

inquiring (1)
66:4

insiders (1)
217:4

insisted (7)
17:21 65:8 122:24
125:12 131:5 167:24
168:2

insisting (1)
113:21

insolvent (2)
120:18 203:14

instance (3)
137:21 250:5
254:19

instead (4)
109:16 162:22
179:13 241:1

instrumentally (1)
184:15

insufficient (2)
73:13 122:2

insurance (1)
170:22

integrated (1)
145:4

intend (2)
21:17 71:5

intended (4)

20:23 136:15 176:4
231:24

intent (4)
70:3 71:9,21 72:1

intention (4)
67:12 136:8,21,23

intentions (1)
244:19

interest (6)
105:17 162:14
182:14,15,17 184:6

interested (3)
38:24 77:5 81:13

interesting (1)
134:15

interests (2)
157:18 161:23

interim (10)
44:5 55:10 154:20
188:7,9,19,22 201:23
242:8,8

intermediary (1)
207:24

intermediate (1)
235:13

Internal (13)
82:1,6,16 83:13
84:13 85:3,11,17
87:14,20 90:11 137:8
138:2

interpreted (2)
19:3 237:2

interrupt (1)
74:17

intertwined (1)
207:11

introduction (1)
94:3

invalid (1)
135:7

investigation (1)
159:15

investigations (1)
11:13

invited (2)
196:15 197:3

involve (1)
150:7

involved (21)
30:14 40:8 117:11
129:21 146:1,2,3,20
150:16 151:4 152:22
154:2,3 163:5 169:22
171:15,19 216:12,13
248:18 250:9

involvement (3)
103:14 184:13
250:12

involves (2)
170:16 171:14

involving (1)
186:22

iota (1)
180:14

Iridium (2)
235:13 251:10

irrelevant (1)
55:22

IRS (27)
84:17 86:20 87:2,4
90:17,17,21,22 91:4
134:20,23 135:2,9,22
136:1,10,16 137:2,18,
20 156:12 157:11
162:12 163:12 183:6
216:12,15

I's (1)
191:23

isolation (1)
243:20

**issue (25)**
10:16,17 19:1
39:12 49:19 63:21
72:11 120:6 121:6
152:4,7,18 156:22
157:14 158:1 169:7
174:17 203:8 209:12
214:7 224:5 237:16,
21 243:11 249:2

**issued (1)**
236:24

**issues (9)**
6:11 12:22 18:17
66:1 93:8 145:5 156:8
224:8 237:10

**item (3)**
31:19,22 224:7

**itemization (1)**
75:12

**items (2)**
5:9,14

**iterations (2)**
42:3 147:24

**itself (7)**
21:12 99:6 183:15
192:9 207:7 208:4
253:18

**J**

**Jack (3)**
19:21 62:16 206:23

**Jacobson (1)**
12:20

**Jevic (117)**
11:18,21 13:23
14:20 18:1,16 19:2
20:3,3 83:22 148:6,8
149:15,17,19,22
150:14,15,16 151:5

152:2,6 153:19,22
164:2 167:17,19
169:19,21,24 170:2,
10,13 172:17 173:1,
13,17 174:2,5,6,11,13,
14,23 178:15 184:12
186:4,12 187:18,23
188:2,3,16 189:4
190:23,24 191:11,13,
19 193:3 194:3,23
195:24 197:13,24
198:6 200:11,17
207:1,19 209:12,14,
19 210:6 211:23
213:6 216:5 217:13,
18 221:23 222:3
223:9,22 224:4,11
227:17 229:4 230:21
235:6 236:15,16,18
237:2 238:24 239:4,
22 246:6,10,21
247:22 248:2,5,16,17,
17,24 249:13,20
250:2 251:1,7 252:7,
18 253:2,5,16 254:21

**Jevic's (1)**
188:21

**job (8)**
97:17 123:8,19
207:11 223:23,24
235:8 245:15

**Joe (1)**
54:12

**joined (1)**
19:23

**joint (3)**
5:10 23:13 28:13

**jointly (1)**
24:15

**Judge (5)**

18:3 152:18 172:12
227:15 253:15

**judgement (1)**
184:17

**judgment (13)**
9:14 16:7,18 180:4,
10,11,16 218:2
219:11 224:17 226:13
244:7 252:20

**judicial (1)**
141:11

**July (1)**
109:6

**jump (1)**
163:1

**jurisdiction (17)**
147:3,6,7,9 152:12
176:21,24 177:2,9
178:6 214:8,24 215:6,
10,11,24 216:8

**jurisdictional (2)**
178:22 250:19

**Justice (7)**
81:24 85:1,4,12,19,
21 137:9

**justices (1)**
152:6

**justification (6)**
173:16,21,22
188:12,24 189:3

**justifications (1)**
150:9

**justifies (1)**
251:15

**justify (2)**
129:16,19

**K**

**KAPLAN (55)**

6:3 12:16,17,19
28:24 29:2,9,11 37:23
42:2,10 46:4,8,11
47:9,18 50:5,22 53:14,
19 54:2 61:12,22 62:1
86:5 87:24 94:13
99:15 102:22 103:1,2,
13 120:15 121:13
122:6 127:2 139:21
140:1,14,19 141:8,19,
23 158:17 159:1,7,16
160:11 166:11,12
167:15 185:13 207:10
217:9 244:14

**Kaplan's (4)**
121:21 139:8
162:10 231:22

**keep (6)**
90:1 149:7 179:10,
13 211:17 234:8

**keeping (4)**
88:10 92:17 97:17
179:14

**keeps (1)**
245:22

**kept (6)**
91:24 97:14 123:10,
11 169:5 240:19

**key (3)**
6:24 179:10 219:14

**kick (1)**
211:16

**kicked (1)**
196:20

**kicking (1)**
149:13

**killed (1)**
29:4

**kills (2)**
17:17 169:4

**kind (12)**
87:10 102:8 148:14
210:5 216:19 220:10
221:15,20 227:19,20
240:8 252:4

**kinds (2)**
164:19 251:13

**Kinel (47)**
9:22 15:2 41:24
42:9 53:8,11 70:14
94:21 95:6 97:22 98:1,
8 99:21,24 100:4,9,12
102:19 120:1 128:12
133:6,16 138:10,11,
14 139:11,16,19
140:3,7,9,17,24 141:5,
18 142:6 143:17,18
167:16 170:24 174:12
227:14 238:8,9
240:11,14 245:20

**Kinel's (3)**
169:19 216:11
228:8

**KL (1)**
43:3

**knots (1)**
53:9

**knowledge (17)**
25:10 27:5 64:8
65:5 68:10 80:10
85:13,14 91:2 99:9,12,
17,22 100:5 104:5
113:23 223:7

**known (1)**
133:10

**knows (4)**
103:10 173:2
181:20 213:3

**Kramer (2)**
41:1 42:15

## L

**lack (1)**
244:6

**lacked (1)**
150:4

**LaForge (30)**
5:7 21:6,9,14 22:2,
4,6,11,12 23:10,16
27:10 28:19 29:10
42:11 54:8 62:16,19
64:7 66:11 75:11
76:21 78:6,23 82:5
91:15 134:19 144:21
145:24 149:5

**LaForge's (2)**
145:9 234:13

**language (22)**
34:24 38:14 39:10
40:7 41:12 42:12,24
70:2 77:6 110:15
111:11 112:13,15
115:2,14,23 122:24
123:1,24 235:12
248:8,10

**large (4)**
96:1 131:21 195:4
196:18

**largely (1)**
145:13

**larger (1)**
90:20

**laser (1)**
70:15

**last (12)**
21:16 27:9,24
43:18 96:19 129:6
138:19 142:1 163:19
196:21 238:8 243:8

**last-best-chance (1)**
11:5

**lastly (1)**
16:6

**late (3)**
25:3 40:6 92:14

**later (7)**
7:5 8:9 48:9 55:3
145:4 180:2 220:17

**latter (1)**
63:9

**launder (1)**
171:24

**laundering (3)**
221:15,19,24

**law (27)**
16:23 81:5,6 84:10
95:13,18 153:20
158:23 180:6 183:21
185:10 187:1 190:8
199:24 205:5 222:19
223:24 224:2,18
231:10 238:22 239:15
246:3,3 248:4 253:6
254:22

**laws (1)**
74:24

**lawyer (1)**
107:3

**lawyers (9)**
148:11 149:2
156:24 168:9 191:23
197:16 209:14 239:1
245:15

**Layton (2)**
5:4 20:20

**Layton's (1)**
30:1

**LCI (1)**
12:2

**leading (1)**
64:3

**leads (3)**
163:18 164:13
238:24

**learned (3)**
29:20 30:2 99:18

**lease (1)**
170:23

**least (8)**
43:11 94:19 164:14
167:21 200:24 211:23
220:2 222:21

**leave (7)**
16:10 48:19 57:5
93:21 174:6 180:12
251:5

**leaves (3)**
23:7 197:15 212:7

**left (10)**
13:16 14:1 125:1
126:10 166:21,23
167:8,9 168:3 181:9

**left-hand (1)**
27:18

**legal (14)**
37:18 38:17 65:16,
17 68:22 71:24 76:18,
21 77:2 83:16,23 90:2
133:7 151:9

**legitimate (1)**
231:4

**lender (5)**
161:8 202:3 205:19
207:23 208:1

**lenders (8)**
154:14 158:6,17,19
196:17 201:20 206:3
212:12

**lenders' (1)**

158:13

**length (4)**
99:10,13 100:6
154:8

**lengthy (5)**
11:1 71:15 76:8,8
254:23

**Leonard (1)**
54:11

**less (3)**
79:15 118:3 210:19

**lesser (1)**
116:18

**letter (1)**
165:21

**letting (1)**
57:4

**level (1)**
10:21

**leverage (1)**
166:4

**Levin (2)**
41:1 42:15

**Lexus (1)**
157:17

**liabilities (3)**
215:3,12,16

**liability (4)**
72:6 214:12 215:1,6

**liable (2)**
208:7,10

**lien (5)**
160:4 170:4,5
229:6 248:21

**liens (4)**
176:6 181:6,8 232:3

**Life (4)**
176:7 232:4,8
252:11

**light (3)**

190:6 199:22

208:14

**liked (1)**
52:15

**likelihood (1)**
19:13

**Likely (3)**
182:9 197:5 234:17

**likes (1)**
182:6

**limitation (2)**
174:2 177:1

**limited (5)**
9:10 21:19 31:15
215:1 222:4

**limits (1)**
178:22

**Linda (3)**
18:20 127:8 185:16

**line (17)**
33:18 42:20,21
46:13,17 47:6,8,11
54:18,21,22 111:21,
23,24 112:7 216:21
242:22

**lined (1)**
54:15

**lines (2)**
112:9 251:8

**Liquidated (1)**
101:14

**liquidating (20)**
80:1,6 100:18
101:1,4 143:24 214:6,
9,11,17,20,22 215:11,
12,19,22 216:1,2,6,9

**liquidation (3)**
108:13 192:20
234:22

**listed (3)**

5:15 158:22 159:10

**listen (1)**
182:23

**litigate (1)**
164:8

**litigating (1)**
211:17

**litigation (6)**
89:24 107:24 108:5
145:18 182:10 253:18

**little (17)**
17:17 26:5 33:3
49:23 56:1 59:15
120:24 126:10 127:11
128:3 129:4 131:2
167:2 169:20 175:12
191:24 251:23

**live (4)**
18:14 235:6 239:11
254:20

**LLC (1)**
24:20

**locate (1)**
157:13

**lodge (1)**
63:18

**lodged (1)**
210:11

**long (14)**
11:17 27:21 28:1
47:1,13 56:13 156:23
167:4 177:3 194:12
198:18,19 223:10
251:13

**longer (7)**
57:9 113:6 114:19
196:9 238:21 247:8
254:16

**look (32)**
13:4 14:11,14,17,

18,23,24 16:2 23:1
33:11 48:6 70:13
76:23 98:6 123:23
148:3 158:5 159:17,
24 162:6 169:16
175:2 182:15 188:21
198:3 202:5 203:12
219:8 227:12 243:3
251:12 254:2

**looked (9)**
41:10 68:15 84:19
91:18 108:15 129:5
136:14 149:2 181:21

**looking (13)**
14:10 16:19 20:7
81:4 105:18,21 130:1,
17,18 187:18 213:11
245:19 252:1

**lopsided (1)**
20:5

**lose (2)**
17:5 166:16

**losery (1)**
212:4

**loses (1)**
252:4

**loss (1)**
245:23

**lost (2)**
207:18 243:5

**lot (25)**
7:21 8:5 10:13,15
12:24 15:3 96:21
98:22 102:9 107:13
114:24 116:2 117:12
130:20 141:9 158:4
162:5 164:24 171:21
182:19 232:14 244:12
246:5 250:10 254:3

**loud (6)**

10:14 46:23 47:17,
22,23 234:7

**love (2)**
166:16 181:11

**low (3)**
10:19 190:1 194:24

**lower (2)**
227:16 243:14

**lowest (4)**
9:16 10:21 142:20
145:8

**lunch (3)**
94:20 142:2,8

## M

**made (32)**
6:17 17:11 19:24
20:11 50:15 52:7
55:13,23 64:4 66:15,
21 74:19,21 75:2
89:22 90:21,22
113:18 121:5 151:22
160:23 163:13 168:5
169:5 215:18 224:16
227:18 234:10,14
238:23 246:10 248:9

**main (1)**
19:1

**maintain (1)**
92:20

**maintained (1)**
148:9

**major (3)**
174:2 193:8 195:3

**majority (2)**
79:5 187:7

**make (35)**
6:12,16 7:10 13:2
17:12 18:6,12 32:7,16

39:7 50:4 51:20 53:20
84:9 85:6 87:9 98:6
103:6 135:11 153:5
159:18 170:9,14
172:12 184:7 185:4
207:17 209:3,21
216:19 220:7 221:11
228:16 234:9 239:24

**makes (7)**
8:3 125:6 198:22
200:6 225:7 236:14
248:10

**making (10)**
16:17 55:24 60:17
86:15 114:16 130:18
148:3 190:2 196:23
227:20

**management (1)**
95:12

**mandate (1)**
178:17

**manipulating (1)**
223:21

**manner (2)**
194:18 212:14

**Manufacturing (1)**
157:5

**many (9)**
12:10,11 52:7
113:10 116:9 117:10
147:24 149:2 182:8

**mapped (1)**
39:10

**mapping (1)**
58:13

**Marcos (2)**
20:20 255:5

**marked (5)**
42:6 43:19 98:3
100:14 158:7

**market (1)**
221:4

**markup (1)**
54:24

**Martin (5)**
15:8 180:8 181:24
184:5 196:1

**Maryland (1)**
95:14

**matter (18)**
11:24 28:17 45:14
77:7 84:7 94:1 146:18
148:7 149:2 173:20
177:5 215:9 217:6
225:2 231:12 239:13
240:18 250:19

**mattered (1)**
249:2

**matters (8)**
88:24 91:1 92:4
96:22 147:3,7 177:24
225:3

**may (45)**
6:4 15:4,5 16:13
20:3 25:15 29:5 44:7
46:8 47:6 58:12 62:8
63:7,9 64:21 65:18
92:12,14 93:20,21
97:22 100:9 106:3,6
140:7 145:24 149:1
156:24 157:22 161:3,
4 174:15,15 195:24,
24 204:20 207:19
209:2 212:20,21,22
236:9 251:13 254:5,18

**maybe (8)**
16:14 17:24 48:4
57:13 121:13 230:21
236:17,21

**MBA (1)**

**market (1)**
95:12

**mean (13)**
37:8 38:21 82:20,
23 118:8 124:11
128:16 130:2 143:13
176:14 232:13 242:21
244:11

**meaning (3)**
30:19 131:10 216:3

**means (5)**
82:24 167:19
170:13 186:20 213:1

**meant (2)**
168:11,12

**mechanic (6)**
10:7 36:1 224:9
225:9,12,13

**mechanics (5)**
5:13 10:4 12:3 58:7
214:4

**mechanism (11)**
12:8 16:5 36:12
38:6,15 55:18 58:12
79:7 80:18 176:16
238:3

**mediation (8)**
101:9,15,22 102:11
144:1 178:18 198:15,
16

**meet (2)**
180:15 205:16

**meeting (1)**
98:16

**meetings (2)**
96:8,12

**meets (2)**
143:15 145:6

**member (6)**
5:8 50:14 95:23
97:5 104:20 118:22

**members (6)**
34:6 79:5 96:3
132:16,19 146:1
**memorialized (1)**
219:7
**memory (1)**
139:4
**mention (1)**
143:21
**mentioned (10)**
15:2 75:13,15 76:3
90:6,15 113:8 122:15
130:22 137:1
**Mentioning (1)**
154:13
**mercy (1)**
17:18
**merits (2)**
143:5 252:24
**messed (1)**
168:16
**messenger (1)**
207:23
**met (2)**
34:6 244:4
**Metal (1)**
90:19
**method (1)**
120:5
**mid (5)**
92:12 109:6 190:2
195:1,8
**middle (5)**
110:10 112:4,14
236:23 252:10
**might (13)**
39:9 65:11 72:24
75:19 120:12 128:2
151:4 152:13 157:20
196:3 203:18 207:18

212:8
**Miller (1)**
62:17
**million (19)**
63:8 64:21 65:1
66:23 67:9,11 72:23
84:14 135:4,20
153:11,15 158:13
164:19 210:15 211:1,
9 212:4 248:20
**millions (2)**
163:11,15
**mind (9)**
38:14 39:13,22
45:13 58:12 59:10
87:2 249:7,11
**minor (1)**
113:13
**minute (2)**
61:22 241:14
**minutes (5)**
44:9 62:12 103:6
206:19 238:16
**miracle (1)**
237:13
**mischaracterizes (1)**
37:14
**misconception (1)**
151:3
**misperception (1)**
151:3
**missed (2)**
114:23 211:3
**misses (1)**
15:11
**missing (1)**
150:16
**misstates (1)**
57:21
**mixing (1)**

63:7
**Mm-hmm (4)**
61:24 97:24 100:11
107:21
**model (1)**
231:10
**modicum (1)**
184:16
**modifications (1)**
32:17
**modified (1)**
151:1
**modify (1)**
55:14
**modifying (1)**
57:18
**moment (11)**
40:13 67:2 71:18
73:19 78:6 88:6
138:22 158:2 172:4
180:9 239:10
**money (49)**
7:15 73:23 75:9
78:12 83:8 102:13
117:3,7 118:13,17
119:14,18,20 120:3,8
121:15,20 122:2,10,
13,18 123:12 126:24
131:3,5,14,15,19
164:5 165:15 178:4
194:6 197:1,7 203:4
207:24 208:2,8,19
209:9 210:4,18 212:8,
20 213:5 218:11
227:22 229:6 245:21
**month (1)**
184:22
**monthly (1)**
90:21
**months (10)**

7:5 12:11 60:8 61:1
89:22 148:14 161:11
163:8 252:2,2
**moots (1)**
255:2
**more (36)**
6:19 8:9 32:20
34:19 43:23 48:10
49:23 68:4 75:9 79:15
88:9 92:4 97:3,11
99:6 100:23 102:12
116:4 130:20 133:14
135:9 140:4,6 184:22
190:3 196:23 197:5,9
200:6 220:16 221:2
234:7 236:10 237:7
245:1 251:7
**morning (31)**
5:1,2 7:12 9:21
12:18 18:19 19:20
20:19 22:11 28:24
29:10,22 30:21 31:1
32:11 33:20 36:14
38:7,24 40:3,6 59:22
61:18 62:16,18 70:12
88:12 144:3 179:18
226:4,9
**Mortgage (1)**
157:17
**most (15)**
9:8 72:4 78:14
101:3 105:24 107:14
116:21 131:1 156:24
182:11 211:5 215:4
219:21 227:13 234:17
**mostly (3)**
97:20 107:15
114:23
**motion (45)**
5:10,13 10:2,3,4

12:3 18:24,24 20:24
21:5,16 23:14,22,24
24:4 61:16 70:11,12,
19 86:7 93:7 143:22
144:14 146:6,22,23
158:13,15 161:7
162:18 184:10 206:7
208:15 214:4 234:15
236:3,4 237:11,13,19
245:18 247:7 252:17
255:1,3

**motions (5)**
11:13 143:20
144:15,24 235:14

**motivation (1)**
209:23

**mouth (2)**
213:12 234:8

**move (14)**
19:7 29:17 44:8
94:2 113:24 123:11
126:5 139:16 140:10
141:13 143:9 167:19
176:18 221:7

**moved (4)**
17:5,6 73:8 97:10

**movement (1)**
254:3

**moves (1)**
126:3

**moving (4)**
123:10 134:18
216:10 234:11

**much (23)**
6:23 9:7,24 40:7
48:11 52:3 58:3 97:3
102:11 106:6 120:7
127:24 142:5 165:5,6
192:8 222:20 231:9
245:10,11 249:8

255:7,11

**multi-million (2)**
165:9 199:3

**multiple (2)**
77:23 168:13

**must (12)**
17:22,22 185:10,23
187:4 188:10,21
189:9 207:3 216:2,3
219:20

**mutual (2)**
201:2 242:18

**myself (1)**
49:10

## N

**name (2)**
64:19,21

**names (1)**
64:15

**narrative (1)**
145:19

**narrow (1)**
247:20

**narrowed (1)**
248:1

**narrowest (1)**
187:20

**narrowly (3)**
19:3 188:3 190:24

**narrowness (1)**
88:21

**nation (2)**
199:15,19

**nature (3)**
109:18 116:6
129:24

**Nava (4)**
41:1 54:10,12

109:23

**near (1)**
163:21

**nearly (1)**
96:12

**necessarily (4)**
10:14 191:19
235:10 236:3

**necessary (1)**
165:4

**need (18)**
10:12 48:3 49:24
106:6 115:4 116:13
139:16 141:17 150:20
174:4 181:21 183:4,9
202:5 217:13 219:3
230:11 242:6

**needed (4)**
6:20 8:5 27:3 221:3

**needs (5)**
12:7 77:9 81:7
174:3,24

**negative (1)**
18:12

**negotiate (9)**
17:9 31:20 32:2,21
52:9,17 91:19 135:15
180:14

**negotiated (15)**
51:18 57:2 66:22
67:24 70:4 80:22 99:9,
13 100:6 122:21
155:19 163:8 187:13
193:16 232:24

**negotiating (8)**
16:4 19:12 87:20
103:20 110:20 129:21
167:7 204:10

**negotiation (10)**
30:14 80:24 84:23

92:21 103:15,16
123:9 145:24 154:9
165:7

**negotiations (14)**
11:1 85:5 86:3
88:18 90:7 97:6,9,13,
15,19 98:20 103:23
104:6 217:16

**neither (7)**
7:7 170:5,7 231:12
243:16 248:22 254:19

**net (3)**
138:20 139:8
212:15

**never (32)**
12:5 34:16,18 36:3
38:18 39:18 52:2,22
53:3 58:14,19 65:4
67:7 80:9,11,13
147:19 148:23 153:13,
14 159:19,20 162:16
168:12 179:17 181:15
183:7 185:5 225:19
226:14 229:7 244:23

**Nevertheless (1)**
248:23

**new (6)**
30:22 88:20 112:15
178:19 254:20,21

**next (8)**
27:21 94:19,20
108:19 110:23 206:18,
21 221:12

**nice (3)**
16:20 54:1 235:8

**nickle (1)**
240:17

**nine (1)**
252:1

**nobody (8)**

104:4 126:14,17
133:11 168:22 213:3
241:8,19

**no-brainer (1)**
7:22

**noise (3)**
10:13 15:3,4

**non-case (1)**
150:6

**non-CSC (3)**
144:14 151:7
225:21

**non-debtor (3)**
177:21 178:13
228:20

**none (9)**
8:21 16:15 18:9
20:6 35:6 198:16
203:1 249:21 251:18

**non-estate (26)**
7:15 134:13 151:16
152:1,8 170:1,12
174:7,17 186:19
189:4 191:8 192:6
193:13 195:5 197:18
200:8,16 204:5,15
205:7 207:5 239:8
249:16 251:2,3

**nonetheless (1)**
90:3

**non-issue (1)**
207:6

**non-priority (5)**
83:10 112:16 115:6,
15 172:21

**nonsensical (1)**
222:8

**non-starter (1)**
207:9

**non-viable (1)**

152:17

**non-WARN (7)**
69:24 72:20 78:7,
10 208:16 209:5 210:7

**nor (3)**
9:14 231:12 254:19

**normal (3)**
48:22 150:3 251:15

**normally (3)**
102:9 106:21
123:18

**Norman (2)**
9:22 143:18

**note (5)**
47:5 65:23 155:21
214:9 254:14

**noted (5)**
160:2 189:11 190:5
222:1 243:9

**noteholders (35)**
11:2 16:1 17:14,21
18:5 20:10 32:9,15
65:6 71:4 74:8 85:9
97:8 103:20 108:5,8
111:16 113:21 126:15
138:1 147:15 151:11
153:7,12 164:12,15
171:2 181:4,5 184:21
204:10 240:17,19
241:15 242:3

**noteholders' (3)**
109:5,24 156:13

**notes (2)**
110:19 212:10

**nothing (27)**
8:16,20,20 15:23
16:12 61:2 62:1 68:17
118:2 119:22 122:8
127:2 152:16 153:17
171:18 173:14,15

177:17,22 178:13
210:17 219:15 222:5
230:17 242:11 244:22
255:6

**notice (6)**
12:10 78:8 141:11
169:19 208:18 209:2

**notion (1)**
190:16

**Notwithstanding (3)**
59:13 161:20
221:10

**November (5)**
25:3,7,9 56:6
223:14

**number (10)**
26:6 27:10,16
33:18 75:8 117:22
135:5 145:5 163:3
239:11

**numbers (5)**
72:15 76:4 84:19
112:10 126:22

**numerous (3)**
42:3 113:9 158:16

## O

**object (10)**
42:1 128:12 141:1
163:14 205:13,17
206:1,2 208:21 241:12

**objected (9)**
12:12 46:22 147:22
162:17,18,19 241:8,
13,19

**objecting (9)**
10:6 28:21 145:18
152:12 163:20 164:4
186:8 190:18 192:18

**objection (57)**
17:2 18:8,10 19:24
21:21,22,24 37:13
42:4 47:12 49:17
50:12 53:8,17 57:20
61:8 63:18 65:19
67:14 68:21 70:9
83:15 85:1 86:6 94:4,
11,13 99:15 120:1
121:10 133:6 137:5
139:20,21,24 140:13,
14,23 141:20 147:4,5
176:23,23 180:1
182:1,1,11,12 188:2
197:23 203:3 204:17
205:3 209:1 210:11,
20 216:8

**objections (24)**
7:17 10:5 11:12
18:23 19:6 93:10
143:6 144:19,20
146:4,5,6 164:6 179:4
182:8 187:10 192:10
194:7 196:5 198:8
206:6 211:4 214:3
218:14

**objective (4)**
172:23 173:8
251:14,22

**objectors (7)**
9:3 62:4 144:9
149:15 158:3 206:19
221:13

**obligated (1)**
233:4

**obligation (2)**
90:23 230:24

**obligations (2)**
161:20 205:16

**observation (1)**

160:24

**obtain (9)**
6:23 11:8 19:15
165:18 166:5 186:9
194:9,11 197:22

**obtaining (1)**
11:6

**obvious (1)**
90:2

**obviously (11)**
6:7,11 10:1 33:22
94:7 114:5 115:3
120:11 145:4 171:6
176:22

**occasion (1)**
117:9

**occasions (1)**
52:21

**occur (3)**
12:7 87:3 150:7

**occurred (5)**
25:2,3,5 166:1
203:2

**occurring (1)**
97:7

**October (3)**
140:12 158:8
161:11

**off (10)**
160:3,8 164:18
165:21 178:4 227:23
228:23 229:15 236:22
242:17

**offensive (1)**
221:18

**offered (3)**
94:9 191:5 213:7

**offering (1)**
21:18

**offers' (1)**

190:18

**officers (3)**
171:5,11 242:4

**offices (3)**
30:1 40:3 58:9

**Official (4)**
116:14 132:19
140:10 191:2

**offsetting (3)**
150:4 188:11,23

**Often (6)**
114:9,10 116:21
117:4 142:24 165:21

**Ohio (1)**
76:6

**old (2)**
253:10 254:15

**omitted (1)**
37:16

**once (4)**
100:9,23 135:10
239:12

**one (93)**
5:17,18 6:18,24
12:22,23 17:10 27:9
31:19 32:7 33:6,10
34:5,11 41:1,5 43:17,
18 54:15 61:6,22
63:15 68:4,16 70:15
78:12 89:24 90:18
92:4 93:24 95:24
100:19 103:10,12,12
107:15,18 109:10
111:14 127:12 129:7
130:24 133:14 140:4,
5 143:22 149:21
150:15 155:9 156:24
157:13 163:3 173:23
179:9 180:1,14,17
184:22 197:10 205:9

207:17 210:19 211:12,
13 213:7 216:14
225:23 229:23 230:22
232:8,13,22 233:6,15,
23 234:9,15 237:1,7
238:10 239:11,14
241:10,21 243:20
244:10,14 245:14
246:24 248:8 249:1,
10,19

**ones (2)**
91:11 122:14

**ongoing (3)**
49:2 66:1 97:13

**only (47)**
7:13 11:5,11 12:11
21:19 33:7 38:9 65:13
68:11,20,24 74:9
78:14 86:16 87:22
109:16 110:18 144:5
151:16 157:9,22
158:9 159:23 162:7
169:15 170:10 172:7
173:22 176:15 178:7
184:12 187:21 188:18
196:14 215:15,21
223:6 224:6,14
228:15 230:5 233:3,
23 238:19 242:9
243:10 250:16

**open (2)**
197:16 239:1

**open-ended (2)**
212:7,23

**opening (4)**
6:16 10:12 169:4
180:18

**openings (4)**
6:6,9,12 12:24

**operating (2)**

48:23 60:15

**operation (1)**
49:2

**operative (1)**
79:14

**opinion (12)**
97:16 149:22
191:20 207:20 219:23
222:3 235:12 237:1
243:3 246:17 248:10
253:5

**opinions (1)**
72:5

**opportunity (4)**
100:22 126:10
210:24 211:3

**opposed (3)**
75:21 81:6 106:9

**opposite (3)**
149:8 160:1 182:7

**oppositions (1)**
89:18

**optimum (1)**
118:4

**oral (1)**
153:24

**order (50)**
5:15 28:11,15 55:4
60:6,9 62:21 63:2,21
67:19 69:19,20 73:18
77:18 98:2 118:5
143:23 151:2 154:17,
21 155:15 160:16
181:6 186:9 201:9,15,
16,23,23 202:20
203:4 204:17 208:21
211:22,23 212:6
215:23 219:19 230:14
231:14 236:8 240:21
242:7,8 244:2 251:8,9,

9 254:21 255:2

**orders (8)**
16:15 88:10 155:7,
12 187:11 212:3
235:14,15

**ordinarily (1)**
114:7

**originally (2)**
124:23 159:9

**originals (1)**
94:8

**origins (1)**
229:14

**orphan (1)**
17:19

**other (69)**
5:8,23 17:10 18:17
21:3 30:7 42:16 56:24
62:3 71:11 78:1,20
80:22 81:16 82:24
83:2 100:20 106:2
114:8,10 116:19
118:13,13,17,17
125:12 130:12 137:23
138:9 144:6 145:14
146:15 149:8 150:6,8
152:10 154:4,10
155:5 156:7 157:11,
12 159:17 171:20
174:12,13 186:10
192:14 197:5 203:21
209:19 212:13,19,21
216:23 219:6,13
222:16 223:10 226:18
228:17 234:13 241:9
242:9,16,21 248:12
249:1 253:14

**others (6)**
8:18 45:21 46:21
154:14 163:17 243:21

**otherwise (8)**
13:24 92:1 117:1
125:6 164:20 176:3
192:16 231:24

**ours (2)**
20:1 57:10

**ourselves (1)**
102:3

**out (96)**
7:14 13:18 14:3
15:17,18 17:15 22:13
23:7 29:6 40:2 46:23
47:17,22,23 52:16
58:9 67:19 72:6 75:2,
13 76:4 77:11,17 78:1
79:8 81:15 85:3,8,10,
16,21 86:20,24 87:2,4,
8 88:3 90:15 93:15
98:2 103:10 107:15
108:11,17 110:18
115:8 120:21 126:11
135:9,20 137:2,8,16,
20 138:1 147:22
149:10 155:13 161:17
162:23 164:23 165:15
166:1 180:1 183:17,
17,21 184:24 190:1
195:1,9,14 196:20
200:4 201:5 205:15,
22 210:13,15,21
212:3 216:21 217:8
218:11 225:10,10
232:12,17 239:24
242:14,19 245:6
251:12 253:12,17,23

**outcome (5)**
18:11 144:4,5
160:6 234:17

**outs (1)**
111:7

**outset (5)**
6:17 11:9 91:23
210:10 222:8

**outside (5)**
90:2 171:17 172:11
176:18 177:19

**outstanding (1)**
184:3

**over (15)**
20:7 34:11 74:20
96:19 124:21 147:4
148:1 156:12 193:24
196:11 204:11 214:8
215:11 233:14 254:4

**overall (2)**
51:22 178:6

**overcome (1)**
194:7

**overlapping (1)**
65:7

**overly (3)**
185:19 186:3,24

**overrule (2)**
121:10 223:9

**Overruled (16)**
37:20 42:8 49:21
50:18 53:18 57:22
61:10 64:12 66:9
67:16 68:23 84:4
99:20,23 141:2,6

**overseeing (1)**
80:17

**oversight (2)**
79:5,10

**overturn (1)**
173:14

**overturned (3)**
227:24 247:22,24

**owe (3)**
132:8,16 184:2

**owed (3)**
71:12 134:11
161:19

**own (10)**
10:3 19:24 29:4
106:13 116:10 218:10
233:7,7,15,19

**owned (6)**
86:19 227:9,11
232:22 239:12,13

**owner (1)**
194:19

**ownership (1)**
246:14

**owns (1)**
233:2

# P

**package (1)**
70:17

**page (38)**
24:17 27:13,16
33:15 36:22 41:10
42:14,21 43:24 44:18
46:13,16 47:8,11 49:4
54:21,22 107:2,19
108:19,20 110:7
111:14,21 112:2,6,10,
14 138:19 158:20
159:4,6,16 160:11,18,
22 161:1 243:5

**pages (2)**
23:19 24:5

**paid (38)**
19:6 51:10 70:8
77:16 114:14,15,20
118:9,12,15 122:15
156:1 160:8 163:16,
22 164:3 165:21

176:5 186:8 194:7,8
197:1,7,21 200:4,5
202:9,18,23 203:11,
18,22 232:2 233:1
240:17 243:15 245:1
246:1

**paper (1)**
245:10

**papers (4)**
6:17 144:15 160:2
202:19

**paragraph (17)**
23:2,5 24:22 27:21
28:1 44:17 49:4 52:18
107:22 108:19 110:10,
22,23 112:3 123:24
138:20 243:8

**paragraphs (2)**
24:19 108:15

**paramount (4)**
182:14,15,17 184:5

**pardon (3)**
60:23 76:15 89:9

**parents (2)**
17:18 169:4

**part (37)**
27:1,2 36:3 57:10
65:1 66:13,22 67:4,7
68:2 75:19 78:24
85:24 101:3 105:24
121:2 131:1 153:14
155:9,14,19 156:8
159:11 172:17 176:8
178:2 192:15 209:16
211:16 215:4 217:17
220:2 232:5 239:21
248:18,19 254:3

**participants (1)**
85:8

**participate (5)**

95:23 96:7 193:21
196:16 217:16

**participated (2)**
78:17 96:11

**participating (1)**
112:23

**participation (1)**
80:15

**particular (16)**
36:23 43:4 46:12
97:2 113:14,14
125:15,15,17 130:1
146:11 158:1 189:20
193:2 221:17 250:21

**particularity (1)**
208:21

**particularly (1)**
160:22

**parties (67)**
5:23 10:6 11:3
12:11,20 17:23 18:9
19:15 21:3,20 28:22
29:12 31:23 33:18
42:16 52:5 78:2 80:22
81:12,13,14 89:4
90:11 91:4,19 94:5
100:7 103:4 129:21
142:24 145:15,19
146:2,9 149:8 151:18
152:13 166:13 171:9
177:5,23 186:8
187:13 192:19 193:8
195:3,22 196:24
197:3,6 201:5 205:19
212:12 217:23 218:20
219:6,20 220:3 221:2,
14,21 222:21 223:19
241:6 242:17 244:20
246:18

**parties' (3)**

19:11 183:1 205:14

**partner (1)**
147:16

**partners (1)**
72:12

**parts (1)**
135:13

**party (21)**
8:3 71:11 87:21
117:4,4 125:13,15
130:18 131:16 139:16
144:18 154:9 177:21
178:12 190:18 193:5
195:12 202:11,12,16
241:9

**pass (1)**
28:21

**pass- (1)**
232:5

**passage (1)**
160:23

**passed (1)**
151:8

**passive (1)**
207:24

**pass-through (1)**
176:9

**past (2)**
112:8 224:6

**path (1)**
18:10

**patricide (1)**
217:9

**pattern (1)**
88:13

**Patton (2)**
9:22 143:18

**pause (2)**
5:22 37:15

**pay (36)**

66:15 67:9,12,22
69:24 71:5,16,17 72:2,
2 73:18 77:11 118:17
119:9,14,18,21
121:15,20 122:2,10,
13 126:7 144:18,20
170:18 192:17,18
198:15 199:12 202:4
210:22 212:5,16,21
253:19

**payable (1)**
75:12

**paying (5)**
88:7 119:5 160:3
165:22 199:11

**payment (11)**
75:17 118:14 120:5
130:19 139:6 190:16
193:16 194:12 199:7
202:3 243:10

**payments (7)**
90:21,22 114:16
115:1 116:7 130:6
155:4

**payouts (1)**
243:14

**payroll (1)**
71:24

**PE (1)**
212:11

**pending (3)**
143:21 146:3,5

**people (19)**
6:11 52:2 72:4 88:7,
8 89:21 92:8,14 98:6
129:11 145:21 149:9
158:4 163:19 182:21
185:7 228:10 232:14
241:23

**perceived (1)**

135:16

**percent (2)**
130:5 131:7

**perfect (3)**
8:24 9:2 143:3

**perhaps (9)**
46:1 87:11 185:2
191:3,21 195:23
213:17 228:17 243:24

**period (10)**
15:24 85:23 91:22
137:3,6 148:1 151:7
171:1,7 175:6

**periods (2)**
201:22 214:20

**permit (4)**
19:4,7 192:11
197:16

**permitted (6)**
150:2,13 175:13
189:12 222:4 224:18

**permitting (3)**
188:24 192:23
193:8

**person (5)**
20:12 62:10 81:9
131:4 244:10

**personal (2)**
50:16 78:18

**personally (5)**
48:13 50:2 56:17
92:19 208:7

**perspective (5)**
94:2 106:5 121:8
226:3,12

**pertinent (2)**
64:6,9

**petition (8)**
90:8 137:4 138:2
159:21 161:6 222:12

229:10 247:4

**phrase (4)**
82:20 242:23
243:20,21

**phrased (1)**
45:10

**pick (1)**
242:22

**pieces (1)**
14:8

**place (4)**
74:9 137:12 198:22
216:20

**placed (1)**
213:14

**places (1)**
158:24

**plainly (1)**
14:1

**plaintiffs (2)**
213:7 249:5

**plaintiffs' (1)**
77:2

**plan (10)**
15:17 116:19 117:1
154:3 166:3 181:14
188:15 235:23 251:17,
19

**play (1)**
40:2

**played (2)**
166:1 209:16

**playing (3)**
196:24 208:5
223:10

**pleadings (6)**
120:21 141:10,14,
15 169:20 180:23

**please (10)**
23:4 37:22 58:20

70:22 93:23 94:24
95:1 111:17 125:23
128:21

**pleasures (1)**
245:14

**plenty (2)**
240:3,7

**plot (1)**
148:6

**plus (2)**
71:23 164:19

**pm (2)**
142:4 255:13

**PNC (2)**
160:4,8

**pocket (1)**
230:24

**pockets (2)**
153:13 208:2

**point (52)**
5:21 9:16 13:8
15:11 17:10,11,12
30:4 33:1 48:16 57:3
77:8 84:22 105:23
113:15,16 127:13
129:23 142:20 145:8
152:17 161:2,17
170:24 183:21 198:9
205:9 207:5,18
221:12 223:19 225:5,
7 228:16 230:7,22
231:19 232:13 233:6
234:2,9 235:6 236:2
237:8 238:23 239:3
241:12,13 247:9
248:9,10 249:9

**pointed (4)**
75:2 93:15 147:22
201:5

**pointing (1)**

238:17

**points (6)**
166:15 214:2
217:22 234:7 236:11
238:12

**poor (1)**
151:3

**port (1)**
188:3

**portion (11)**
114:24 116:8
117:24 118:10 127:16,
20 128:11 129:3,17
130:13 163:2

**posed (1)**
121:4

**posit (1)**
191:16

**posited (1)**
173:22

**position (5)**
23:11 136:22
144:10,17 244:13

**positions (2)**
19:12 129:22

**possibility (5)**
145:3 173:5 188:14
203:16 211:24

**possible (4)**
11:8 144:4 145:10
187:20

**possibly (1)**
220:4

**post (4)**
72:16 91:2 200:17
250:2

**postponed (1)**
87:19

**pot (1)**
164:12

**potential (4)**
  71:17 78:15 145:15
  245:23
**potentially (3)**
  20:12 186:14
  189:17
**powder (1)**
  240:19
**power (4)**
  74:14 189:21 194:3,
  14
**practically (1)**
  162:7
**practice (2)**
  95:18 213:22
**Praxair (1)**
  95:24
**Praxair's (1)**
  96:4
**pre (1)**
  166:24
**precedent (8)**
  12:2 15:1 152:11
  153:20 157:4 165:14
  174:2 185:23
**precipitated (1)**
  10:5
**precise (3)**
  189:13 192:5 224:8
**precisely (2)**
  64:6 152:4
**precluding (1)**
  11:22
**predictability (2)**
  190:6 199:22
**predicted (1)**
  11:8
**predominantly (4)**
  149:24 150:17
  169:21,22

**prefer (1)**
  89:23
**preferred (5)**
  48:11,19 52:20
  196:11 217:5
**pre-filing (1)**
  90:16
**premise (1)**
  220:13
**preparation (1)**
  64:16
**prepared (6)**
  28:16 32:1,4 46:18
  88:5 219:5
**preparing (1)**
  60:1
**pre-petitioned (1)**
  112:17
**present (4)**
  30:10 67:4 186:18
  249:7
**presentation (1)**
  245:12
**presented (5)**
  39:6 51:18 100:19
  176:2 231:23
**preserve (3)**
  49:1 173:4 208:22
**preserving (1)**
  188:13
**pressing (1)**
  11:12
**pressure (2)**
  60:14 87:23
**presume (1)**
  126:8
**pretty (8)**
  10:19 16:8 164:16
  167:17 170:2 184:3
  238:12 249:8

**prevail (1)**
  144:9
**prevent (1)**
  199:15
**previously (3)**
  117:16 122:23
  124:10
**price (2)**
  232:24,24
**prima (2)**
  159:12 160:15
**primarily (3)**
  11:1 90:18 246:10
**primary (2)**
  67:23 88:11
**principle (1)**
  189:1
**principles (1)**
  208:6
**prior (19)**
  25:12,14 30:20
  31:9 32:9 35:2 39:17
  54:15 57:21 59:17,21
  61:17 78:16 88:23
  90:23 91:22 100:21
  187:11 195:20
**priorities (1)**
  150:3
**priority (147)**
  17:22 18:7 19:4
  51:4,8,9,14 52:1,23
  66:16,19 67:13 69:23
  70:8 71:5 72:20 73:14
  78:7 80:8,18 82:21
  83:1,3,9,12,14,21
  84:1,3,8,11,12 87:13
  88:17 105:6,7,8,9
  106:3 111:8 113:5
  114:6,11,13,19 115:1,
  8,11,12,20 116:1,3,7,

  8,17,24 117:20,24
  118:9,11,18 119:10,
  15,19,21,24 121:20
  122:2,8,10,12,14,16
  132:7,15,21,23 133:1,
  4,19,23 134:3,5,24
  135:3,7,15,17,22
  136:10 138:4 152:20,
  22 156:2,4,19 157:11
  160:5 162:9,12
  163:11,16,23 174:8
  178:16 183:17,24
  186:17,21 187:21
  188:10 189:7,24
  190:1,2 193:18,20,24
  194:16,24,24 195:2,8,
  14 196:14 200:14
  203:9,21 207:3
  209:21 210:1,22
  212:17 216:21,23
  217:3,5,6,13 228:2
  236:21 246:7,19
  251:15 253:12,22
  254:7
**priority-skipping (1)**
  197:14
**priority-violating (1)**
  172:21
**pro (6)**
  58:15 128:1 150:10
  187:10 193:22 203:2
**probably (15)**
  58:6 67:21 72:4
  76:1 77:24 89:7
  107:12,17 113:12
  117:13 131:12 196:18
  234:8 235:22 247:24
**problem (4)**
  121:22 210:8 216:5
  227:12

**procedural (1)**
250:18

**procedure (2)**
136:15 215:15

**procedures (16)**
18:24 78:20 80:7
101:22 136:12 178:10
198:2,3,4 206:7
208:14 210:9 237:11,
15,17 255:2

**proceed (2)**
21:17 108:24

**proceeding (4)**
21:4,21 66:3 237:23

**proceedings (1)**
146:22

**proceeds (17)**
10:8 20:5 108:23
109:14 111:1 138:20
139:9 160:8 176:6
187:3 190:19 197:2,
23 212:15,21 232:3
245:23

**process (23)**
12:7 20:8,10 50:7
65:9 78:8 96:10 116:5,
11 162:16 165:22,23
166:1 171:16 179:17
207:8 208:11 209:12
219:2,15 230:20
249:10 250:14

**produced (1)**
181:2

**product (1)**
60:17

**professional (6)**
81:1 202:4,9,11,16
245:12

**professionals (26)**
38:17,17 81:14

85:3,7,10,15 86:9,12
87:8 89:3 97:17 123:7,
8 129:8 131:22 132:8,
10 135:9 137:1
170:18 205:14,18,20,
21 206:5

**proffer (1)**
159:12

**prohibit (1)**
150:6

**prohibited (4)**
187:22 236:15,16,
18

**prohibition (1)**
190:12

**promote (5)**
173:5 251:17,17,19,
20

**promoted (1)**
251:21

**promoting (1)**
188:14

**promptly (1)**
142:4

**promulgated (1)**
136:13

**proof (2)**
82:14,15

**proofs (3)**
82:7,10 134:20

**property (48)**
134:6,8,14 146:19
150:1,7 151:11,12,16,
24 152:1,8 154:2
156:3 163:3 190:19
197:3,18,18,24
201:12 229:11,12,13,
16,19 243:11 246:13,
16 247:4,5,6,8,9
248:7,19,22 249:2,14,

16,21,21 250:17,22
251:1,2,3,4

**proportionate (1)**
211:15

**proposal (4)**
5:22 108:11 109:5
180:12

**propose (3)**
5:14,16 43:12

**proposed (18)**
18:5 28:11 58:12,
13 92:1 101:22 108:4,
5 109:6 131:11 151:1
184:22 188:7 198:5
208:15 209:2 222:15
250:12

**proposition (3)**
16:10 157:6 229:10

**pros (1)**
129:10

**protect (4)**
74:22 76:11 81:2
162:13

**protecting (2)**
193:17,23

**protection (1)**
116:13

**protections (2)**
189:19 193:2

**prove (2)**
160:1 182:20

**proven (2)**
161:14 244:8

**provide (9)**
38:1 39:22 41:11
65:9,11 139:1 154:10
198:8,13

**provided (18)**
7:14 13:2 19:16
21:7 34:10 39:24 64:7

65:6 69:2 110:14,15
124:24 131:15 148:19
187:8 222:14 225:24
226:8

**provider (1)**
60:18

**provides (11)**
51:14 55:1 63:2
114:19 139:5 170:23
187:9 202:2,6 205:12
246:17

**providing (7)**
131:4 193:20 201:2,
4 236:12,13 237:21

**provision (15)**
28:10 41:10 42:24
57:7 63:1 66:14,21
70:5,6 77:14 124:21,
23 139:5 206:1 210:22

**provisions (5)**
53:15 64:4 69:5
177:10 214:5

**prudent (1)**
78:4

**public (2)**
64:17,18

**pull (5)**
22:13 52:16 120:21
184:23 210:13

**purchase (15)**
25:21 36:9,16
38:10,11 86:17,18
92:2 148:19 199:6
225:22 226:17 232:23,
24 241:11

**purchased (11)**
36:10 124:16,17
148:22 151:10,13
153:9 172:4 175:7
218:8 222:16

**purchaser (65)**
13:16 14:4,13
19:17 35:12,12 36:2
37:3 42:16 51:17,17
55:16,19 58:20 59:3
86:19,22 104:7
124:17 125:12 148:19
151:21 153:2,4,10
168:1 169:2 176:6
177:18 178:3 183:15
190:17 191:6 192:9,
10,11 193:16 194:8,
13 195:7 197:7,11
199:2 204:1 205:20
218:7,9 221:22 222:9
223:2,5,15 226:6
227:9,11 229:8 232:2
233:9,10,12,18 245:1,
23 246:15 247:12

**purchasers (10)**
36:11 40:10 55:1
56:16 65:6 89:15
92:10,12 110:20
111:16

**purchasers' (1)**
206:4

**purchaser's (1)**
230:24

**pure (3)**
250:24 251:1,3

**purported (1)**
19:16

**purportedly (3)**
186:1 197:18 204:1

**purports (1)**
70:7

**purpose (4)**
210:3 228:3 235:16,
16

**purposes (1)**

247:11

**pursuant (4)**
118:12 154:19
157:8 205:6

**pursue (4)**
172:16 201:19
227:1 233:18

**pursued (2)**
175:9 233:21

**pursuing (2)**
125:21 207:7

**pursuit (2)**
111:2 171:19

**put (27)**
13:11 27:3,11
79:17 109:7 120:16
122:19,20 124:12
129:23 147:10,12,14
158:9 162:20 166:14
167:10 177:8 181:23
198:22 211:7,19
212:2 216:20 218:4,6
244:21

**puts (1)**
20:8

**putting (4)**
50:6 65:20 119:19
210:3

## Q

**Qualcomm (1)**
215:2

**qualified (1)**
95:14

**qualify (1)**
133:16

**quantified (1)**
120:14

**quarter (1)**

164:19

**Query (1)**
195:10

**question (52)**
27:9 37:16,22
45:10,12,14,17,24
46:5,16 48:2,7 49:12,
13,20,24 59:20 64:1,
13,15,19 66:12,13
67:2 68:4,5 70:10,22
72:9 73:22 86:1,8
90:14 91:21 93:9
100:3 117:19 119:17
120:10 121:3 122:4
128:17,21 133:11
134:15 136:20 146:7
156:17 161:2 190:23
232:9 246:24

**questioning (1)**
50:8

**questions (25)**
21:19 61:14 63:19,
20 64:6 66:9 67:18
81:19 82:5 88:1 91:9
93:18 98:21 102:20
104:13 129:11 131:24
132:2 134:19 138:9
139:12 157:3 174:22
206:14 233:3

**quick (3)**
23:1 63:18 91:11

**quid (4)**
58:15 128:1 187:10
203:2

**quiet (1)**
183:6

**quite (4)**
20:3 36:13 73:22
191:22

**quo (4)**

58:15 128:2 187:10
203:2

**quote (5)**
159:5 175:21 176:1,
3 211:22

**quote/unquote (1)**
253:10

**quoted (4)**
166:18 231:21
242:24 248:9

**quotes (1)**
218:18

## R

**raised (5)**
32:5 72:11 98:22
211:4 217:22

**RAISNER (16)**
19:20,21 62:15,17
63:24 64:23 66:10
68:6 69:6 70:23 79:24
81:18,21 206:21,22,23

**Ramos (35)**
5:6 20:19,20 21:2
22:1,10 28:18 37:13
42:7 46:1,21 47:4
49:17 50:12 57:20
61:8 63:17 65:18
67:14 68:21 70:9
79:16 83:15 85:22
91:11,14 93:17,24
94:16 120:7,9 121:1
141:20 255:4,5

**range (4)**
9:16 142:20 145:8
150:13

**ranked (2)**
243:13,14

**ranking (1)**

243:15

**rare (4)**
186:16 189:6,11
215:4

**rata (1)**
193:22

**ratable (2)**
109:2 111:4

**ratably (1)**
109:15

**rather (12)**
55:2 76:5 77:19
144:10 169:1 188:5,
20 193:11 195:13
207:8 253:2 254:23

**rationale (2)**
188:21 227:23

**Re (1)**
157:16

**reach (13)**
78:1 85:3,7,10 87:2,
3,7 90:15 137:20
138:1 209:23 211:1,2

**reached (15)**
29:16,21 41:7
86:20,24 90:20 135:9
137:8,16 154:8,23
184:23 213:17 229:18
252:2

**reaching (4)**
85:16,21 137:2
210:2

**reaction (2)**
74:11,13

**read (24)**
6:10 39:23 43:20
46:22,23 47:14,17,19,
21,22,23 55:20 58:5
69:3,4 110:15 138:22,
24 180:13 188:3

190:24 212:9,24 243:4

**reader (1)**
39:12

**reading (1)**
59:24

**reads (1)**
43:19

**ready (1)**
245:17

**real (2)**
245:14 254:17

**realistic (1)**
146:13

**realities (1)**
12:5

**reality (1)**
121:17

**realize (2)**
166:7 209:15

**really (24)**
8:12,23 10:16
15:12,23 125:5
127:23 130:21 134:16
136:22 164:6 166:23
168:12 190:21 195:22
221:13 223:10,11
230:1 241:2 243:7
245:13 246:11 249:18

**reason (22)**
56:22,24 67:23
72:8 83:11 84:2,6,16
87:18 135:6,21,24
136:4,6 137:19
143:14 173:7 185:3
217:7,11 221:7 244:13

**reasonable (8)**
44:22 72:22 73:2
99:3,7 101:2 114:2
219:16

**reasonableness (2)**

142:21 145:9

**reasoning (1)**
189:8

**reasons (11)**
9:17 10:11 12:23
76:3 90:2 97:12 116:3
117:23 153:18 189:14
254:24

**reattached (1)**
175:4

**rebuffing (1)**
211:11

**recalcitrant (1)**
213:8

**recall (34)**
33:6 43:16 44:4
45:6,9,11,19,22,23
48:8 55:10,11,12,17
57:7 59:16,21,24 60:2,
22 61:21 64:13
104:14 107:10,18
109:13,17 112:21
113:1,3,13 125:5,7
135:18

**receipt (2)**
32:23 208:20

**receive (15)**
51:4,15 52:24
53:16 108:13 113:6
114:7,20 119:22
122:8 126:1 144:7,12
163:2 209:1

**received (8)**
7:6 9:3 52:10 196:4
199:2,10 201:13 220:5

**receiving (10)**
30:20,24 32:11
39:17 40:18 43:13
53:12 109:12 130:6
243:13

**recent (1)**
211:5

**recently (3)**
97:11 216:13 246:5

**recess (7)**
62:6,13 142:8
206:18,20 245:6,8

**recognize (5)**
98:10 100:15
101:11 179:9 209:13

**recognized (1)**
157:18

**recognizing (1)**
207:9

**recollection (7)**
45:18 61:15 63:12
65:22 93:9,13 222:20

**recommendation (1)**
131:22

**reconciliation (3)**
171:16 175:20
250:13

**reconvene (1)**
142:4

**record (37)**
5:3 8:3,4 9:6 12:18
13:10 16:7 22:19
26:24 29:1 53:21
81:24 101:13 120:16
140:24 141:12,14,16
142:2,12 147:10,12,
14 162:21 183:13
184:21 191:13,16,22
192:1 193:14,15
195:18 203:15 212:10
225:7 244:21

**recovered (2)**
108:24 111:2

**recoveries (1)**
165:20

**recovery (8)**
112:24 113:7
114:21 123:20 124:2
139:2 144:12 165:18

**red (1)**
54:15

**redirect (7)**
5:19,20 28:20
91:10,13 138:10,13

**refer (5)**
24:3 27:24 46:2
68:14 115:4

**reference (3)**
24:19 68:11 160:10

**referenced (1)**
245:20

**references (1)**
158:16

**referral (1)**
37:15

**referred (7)**
10:3 11:18 25:11
26:2 36:7 48:16 76:24

**referring (7)**
22:13 25:21 26:15
34:20 75:18,20 132:11

**refers (4)**
24:22 69:20 77:1
222:10

**reflect (2)**
9:6 202:14

**reflects (1)**
41:6

**refresh (1)**
63:12

**refreshed (1)**
61:15

**refreshing (1)**
139:4

**refund (2)**

214:12,16

**refunds (1)**
214:15

**refusal (1)**
120:20

**refusing (2)**
120:17 186:16

**regard (4)**
9:7 121:6 246:6,19

**regarding (5)**
23:11 138:3 156:11
210:14 219:2

**Regardless (2)**
20:1 160:6

**rejected (1)**
190:16

**relate (1)**
141:15

**related (13)**
5:13 93:8 106:2
172:23 177:24 178:1
188:12,24 209:5
215:6 228:3 251:14,21

**relates (2)**
134:6 215:8

**release (5)**
16:3 196:5 242:9,
10,20

**released (5)**
31:23 154:16,18
171:6 242:3

**releases (26)**
145:14 154:14
171:2,4,9,10,13
175:20 201:3,4,5,6,10,
14,14,16,18 236:11,
13,14 242:1,2,18
250:10,11,20

**releasing (1)**
201:11

**relevance (6)**
42:4 50:13 63:19
70:12 83:18 224:7

**relevancy (2)**
141:3 147:23

**relevant (19)**
10:23 11:21 13:4
38:9 42:9 74:9 83:17
86:17 131:12 137:18,
23 143:15 152:1
169:15 214:7 237:18
241:8 244:16,18

**relied (2)**
131:18 227:15

**relinquishing (1)**
210:20

**relitigate (2)**
13:5,6

**reluctance (2)**
57:6 245:19

**rely (8)**
87:9 128:9,24
161:24 224:12,14,19
244:2

**relying (4)**
67:8 88:7,8 241:23

**remain (9)**
22:5 35:19 37:11
38:3 94:24 145:15
205:5 223:14 244:24

**remains (2)**
185:22 187:1

**remarks (1)**
142:14

**remedy (1)**
75:19

**remember (10)**
25:4 41:17,19
44:24 45:3 56:11
68:13 83:5 150:19

171:1

**remembering (1)**
71:14

**remove (2)**
185:6 224:3

**renamed (1)**
63:14

**rendered (1)**
207:7

**renders (1)**
152:16

**renew (2)**
65:19 70:12

**reorganization (3)**
173:1 235:16
251:18

**repaginated (1)**
112:8

**repeat (3)**
37:21 59:20 70:21

**repeatedly (1)**
120:16

**repetitive (1)**
18:15

**rephrase (2)**
132:14 232:22

**reply (5)**
12:23 57:24 211:6
217:20 245:21

**reporting (1)**
128:4

**reports (1)**
129:7

**represent (4)**
11:3 106:5 225:16
242:12

**representation (2)**
157:9,10

**representative (2)**
96:4 103:19

**representatives (1)**
31:7
**represented (5)**
161:21 183:2
216:24 249:4,5
**request (2)**
214:14 215:14
**requested (2)**
127:14 128:1
**require (2)**
146:10 178:18
**required (1)**
230:9
**requirement (1)**
146:19
**requires (1)**
222:21
**requiring (1)**
170:19
**reservation (1)**
180:21
**Reserve (3)**
63:6,15 209:4
**reserved (1)**
203:17
**reserves (1)**
214:18
**resides (1)**
177:6
**resolution (8)**
12:7 20:15 89:6
107:7 197:4 210:5
211:2,14
**resolve (6)**
19:6 89:1,23
146:16,17 238:2
**resolved (3)**
7:13,16 145:17
**resolving (1)**
177:3

**resources (1)**
216:17
**respect (11)**
8:6 12:9 53:21
65:12 72:14 78:16
157:15 162:4 165:2,6
202:4
**respectfully (3)**
165:24 166:6
240:11
**respond (4)**
166:15 208:23
216:11 217:22
**responded (1)**
211:5
**response (3)**
142:15 234:15
237:9
**responsibility (2)**
48:17 211:16
**responsible (5)**
65:14 71:20 72:3
73:5 75:4
**rest (1)**
246:14
**restate (3)**
122:5 128:20
133:13
**Resting (1)**
190:15
**result (10)**
88:15 123:12,14
131:9 143:8 189:16
192:24 197:5 213:12
221:16
**resulted (2)**
7:19 200:1
**resulting (3)**
19:14 189:15
197:19

**results (5)**
11:15 92:21 159:24
160:1 193:13
**resurrect (1)**
178:9
**retain (1)**
93:2
**retained (3)**
202:11,12,16
**retaining (2)**
59:1 94:8
**return (3)**
75:11 142:3 233:9
**returns (1)**
239:9
**Revenue (13)**
82:2,7,17 83:13
84:13 85:4,11,17
87:14,20 90:11 137:8
138:2
**reverberate (3)**
165:14 199:15,19
**reverse (2)**
67:19 238:14
**revert (1)**
66:24
**review (7)**
64:18 66:7 100:22
101:18 205:17 220:14,
20
**reviewed (2)**
28:2 189:10
**reviewing (6)**
16:19 41:17,19
43:16 64:17 78:15
**revised (3)**
54:14 110:3 111:17
**revocable (1)**
68:18
**revolving (1)**

**160:5**
**Richards (3)**
5:4 20:20 30:1
**rid (4)**
144:18,20 179:4
192:9
**ridiculous (2)**
148:15 167:2
**right (98)**
5:17 16:10 27:11,
22 28:23 29:22 30:5,
21 31:2,8,11,16,20
33:2 34:12 35:14
39:19 41:3,7,15 42:17
43:1 44:20,22 47:14
49:6 51:5,11 52:11
53:1 54:12,15 56:7,14,
20 58:20 60:9 74:5
84:15 91:6 94:10,23
102:5 104:8 105:6
107:4 108:9,14 109:9
110:1,4,21 111:5,10
113:18,21 114:3,8,21
115:6,7,10 118:20,23
119:2,6,15 120:22
123:1,5,17 124:8,9,18,
21 125:3,7,13 126:13
127:4 142:1,16
167:16 198:12,13
200:2 201:19 219:21
221:21 227:20 228:4,
18 229:2 230:2
231:13 235:18 245:5,9
**rights (3)**
52:6 180:21 214:16
**ripe (1)**
136:24
**risk (3)**
88:5,6 189:23
**risks (1)**

194:23

**risky (3)**
223:16 230:22
231:4

**RLF's (1)**
58:9

**Rogoff (1)**
219:4

**role (3)**
16:18 95:20 208:5

**room (3)**
9:3 12:12 133:11

**roughly (1)**
210:15

**round (1)**
10:5

**routine (1)**
11:24

**Rubin (3)**
110:1 218:20,21

**rule (12)**
18:7 146:17 150:10
156:5 163:23 174:10
189:15 207:2 239:14
245:17 249:24 252:23

**ruled (3)**
246:5 253:5,6

**rules (9)**
164:17 198:7,11,22
212:2 243:12 253:10
254:15,20

**ruling (14)**
148:13 149:20
160:22 161:7 227:16
245:7 247:11,23
248:2 253:1,2,15
254:13,24

**run (4)**
14:20 15:9 104:21
105:5

**running (1)**
148:11

**rush (1)**
191:1

**rushed (2)**
179:16 180:11

## S

**safe (2)**
7:20 234:16

**said (58)**
8:7 13:5,7 16:9,11
17:1 18:5 43:22 45:11
48:15 50:19 53:14
55:20 58:1 61:14 66:6
67:8 83:22 88:19
102:14 104:9 105:20
108:12 117:23 132:6
144:2,15 152:7,19
159:9,18 160:24
161:1,12 162:5,8
170:24 173:16,17
176:18 179:3,20
180:24 181:10,24
184:23 185:1 198:3
199:1,21 200:11
218:21 225:9 238:1,
24 239:23 241:14
254:2

**sailed (2)**
57:16 167:4

**sale (79)**
11:13 14:12 16:13,
21 19:7,7 56:9,10
60:4,5,9,12,21,23
61:3,6 62:20,22,23
63:2,21 65:8,9 66:22
69:19 81:2 87:12,15,
18 90:9 92:21,22

137:21 138:3 144:14
146:6,23 147:5 151:6,
7,8 160:7,7 166:24
176:23 179:3 181:1,2
182:1,11 186:10,22
192:6,7 193:9 204:8,8,
17 212:6,15 216:18
220:23 221:4,7 227:8
229:24 230:3,3,12,12,
13,13,16,17,23
231:14 234:22,23
251:22

**sales (16)**
6:19 7:3,7,11,17,19
8:16,19 92:24 147:5
162:18 194:7 195:6
218:13 219:12 252:4

**same (25)**
24:22 25:16 41:9,
11 47:8 56:12 63:16
75:8 92:14,15 145:2
148:17 149:4 153:16
170:7 173:10 189:1
191:9,22 192:4
195:11 215:13 220:5
224:13 227:15

**Sass (17)**
94:22,23 95:2,7
98:9,24 100:13
102:14 103:2 120:4
122:7 132:5 133:10
138:15 139:13 162:3,4

**Sass's (1)**
156:18

**sat (1)**
183:6

**satisfaction (1)**
209:5

**satisfied (2)**
181:23 252:21

**satisfies (1)**
184:4

**satisfy (3)**
69:22 184:17
254:22

**save (2)**
42:2 142:15

**saving (2)**
102:13 251:20

**saw (1)**
43:18

**saying (23)**
16:20 33:18 45:6,
23 112:12 115:11
128:15 134:12 159:5
168:11 169:9 172:3,
10 177:14 198:18
200:1 208:18 209:14
217:2 220:3 229:23
239:18,20

**scenario (6)**
72:22 73:3 154:3,4,
5 155:24

**schedule (1)**
160:18

**scheduled (1)**
255:8

**schedules (1)**
158:22

**scheme (13)**
15:14 51:8 152:21
184:1,7 186:18
188:10 189:8 198:17
221:15 228:2 246:19
251:16

**scope (1)**
66:4

**screen (2)**
108:2 115:3

**scrutiny (2)**

92:7 181:17

**se (1)**
150:10

**second (8)**
5:12 27:17 68:2
143:22 155:1 186:23
194:2 201:18

**section (8)**
133:4,23 157:8
202:13 214:10,13,18,
23

**secure (2)**
156:21 159:13

**secured (26)**
105:13,16,16
106:15 112:18 130:4,
6 139:2 144:7 154:14
158:6,18,21 159:2,8,
20 160:19 161:13
165:19 166:24 167:1,
2 196:17 201:20
202:3 207:23

**security (1)**
212:17

**seeing (2)**
44:4 55:10

**seek (7)**
5:11 24:15 32:19
56:23 178:17 214:11
237:23

**seeking (4)**
11:15 34:12 191:4
237:14

**seem (3)**
123:7 156:24
211:21

**seemed (1)**
90:1

**seems (2)**
102:11 122:22

**sees (1)**
209:10

**segregated (1)**
213:5

**self-interested (1)**
208:5

**seller (2)**
202:11,15

**selling (1)**
241:16

**send (1)**
52:17

**senior (2)**
144:7 200:5

**sense (12)**
88:12,16 125:6
147:1 170:14 172:13
184:7 198:22 213:6
223:17 230:21 236:6

**sensitivity (1)**
65:24

**sent (8)**
7:12 78:9 109:6
124:7,8,12 149:11
208:18

**sentence (3)**
27:24 212:6,7

**sentences (1)**
212:2

**separate (6)**
66:2 70:19 197:11
230:14 231:16 234:22

**September (8)**
63:13 219:13,22
220:16 225:11 229:19
254:4,12

**sequence (1)**
78:19

**serious (3)**
186:15 189:18,18

**serve (2)**
106:1,8

**served (1)**
102:14

**Service (13)**
82:2,7,17 83:13
84:13 85:4,11,17
87:14,20 90:12 137:9
138:2

**serving (1)**
207:22

**set (18)**
12:6 20:5 23:5 68:8
80:6 120:17 154:20
155:6 163:12 164:5
165:13 174:1 201:22
206:18 212:13,21
242:2 247:17

**sets (2)**
148:2 188:5

**setting (2)**
188:12 209:8

**settle (5)**
146:18 147:9
176:22,23 208:3

**settled (6)**
14:18 15:23 144:13
146:7,12 187:13

**settlement (264)**
5:12 8:6,24 9:2,13,
15 10:2,8,18,24 11:5,
23 12:1 13:10,15,20
14:9,16,23,24 15:7,13,
22 16:16,19 17:13
18:23 19:13 20:24
21:15 23:14,23 24:12,
13,18 25:11 26:3,7,11
27:1,2,14 28:13 29:15,
18,21,23 38:9 42:6
43:15 44:21 45:7

46:19,20 48:10,10
49:15 51:14 52:19
56:19 61:19 63:22
64:2,2 73:5 78:15
83:19 84:24 85:2 86:7,
16 87:5 88:22 89:9,14,
23 90:10,17,20 97:6,9
98:4,18 99:1,4,7,13
100:5 103:15,21
104:17 113:9 114:1
117:21 118:1 119:14,
23,23 122:9,11
125:22 126:2,8,9
128:8,24 137:5 139:1
142:18,19,23 143:1,2,
10,15 144:3,13 145:5,
12,16,17,22 146:10,
20 147:14,19 148:10,
12 149:18,24 150:3,
12 151:13,15,19
154:7,22 155:9,14,14,
20 156:11,16 161:11
162:20 164:7,18,23
165:12 166:5 167:21
170:15 171:3,8,14
172:13 176:3,5,13
177:1 180:5 181:11,
12 182:22 184:10,23
185:10,21 186:2
187:3,6,12,17 190:3
195:11,19 196:2,23
197:4,8 198:2,4
200:12,20 201:18
202:1,2,5,19 203:1,6
204:6,19 205:2,6,8,11,
11,22,24 209:24
211:2,15 212:1
213:15,16 214:8
216:20 218:3 219:19
220:5,17 221:1,14

222:2,10 223:12
226:23,24 227:3,9
228:19 229:18,24
230:6,14,16 231:2,11,
17,24 232:2 233:5
235:19,20 236:4,7,14,
16,18,22 237:2,19
238:19 241:7 242:14,
16 244:3,5,20 245:18
247:6,7 248:20
249:17 250:6,9,24
251:2,9 252:1,16
254:5,18

**Settlements (6)**
146:14 150:14
199:17 220:2 235:13
246:8

**settling (2)**
195:12 210:19

**seven (1)**
96:3

**several (5)**
52:21 60:8 140:20
158:24 188:12

**severance (5)**
65:12 66:20 71:16
72:2,20

**shall (6)**
37:3,5 108:6
195:10 202:9,14

**sham (2)**
239:19 241:10

**shame (1)**
166:7

**Shannon (1)**
227:15

**Shannon's (1)**
253:15

**SHAPIRO (28)**
5:2,3 6:15 10:1

17:1 20:22 142:11,12
217:21 224:14,24
225:6,17 226:22
228:5,14 229:2,21
232:11,19,21 233:22
234:6 236:10,19
237:4,7 242:1

**share (4)**
57:11 86:21 139:8
191:5

**shared (5)**
81:12,13 107:8,11,
14

**sharing (3)**
57:13,15 130:13

**sheet (131)**
7:13,23 8:1,10
13:10 24:12,18 25:11
26:3,7,11 27:14 30:15,
16,18 31:1,6,11,19,23
32:6,12,13,17,24 33:1,
10,12,19,23 34:2,10,
11 35:6,17 36:23 37:9,
14,16,24 38:22 39:4,7,
17,19,22,23 40:4,4
41:3,6,11,18,20 42:6
43:6,21 48:21 50:6,10
51:18,21 52:10,14,15,
16,19 53:13,15 54:15
55:9,11 57:18 58:1
59:12,14 60:13 61:19
63:23 84:24 86:4,4
88:20 89:12,14 91:17
92:11 98:4 107:7,10,
20 108:4 109:12,22
110:4,5,9,14 111:18
112:22 113:4,10
114:19 124:7,15
138:16 147:24 149:1
155:9 168:16,17,17

169:6 171:3 175:4
176:17 179:6,11,20
183:16 184:20 202:19
220:18 221:9,10
222:14 223:20,22
225:12,19 242:3

**sheets (6)**
42:4 43:17 44:7
53:22,23 107:13

**shelf (2)**
54:1,1

**shield (1)**
200:20

**Shifer (1)**
54:12

**shifted (1)**
168:2

**shifts (1)**
194:9

**ship (4)**
57:16 88:8 167:4
193:8

**shocked (1)**
121:22

**short (5)**
62:6 72:24 186:14
206:17 236:8

**shortly (4)**
21:14 247:17
252:13,15

**show (10)**
13:11,22 15:16,23
17:21 176:11 181:23
192:1 211:8 221:4

**showed (1)**
176:10

**showing (2)**
33:19 207:11

**shows (5)**
175:21 183:13,14

191:14 195:18

**shred (1)**
240:14

**Shriver (1)**
12:19

**shut (1)**
234:9

**side (13)**
18:9 19:16 27:18
36:23 77:24 81:15
168:10 178:4 191:5
197:12 199:6 200:8
209:19

**sides (2)**
34:24 72:5

**sign (1)**
242:17

**signatories (1)**
77:23

**signed (1)**
220:4

**significant (5)**
34:14 166:4 172:22
188:11,23

**significantly (2)**
248:1 250:8

**silent (2)**
183:8,12

**silly (1)**
120:24

**similar (2)**
134:19 239:10

**simple (1)**
175:5

**simplified (2)**
185:19 186:24

**simplistic (1)**
186:3

**simply (22)**
18:4 34:21 38:14

65:23 98:4 142:22
144:11 145:10 155:5
159:7 164:9 167:18
188:17 191:12 219:18,
20 233:20 239:6
246:20 249:3,20
254:14

**single (2)**
103:18 117:13

**sit (4)**
123:3 158:20
183:23 225:4

**sitting (8)**
12:12 46:18 50:9
60:19 61:5 125:20,24
164:16

**situated (1)**
116:4

**situation (15)**
17:7 36:4 48:21
78:5 86:16 102:2,5,9
117:15 122:17 162:6
192:4 196:13 250:2
251:6

**situations (1)**
172:24

**six (4)**
148:14 154:22
228:11 252:2

**six-page (2)**
220:14,20

**skip (5)**
17:22,23 156:12
196:11 200:14

**skipping (15)**
19:4 174:8 186:18,
21 187:21 189:7
203:10,21 209:21
220:1 222:4 224:18
236:21 246:7,8

**slides (2)**
166:13 167:11

**sloppy (2)**
168:12,14

**smack (1)**
14:20

**small (1)**
148:21

**Smarter (1)**
185:4

**Smith (2)**
30:7,10

**so-called (1)**
222:17

**sod (1)**
168:7

**sold (11)**
13:3 14:3 35:11
36:1 55:15 166:20
180:19,21 204:1
232:23 239:20

**sole (3)**
23:8 30:5 115:17

**solely (2)**
7:15 202:9

**solicitor (1)**
153:23

**solutions (1)**
197:17

**solve (1)**
121:21

**solvent (1)**
121:19

**Somebody (5)**
57:10 81:4 231:2
239:8 241:13

**somehow (15)**
145:20,20 155:4
161:17 164:1 166:17
168:2,15 172:3,5

178:9 183:10 184:4
213:11 250:16

**someone (3)**
48:4 52:17 122:19

**someone's (1)**
209:11

**something (26)**
7:20 8:17 36:5 38:6,
20 39:11 63:3,5 89:19
114:23 118:5 132:6
143:3,13 146:7
160:24 168:21 170:13
174:24 184:20 198:23
212:1 213:7,9 239:9,
10

**sometimes (4)**
118:5 190:8 199:24
215:19

**somewhat (3)**
31:14 76:4 130:17

**soon (1)**
236:1

**sophisticated (2)**
179:8 195:2

**sorry (28)**
17:6 27:10 41:23
46:15 47:21 49:11,22,
24 61:21 69:4,16
74:17 82:9,12 95:17
99:11 100:2 101:10
112:11 125:23 132:13
133:2 140:6 210:6
226:24 232:21 235:19
254:23

**sort (16)**
14:8,22 15:11
61:14 66:16 67:18
121:24 148:7 174:19
178:19 209:24 231:11
235:15 242:24 249:15

**sorted (1)**
72:6

**sorts (1)**
80:6

**sought (2)**
186:16 216:1

**sound (8)**
9:14 180:3,10,16
218:2 219:11 224:16
226:13

**sounded (1)**
7:22

**sounds (2)**
84:15 220:9

**source (2)**
77:12 119:8

**sources (1)**
7:16

**speak (1)**
88:2

**speaks (1)**
221:12

**specific (12)**
34:19 52:22 53:3
56:11 70:14 77:6 89:2
107:18 108:12 157:14
198:8 206:6

**specifically (17)**
106:13 125:19
137:3 151:2 157:7
158:19 164:6 186:7
189:5 190:4 193:20
199:21 202:6 218:5
234:20 246:17 252:16

**specifics (2)**
128:19 129:14

**specified (12)**
108:20,24 110:24
111:2 139:9 151:14,

20 196:3 222:11
223:3 226:1 233:24

**speculating (1)**
231:6

**speculation (1)**
61:9

**spending (1)**
255:8

**spends (1)**
182:19

**spent (1)**
170:21

**spite (1)**
88:13

**SPM (1)**
157:5

**spoke (1)**
183:8

**spoken (1)**
183:7

**spot (1)**
250:3

**spreadsheet (3)**
71:15 76:8,9

**squarely (1)**
150:13

**squeeze (2)**
190:1 195:1

**squeezed (1)**
195:8

**squeezing (1)**
195:14

**Squire (2)**
9:22 143:18

**stage (1)**
7:10

**stake (1)**
210:17

**stalking (1)**
192:14

**Stan (1)**
92:7

**stand (4)**
22:2,5 94:24 161:8

**standard (12)**
10:18 15:21 116:18
142:18,21,23 146:9,
13 180:4,15 181:12,15

**standardizes (2)**
190:7 199:23

**standards (7)**
143:16 145:6 180:8
181:16,19,21 244:4

**standing (9)**
22:5 59:11 94:24
95:16,17 120:10
169:9 172:9 221:8

**standpoint (1)**
67:20

**Star (4)**
24:19 56:5 160:3
225:24

**start (14)**
12:22 29:13 31:9,
14 32:9 47:10,11 48:3,
5 106:23 112:10
167:16 187:16 229:9

**started (9)**
11:19 27:11 94:19
169:3 180:17 184:18
228:23 229:15 233:12

**starting (4)**
47:6,7 48:6 90:8

**starts (3)**
108:1 110:11
138:20

**state (5)**
95:14 152:1 221:22
229:16 247:3

**stated (3)**

8:4 188:8 200:22

**statements (3)**
10:12 205:17 206:3

**States (5)**
18:21 86:6 137:4
185:17 216:12

**status (3)**
149:17 158:18
217:14

**statute (2)**
190:10 194:10

**statutory (1)**
75:19

**stay (3)**
23:16 24:17 250:15

**stayed (1)**
239:24

**step (6)**
14:14 22:4 89:1
93:20 187:16 213:9

**steps (1)**
218:23

**Steve (1)**
54:11

**Steven (2)**
94:22 95:2

**still (25)**
8:1,5 38:13 44:11
47:19,24 74:23 103:5,
7 121:21 122:22
146:5 167:3 174:13,
14 192:18 226:21
227:5,11 229:19
241:5 248:4 253:6,8
254:16

**stipulations (2)**
154:20 201:8

**stood (3)**
14:15 164:22
180:24

**stop (2)**
74:10 185:24

**strangely (1)**
243:6

**strategic (2)**
18:13,14

**strike (1)**
57:13

**string (1)**
230:5

**strong (4)**
60:16 76:13 117:5,6

**strongest (1)**
60:18

**struck (5)**
19:11 57:12 92:8
190:9 194:9

**structure (22)**
18:1 29:23 30:18,
22 39:20 88:21
102:11 117:7 118:1,6
122:16 131:10 134:6
148:12 179:18 193:9,
12 195:19 196:8
224:1,2 231:3

**structured (12)**
17:20 81:7 130:21
150:10 189:23 194:5
195:7 197:6 235:7
253:7,14 254:15

**structuring (1)**
186:20

**stuck (1)**
177:7

**sub-cap (1)**
155:11

**subject (12)**
8:1 28:20 71:17
73:6 124:9 143:10
170:5 181:7 205:2

218:16 220:8 227:2

**submissions (1)**
245:10

**submit (6)**
8:22 28:12 143:15
157:24 165:24 178:21

**submitted (1)**
22:20

**subset (1)**
148:21

**substance (2)**
62:9 128:16

**substantial (3)**
11:6 12:14 126:21

**substantially (1)**
153:3

**successful (2)**
93:1,4

**successor (3)**
215:20 216:3,7

**sudden (3)**
168:10,21,23

**sufficient (4)**
121:15 182:2
189:14 212:16

**suggest (2)**
75:5 88:2

**suggestions (2)**
87:10 148:4

**suggests (1)**
157:21

**suing (1)**
233:12

**sum (1)**
160:12

**summit (1)**
223:7

**sums (2)**
176:5 232:2

**Sun (2)**

**superceded (1)**
157:12

**support (14)**
6:23 7:11 8:15,19
23:13 56:19,20
116:13 143:12,13
218:13 219:17 223:18
253:12

**supported (2)**
148:10 253:14

**supporting (2)**
7:19 198:14

**supportive (3)**
165:1,11 218:24

**suppose (2)**
72:7 232:12

**supposed (4)**
51:10 114:14
209:20 211:9

**supposedly (2)**
208:17 211:1

**Supreme (34)**
19:2,9 148:13
149:20,22 152:3,9
172:18 186:15 188:8,
18 189:5,10 190:4
191:10,15 192:2,24
196:22 197:19 199:20,
20 200:1,10 209:19
217:2,17 223:8
227:18,24 231:8
235:9 246:5 248:2

**Sure (30)**
9:4 34:21 37:24
44:12 46:10 53:20
58:21 63:19 70:24
77:1 79:9 85:6 95:11,
22 103:6 118:4
127:19 128:6,7 130:1,

2 137:11 147:10
165:4 185:5 216:19
239:24 242:22 243:2
250:18

**surely (2)**
220:19 221:6

**surfaced (1)**
207:19

**surprise (1)**
84:20

**survive (8)**
69:8,10,15 186:13
189:4 190:23 197:24
221:6

**suspect (2)**
74:12 212:5

**suspicious (1)**
145:20

**swamp (1)**
196:19

**sway (1)**
76:7

**sworn (2)**
22:7 95:3

**system (1)**
209:8

---

# T

**tab (15)**
23:17 25:15 26:6,
18 27:10 33:12 40:22
41:21 54:6 106:23
107:1 109:19,21
111:13 140:22

**table (3)**
5:5 197:4 236:22

**tabs (1)**
140:21

**tail (1)**

170:21

**Taking (4)**
67:19 148:3 207:24
209:11

**talented (1)**
168:9

**talk (15)**
32:8 89:5 90:13,15
121:6 137:3 158:2
159:18 165:21 180:8
210:19 217:12 220:22
222:7 246:3

**talked (11)**
48:9 56:1 59:15
172:19,24 175:18
193:3 213:16 246:4
250:9 252:7

**talking (14)**
15:12,13,21 17:3
35:3 103:12 130:15
134:8,10 175:23,24
228:2 229:5 250:21

**talks (3)**
107:23 108:20
110:24

**tango (1)**
222:20

**targets (1)**
145:15

**task (1)**
80:23

**tax (8)**
81:24 214:12,15,15
215:1,2,11 216:14

**taxable (1)**
214:20

**taxes (3)**
71:23,24 214:15

**team (2)**
190:1 195:1

**teams (1)**
195:1
**technical (2)**
18:23 205:9
**telephonically (1)**
98:16
**telling (5)**
45:9 57:24 198:24
226:19 232:16
**tend (3)**
106:1,3 116:12
**Tennessee (2)**
236:23,24
**term (143)**
7:13,23,24 8:10
13:10 24:12,18 25:11
26:3,7,11 27:14 30:15,
16,18,24 31:6,11,19,
23 32:5,6,12,12,17,24
33:1,10,12,19,23 34:1,
10,11 35:6,17 36:23
37:8,14,16,17,24
38:21 39:3,7,17,19,22,
23 40:3,4 41:3,6,11,
17,19 42:4,6 43:5,17,
21 44:7 48:20 50:6,10
51:18,21 52:5,10,14,
15,16,19 53:13,15,22,
23 54:15 55:9,10
57:17 58:1 59:12,13
60:13 61:19 63:22
82:13,13,14 84:24
86:3,4 88:20 89:12,14
91:17 92:11 98:4
107:7,10,13,20 108:4
109:12,22 110:4,5,9,
14 111:18 112:22
113:4,9 114:19 124:7,
15 138:16 147:24
149:1 155:9 168:16,

16,17 169:6 171:3
175:4 176:17 179:6,
11,20 183:16 184:20
220:18 221:1,9,10
222:14 223:20,21
225:11,18 242:3
**termed (1)**
89:5
**terminology (1)**
169:19
**terms (45)**
8:4 15:7 16:6 18:5
21:18 32:2 34:15
44:21 49:14,18 52:10
57:17 58:5 63:7,21
66:3 68:8 78:14,19
79:3 83:21 93:1 98:17
100:24 101:21 104:7
119:13 122:9 147:14,
18,18 162:20 168:15
169:11 171:8 181:6
202:18 210:13,17
213:19 214:19 218:7
219:1 244:21 254:4
**terrible (1)**
166:7
**test (1)**
188:6
**testified (14)**
22:8 36:15 56:5
79:18 93:5 95:4 104:4,
16 113:24 117:16
120:4 122:23 144:22
179:9
**testify (4)**
44:21 123:3 131:4
149:6
**testifying (1)**
125:11
**testimony (32)**

6:7 7:9 13:13 15:16
21:18 23:13 47:24
50:10 56:18 57:21
62:9 64:8 66:12 70:18
99:18 106:7 127:13,
18 131:17 145:9
156:11,18 168:1
179:5,22 182:3
194:15 198:14 204:21
213:3 221:3 234:13
**Thanks (2)**
71:1 139:4
**their (64)**
9:14 15:10 16:21
40:10 50:14 52:6
74:11,12 78:12 81:1
85:7 88:8 89:18
102:17 105:16 114:23
116:10 118:9 120:21
123:19 138:4 144:8,
10 160:3,4 161:15
162:13 163:24 164:6,
9,22 165:16,18
169:20 171:11 175:12
179:2 180:16 181:4
182:3 183:19 184:17
185:8 189:2 191:5,23,
24 192:16 193:6
198:12 200:22 202:19
203:16 205:16,20
208:2,16,23 213:8
217:14 223:18 240:19,
23 244:11
**theirs (1)**
233:2
**theme (1)**
70:14
**themselves (7)**
76:11 78:21 88:2
106:6 143:1 167:20

250:15
**theory (2)**
170:7 223:19
**there (245)**
8:5 12:5,6 13:15
15:23,24 16:3 22:17
23:18 24:6 25:17 26:9,
19 27:1,15 31:18,21
32:6 34:14,21 36:3
37:2 38:11,14 39:1,2,
9 40:3,13,23 42:13
44:19,20 46:14 47:10
52:3,4,5,18 54:1,8,9,
23 55:17,22,23 56:24
58:11,13 60:11,14
64:1 65:10 66:1,14
67:17,18,21 68:16,17,
19 69:5,7,10 70:6
71:7,12,13 72:6,10,12,
17,22 73:17,19,21
74:11,20,21 75:5
77:23 80:5,5,8,9
81:11 87:11,17,18
88:4,24 89:2 90:6,9,9,
16,20,24 92:6,10,11,
13 93:5,14 94:4 97:4
98:17,21,22 103:5,7
104:4 105:1,3 106:19,
24 107:13 108:1
109:20 110:5,6 111:1,
7 112:11 113:8,11
114:10 118:3 120:11,
12 121:12,14 125:16,
21 126:18,21,23
128:4 130:3 135:19,
20 136:14,20 137:20,
24 139:5 143:20
145:2,13,21,23
146:19 147:4,23
148:20 149:4 152:19,

22 153:17 154:23
156:11 157:2,4
158:16 160:13 161:14
166:18 167:8,24,24
168:7,22 171:8 172:8,
10,20 173:6,7 174:22
175:23 179:22 180:19,
21 181:8,18,20 182:5
184:13 188:22 197:9
198:18 200:23,24
203:21,23 205:14
209:17 210:2,16,16,
16,16,17 211:1,8,8,9,
12,18,18,19,19,21
213:6,6 215:10
216:19 218:14,21,24
219:2,23 221:3 222:5,
22 225:19 230:12
231:12 232:10 234:18
235:2,24 238:3 239:7
240:2,7 244:22
246:23,24 248:20
249:4,15 252:21
254:3,20

**thereby (1)**
19:7

**therefore (10)**
19:8 64:5 143:14
188:19 193:12 203:5,
19 205:20 215:9 255:6

**thesis (1)**
247:3

**they (260)**
9:4,15 13:14 14:7,
15,16,22 15:4,5,17,19
16:1,2,4,9,9,11,20,20
17:4,5,8 18:4,8,10,13
28:11,16 32:3,21
34:24 35:13 38:17,22
40:11,12 51:16 52:6

53:15 55:21 57:18
58:16,20 60:15,17
69:23 70:4 73:24 74:6,
14,19,20 76:6 78:10,
11 84:8,10 85:16 86:9,
12 90:13,14 93:11,12,
13,15 101:3 102:1
105:12,13,22 106:16
108:16 111:9 116:20,
21 117:23 118:11,14
123:7,14,19 124:10,
11 126:9 127:19
129:9 131:9,10,11,12
135:19,19 137:16
141:16 145:1 147:1,
15,17 148:5 151:11,
21,23 154:18,21
158:5,21 159:9,14,18,
22,23 161:11,18,21
162:13,14,15,16,17,
18,19,20,21 163:1,5,5,
9,14 164:2,3,4,8,16,
18,22 165:1,5,10,10,
11,20 166:7,24 167:1,
7 169:5,5,21 170:4,5
172:24 173:2,19
175:14 176:13,17,22
177:2,9,13 178:7,8,9,
17 179:8,17,17,20
180:12 181:8,11,15,
22,23,24 182:5,7,8,20,
21 183:2,2,3,4,6,7,7,8,
10,11 184:2,15,17,20
185:21 187:2 188:20
191:18,19 192:16
193:3 199:11 201:9
202:19 203:18 204:7,
13,15,19,20,24 205:1
207:22 208:20,22,23
209:7,9,15 211:5,10,

11 213:8 223:14,20
224:1 226:21 227:24
228:22 230:1,17
232:15,22,23 234:23
235:2,3 236:14
237:22,23 238:4
240:20,22,23,24,24
242:3,22 245:1
246:14,18 247:5,6,7,8,
14,16 253:5,19

**thing (8)**
16:22 49:6 70:16
129:13 153:16 169:15
226:18 232:18

**things (15)**
5:8 10:15 63:15
87:7 173:23 179:9
180:17 218:23 230:2
244:8 246:23 248:12
251:11,13,16

**think (130)**
6:16 7:9,20 8:13
9:11,18 10:10,10,13,
20 12:9,13 15:1,11
18:24 35:21 40:1 50:2,
3,6 57:1 59:8 63:20
64:14 65:19 66:5,8
67:22 68:3 70:16
72:10 75:24 76:19
77:7 78:24 79:18
80:20 86:8,11 92:10
93:5 103:10 104:9,16
106:1 113:8 117:22
121:10,23 122:3
123:19 124:9 126:20
127:22 129:13 130:24
134:9 141:11,16,16
143:2 149:16 157:1
160:12 162:7 165:9
167:17 173:24 174:3

175:20 182:24 206:10
207:18 208:14 209:12
210:3 214:7 217:11
218:3 221:2 225:7
229:21 230:11 231:4
234:12,16,17 235:1,5,
8,10,17,18,20 236:1,4,
22 238:1,5,12,16,18
239:3 242:1 243:20
244:16,17 247:2,2,10,
19,19,20,21,24
248:16 249:12,22,22
250:3 251:6,7 252:8,
17 254:7,8,14,17
255:2,5

**thinking (1)**
43:19

**thinks (1)**
241:9

**third (30)**
12:2 117:4,4
130:18 131:16 144:18
154:9 173:15 177:5,
23 178:11 185:22,23
190:15 191:20 194:22
202:2,11,12,16
207:14 215:2 219:23
222:2 223:9 224:17
238:14 246:16 253:4,7

**Thirty-ish (1)**
96:20

**though (6)**
40:17 179:7,21,22
211:21 253:1

**thought (12)**
6:5 9:4 39:9 40:13
48:13 67:6 114:1
134:16 156:23 179:14
182:5 243:5

**three (11)**

7:5 8:9 24:5,18
60:15 61:1 146:4
148:2 220:15,17,19

**throughout (7)**
52:4 147:20 148:9
155:8 158:15 162:15
165:1

**thrown (1)**
213:19

**thrust (2)**
224:11 228:8

**thus (7)**
37:11 125:1 131:11,
13 192:19 205:5
243:12

**tied (6)**
184:14 230:8,18
235:10 236:3 252:16

**timely (1)**
209:1

**times (5)**
95:19 105:18,20
130:22 172:20

**timesheet (1)**
40:18

**timing (7)**
55:21 91:1 93:8,14
137:22 143:7 145:20

**tires (1)**
211:16

**title (1)**
101:12

**today (59)**
5:4 9:1 10:14 13:9,
13 14:12 15:3 19:1
23:6,13 24:1,15 28:5
34:12 42:5 46:18
47:20,24 50:9,23 56:3,
23 61:5 63:22 120:10
125:20,24 144:9,22

149:6 158:21 161:9
163:24 164:16 165:3,
8,14 170:7 174:20
175:1 186:1 187:4
190:11,22 191:17
198:24 200:23 204:7
213:3 218:22 223:14
224:8 225:4 227:10
241:18 244:17 245:11
253:22 255:8

**today's (2)**
5:9 79:1

**together (5)**
89:4 129:24 145:1
153:6 230:8

**told (4)**
68:16 181:1 226:10
244:14

**tomorrow (1)**
126:12

**took (4)**
11:17 60:8 137:12
180:14

**top (1)**
240:23

**topic (1)**
44:8

**topping (2)**
74:7,15

**total (1)**
202:15

**totality (2)**
203:12,13

**totally (1)**
216:22

**touched (1)**
242:1

**tough (1)**
250:3

**towards (2)**

126:3,5

**trace (1)**
232:13

**tracked (1)**
107:15

**trade (1)**
106:2

**trade-off (1)**
118:3

**transaction (16)**
36:3 56:6 60:24
64:11 89:13 160:3
224:2 227:21 239:19
240:1,8,16 241:20
247:14 248:11 254:12

**transactions (2)**
224:1 241:10

**transcript (11)**
46:3 140:11 158:8,
11,16,20 159:1,4,6
160:11 225:8

**transcripts (1)**
152:5

**transfer (10)**
151:19 193:10
197:17 203:23 204:3,
4 221:22 240:5,6
248:18

**transferred (11)**
57:19 150:22
202:24 204:2 205:6
230:7 231:15 247:13,
15,16 248:13

**transferring (2)**
55:18 247:11

**transfers (1)**
172:14

**transmittal (1)**
33:16

**treated (5)**

156:14,15 161:10
219:20 254:1

**treatment (7)**
49:15,19 50:11
117:19 138:3 182:16
184:24

**treats (1)**
122:16

**trees (1)**
29:4

**Trevor (1)**
62:17

**tried (13)**
9:6 40:15 49:8 52:9
57:23 89:1 91:23
162:23 164:23 196:22
204:22 213:2 224:2

**troubled (1)**
254:17

**true (20)**
9:8 79:15 134:5
159:8 173:10 174:15
176:5 177:14,20
186:4 203:1 207:4
215:13 216:4 220:13
228:5 232:1,13
236:12 250:2

**truly (1)**
230:1

**trust (97)**
28:7 30:19 36:2
38:5,8 40:13 41:14
43:8,14 51:5 52:24
53:6 55:5,6,19 58:16,
18 59:2,4 78:24 79:4,
13,14 80:3,8,21 81:7
83:4 86:24 100:18
101:1,4,14 102:7,10,
13 107:24 108:5,14
109:8 110:12,16

111:4 114:21 115:18,
22 122:20 123:6
124:3,18 125:3 126:7
127:16,21 129:3,18
130:14,19 131:15
143:24 149:11 151:17,
23 153:5,5,16 154:10
157:2 168:8,20
172:15 175:13,14
193:23 195:21 204:2,
12 214:6,10,14,17,20,
22 215:11,12,19,22
216:1,2,6,9 218:9,10
221:23 223:6 226:12
233:4

**Trustee (17)**
18:21 79:11 80:2,6
127:10 153:21 154:12
155:3,13 172:2 176:2
185:17 214:11 231:23
238:13 239:5 241:9

**Trustee's (1)**
154:24

**try (13)**
18:1 32:21 35:21
40:17,20 91:19 93:2
122:18 142:4 152:13
163:7 183:21 211:23

**trying (19)**
13:5,6 15:20 49:1
57:8 58:22 76:11
121:2,3 165:17
174:19 181:13 182:19
191:18,20 192:2
210:21 237:24 238:2

**T's (1)**
191:24

**TSIC (1)**
175:24

**turn (30)**

6:13 22:15 23:17,
19 25:15 26:18 27:13
33:12 36:22 40:22
41:9,21 42:11,19
44:17 54:17 76:4 78:6
107:19 109:19 110:7
111:13,20,21 138:15
154:1 174:21 178:24
189:14,16

**turned (2)**
152:4 210:15

**turning (1)**
123:12

**turns (1)**
212:3

**two (18)**
5:9 23:19 24:4 33:8
63:15 72:5,5 87:22
91:11 135:13 143:20
146:22 162:12 164:18
186:3 214:5 222:21
230:1

**two-step (1)**
230:20

**type (3)**
12:1 87:4 178:20

**types (2)**
75:14 251:11

**Typically (2)**
116:8 129:10

---

# U

**UCC (1)**
85:9

**ultimate (1)**
225:13

**ultimately (6)**
18:11 147:13
158:14 187:14 213:4

254:11

**unaware (3)**
30:18 35:24 57:17

**uncertain (1)**
8:4

**uncertainty (5)**
19:14 189:15,16
191:10 192:8

**unchanged (1)**
230:16

**unclear (1)**
215:8

**uncontroverted (4)**
150:18,23 160:13
221:3

**undeniably (1)**
204:19

**under (60)**
15:20 23:24 24:5
26:11 31:23 37:5,12
40:11 41:13 51:7
53:12,14,15 63:9,20,
22 72:3 74:24 92:1
101:2,23 113:7
114:12 115:13,23
117:20 119:13,23
122:9 133:4,23 134:7
136:13 150:14 151:13
155:24 156:16 160:16
169:11 171:8 172:1
174:14,16,23 181:5,
15 184:18 209:16
214:12,18 215:14,15
216:1 238:20 244:4
251:23 252:7 253:10
254:15,20

**undergraduate (1)**
95:11

**underlying (1)**
220:12

**under-secured (3)**
156:21 157:20
161:19

**understand (19)**
13:7 65:24 77:20
94:4 102:6 114:5,12
119:1,4 165:10
180:13 183:18 211:10
220:14,20 228:14
234:5 236:2 239:14

**understanding (22)**
25:13 26:1,4 34:23
35:5,9,10 64:24 65:2
67:3 69:7,14 71:3
75:16 77:14,22 78:18
118:16 119:7 126:23
130:8 226:5

**understood (3)**
39:24 62:11 67:6

**undertaken (2)**
80:23,24

**undisputed (1)**
160:19

**unequal (1)**
243:13

**unfair (2)**
65:21 251:24

**unfairly (1)**
162:1

**unfortunately (5)**
86:22 166:2 185:9
212:3 213:10

**unhappiness (1)**
145:12

**unhelpful (1)**
15:5

**United (5)**
18:20 86:6 137:4
185:16 216:12

**unknown (2)**

102:7,8

**unless (7)**
114:22 141:12
215:4,12 229:24
231:1 241:18

**unnecessary (1)**
88:16

**unpreferred (1)**
196:12

**unrealistic (3)**
122:3 216:22,23

**unreasonable (1)**
145:11

**unruly (2)**
190:8 199:24

**Unsecured (85)**
11:4,10 12:14
49:16 51:10 83:6,10
89:15 99:7 104:18,21,
23,24 105:1,4,7,17,23,
24 106:10,16 108:7,
12 109:3,8,15 110:17
112:5,15 114:2,8,14
115:15 116:5,12,14,
15 118:2 121:15,20
122:3 130:10,12
132:11,19,20,23,24
133:3,21,22 134:4
135:11 136:16,17
144:11 153:6,11
154:11 156:2,14,19,
20 157:10,19,21,23
159:20,22 161:9,16
162:2,9 164:21
165:15 167:5 184:2
193:17 194:17 195:3,
15 196:17,19 200:3,15

**until (11)**
8:9 39:23 42:2 54:3
148:23 200:4 211:18

216:13 217:8 220:16
226:4

**unusual (4)**
101:4 116:16
130:23 155:15

**up (50)**
8:16,20 14:15
15:14 17:4 20:5 22:4
35:12 38:8 71:9 72:17
73:23 74:1,7,15 76:13,
14,15 84:10 89:5,16
92:22 103:5,7 116:17
121:24 123:12 126:22
149:12 153:23 156:17
161:8 163:24 166:14
167:10 168:16 169:9
180:24 182:19 183:7,
8 190:1 195:1 209:8
213:9 216:12 219:15
226:4 242:22 254:11

**updated (1)**
202:15

**upon (14)**
55:3 60:5,22 65:8
78:9 128:9,24 131:18
187:13 190:15 212:20,
22 213:4 239:12

**urge (2)**
165:13 187:2

**urgency (2)**
88:12,16

**urges (1)**
187:19

**urging (1)**
185:19

**USC (1)**
157:8

**use (11)**
15:21 30:19 53:24
71:5 171:23 175:13

181:11 195:5 213:4,
14 221:18

**used (9)**
67:1 140:20 144:21
170:7 207:21 212:4,9
213:15 221:21

**using (5)**
165:22 168:15
208:2,8 233:24

**Usually (1)**
60:16

**utilize (1)**
61:2

**utmost (1)**
162:4

## V

**vacation (5)**
65:12 66:20 71:16
72:2,20

**vacuum (1)**
198:4

**valid (4)**
150:11 159:12
181:6 221:7

**validity (1)**
164:9

**valuation (2)**
196:1,2

**value (22)**
45:20 46:20 49:2
51:15,22 120:13
144:16 150:4 160:14,
16 161:2,5,14 162:23,
24 167:8 170:16
181:3 192:20 235:3
242:19 249:6

**valued (1)**
234:24

**various (6)**
75:14 94:5 129:6
152:6 223:20 244:15

**vehicle (1)**
118:14

**vehicles (1)**
116:19

**vendor (2)**
235:14 251:8

**vendors (3)**
48:22,24 221:4

**venue (1)**
72:7

**verbal (2)**
35:1 58:4

**verbally (1)**
39:13

**version (9)**
24:11 33:23,23
34:1 39:15 110:3,5
124:5,14

**versions (3)**
86:4 113:9 129:6

**versus (7)**
59:2 132:23 170:1
175:8 243:21 251:1,3

**veto (2)**
74:14,20

**viability (2)**
182:4 200:20

**viable (2)**
174:23 186:20

**view (5)**
6:22 47:20 50:16,
23 219:16

**violated (1)**
243:16

**violates (1)**
173:19

**violating (2)**

184:1 251:15

**violation (4)**
152:20,23 163:22
188:10

**virtually (1)**
153:1

**visible (1)**
116:11

**vocal (1)**
116:10

**voice (1)**
163:6

**Volume (3)**
21:8,10,10

## W

**wage (2)**
235:14 251:8

**wages (5)**
65:15 71:21 73:6
75:4 76:16

**wait (2)**
54:3 206:11

**waiting (1)**
206:10

**waived (1)**
181:5

**waivers (1)**
201:8

**walk (2)**
164:18 165:8

**wandering (1)**
149:4

**wanted (13)**
10:6 12:21,24
75:16 136:17 163:5
179:2,3,10 182:7
219:8 234:9 241:21

**wants (2)**

153:24 231:3

**Ward (1)**
81:24

**WARN (28)**
19:21 62:17 65:15
66:1 70:1 71:17,17,18,
20 72:4 73:6 75:4
76:16 78:17 119:10,
19 163:18 203:15
206:24 210:6 237:8,9,
16,20 238:1 249:4
253:16,19

**warned (1)**
199:13

**washing (1)**
228:11

**Washington (1)**
228:10

**waste (1)**
165:16

**way (45)**
11:21 12:13 15:18
17:20 18:2 20:4,5
21:17 30:14 40:1,2
45:10 57:9 61:6 65:23
78:4 89:1 102:12
131:10 134:7 151:5
161:18 164:10 177:13
180:2 186:23 195:8
208:12 211:11 213:5,
17 222:1 224:3 230:9,
12 231:3,4,13 238:19
249:1,10,19 251:12
253:13,20

**ways (3)**
154:13 186:4 240:7

**wayside (1)**
228:1

**weasel (1)**
164:23

**week (2)**
60:12 61:7

**weeks (6)**
8:9 45:1 148:1
220:15,17,19

**Wehrer (3)**
219:1 225:9,15

**weigh (1)**
5:24

**weight (2)**
7:21 227:17

**welcome (6)**
9:20 81:22 94:18
133:15 213:23 245:4

**well-funded (1)**
195:3

**well-known (1)**
167:6

**weren't (10)**
30:4 60:4,15 89:19,
19 162:15 166:7
191:18 216:13 253:19

**whatever (8)**
64:21 120:11 148:4
162:3 185:3 198:22
213:4,12

**what's (12)**
10:16,17 22:16
24:5 42:5 68:2 100:13
101:12 142:17 167:18
228:18 241:17

**whatsoever (5)**
71:3 99:16 159:15
211:8 231:1

**whereby (1)**
78:8

**Whereupon (1)**
142:8

**whittle (1)**
90:22

**whittling (1)**
90:24

**whole (11)**
49:7 51:19,21
92:20 115:4 141:15
144:5 183:6,8 217:2
232:18

**wholesome (1)**
48:10

**wholly (1)**
187:5

**whose (3)**
38:7 65:17 244:20

**wide (2)**
197:15 239:1

**willing (8)**
32:16 122:19
129:23 144:18,20
192:9,10,17

**willingness (1)**
187:9

**win (1)**
240:21

**wind-down (4)**
170:20 202:10,13,
17

**windfall (4)**
17:14 165:9 199:3,
11

**window (1)**
197:14

**winning (3)**
225:21,24 226:16

**wish (7)**
5:23 6:1 52:7 62:4
167:2,3 246:19

**withdraw (3)**
133:20 187:10
204:17

**withdrawn (3)**

93:11,13,16

**within (4)**
20:14 132:15 149:7
150:13

**without (16)**
21:24 58:15 65:20
67:10 73:4 76:19
77:17 117:24 128:15,
17 129:13 139:24
197:22 199:11 228:3
246:19

**witness (44)**
5:17,18 20:24 21:4,
5 28:21 29:5,5 37:21
46:6 47:2,7,16 49:22
50:19 54:5 57:23
61:11 62:4,11 64:9,14
65:22 66:5 67:17
68:24 70:21 79:18,22
93:21 94:19,20 98:3
100:2 103:4,11,18
128:20 133:13 139:14
167:23 168:22 182:3,4

**woe (3)**
161:9 169:9 173:11

**won (1)**
226:7

**wonderful (1)**
211:14

**word (7)**
56:20,24 115:6
144:21 171:23 221:19
238:8

**wording (1)**
149:1

**words (9)**
58:1,2 59:11,13
124:11 168:3 219:13
222:16 223:10

**work (11)**

8:5,7 34:3 38:16
48:18 75:9 102:10
177:13 219:3,5 250:18

**worked (6)**
79:8 81:15 123:14
204:23 225:10,10

**workers' (1)**
71:24

**working (1)**
212:19

**world (3)**
14:14 177:4 254:21

**worried (2)**
183:19,20

**worry (5)**
177:14,16 178:14,
15 183:4

**worrying (1)**
211:12

**worse (1)**
227:22

**worth (3)**
161:15 198:1
242:11

**worthy (1)**
197:11

**wrap (1)**
15:14

**written (5)**
80:7 179:7 240:22
241:1 253:3

**wrong (4)**
121:18 159:5
170:13 236:9

**Y**

**years (1)**
96:20

**yesterday (2)**

41:7 243:4

**yourself (2)**
132:16 138:23

**Z**

**Zac (2)**
5:3 142:12

**zero (4)**
160:8 168:1 172:10
242:18

**1**

**1 (10)**
23:2,5 24:4,17 94:6,
11 100:14 139:17,23
140:21

**10.6 (1)**
214:13

**10:23 (1)**
40:4

**100 (7)**
96:18 102:15
117:12 130:4 131:7
160:22 161:1

**10th (1)**
109:22

**11 (10)**
9:8 15:15,18 157:8
165:17 175:11,17
178:14 181:14 252:11

**1102 (1)**
157:8

**11th (1)**
163:7

**12 (1)**
159:4

**13 (4)**
21:10 22:16 44:13,

14

**1305 (1)**
157:6

**1334 (1)**
215:5

**13th (1)**
63:13

**14 (2)**
208:20,24

**15th (2)**
8:13 226:4

**16 (4)**
25:15 143:10 146:8
160:11

**16th (48)**
7:1,12 8:13 13:19
14:15,19 29:14,14,22
30:15,21,23 31:1
32:20 33:12,24 37:9
38:1 52:11 56:2 59:17,
22 61:17,18 86:15
87:15 88:20 89:10
91:17 93:7 149:16
158:8 218:16,19
219:12,22 220:24
221:8 224:15,20
225:8,20 226:5 227:1
229:18 239:23 244:22
247:18

**17 (6)**
26:18 94:6,12
106:23 107:1 140:22

**18 (3)**
109:19,21 140:22

**19 (3)**
62:20 111:13
140:22

**1981 (1)**
157:17

**19th (1)**

212:6

## 2

**2 (8)**
36:22 41:10 42:21
54:21,22 101:7
107:19 108:20

**2.2 (1)**
214:10

**2.4 (1)**
84:14

**2:00 (1)**
142:4

**20 (2)**
33:12 140:22

**2016 (5)**
62:20 140:12 146:8
223:15 253:4

**20-some-odd (1)**
96:19

**21 (5)**
40:22 41:21,21,22
140:22

**22 (4)**
41:23 44:17 49:4
140:22

**24 (7)**
46:13,17 47:5,6
53:23 54:6 140:22

**28 (1)**
223:14

**28th (1)**
25:9

**2d (1)**
157:6

## 3

**3 (19)**

21:8,10,10 22:14,
15 23:17 27:13,16
44:14 98:3,10 99:1
110:7 111:21 112:2,6
138:16 139:17,24

**3.1 (1)**
202:14

**30-some-odd (1)**
96:20

**3272 (1)**
157:18

**363 (6)**
186:10,22 192:7
195:6 243:16 251:23

## 4

**4 (3)**
138:19 140:10
158:7

**4.6 (1)**
212:4

**4:35 (1)**
255:13

**46 (1)**
48:5

**47 (1)**
48:6

**48 (5)**
46:13,15,16 47:8,11

## 5

**5 (3)**
171:20 178:8
233:18

**505 (4)**
214:13,18,23
215:14

**507 (2)**

133:4,23

**51 (1)**
159:6

**53 (1)**
159:16

## 6

**6 (3)**
44:18 49:4 140:12

**64 (1)**
160:18

**66 (1)**
158:20

**685 (1)**
69:20

## 7

**7 (4)**
47:11 48:1 69:9
126:13

## 8

**8 (3)**
47:8 140:21 220:16

**8th (2)**
225:11 229:19

## 9

**9 (3)**
23:17 26:6 27:10

**9019 (9)**
15:20,21 145:7
180:7 181:11,15,22
184:18 244:5

**984 (1)**
157:5

**9th (2)**
219:13,23

## CERTIFICATE OF SERVICE

I hereby certify that on February 22, 2025, I electronically filed *United States Trustee's Objection to the Debtor's Motion to Sell Substantially all of its Assets* with the Clerk of this Court using the CM/ECF system which will send notification of such filing to all ECF registrants in this case. I further certify that the foregoing was emailed to the following:

McDermott Will and Emery LLP
1000 N. West Street, Suite 1400
Wilmington, Delaware 19801
Attn: David R. Hurst (dhurst@mwe.com)
Jonathan Levine (jlevine@mwe.com)
Lucas Barrett (lbarrett@mwe.com)
Bradley Thomas Giordano
(bgiordano@mwe.com)
Carmen Dingman (cdingman@mwe.com)

Pachulski Stang Ziehl & Jones LLP 780 Third
Avenue, 34th Floor
New York, NY 10017
Attn: Bradford J. Sandler
(bsandler@pszjlaw.com)
Paul J. Labov (plabov@pszjlaw.com)
Cia H. Mackle (cmackle@pszjlaw.com)

Seward and Kissel LLP
One Battery Park Plaza
New York, New York 10004
Attn: Gregg S. Bateman
(bateman@sewkis.com)

Ropes & Gray, LLP
1211 Avenue of the Americas
New York, New York 10036
Attn: Gregg M. Galardi
(gregg.galardi@ropesgray.com)
Sam Badawi (sam.badawi@ropesgray.com),
Lindsay Barca
(lindsay.barca@ropesgray.com)

Chipman Brown Cicero & Cole, LLP
Hercules Plaza
131 N. Market Street, Suite 5400
Wilmington, Delaware 19801
Attn: Mark L. Desgrosseilliers
(desgross@chipmanbrown.com)

/s/ *Linda J. Casey*
Linda J. Casey, Trial Attorney